1  Thomas A. Saenz (State Bar No. 159430)
   Denise Hulett (State Bar No. 121553)
2  Matthew J. Barragan (State Bar No. 283883)
   MEXICAN AMERICAN LEGAL DEFENSE
3  AND EDUCATIONAL FUND
   634 S. Spring St., 11th Floor
4  Los Angeles, CA 90014
   Telephone:  (213) 629-2512
5  Facsimile:  (213) 629-0266
   Email:  tsaenz@maldef.org
6          dhulett@maldef.org
           mbarragan@maldef.org
7
8  *Attorneys for Plaintiffs*

9

10                    UNITED STATES DISTRICT COURT

11                    EASTERN DISTRICT OF CALIFORNIA

12

13  OSCAR LUNA, ALICIA PUENTES,              Case No. 1:16-CV-00568-DAD-JLT
    DOROTHY VELASQUEZ, and GARY
14  RODRIGUEZ,                               **PLAINTIFFS' OPPOSITION TO
                                             DEFENDANTS' MOTION TO DISMISS
15                 Plaintiffs,               FOR FAILURE TO STATE A CLAIM
                                             [FRCP 12(B)(6)]**
16         v.
                                             JUDGE: Hon. Dale A. Drozd
17  COUNTY OF KERN, KERN COUNTY              COURTROOM: 5
    BOARD OF SUPERVISORS, and                HEARING DATE: June 21, 2016
18  MICK GLEASON, ZACK SCRIVNER,             TIME: 9:30 a.m.
    MIKE MAGGARD, DAVID COUCH,
19  and LETICIA PEREZ, in their official
    capacity as members of the Kern County
20  Board of Supervisors, and JOHN
    NILON, in his official capacity as Kern
21  County Administrative Officer, and
    MARY B. BEDARD, in her official
22  capacity as Kern County Registrar of
    Voters, inclusive,
23
                   Defendants.
24

25

26

27

28

_____

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     PLAINTIFFS ALLEGE FACTS SUFFICIENT TO STATE A CLAIM UNDER
        SUPREME COURT JURISPRUDENCE GOVERNING THE ADJUDICATION
        FRAMEWORK FOR FINDING VIOLATIONS OF SECTION 2 OF THE
        VOTING RIGHTS ACT. .................................................................................................2

        A.      *Thornburg v. Gingles'* Two Step Inquiry.................................................................2

        B.      Plaintiffs' Complaint Satisfies Notice Pleading Requirements; Additional
                Specificity is Not Required Prior to Exchange of Expert Testimony and
                Maps During Discovery. ..........................................................................................4

        C.      The Map Defendants Criticize is Not Plaintiffs' Illustrative Map;
                Defendants are Wrong on *Gingles* Prong One Law...................................................5

                1.      The Map's Appearance is Not Relevant to *Gingles* Prong One;
                        Compactness Refers to the Compactness of the Minority
                        Population, Not the Appearance of the District Lines ...............................8

                2.      There is no Per Se Unconstitutional Deviation Rule ................................12

        D.      Plaintiffs Have Pled Sufficient Allegations Under *Gingles* Prong Two and
                Prong Three; Further Factual Specificity Requires Expert Analysis and
                Opinion....................................................................................................................15

                1.      Supreme Court Jurisprudence Rejects Blanket Numerical
                        Thresholds for Measuring Racially Polarized Voting and for
                        Measuring Minority Voter Success.............................................................17

                2.      Plaintiffs Need Not Provide Additional Specificity Concerning
                        Evidence That Requires Expert Analysis....................................................19

        E.      The Senate Factors are Supportive of, but Not Essential to Plaintiffs'
                Claim.......................................................................................................................23

III.    CONCLUSION..............................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. Johnson*,
    521 U.S. 74 (1997) ....................................................................................................... 14

*Allen v. State Bd. of Elections*,
    393 U.S. 544 (1969) ....................................................................................................... 1

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................. 1, 4, 15

*Benavidez v. Eu*,
    34 F.3d 825 (9th Cir. 1994) ........................................................................................ 6, 7

*Benavidez v. Irving Indep. Sch. Dist.*,
    No. 3:13-CV-0087-D, 2014 WL 4055366 (N.D. Tex. Aug. 15, 2014) ................................ 17

*Bone Shirt v. Hazeltine*,
    336 F. Supp. 2d 976 (D.S.D. 2004) ............................................................................. 21

*Bone Shirt v. Hazeltine*,
    461 F.3d 1011 (8th Cir. 2006) ..................................................................................... 17

*Broward Citizens for Fair Districts v. Broward Cty.*,
    No. 12-60317-CIV, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012) ................................... 2, 20

*Bush v. Vera*,
    517 U.S. 952 (1996) .............................................................................................. 11, 14

*Campos v. City of Baytown*,
    840 F. 2d 1240 (5th Cir. 1988) ................................................................................. 15, 16

*Cane v. Worcester Cty., Md.*,
    840 F. Supp. 1081 (D. Md. 1994) ............................................................................... 21

*Cano v. Davis*,
    211 F. Supp. 2d 1208 (C.D. Cal., 2002) ..................................................................... 19, 20

*Citizens for a Better Gretna v. Gretna*,
    834 F.2d 496 (5th Cir. 1987) ...................................................................................... 19

*City of Mobile v. Bolden*,
    446 U.S. 55 (1980) ...................................................................................................... 2

*Clark v. Roemer*,
    777 F. Supp. 445 (M.D. La.1990) ................................................................................ 8

*Collins v. City of Norfolk*,
    816 F. 2d 932 (4th Cir. 1987) ..................................................................................... 15

*Easley v. Cromartie*,
    532 U.S. 234 (2001) ..................................................................................................... 8

*Evenwel v. Abbott*,
    136 S. Ct. 1120 (2016) ................................................................................................ 12

*Fletcher v. Lamone*,
    831 F. Supp. 2d 887 (D. Md. 2011) ............................................................................. 9

*Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
    950 F. Supp. 2d 1294 (N.D. Ga. 2013) ........................................................................ 8

*Garza v. County of Los Angeles*,
    756 F. Supp. 1298 (C.D. Cal. 1990) ........................................................ 16, 19

*Gomez v. City of Watsonville*,
    863 F.2d 1407 (9th Cir. 1988).......................................... 15, 16, 20, 23

*Growe v. Emison*,
    507 US. 25 (1993) .............................................................................. 11

*Harris v. Arizona Indep. Redistricting Comm'n*,
    136 S. Ct. 1301 (2016) ............................................................ 12, 13, 14

*Houston v. Lafayette Cty.*,
    20 F. Supp. 2d 996 (N.D. Miss. 1998) ........................................ 17

