UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSCAR LUNA, ALICIA PUENTES, DOROTHY VELASQUEZ, and GARY RODRIGUEZ,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF KERN; KERN COUNTY BOARD OF SUPERVISORS; MICK GLEASON, ZACK SCRIVNER, MIKE MAGGARD, DAVID COUCH, and LETICIA PEREZ, in their official capacities as members of the Kern County Board of Supervisors; JOHN NILON, in his official capacity as Kern County Administrative Officer; and MARY B. BEDARD, in her official capacity as Kern County Registrar of Voters,<br><br>Defendants. | No. 1:16-cv-00568-DAD-JLT<br><br>ORDER DENYING DEFENDANTS' MOTION TO DISMISS<br><br>(Doc. No. 16) |

This matter is before the court on defendants' motion to dismiss plaintiffs' complaint for failure to state a claim. A hearing on the motion was held on June 21, 2016. Attorney Christopher Skinnell appeared on behalf of defendants. Attorneys Denise Hulett and Matthew Barragan appeared on behalf of plaintiffs. Having considered the parties' briefs and oral arguments and for the reasons set forth below, the court will deny defendants' motion to dismiss.

/////

**BACKGROUND**

According to the complaint, defendant Kern County is required to redraw the lines to its five county supervisorial districts every ten years to comply with state and federal laws. (Doc. No. 1 ¶ 19.) Following the 2010 United States Census, the Kern County Board of Supervisors ("Board") held a series of public meetings and adopted a districting plan that maintained one supervisorial district—District 5—where Latinos constitute a majority of voting age residents. In the two decades since the creation of District 5 as a Latino majority district, no Latino candidate for county supervisor has won outside of District 5. The resulting 2011 redistricting plan went into effect for the 2012 primary and general elections. (*Id.* ¶¶ 20–23, 34.)[1]

Since the last redistricting effort ten years prior, the Latino population in Kern County has grown significantly, from 38 percent to 49 percent of the total population. Similarly, among Kern County's total citizen voting age population ("CVAP"), the Latino population grew from 25 percent to 34 percent. (*Id.* ¶¶ 16–17.) Because of the growth and geographic distribution of the Latino population in Kern County, plaintiffs allege it is possible to draw a second Latino majority supervisorial district.[2] As a result, plaintiffs allege that the Board's 2011 redistricting plan violates Section 2 of the Voting Rights Act because it impermissibly dilutes the Latino vote in Kern County, allowing a non-Latino majority to defeat Latino voters' preferred candidates, and depriving Latino voters of an equal opportunity to participate in the political process and to elect candidates of their choice. (*Id.* ¶ 24.)

Plaintiffs allege the following. Voting in Kern County, including for county supervisors, is racially polarized between Latino and non-Latino voters. Latino voters are politically cohesive because they express their preference for Latino candidates. Moreover, non-Latino voters

---

[1] *See also* Kern County Supervisorial District Map, *available at* http://www.co.kern.ca.us/bos/pdf/kcmap.pdf.

[2] Plaintiffs reference a 2011 redistricting proposal which certain Latino community members presented for the Board's consideration. That proposal would have increased the number of Latino-majority supervisorial districts from one to two. (*Id.* ¶ 21.) Plaintiffs state they neither rely upon the map reflecting this 2011 redistricting proposal in support of their claim, nor take a position as to the constitutionality of that proposal. (*See* Doc. No. 19 at 6–14.)

typically vote as a bloc sufficient to defeat Latino voters' preferred candidates. Thus, in county supervisorial districts where Latinos do not comprise a majority of the CVAP, Latino voters are unable to elect candidates of their choice. (*Id.* ¶¶ 25–30.) Plaintiffs further allege that Latinos in Kern County have been subject to a history of social inequality and discrimination, in areas such as education, employment, housing, and health. Historically, there has also been a lack of responsiveness by the Board to the particular needs of Latino residents in Kern County. (*Id.* ¶¶ 31–36.)