*Jeffers v. Tucker*,
    847 F. Supp. 655 (E.D. Ark. 1994) ...................................... 11, 12

*Johnson v. De Grandy*,
    512 U.S. 997 (1994)................................................................ 18, 22

*League of United Latin Am. Citizens v. Perry*,
    548 US 399 (2006).................................................... 8, 9, 13, 14

*Lewis v. Alamance Cty.*,
    99 F.3d 600 (4th Cir. 1996)................................................ 18

*Mahan v. Howell*,
    410 U.S. 315 (1973) .......................................................... 13

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006)................................................ 4, 7

*McDaniel v. Sanchez*,
    452 U.S. 130 (1981) .......................................................... 14

*Miller v. Johnson*,
    515 U.S. 900 (1995)............................................................ 11

*Montes v. City of Yakima*,
    40 F. Supp. 3d 1377 (E.D. Wash. 2014) ........................*passim*

*N.A.A.C.P., Inc. v. City of Columbia, S.C.*,
    850 F. Supp. 404 (D.S.C. 1993).......................................... 21

*NAACP v. Snyder*,
    879 F. Supp. 2d 662 (E.D. Mich. 2012)........................ 2, 20

*Old Person v. Cooney*,
    230 F.3d 1113 (9th Cir. 2000).......................................... 17, 22

*Reed v. Town of Babylon*,
    914 F. Supp. 843 (E.D.N.Y. 1996) .................................... 13, 14

*Reynolds v. Sims*,
    377 U.S. 533 (1964)............................................................ 12

*Rodriguez v. Pataki*,
    308 F. Supp. 2d 346 (S.D.N.Y. 2004).............................. 21

*Romero v. City of Pomona*,
    883 F.2d 1418 (9th Cir.1989)............................................ 9, 16

*Ruiz v. City of Santa Maria*,
    160 F.3d 543 (9th Cir. 1998)..........................................*passim*

*Sanchez v. State of Colorado*,
  97 F.3d 1303 (10th Cir. 1996) ............................................................................................ 16

*Shaw v. Reno*,
  509 U.S. 630 (1993) .............................................................................................................. 8

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) .............................................................................................................. 1

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ....................................................................................................... *passim*

*Twombly v. Bell Atlantic Corp.*,
  550 U.S. 544 (2007) ............................................................................................................ 15

*United States v. Blaine Cty., Montana*,
  363 F.3d 897 (9th Cir. 2004) ......................................................................... 17, 18, 19, 23

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004) ............................................................................................................ 13

*Voinovich v. Quilter*,
  507 U.S. 146 (1993) ........................................................................................................ 3, 18

*Walsh v. Tehachapi Unified Sch. Dist.*,
  827 F. Supp. 2d 1107 (E.D. Cal. 2011) ............................................................................... 4

*Wright v. N. Carolina*,
  787 F.3d 256 (4th Cir. 2015) ............................................................................................. 20

*Wright v. Sumter Cty. Bd. of Elections & Registration*,
  No. 1:14-CV-42 WLS, 2015 WL 4255685 (M.D. Ga. July 14, 2015) ................................ 17

*Wyatt v. Liljenquist*,
  96 F. Supp. 2d 1062 (C.D. Cal. 2000) ............................................................................... 24

**Federal Rules**

Fed. R. Civ. Proc. 12(b)(6) ...................................................................................... 1, 4, 7

**Other Authorities**

S. Rep. No. 97-417 (1982), *reprinted at* 1982 U.S.C.C.A.N. 177 ........................................ 2, 18

## I.    __INTRODUCTION__

Defendants move for dismissal of this case without citation to a single Ninth Circuit or Supreme Court case affirming the dismissal of a challenge to a districting plan under Section 2 of the Voting Rights Act.  That is because no such precedent exists, either before or since *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *Iqbal* heightened the pleading standard for federal court complaints, but it did not overturn the long-standing principle that, because Congress enacted the Voting Rights Act for the broad remedial purpose of "rid[ding] the country of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966), the Act should be interpreted in a manner that provides "the broadest possible scope in combating racial discrimination," *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969).

Defendants' argument relies, in part, on a map it asks this Court to judicially notice – a map that is *not* the map Plaintiffs will submit to meet their evidentiary burden in this case.  Rather, it is a map that the Mexican American Legal Defense and Educational Fund ("MALDEF"), Plaintiffs' lawyers in this case, submitted to the Kern County Board of Supervisors in 2011, a map that cannot be imputed to Plaintiffs simply because it was drawn five years ago by the law firm that now represents them.  The 2011 MALDEF map is most certainly not essential to the claims in this case, because Plaintiffs could bring this action whether or not MALDEF had submitted a plan during the 2011 Kern County redistricting process.  It is not Plaintiffs' map and is therefore not central to the claims in this case.  Accordingly, the map may not be considered in a ruling on a motion to dismiss.[1]

Defendants' arguments are premature at this early stage of the proceedings.  *Thornburg v. Gingles*, 478 U.S. 30 (1986) established a framework for analyzing claims under Section 2, a framework that requires Plaintiffs to meet their evidentiary burdens through the testimony of a

---

[1] The 2011 MALDEF map was referenced in paragraph 21 of the Complaint as part of the factual narrative surrounding the 2011 redistricting process Plaintiffs now challenge.

number of expert witnesses, including demographers, political scientists, social scientists and historians.  Requiring Plaintiffs to detail their evidence with the kind of particularity that Defendants seek prior to discovery of the analyses and opinions contained in the reports of the experts is simply premature.  All but two of the cases[2] cited by Defendants were decided on summary judgment or after trial, weighing extensive expert testimony from both sides.  The arguments raised by the exhibits not part of the Complaint are best addressed through a motion for summary judgement or at trial, after the parties have had opportunity to discover all relevant expert testimony for presentation to the Court.  The factual allegations in the Complaint permit a reasonable inference that Plaintiffs have sufficiently stated a claim for relief under Section 2 of the Voting Rights Act.  Thus, Defendants have failed to meet their burden to demonstrate why the claim should be dismissed.

## II.   PLAINTIFFS ALLEGE FACTS SUFFICIENT TO STATE A CLAIM UNDER SUPREME COURT JURISPRUDENCE GOVERNING THE ADJUDICATION FRAMEWORK FOR FINDING VIOLATIONS OF SECTION 2 OF THE VOTING RIGHTS ACT.

### A.   *Thornburg v. Gingles'* Two Step Inquiry.

In 1982, Congress amended the Voting Rights Act to reach discriminatory conduct that might otherwise evade liability under the more stringent intent standard established in *City of Mobile v. Bolden*, 446 U.S. 55 (1980).  The Section 2 amendment created a "results-based" test to analyze vote dilution claims.  S. Rep. No. 97-417, at 40 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 218.