In response to the 2011 redistricting plan, plaintiffs Oscar Luna, Alicia Puentes, Dorothy Velasquez, and Gary Rodriguez commenced this action on April 22, 2016. Plaintiffs assert a single claim under Section 2 of the Voting Rights Act. (Doc. No. 1.) On May 17, 2016, defendants moved to dismiss plaintiffs' complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 16.) On June 7, 2016, plaintiffs filed an opposition to that motion. (Doc. No. 19.) On June 14, 2016, defendants filed their reply. (Doc. No. 20.)

## LEGAL STANDARD FOR MOTIONS TO DISMISS

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). However, the court need not assume the truth

of legal conclusions cast in the form of factual allegations. *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). In ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), the court is permitted to consider material which is properly submitted as part of the complaint, documents that are not physically attached to the complaint if their authenticity is not contested and the plaintiffs' complaint necessarily relies on them, and matters of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

**DISCUSSION**

**A.     Section 2 of the Voting Rights Act**

Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of eliminating racial discrimination in voting. *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966). Section 2 of the Voting Rights Act of 1965 was enacted "to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude.'" *Voinovich v. Quilter*, 507 U.S. 146, 152 (1993); *see also Chisom v. Roemer*, 501 U.S. 380, 404 (1991) (recognizing that Congress's express objective in amending § 2 was to "broaden the protection afforded by the Voting Rights Act."). The statute prohibits states or their political subdivisions from enacting voting standards, practices, and procedures "which result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of § 2 is established if, "based on the totality of circumstances," the challenged electoral process is "not

equally open to participation by members of a [racial minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 566–67 (the language "voting qualifications or prerequisite to voting, or standard, practice, or procedure" was employed in § 2 in order to be "all-inclusive of any kind of practice" that might be used to deny citizens the right to vote).

Following Congressional enactment of § 2, the Supreme Court articulated a two-step inquiry for analyzing vote dilution claims. First, a minority group of voters challenging a particular election system must demonstrate three prerequisites: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the minority group is politically cohesive, and (3) the majority group votes sufficiently as a bloc to enable it, in the absence of special circumstances, "usually to defeat the minority's preferred candidate." *Thornburg*, 478 U.S. at 50–51.

Assuming these threshold conditions are met, the court must then determine whether, "based on the totality of circumstances," the challenged electoral process impermissibly impairs the minority group's ability to elect representatives of its choice. *Id.* at 44–45; *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 (9th Cir. 1998) (adopting the *Gingles* two-step analysis). In assessing the totality of circumstances, the *Gingles* court identified several factors relevant to finding a § 2 violation. These "Senate factors," developed by the Senate Judiciary Committee, are as follows:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

/////

> (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> (6) whether political campaigns have been characterized by overt or subtle racial appeals;
>
> (7) the extent to which members of the minority group have been elected to public office in the jurisdiction;
>
> (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
>
> (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37 (citing S. Rep. No. 97-417, at 28–29 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 206–07).

Although *Gingles* involved multimember districts, the Supreme Court has held that the *Gingles* test applies in cases, such as this one, involving single-member districts, where the challenged practice is the manipulation of district lines. *See Voinovich*, 507 U.S. at 157–58 (citing *Growe v. Emison*, 507 U.S. 25, 40–41 (1993)); *see also Bartlett v. Strickland*, 556 U.S. 1, 11 (2009); *Old Person v. Brown*, 312 F.3d 1036, 1040–42 (9th Cir. 2002).