*Gingles* provides the framework for determining whether a redistricting plan impairs the ability of Latinos to elect representatives of their choice in violation of Section 2.  In *Gingles*, the

---

[2] *Broward Citizens for Fair Districts v. Broward Cty.*, No. 12-60317-CIV, 2012 WL 1110053, at *5 (S.D. Fla. Apr. 3, 2012) and *NAACP v. Snyder*, 879 F. Supp. 2d 662 (E.D. Mich. 2012), are the two distinguishable out-of-circuit district court opinions, *see* Section D.2 below.

Supreme Court established a two-step inquiry for analysis of vote dilution claims.  478 U.S. at 50-51.  First, the minority group must be able to demonstrate: (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "that it is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate."  *Id.*  This first step – the *Gingles* prongs – "cannot be applied mechanically and without regard for the nature of the claim."  *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

The second step of the inquiry requires the Court "to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality whether the political process is equally open to minority voters."  *Gingles*, 487 U.S. at 79 (citations and internal quotation marks omitted).  The Senate Judiciary Committee, in a report accompanying the 1982 amendments to the Voting Rights Act, provided a non-exclusive list of factors that a court may consider in determining "whether the challenged practice impermissibly impairs the ability of the minority group to elect their preferred representatives."  *Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 (9th Cir. 1998).[3]  The Senate Report's "list of

---

[3] These factors include, but are not limited to:
 (1) the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;
 (2) the extent to which voting in government elections is racially polarized;
 (3) the extent to which the state or political subdivision has used voting practices or procedures that end to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);
 (4) exclusion of minorities from a candidate slating process;
 (5) the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;
 (6) the use of overt or subtle racial appeals in political campaigns;
 (7) the extent to which minorities have been elected to public office in the jurisdiction.
*Ruiz*, 160 F.3d at 550 n.15.

typical factors is neither comprehensive nor exclusive" and "there is no requirement that a particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 487 U.S. at 45.

**B.**     **Plaintiffs' Complaint Satisfies Notice Pleading Requirements; Additional Specificity is Not Required Prior to Exchange of Expert Testimony and Maps During Discovery.**

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) requires that a complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Federal Rule of Civil Procedure 12(b)(6) jurisprudence requires this Court to view the allegations through a forgiving lens, accepting the factual allegations of the Complaint as true and construing the pleadings in the light most favorable to the party opposing the motion.  *Walsh v. Tehachapi Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1114 (E.D. Cal. 2011).

When ruling on a Rule 12(b)(6) motion to dismiss, courts generally may not take judicial notice of material outside the pleadings without converting the motion into a motion for summary judgment, but may consider evidence on which the complaint "necessarily relies" if:  "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document."  *Marder v. Lopez*, 450 F.3d 445, 448-49 (9th Cir. 2006) (court relied on a release of claims central to plaintiffs' complaint but did not consider a letter created after the complaint was filed).  However, a complaint's "mere mention of the existence of a document is insufficient to incorporate the contents of a document."  *Id.*

---

Additional factors are "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."  S. Rep. at 29; *see also Gingles*, 478 U.S. at 48 n.15.

Here, the allegations in the Complaint set forth the facts necessary to meet Plaintiffs' burden under the three prongs of *Gingles*.  Those facts will be proffered through expert witnesses who will testify regarding their illustrative maps and racial polarization analysis of election returns.  Defendants have no authority for the premise that the illustrative *Gingles* prong one map must be attached to the Complaint, without the benefit of expert testimony, or for the argument that Plaintiffs must allege with particularity the facts underlying their racial polarization analysis, again without the benefit of expert testimony.  During discovery, expert reports will emerge that will include not only the particularity Defendants prematurely seek, but the analysis underlying the conclusions of the experts.

The facts alleged in the Complaint permit a reasonable inference that Plaintiffs have sufficiently stated a claim for relief under Section 2 of the Voting Rights Act; Defendants have failed to meet their burden to demonstrate why the claim should be dismissed.

**C.     The Map Defendants Criticize is Not Plaintiffs' Illustrative Map; Defendants are Wrong on *Gingles* Prong One Law.**

*Gingles* requires a Plaintiff to prove, *inter alia*, that Latinos are sufficiently geographically compact to constitute a majority of the citizen voting age population ("CVAP") in a single member district.  478 U.S. at 50.  Paragraph 39 of Plaintiffs' Complaint alleges that "[t]he Latino population in Kern County is sufficiently numerous and geographically compact such that two properly apportioned electoral districts can be drawn in which Latinos would constitute a majority of the CVAP."  Paragraph 22 alleges that Defendants adopted a plan that maintained only one Latino majority district, and "fractured a large and geographically compact Latino community of eligible voters between District 1 and District 4."  The Complaint identifies both that the *Gingles* prong one district can be drawn, and where it can be drawn.  Plaintiffs will make that showing at trial with one or more illustrative maps proffered through expert testimony concerning the mapping process, census data, statistical compactness measures, traditional redistricting

principles and how they interact with the geography in Kern County (Plaintiffs' prong one illustrative plan).

Defendants argue, without a single case citation because none exist, that failure to attach Plaintiffs' *Gingles* prong one map to the Complaint is "enough to warrant dismissal." Defendants' Motion to Dismiss ("Defs' MTD") at 1.  Defendants then take a great leap to assume, without basis and incorrectly, that Plaintiffs' illustrative *Gingles* prong one map is the same plan that Plaintiffs' *law firm*, MALDEF, submitted to the Board of Supervisors in 2011, and that is referenced in paragraph 21 of the Complaint as part of the factual narrative surrounding the 2011 redistricting process.  Defendants accuse Plaintiffs of deliberately and for some nefarious reason withholding the 2011 map from the Court.[4]  Defendants ask the Court to judicially notice the five-year-old map, and then argue that the map is insufficient to carry Plaintiffs' burden under *Gingles*.  Defendants' arguments for dismissal rest on that caviling straw man, and thus crumble with its disintegration.