In moving to dismiss the complaint now before this court, defendants challenge the sufficiency of plaintiffs' allegations. Specifically, they contend plaintiffs have failed to allege facts sufficient to support each of the three *Gingles* preconditions, and further that plaintiffs' allegations regarding Latino voters' inability to elect their preferred representatives are insufficient to support consideration under the totality of the circumstances. As an initial matter, the court notes that it has found no binding Supreme Court or Ninth Circuit authority addressing the extent to which a plaintiff must plead specific facts sufficient to state a § 2 claim following

the Supreme Court's decisions in *Iqbal* and *Twombly*.³  However, in light of the "broad remedial purpose" of the Voting Rights Act, *see Chisom*, 501 U.S. at 403 (citing *Katzenbach*, 383 U.S. at 315), and considering Rule 12(b)(6) challenges in similar vote dilution cases, the court concludes plaintiffs have pled sufficient facts in this case to state a cognizable § 2 claim.

**B.      Plaintiffs Plead Sufficient Facts to State a Claim as to the *Gingles* Preconditions**

        1.      Numerosity and Compactness

The first *Gingles* precondition includes two requirements:  the minority population must be "sufficiently large" and "geographically compact" to constitute a majority of voters in a single-member district. *Gingles*, 478 U.S. at 50. As to the numerosity requirement, the Ninth Circuit has held that the effective voting population of a minority group (i.e., its CVAP), rather than its total population, is the appropriate metric by which to measure its size. *Romero v. City of Pomona*, 883 F.2d 1418, 1425 (9th Cir. 1989), *abrogated on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990); *see also Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1391 (E.D. Wash. 2014); *Cano v. Davis*, 211 F. Supp. 2d 1208, 1233 (C.D. Cal. 2002) ("The Ninth Circuit, along with every other circuit to consider the issue, has held that CVAP is the appropriate measure to use in determining whether an additional effective majority-minority district can be created."), *aff'd*, 537 U.S. 1100 (2003) (citing *Romero* approvingly).  As to a minority population's geographic compactness, "the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional

---

³ At least one circuit court of appeals has intimated that resolution of vote dilution claims such as this one may be more appropriate on summary judgment:

> It is no accident that most cases under section 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss. This caution is especially apt where, as here, we are dealing with a major variant not addressed in *Gingles* itself—the single member district—and one with a relatively unusual history. As courts get more experience dealing with these cases and the rules firm up, it may be more feasible to dismiss weaker cases on the pleadings, but in the case before us we think that the plaintiffs are entitled to an opportunity to develop evidence before the merits are resolved.

*Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004).

boundaries." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (citations and internal quotations omitted).

Here, plaintiffs allege that between 2000 and 2010, the Latino population grew from 25 percent to 34 percent of Kern County's total CVAP. (Doc. No. 1 ¶¶ 16–17.) Assuming the Latino population in Kern County is sufficiently compact, it can reasonably be inferred that a minority group comprising nearly one-third of the county's total voting population could comprise majorities in each of at least two county supervisorial districts (representing 40 percent of the total county population). Moreover, plaintiffs allege that the Board's 2011 redistricting plan effectively "fractured" a significant portion of the Latino citizen voting age population between two contiguous supervisorial districts, Districts 1 and 4, neither of which has a majority Latino CVAP. (*Id.* ¶¶ 22, 39.) Such an allegation is sufficient to plausibly suggest the existence of a geographically compact minority population.

Defendants, however, contend these allegations alone are insufficient to plead a § 2 claim as to the first *Gingles* precondition. In particular, defendants point to the complaint's reference to a 2011 proposed redistricting map which would have increased the number of Latino-majority districts from one to two. Defendants urge the court to reject this proposal on grounds that it would have been unconstitutional or defective on other grounds, or in the alternative, to require plaintiffs to submit a proposed redistricting map with their complaint. (Doc. No. 16 at 3–8.)