Defendants' exhibits confirm their consequential mistake.  The Declaration of Allan Krauter, Kern County Senior Administrative Analyst who was the staff member assigned to oversee the redistricting process following the 2010 Census, identifies the map submission as a 2011 MALDEF submission to the Board.  Krauter Decl., Ex. B.  Exhibit C to the same declaration is a letter submitted to the Board, in its own words, "[o]n behalf of the Mexican American Legal Defense and Educational Fund (MALDEF)."  Plaintiffs in this case are Oscar Luna, Alicia Puentes, Dorothy Velasquez, and Gary Rodriguez.  MALDEF is the law firm that represents them.  There is no basis for imputing a 2011 MALDEF map to these Plaintiffs simply because MALDEF currently represents them.  Indeed, the Ninth Circuit specifically held that attorney and client are not to be confused when it reversed a three judge court's grant of *Younger*

---

[4] The "method to [Plaintiffs] madness," according to Defendants, is to hide its purported defects from the Court, an accusation that is as groundless as it is offensive.  Defs' MTD at 4.

abstention in *Benavidez v. Eu,* 34 F.3d 825, 832 (9th Cir. 1994).  The appellate court rejected the Governor's argument that MALDEF's participation as state court amicus in statewide redistricting matters gave MALDEF's *federal* court plaintiffs the opportunity to be heard, finding that the Governor's argument "cannot be taken seriously."  *Id.*

Defendants' straw man enables them to make a number of completely factually and legally irrelevant arguments – whether or not prison population should be counted in drawing county supervisorial districts, whether the 2011 MALDEF map exceeds 10% deviation, whether a deviation larger than 10% is legally insufficient to meet Plaintiffs' *Gingles* prong one burden, whether the 2011 MALDEF map is compact, and whether the 2011 MALDEF map is a racial gerrymander.

Plaintiffs do not dispute that the 2011 MALDEF map included prisoner population in the population base for evaluating total population, or that Kern County excluded those prisoners, or that the County did so following the advice from the Attorney General.  Indeed, Plaintiffs do not dispute that excluding prisoners from the 2011 MALDEF map *could possibly* cause the total deviation in the plan to exceed 10%.  (Although, should this case eventually raise the factual issues of the location of prisoners and the proper method of their exclusion or inclusion, of whether there are non-prisoner residents in the census blocks the County excluded, or of whether the exclusion of prisoners actually creates an impermissible deviation, those issues would be a subject for expert witnesses to address, and not a proper subject for judicial notice (See Plaintiffs' Opposition to Defendants' Request for Judicial Notice at 6)).  What Plaintiffs do dispute is that the 2011 MALDEF map is their *Gingles* prong one illustrative map.  It is not.  The map, along with all of the materials Defendants submit by way of Request for Judicial Notice, should not be considered by this Court on a Rule 12(b)(6) motion to dismiss because the Complaint does not

1  rely on those materials and they are not central to Plaintiffs' claim. *Marder v. Lopez*, 450 F.3d

2  445, 448-49 (9th Cir. 2006)

### 1.   The Map's Appearance is Not Relevant to *Gingles* Prong One; Compactness Refers to the Compactness of the Minority Population, Not the Appearance of the District Lines.

Defendants' straw man and his progeny have arrived at the wrong family reunion.  This case alleges a violation of Section 2 of the Voting Rights Act, not unconstitutional racial gerrymandering under the Equal Protection Clause.  The inquiry in a *Gingles* prong one analysis is distinct from and "not to be confused with the compactness inquiry in the context of a challenge under the Equal Protection Clause," an inquiry Defendants incorrectly urge on this Court.  Defs' MTD at 7-8; *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006).  The latter inquiry, inapplicable here, asks whether race was the predominant factor in drawing the lines such that the districts were deliberately gerrymandered by race.  In contrast to the equal protection analysis, the *Gingles* prong one compactness inquiry does not require a court to determine whether the illustrative district subordinates traditional redistricting principles to race.  *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1391-92 (E.D. Wash. 2014) (citing *Shaw v. Reno*, 509 U.S. 630, 647 (1993)); *Easley v. Cromartie*, 532 U.S. 234 (2001).  "In other words, the court must first determine whether *Gingles* is met before ensuring that the proposed remedy complies with the Equal Protection Clause."  *City of Yakima*, 40 F. Supp. at 1401 (citing *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1304–06 (N.D. Ga. 2013)).  *See also, Ruiz*, 160 F.3d at 559 (consideration of the scrutiny required for a future remedy premature in the liability phase of a lawsuit under Section 2 of the Voting Rights Act ).  The district court in *City of Yakima* summarized this issue, noting:

> What the first *Gingles* precondition does not require is proof that a perfectly harmonized districting plan can be created.  Indeed, conditioning a § 2 plaintiff's right to relief upon his or her ability to create a letter-perfect districting plan would put the cart before the horse.

40 F. Supp. at 1399 (citing *Clark v. Roemer*, 777 F. Supp. 445, 463 (M.D. La. 1990)).[5]

Despite the clear distinction between a *Gingles* prong one analysis and proof of violation of the Equal Protection Clause, Defendants urge dismissal of the case because the 2011 MALDEF map is "presumptively unconstitutional," because it exceeds 10% overall deviation when it is adjusted by Defendants to exclude prisoners, and because its "bizarre configuration" has no "obvious explanation," which "suggests" that MALDEF engaged in racial gerrymandering.  Defs' MTD at 7.

Putting aside, for sake of argument, the fact that Plaintiffs' illustrative prong one map is *not* the one submitted by MALDEF five years ago to the Board of Supervisors, Defendants' suggestion of presumptive unconstitutionality is misplaced within the context of *Gingles* prong one.  Courts typically divide *Gingles* prong one inquiry into two criteria – numerosity[6] and compactness.  C*ity of Yakima*, 40 F. Supp. 3d at 1390-91.

In Supreme Court voting rights jurisprudence, the word "compactness" in the *Gingles* context refers to the compactness of the minority population – *e.g.* whether it is sufficiently concentrated to enable it to constitute the majority of the citizens over 18 in a single-member district – not to the shape of the district.  *Gingles,* 478 U.S. at 50; *see also Fletcher v. Lamone*, 831 F. Supp. 2d 887, 899 (D. Md. 2011), *aff'd*, 133 S. Ct. 29, 183 L. Ed. 2d 671 (2012).  "In the equal protection context, compactness focuses on the contours of district lines to determine

---

[5] "The first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district.  Moreover, Plaintiffs' proposed district is not cast in stone.  It was simply presented to demonstrate that a majority-black district is feasible in Calhoun County.  If a § 2 violation is found, the county will be given the first opportunity to develop a remedial plan."  *Clark v. Calhoun Cty., Miss*., 21 F.3d 92, 95 (5th Cir. 1994) (internal citations omitted).
[6] All parties here will likely agree that the correct measure of numerosity is whether Latinos can constitute a majority of the CVAP in a single member district.  *Romero v. City of Pomona,* 883 F.2d 1418, 1425–26 (9th Cir.1989).

whether race was the predominant factor in drawing those lines." *League of United Latin Am. Citizens*, 548 U.S. at 433.