In support of their argument, defendants rely on the decision in *Broward Citizens for Fair Dists. v. Broward Cty.*, No. 12-60317-CIV, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012). In that case, citizens in Florida alleged that a redistricting plan for the Broward County Commission violated § 2. *Id.* at *1. With regard to the first *Gingles* precondition, the complaint in *Broward Citizens* alleged only that the minority populations in question "have become sufficiently large and geographically compact" and that "Broward County, as a whole, represents a 'majority-minority political subdivision.'" *Id.* at *5. Finding that these allegations amounted to no more than mere recitation of the *Gingles* precondition, and that a majority-minority district could not exist with a 30 percent minority voting age population, the district court granted the defendant's motion to dismiss. *Id.* In a footnote, the district court also observed that the plaintiffs' failure to

present a proposed map "represents an additional pleading deficiency." *Id.* at *5 n.6 ("The Eleventh Circuit has 'repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy.'" (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999))). Defendants argue that the requirement for a proposed map announced in *Broward Citizens* should be applied in this case as well.

This court declines to follow the reasoning of the court in *Broward Citizens*. In requiring the submission of a proposed map with the complaint, that court extended what is an evidentiary requirement for purposes of summary judgment to the pleading stage of litigation. *See Burton*, 178 F.3d at 1199 ("Appellants have failed to raise a genuine issue of material fact as to any of the three *Gingles* prerequisites . . . ."). Moreover, requiring plaintiffs to produce a proposed redistricting map would create the same types of disputes defendants now raise with the prior 2011 proposed redistricting map—disputes that must inevitably lead to some statistical and other factual expert analysis. Forcing plaintiffs to develop an unobjectionable map, before discovery even begins, would be putting the cart before the horse. *See Twombly*, 550 U.S. at 556 ("Asking for plausible grounds [for relief] . . . simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [liability].").

This court is unconvinced that inclusion of such a hypothetical map would help "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," beyond what is already pled. *See id.* at 555 (citations omitted). Here, plaintiffs have adequately alleged facts, beyond the conclusory statements in *Broward Citizens*, from which it may be plausibly inferred that a sufficiently large and geographically compact Latino population exists to constitute a majority of voters in a single-member district. *See, e.g.*, *Hall v. Louisiana*, 974 F. Supp. 2d 978, 992 (M.D. La. 2013) (denying a motion to dismiss a § 2 claim in light of similarly pled facts).

2. Political Cohesiveness and Submergence by a Majority Voting Bloc

The second and third *Gingles* preconditions are interrelated and inquire into the existence of racially polarized voting. *Gingles*, 478 U.S. at 56. The second precondition requires a showing that a significant portion of the minority group votes as a bloc such that it is "politically cohesive." *Id.* at 51, 56; *Gomez v. City of Watsonville*, 863 F.2d 1407, 1414 (9th Cir. 1988). "A

9

showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Gingles*, 478 U.S. at 56. Political cohesiveness must be evaluated "primarily on the basis of the voting preferences expressed in actual elections." *Gomez*, 863 F.2d at 1415; *see also United States v. Blaine County, Montana*, 363 F.3d 897, 910 (9th Cir. 2004). The third precondition involves an inquiry into whether the majority group votes sufficiently as a bloc to enable it, in the absence of special circumstances, "usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51, 56. The effect of majority bloc voting on a minority group's ability to elect representatives of their choice "will vary from district to district according to a number of factors." *Id.* at 56; *see also Blaine County, Montana*, 363 F.3d at 911.

Defendants rightly posit that conclusory allegations merely restating the second and third *Gingles* preconditions are insufficient to support a § 2 claim. (*See* Doc. No. 16 at 9, 12 (citing *Broward Citizens*, 2012 WL 1110053, at *7; *NAACP v. Snyder*, 879 F. Supp. 2d 662, 674–75 (E.D. Mich. 2012)).) Likening this case to *Broward Citizens* and *NAACP*, defendants argue the complaint here recites only conclusory statements about Latino and non-Latino voters in Kern County. (*Id.* at 8–9 (citing Doc. No. 1 ¶¶ 2, 18), 12–13.) The court finds this argument unpersuasive. Plaintiffs have alleged facts in their complaint to support a plausible inference of political cohesiveness and submergence by a majority voting bloc. For example, the complaint alleges that Latino voters in Kern County express a preference for Latino candidates. (Doc. No. 1 ¶ 26.) In District 5, the sole Latino-majority supervisorial district established in the past twenty years, voters have consistently elected Latino candidates to the Board. (*Id.* ¶ 30.) During that same time period, no Latino supervisorial candidate has been elected outside of District 5. (*Id.* ¶¶ 29, 34.) These factual allegations are sufficient and create a plausible inference that the Latino population in Kern County is sufficiently politically cohesive. Likewise, these allegations suggest that in districts where the Latino population constitutes a minority, the majority voting bloc may vote to defeat Latino-preferred candidates.