This is not to say that every illustrative district, no matter how bizarrely drawn, will meet the *Gingles* prong one criteria, and it is expert testimony that aids the Court in determining whether Plaintiffs have met that burden.  The district court in *City of Yakima* examined plaintiffs' *Gingles* prong one maps, presented through expert testimony applying a statistical compactness measure, known as the Reock test,[7] to compare the illustrative districts with districting plans in neighboring towns and state legislative districts, and found them to be sufficiently compact and contiguous to comply with *Gingles* prong one.  40 F. Supp. 3d at 1393-96 & n.3.  And it is clear even to the non-expert eye that the maps approved in the *City of Yakima* case contain "protrusions" of the kind the Defendants believe warrant dismissal in this case.  *Id*. at 1395-96. Again, the 2011 MALDEF map is not Plaintiffs' illustrative prong one map, but even if it were, it is not on its face inadequate to comply with *Gingles* prong one simply because it has a "protrusion."

Ninth Circuit jurisprudence cautions against the kinds of "unconstitutionality" arguments Defendants urge here.  In *Ruiz* the Ninth Circuit reversed a lower court decision that incorrectly based a summary judgement for the City of Santa Maria on its finding that any relief would not survive strict scrutiny, and held that consideration of whether race was the predominant factor in drawing the lines was "premature" at the *Gingles* three prong liability phase.  160 F.3d at 559.  If this Court makes a determination

_____

[7] "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1396 n. 3 (E.D. Wash. 2014).

in Plaintiffs' favor and proceeds to the creation of a remedial map, all of the traditional

redistricting principles will come into play. *See id.* at 558-559. And even then, as the

Ninth Circuit noted in *Ruiz*, the Supreme Court has "assumed that compliance with

Section 2 can be a compelling state interest." *Id.* (citing *Bush v. Vera*, 517 U.S. 952, 978

(1996); *Miller v. Johnson*, 515 U.S. 900, 921, (1995)). Thus, Defendants are incorrect

when they assert that a district plan Defendants opine is "peculiar" is therefore unsuitable

to "meet the first *Gingles* precondition," Defs' MTD at 8, because even a "peculiar"

district created to comply with Section 2 may survive strict scrutiny, even if its designers

used race as a predominant factor. *City of Yakima*, 40 F. Supp. 3d at 1401.

Defendants cite *Growe v. Emison*, 507 US. 25, 38 & 41 (1993), *Jeffers v. Tucker*,

847 F. Supp. 655, 661-662 (E.D. Ark. 1994) and *Vera*, 517 U.S. at 979, for the

proposition that the map incorrectly foisted upon Plaintiffs should be the death knell for

their Section 2 case (because Defendants believe the map lacks compactness). All three

cases were decided after trial. Neither one of the two Supreme Court cases affirmed or

reversed any finding that a proposed district was insufficiently compact to meet plaintiff's

burden under *Gingles* prong one. *See Growe*, 507 US. at 41-42 (district court erred in

finding a Section 2 violation where the record contained no evidence of minority political

cohesion or of majority bloc voting in Minneapolis.); *Vera*, 517 U.S. at 979 (in a

constitutional challenge under the Equal Protection Clause, districts that were "bizarrely

shaped" and "reach[ed] out to grab small and apparently isolated minority communities"

were not narrowly tailored to serve the State's interest in avoiding liability under the

Voting Rights Act and therefore could not survive a claim for racial gerrymandering).

The *Jeffers* court examined whether plaintiffs' objections to a remedial plan that had been

structured in response to court orders should be sustained. The court found that plaintiffs'

proposed districts extended "a series of long, slender fingers deeply to the west . . . cut across numerous communities and political boundaries" and failed to satisfy the compactness precondition of *Gingles*. *Jeffers*, 847 F. Supp. at 662.

This Court, following testimony from Plaintiffs' expert regarding whether Latinos are sufficiently geographically compact to constitute a majority of the CVAP in a single member district, will determine whether Plaintiffs have met their burden under *Gingles* prong one. *Jeffers* does not hold that such a determination is appropriate on a motion to dismiss, without the benefit of expert testimony or a districting plan. And, even if it did, one district court case out of Oklahoma cannot override clear Ninth Circuit precedent that consideration of whether race is the predominant factor in drawing the lines is premature at the *Gingles* three-prong liability phase. *Ruiz*, 160 F.3d at 559.

### 2.    There is no Per Se Unconstitutional Deviation Rule.

Continuing to assume, for the sake of argument, that the five-year-old MALDEF plan is relevant to these proceedings, Defendants' contention that an 11.7%+ deviation between the districts means that Plaintiffs cannot meet their burden under *Gingles* prong one is incorrect and misrepresents the law.

The Supreme Court's "one person one vote rule" requires that districts be drawn with equal population. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). State and local jurisdictions may deviate from strict population equality in legislatively drawn districts to accommodate legitimate state interests in traditional redistricting principles. *Evenwel v. Abbott,* 136 S. Ct. 1120, 1124 (2016). Deviations under 10% are presumptively constitutional, and in an equal protection challenge, the burden is on the Plaintiff to prove unlawful malapportionment. *Harris v. Arizona Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1307 (2016). Deviations over 10%, on the other hand, are not *per se* illegal, but must be justified by legitimate considerations based on rational

state policy, including compactness, contiguity and a state interest in maintaining the integrity of political subdivisions.  *Id.* at 1306*; see also Mahan v. Howell*, 410 U.S. 315,328 (1973) (The state of Virginia justified a 16.4% deviation in its House of Delegates with the rationale of maintaining political subdivisions).  Significantly, the very recent *Harris* decision noted that traditional redistricting principles that may justify deviations include compliance with requirements of the Voting Rights Act.  136 S. Ct at 1307 (citing *League of United Latin Am. Citizens*, 548 U.S. at 518 (SCALIA, J., concurring in judgment in part and dissenting in part, joined in relevant part by ROBERTS, C.J., THOMAS & ALITO, JJ.); *id.,* at 475, n. 12 (Stevens, J., concurring in part and dissenting in part, joined in relevant part by BREYER, J.); *id.,* at 485 n. 2 (Souter, J., concurring in part and dissenting in part, joined by GINSBURG, J.)); *Vieth v. Jubelirer*, 541 U.S. 267, 284, (2004) (plurality opinion).