Defendants contend that plaintiffs must plead additional facts to support their claim, including identification of specific Latino-preferred candidates and whether those candidates

were defeated by a bloc-voting majority. (*See* Doc. Nos. 16 at 9–10, 12–13.) Of course, evidence in this regard will be relevant to resolving the ultimate question of whether the Latino population is politically cohesive and whether that group's interests are impaired by a bloc-voting majority. But such facts need not be alleged at the pleading stage. Construing plaintiff's allegations, as pled, in the light most favorable to plaintiffs, as the court must, the complaint is sufficient as to the second and third *Gingles* preconditions.

Accordingly, the court concludes plaintiffs have pled sufficient facts to state a vote dilution claim under § 2 of the Voting Rights Act.

**C.     The Court Need Not Assess the Totality of Circumstances at the Pleading Stage.**

Upon a finding that the *Gingles* preconditions are met in a § 2 claim, the ultimate inquiry shifts to a determination of whether, "based on the totality of circumstances," the political process resulting from the challenged redistricting plan is "equally open" to participation by the racial minority group. *Gingles*, 478 U.S. at 44–45; 52 U.S.C. § 10301(b). This analysis considers the Senate factors identified in *Gingles*, though such factors are "neither comprehensive nor exclusive." *Gingles*, 478 U.S. at 45; *see also Gomez*, 863 F.2d at 1418. Because the totality-of-the-circumstances inquiry is employed to establish § 2 *liability*, *see* 52 U.S.C. § 10301(b), this court need not look beyond the threshold *Gingles* preconditions to determine whether the complaint states facts sufficient to state a plausible vote dilution claim. *See Montes*, 40 F. Supp. 3d at 1407–08 ("The *Gingles* framework is merely a screening tool 'designed to help courts determine which claims could meet the totality-of-the-circumstances standard for a § 2 violation.'") (quoting *Bartlett*, 556 U.S. at 21); *see also Hall*, 974 F. Supp. 2d at 992 (denying a motion to dismiss without substantive examination of the totality of circumstances inquiry); *Bonilla v. City Council of City of Chicago*, 809 F. Supp. 590, 595–96 (N.D. Ill. 1992) (denying a motion to dismiss without considering the totality of circumstances inquiry).

Accordingly, because plaintiffs have satisfied the *Gingles* preconditions at the pleading stage of this litigation, defendants' motion to dismiss will be denied.

Even if the court were to consider the sufficiency of the complaint with respect to the Senate factors, as defendants suggest is required, plaintiffs would only be required to plead the

*existence* of these circumstances sufficient to create a plausible inference that the ability of Latino voters in Kern County to effectively participate in the electoral process is impaired. *See Twombly*, 550 U.S. at 570; *Gingles*, 478 U.S. at 80. Plaintiffs have done so here and need not specifically delineate the *extent* of racial discrimination in Kern County at the pleading stage in order to survive dismissal. (*See, e.g.*, Doc. No. 1 ¶¶ 31–36.)

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss (Doc. No. 16) is denied.

IT IS SO ORDERED.

Dated:   **September 2, 2016**                              /s/ Dale A. Drozd
                                                                                        UNITED STATES DISTRICT JUDGE