Given this Supreme Court pronouncement, it is not surprising that no case holds anything remotely similar to Defendants' assertion that a 10%+ deviation is by itself inadequate to meet *Gingles* and requires dismissal of the case.  Defs' MTD at 6-7.  Nonetheless, Defendants cite *Reed v. Town of Babylon*, 914 F. Supp. 843, 869 (E.D.N.Y. 1996) and *League of United Latin Am. Citizens*, 548 U.S. at 433, cases that were not decided on a motion to dismiss, but were instead decided after a full trial on the merits, with the benefit of expert testimony and argument. The issue in *Reed* was not whether plaintiffs could proffer an illustrative map with less than 10% deviation.  Indeed, the *Reed* plaintiffs did so.  The issue in *Reed* was whether *Gingles* prong one required that the deviation meet the more stringent "*de minimis*" deviation applicable to court-ordered plans.  914 F. Supp. at 869.  The *Reed* court refused to apply the "*de minimus*" standard because the Town Board would be given the first opportunity to draw a plan in the event that the court reached the remedy phase.  The Town Board plan would thus still be considered to be legislatively drawn rather than court-ordered, and therefore the "*de minimus*" deviation standard

would not apply. *Id.* at 869-870 (citing *McDaniel v. Sanchez*, 452 U.S. 130, 149 n. 30 (1981)). Presumably then, at the remedial phase, the Town Board would either enact a plan with less than 10% deviation, or one with an excess of 10% deviation justified by the legitimate considerations based on rational state policy, including compliance with the Voting Rights Act. *See Harris*, 136 S. Ct at 1307.

The only other case Defendants cite for the imposition of a strict 10% deviation rule under *Gingles* prong one is *League of United Latin Am. Citizens*. Again, the *League of United Latin Am. Citizens* court had the benefit of a full lower court trial with expert testimony and argument. 548 U.S. at 399. Significantly, the *League of United Latin Am. Citizens* court noted, as argued above, that the *Gingles* prong one inquiry is distinct from an equal protection analysis, and that "[w]hile no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *League of United Latin Am. Citizens*, 548 U.S. at 433 (citations and internal quotation marks omitted).

Paragraphs 22 and 39 of the Complaint allege that the Latino population in Kern County is sufficiently numerous and geographically compact such that two properly apportioned electoral districts can be drawn in which Latinos would constitute a majority of the CVAP, and that instead of enacting a plan with two Latino majority CVAP districts, the County included only one, and then split a second geographically compact Latino community between Districts 1 and 4. The allegations are sufficient to state a claim under *Gingles* prong one, to give Defendants fair notice of the claims against them, and to permit a reasonable inference that Plaintiffs have sufficiently stated a claim for relief under Section 2 of the Voting Rights Act.

///

///

**D.**     **Plaintiffs Have Pled Sufficient Allegations Under *Gingles* Prong Two and Prong Three; Further Factual Specificity Requires Expert Analysis and Opinion.**

Paragraphs 2, 24, 25, 26, 27, 28, 29, 30, 34, and 40 of the Complaint contain allegations that, if true, entitle Plaintiffs to a finding that they have met their burden under prongs two and three of *Gingles*.  The allegations are sufficient to permit the Court to infer that voting in Kern County is racially polarized within the parameters of Supreme Court and Ninth Circuit jurisprudence.  *Iqbal,* 556 U.S. at 678 (citing *Twombly v. Bell Atlantic Corp.*, 550 U.S. 544, 556 (2007)).  Defendants' arguments and case citations illustrate precisely why, at this early stage of the proceedings, it would be improper to dismiss the case without the benefit of expert testimony, and why it would be improper to require additional specificity on subjects that are properly left to expert witnesses.

Prong two of the *Gingles* test requires Plaintiffs to demonstrate that Latinos in Kern County are politically cohesive, while *Gingles* prong three requires Plaintiffs to demonstrate that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate.  *See* 478 U.S. at 51.  Political cohesion is to be judged "primarily on the basis of the voting preferences expressed in actual elections."  *Gomez v. City of Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988).  Evidence of racially polarized voting "establishes both cohesiveness of the minority group and the power of white bloc voting to defeat the minority's candidates."  *Id.* at 1415 (quoting *Collins v. City of Norfolk*, 816 F. 2d 932, 935 (4th Cir. 1987)).  Whether Latinos are cohesive is not a question to be determined "prior to and apart from a study of polarized voting."  *Id.* at 1415 (quoting *Campos v. City of Baytown*, 840 F. 2d 1240, 1244 (5th Cir. 1988)) (internal quotation marks omitted).  The *Gingles* analysis asks whether voting is usually polarized over a period of time; whether typical

elections are characterized by racially polarized voting; and whether there is a difference between how Latino votes and non-Latino votes are cast. *Gomez*, 863 F.2d at 1415.

Demonstration of the second and third *Gingles* prongs requires the parties to engage expert witnesses who study past voting patterns, both in the electoral system challenged (endogenous elections), and in other elections in which the voters of the challenged jurisdiction cast votes (exogenous elections). Because ballots are secret, experts estimate group voting behavior by examining a range of elections over an extended period of time, using various statistical methodologies to compare two variables – the density of Latinos in each precinct, and the votes received by each candidate in the corresponding precincts. Techniques approved by the Supreme Court are the homogeneous precinct analysis and the ecological regression analysis, which are both mathematical techniques used to describe the relationship between those two variables. Regression analysis is "standard in the literature for the analysis of racially polarized voting," and was expressly relied upon and approved by the Court in *Gingles*. *See* 478 U.S. at 53 n. 20; *see also Garza*, 756 F. Supp. at 1332, 1346 (rejecting defendants' challenge to reliability of bivariate regression analysis and finding polarized voting); *Romero v. City of Pomona*, 883 F.2d 1418, 1423 (9th Cir. 1989) (approving use of "ecological regression . . . to show the existence of polarized voting"); *Sanchez v. State of Colorado*, 97 F.3d 1303, 1321 (10th Cir. 1996) (district court committed reversible error in rejecting plaintiffs' evidence of racial polarization, "even though they used the same statistical method approved in *Gingles* and most of the § 2 case law"); *Campos v. Baytown*, 840 F.2d 1240, 1246-48 (5th Cir. 1988).

Ecological inference is another method of analyzing voter behavior, derived through a methodology developed by Professor Gary King subsequent to *Gingles*, and a number of courts have relied on this newer methodology, alone or in combination with homogeneous precinct analysis and ecological regression analysis. *City of Yakima,* 40 F. Supp. 3d at 1402; B*enavidez v.*

*Irving Indep. Sch. Dist.,* No. 3:13-CV-0087-D, 2014 WL 4055366, at *11 (N.D. Tex. Aug. 15, 2014); *Wright v. Sumter Cty. Bd. of Elections & Registration*, No. 1:14-CV-42 WLS, 2015 WL 4255685, at *3 (M.D. Ga. July 14, 2015); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1026 (8th Cir. 2006); *Houston v. Lafayette Cty.*, 20 F. Supp. 2d 996, 1002 (N.D. Miss. 1998).

Based on the expert witness testimony, the Court examines the degree of correlation between the two variables (voting behavior and the racial composition of precincts) and whether the correlation justifies confidence in the underlying data. *Teague v. Attala County, Mississippi,* 92 F.3d 283, 290 (5th Cir. 1996). Finally, the expert also explains the extent to which the support for each candidate is attributable to the percentage of Latino voters in each precinct. *Id.*

> **1.      Supreme Court Jurisprudence Rejects Blanket Numerical Thresholds for Measuring Racially Polarized Voting and for Measuring Minority Voter Success.**

There are no blanket rules or bright-line tests for determining what level of minority cohesion and what level of Anglo bloc voting is sufficient to meet Plaintiffs' burden to show that racial polarization usually results in the inability of Latino voters to elect a candidate of choice. Indeed, the Ninth Circuit observed that *Gingles* rejected a blanket numerical threshold for white bloc voting because:

> The amount of white bloc voting that can generally minimize or cancel black voters' ability to elect representatives of their choice . . . will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices . . .; the percentage of registered voters in the district who are members of the minority group; the size of the district; and, in multimember districts, the number of seats open and the number of candidates in the field.

*United States v. Blaine Cty., Montana,* 363 F.3d 897, 911 (9th Cir. 2004) (quoting *Gingles*, 478 U.S. at 56); *see also Old Person v. Cooney*, 230 F.3d 1113, 1127 (9th Cir. 2000) (quoting *Gingles*, 478 U.S. at 57-58) ("'there is no simple doctrinal test for the existence of legally

significant racial bloc voting' … 'the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances.'").

For example, a mechanical approach that counted the number of Latino-preferred candidates divided by the number of elections was rejected by the Ninth Circuit, which called the mathematical approach a failure of the district court's duty to make "'a searching practical evaluation of the past and present reality' with 'a functional view of the political process.'" *Ruiz*, 160 F.3d at 554 (quoting *Gingles*, 478 U.S. at 45).

Similarly, the Ninth Circuit rejected a bright line test for determining what percentage of Latino support qualifies a candidate, regardless of race, to be considered by the court as the Latino-preferred candidate.  Rather, the court held that "a candidate who receives sufficient votes to be elected if the election were held only among the minority group in question qualifies as minority-preferred."  *Ruiz*, 160 F.3d at 552 (citing *Lewis v. Alamance Cty., N.C.*, 99 F.3d 600, 619 (4th Cir. 1996)).

Although Latino-preferred candidates can be of any race, racially-contested elections are the most probative of Anglo bloc voting.  *Blaine Cty., Montana*, 363 F.3d at 911; *see also Ruiz*, 160 F.3d at 553-554 ("Our rule [that a racially-contested election is more probative than a non-minority v. non-minority election] furthers the Voting Rights Act's goal of protecting the minority's equal opportunity to 'elect its candidate of choice on an equal basis with other voters.'") (quoting *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993)).  At trial, both parties will have the opportunity to present testimony from expert witnesses concerning racially polarized voting over the course of several elections, *Ruiz*, 160 F.3d at 549-50, a practice affirmed by the *Gingles* Court, which noted that a pattern of racial bloc voting that extends over a period of time is more probative than are the results of a single election in which the minority preferred candidate was successful, *Gingles*, 478 U.S. at 57.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Finally, to supplement the evidence of racially polarized voting in elections for the Board

of Supervisors, the expert witnesses will also have the opportunity to examine elections in which

Kern County voters made other choices, *e.g.* for county and statewide offices.  *See Blaine Cty.,*

*Montana*, 363 F.3d at 912; *Cano v. Davis*, 211 F. Supp. 2d 1208, (C.D. Cal., 2002); *Garza v.*

*County of Los Angeles*, 756 F. Supp. 1298, 1329 (C.D. Cal. 1990) (racially polarized voting found

solely on the basis of exogenous Congressional, State Senate and State Assembly elections);

*Citizens for a Better Gretna v. Gretna*, 834 F.2d 496, 502-503 (5th Cir. 1987) (approving the use

of exogenous elections in a *Gingles* pre-condition three analysis, and noting that *Gingles*

"suggests flexibility in the face of sparse data.").

> ## 2.   Plaintiffs Need Not Provide Additional Specificity Concerning Evidence That Requires Expert Analysis.

Defendants argue, without Ninth Circuit legal support, that for purposes of *Gingles* prong

two, Plaintiffs must "identify particular candidates that Latino voters are alleged to have

cohesively supported, yet who were defeated in their election bids."  Defs' MTD at 12.

Defendants make the same argument with regard to *Gingles* prong three, asking that Plaintiffs

identify candidates that were defeated by Anglo bloc voting.  *Id*.  As discussed above,

identification of Latino-preferred candidates, assessment of the extent of Latino voter cohesion

and Anglo bloc voting, inquiry regarding the relative evidentiary value of endogenous versus

exogenous elections, and argument regarding whether the evidence supports a finding of vote

dilution, require expert testimony.  Defendants' argument is simply premature.

None of the cases cited by Defendants support their motion for dismissal without the

benefit of expert testimony, or that the motion to dismiss is anything but premature.  Defendants

cite *not one* Ninth Circuit case that dismissed a Section 2 claim without the benefit of expert

testimony.[8]  Defendants cite only two inapposite Ninth Circuit cases for this proposition.  The first Ninth Circuit case Defendants cited for this proposition is *Cano v. Davis,* 211 F. Supp. 2d 1208 (C.D. Cal. 2002), *aff'd,* 537 U.S. 1100 (2003), which was dismissed following expedited discovery and cross-motions summary judgement that included in the record extensive expert reports and analysis.  The second Ninth Circuit case Defendants cite, *Gomez*, 863 F.2d at 1409 & 1414-1415, was reversed in favor of plaintiffs after a trial that included expert testimony.

Instead, Defendants rely primarily on two out-of-circuit district court cases, both of which resulted in Rule 12 dismissal of complaints that contained internally contradictory allegations and concessions regarding the coalition voting behavior between African American and Latino voters, allegations that doomed the complaints.  In *NAACP v. Snyder*, for example, plaintiffs failed to allege that a district could be created where Latinos could constitute the majority of the CVAP. 879 F. Supp. 2d 622, 674-75 (E.D. Mich. 2012).  Instead, plaintiffs suggested that the legislature could have drawn a single district with 42.74% Latino population.  *Id*. at 671.  The allegation itself, even if true, was insufficient to meet *Gingles* prong one.  Second, plaintiffs alleged that the majority–minority *Gingles* district could be drawn by combining Latino and African American voters, a minority coalition group claim that was precluded under Sixth Circuit law.  *Id.* at 672. Third, plaintiffs conceded that one of the challenged districts was majority African American, such that even if the two groups did vote cohesively, the community's preferred candidate could not be defeated in that district.  *Id*. at 675.  Similarly, plaintiffs in *Broward Citizens for Fair Districts v. Broward County* provided contradictory statistics in their complaint regarding the African American and Latino population concentration, and the Court did "not believe that a voting age population in both districts of less than 30% [could] constitute a majority-minority

---

[8] *Wright v. N. Carolina*, 787 F.3d 256, 266 (4th Cir. 2015) (in reversing a dismissal, the Fourth Circuit noted that neither defendants nor the district court cited a single case on all fours, nor any case mandating that dismissal was warranted).

population sufficient to support a Section 2 claim." No. 12-60317-CIV, 2012 WL 1110053, at *5 (S.D. Fla. Apr. 3, 2012). In addition, plaintiffs failed to adequately allege coalition cohesive voting behavior between the two groups. *Id.* at *7.

Not one of Defendants' remaining out-of-circuit district court cases was dismissed without the benefit of expert testimony. *See N.A.A.C.P., Inc. v. City of Columbia, S.C.*, 850 F. Supp. 404, 413-420 (D.S.C. 1993), *aff'd as modified*, 33 F.3d 52 (4th Cir. 1994) (trial included testimony from five expert witnesses); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 361 (S.D.N.Y. 2004), *aff'd*, 543 U.S. 997 (2004) (trial included testimony from eight expert witnesses on the subjects of voting behavior, demographics and statistically-based social science data, voter participation redistricting and voting rights, socioeconomic status of minorities, social, political, historical, and economic issues); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004) (decision following trial that included testimony from four demographic and racial polarization experts); *Cane v. Worcester Cty., Md.*, 840 F. Supp. 1081, 1091 (D. Md. 1994) (decision after trial that included two expert witnesses examining results from homogeneous precinct and ecological regression analyses).

Finally, Defendants urge dismissal because they take exception to the allegation in paragraph 26 of the Complaint that political cohesion manifests in the "higher rates at which Latino voters express their preference for Latino candidates in racially contested elections." Defs' MTD at 10. The allegation is not a "formulaic recitation of the elements of a cause of action," or a "definition" of cohesive voting. It is a specific factual allegation that in racially contested elections, Latinos express their preference for Latino candidates, a factual allegation consistent with the Ninth Circuit's view that the ability to elect non-Latinos is not as probative as the inability to elect a Latino candidate. *See Ruiz*, 160 F.3d at 554 ("The [Voting Rights] Act means more than securing minority voters' opportunity to elect whites.").

Defendants insist that Latino success in the County's sole Latino CVAP majority district "undercuts" Plaintiffs' position.  Defs' MTD at 13 (citing paragraph 18 of the Complaint).  To the contrary, the allegation, if proven at trial, will lend support to the proposition that Latinos are sufficiently politically cohesive to elect Latino candidates when they are the majority of the eligible voters in a district.  Neither will that fact undercut Plaintiffs' allegations regarding Anglo bloc voting, since the *Gingles* prong three inquiry must focus on Anglo majority districts.  In *Johnson v. De Grandy*, 512 U.S. 997, 1003-04 (1994), the Supreme Court acknowledged a district court's finding that there was a "tendency of non-Hispanic whites to vote as a bloc to bar minority groups from electing their chosen candidates *except in a district where a given minority makes up a voting majority.*" *Id*. (emphasis added); *see also Old Person v. Cooney*, 230 F.3d at 1122 (finding that Indian electoral success in majority-Indian districts was relevant to consider only in the totality of the circumstances inquiry, and noting that "[t]o do otherwise would permit white bloc voting in a majority-white district to be washed clean by electoral success in neighboring majority-Indian districts.").

Plaintiffs have located no case under Section 2 of the Voting Rights Act that suffered Rule 12(b)(6) dismissal because, as Defendants complain, Plaintiffs have not identified by name and by election which candidates were preferred by Latino voters, and which candidates nonetheless lost because of Anglo bloc voting.[9]  Those opinions and conclusions are precisely what expert testimony provides to the court – who are the Latino-preferred candidates and what level of "preference" constitutes cohesion for purposes of *Gingles* prong two, and what level of non-Latino support constitutes Anglo bloc voting for purposes of *Gingles* prong three.

///

///

---

[9] "At the very least, Plaintiffs must identify particular candidates that Latino voters are alleged to have cohesively supported, yet who were defeated in their election bids." Def. MTD at 12.

**E.      The Senate Factors are Supportive of, but Not Essential to, Plaintiffs' Claim.**

Defendants urge dismissal because allegations in the complaint regarding the Senate Factors track too closely the language in the Senate Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act.  Defs' MTD at 13-14.  The factual allegations assert that a number of the conditions that lead to and/or exacerbate voting discrimination are present in Kern County.  The extent to which those factors are present and impact Latinos in Kern County is typically the subject of expert testimony on voter behavior, discriminatory electoral systems, socioeconomic disparities and officially sanctioned historical discrimination.

Fatal to Defendants' argument is that the Senate Factors, other than factors 2 (the extent to which elections are racially polarized) and 7 (the extent to which minorities have been elected), are not essential to a claim under Section 2.  The Supreme Court emphasizes that those two factors are the most important, *Gingles*, 478 U. S. at 48 n.15, but that the Senate Report's "list of typical factors is neither comprehensive nor exclusive" and that "there is no requirement that a particular number of factors be proved, or that a majority of them point one way or the other," *id.* at 45.  "Rather, the ultimate 'question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process.'"  *Id.* (internal citations omitted); *Blaine Cty., Montana*, 363 F.3d at 903.  The Ninth Circuit agrees that the presence of the other Senate factors is supportive of a challenge, but they are "*not essential to*" a claim under Section 2.  *Id.* at 915 (emphasis in original) (citing *Gingles*, 478 U.S. at 52 n. 15); *see also Gomez*, 863 F.2d at 1413.

Therefore, a dismissal at this early stage due to lack of specificity of the allegations with regard to the Senate Factors is unwarranted.

///

///

III.     **CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss should be denied in its entirety.  Alternatively, Plaintiffs request leave to amend.[10]

Respectfully submitted,

Dated: June 7, 2016                    MEXICAN AMERICAN LEGAL
                                       DEFENSE AND EDUCATONAL FUND

                                       By:    /s/ Denise Hulett_____
                                              Thomas A. Saenz
                                              Denise Hulett
                                              Matthew J. Barragan

                                              *Attorneys for Plaintiffs*

---

[10] "Dismissal without leave to amend is appropriate only where a court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment."  *Wyatt v. Liljenquist,* 96 F. Supp. 2d 1062, 1065 (C.D. Cal. 2000).