UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSCAR LUNA, ALICIA PUENTES, DOROTHY VELASQUEZ, and GARY RODRIGUEZ,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF KERN; KERN COUNTY BOARD OF SUPERVISORS; MICK GLEASON, ZACK SCRIVNER, MIKE MAGGARD, DAVID COUCH, and LETICIA PEREZ, in their official capacities as members of the Kern County Board of Supervisors; JOHN NILON, in his official capacity as Kern County Administrative Officer; and MARY B. BEDARD, in her official capacity as Kern County Registrar of Voters,<br><br>Defendants. | No. 1:16-cv-00568-DAD-JLT<br><br><u>ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u><br><br>(Doc. No. 39) |

This matter comes before the court on plaintiffs' motion for partial summary judgment. A hearing on the motion was held on May 2, 2017. Attorneys Denise Hulett and Matthew Barragan appeared on behalf of plaintiffs. Attorneys Marguerite Leoni and Christopher Skinnell appeared on behalf of defendants. Having considered the parties' briefs and oral arguments and for the reasons set forth below, the court will deny plaintiffs' motion for partial summary judgment.

/////

1

# BACKGROUND[1]

Every ten years, following each decennial census and in accordance with state and federal law, Kern County ("County") must redraw single-member electoral districts for its five-member Board of Supervisors. (JSUF ¶ 14.) In 2011, the County conducted a number of public workshops and held four formal public hearings, before adopting a new redistricting plan based in part on recently released census data. (*See* JSUF ¶¶ 15–20.) The resulting supervisorial district map (the "Adopted Map") largely maintains the one preexisting majority-Latino supervisorial district in Kern County—District 5—where Latinos constitute a majority of that district's total citizen voting age population ("CVAP"). (*See* JSUF ¶¶ 12–13; Declaration of Denise Hulett (Doc. Nos. 39-5) ("Hulett Decl."), Ex. 1.)

In the decade preceding the 2011 redistricting plan, however, Kern County experienced significant population growth, particularly among its Latino population. According to the 2010 U.S. Census, the total population in Kern County grew from 661,645 to 839,631 persons over the prior ten years. (JSUF ¶¶ 8, 10.) Over that same period of time, the Latino population grew significantly—from 38 percent to 49 percent of the total population—representing most of the County's overall population growth. (*Id.*) Similarly, among CVAP in Kern County, the Latino population grew from 25 percent to 34 percent. (*See* Compl. ¶¶ 16–17; JSUF ¶ 9.)

Plaintiffs, Latino citizens and registered voters in Kern County, commenced this action on April 22, 2016, seeking to enjoin the County's 2011 redistricting plan. (Compl.; *see also* JSUF ¶ 2.) In particular, plaintiffs allege that due to the growth and geographic distribution of the Latino population in Kern County, it is possible to draw a second majority-Latino supervisorial district. Plaintiffs also allege that racially polarized voting persists in County supervisorial elections. As a result, plaintiffs claim, the 2011 redistricting plan violates Section 2 of the Voting Rights Act because it impermissibly dilutes the Latino vote in Kern County. (*See* Compl. ¶ 41.)

/////

---

[1] The relevant facts that follow are principally derived from the complaint (Doc. No. 1) ("Compl."); the parties' joint statement of undisputed facts (Doc. No. 39-3) ("JSUF"); and plaintiff's statement of undisputed material facts (Doc. Nos. 39-4, 42) ("PUMF").

Following discovery, plaintiffs have brought a motion for partial summary judgment with respect to the first precondition for establishing liability under § 2, as announced in *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). (Doc. No. 39.) Specifically, plaintiffs seek a determination that no genuine issue of material fact exists as to whether the Latino population in Kern County is sufficiently large and geographically compact to constitute a majorities of voters in each of two supervisorial districts. On April 18, 2017, defendants filed their opposition to the motion. (Doc. No. 41.) On April 25 2017, plaintiffs filed their reply. (Doc. No. 57.)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a motion for summary judgment, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Where the party moving for summary judgment will bear the burden of proof at trial, as is the case here, that party must come forward with evidence that would entitle it to a directed verdict if the evidence were uncontroverted at trial. *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992); *see also Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.")

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the

existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *See Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v. Central Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## DISCUSSION

**A.     Section 2 Overview**

Section 2 of the Voting Rights Act of 1965 prohibits states or their political subdivisions from enacting voting standards, practices, and procedures "which result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).  A violation of § 2 is established if, "based on the totality of circumstances," the challenged electoral process is "not equally open to participation by members of a [racial minority group] in that its members have less opportunity than other members of the

electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 566–67 (1969) (the language "voting qualifications or prerequisite to voting, or standard, practice, or procedure" was employed in § 2 in order to be "all-inclusive of any kind of practice" that might be used to deny citizens the right to vote).

Following Congressional enactment of § 2, the Supreme Court articulated a two-step inquiry for analyzing vote dilution claims. First, a minority group of voters challenging a particular election system must demonstrate three prerequisites: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the minority group is politically cohesive, and (3) the majority group votes sufficiently as a bloc to enable it, in the absence of special circumstances, "usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51; *accord Cooper v. Harris*, 581 U.S. ___, ___, No. 15-1262, 2017 WL 2216930, at *12 (May 22, 2017). Second, after determining that these threshold conditions are met, the court must determine whether, "based on the totality of circumstances," the challenged electoral process impermissibly impairs the minority group's ability to elect representatives of its choice. *Gingles*, 478 U.S. at 44–45; *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 (9th Cir. 1998) (adopting the *Gingles* two-step analysis).[2] While *Gingles* involved multi-member districts which send two or more members to a legislative chamber, the Supreme Court has since applied the same framework to cases involving single-member districts, where the challenged practice is the manipulation of district lines. *See Voinovich*, 507 U.S. at 157–58 (citing *Growe v. Emison*, 507 U.S. 25, 40–41 (1993)); *see also*

---

[2] In assessing the totality of circumstances for this purpose, the Supreme Court in *Gingles* identified several so-called "Senate factors" relevant to finding a § 2 violation. *See Gingles*, 478 U.S. at 36–37 (describing the Senate factors) (citing S. Rep. No. 97-417, at 28–29 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 206–07).

5

*Bartlett v. Strickland*, 556 U.S. 1, 11 (2009); *Old Person v. Brown*, 312 F.3d 1036, 1040–42 (9th Cir. 2002).

**B.     The First *Gingles* Precondition**

Plaintiffs move for partial summary judgment only with respect to the first *Gingles* precondition, which in this case requires a showing that the Latino voting population in Kern County is both sufficiently large and geographically compact to constitute a numerical majority in a second single-member supervisorial district. *See Gingles*, 478 U.S. at 50; *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994).

To satisfy this first *Gingles* precondition, a § 2 plaintiff must make a preliminary showing that it is *possible* to create "more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy*, 512 U.S. at 1008; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997) ("Because the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." (quoting *Holder v. Hall*, 512 U.S. 874, 881, 950–51 (1994))); *Gingles*, 478 U.S. at 50 n.17 ("Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."). To do so, a plaintiff typically presents illustrative redistricting plans as evidence of vote dilution. *See Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir. 2009); *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 n.6 (5th Cir. 1993) (noting the first *Gingles* precondition "specifically contemplates the creation of hypothetical districts"). However, neither the plaintiff nor the court is bound by the precise lines drawn therein; at this stage, a plaintiff need only show that a remedy may be feasibly developed. *See Fairley*, 584 F.3d at 671 ("[I]t is sufficient that a plaintiff show that a workable plan for another minority-controlled voting district is possible; the plaintiff's plan need not be an ultimate solution." (citing *Gingles*, 478 U.S. at 50 n.17; *Houston v. Lafayette County*, 56 F.3d 606, 611 (5th Cir. 1995))); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1399 (E.D. Wash. 2014) ("What the first *Gingles* precondition does not require is proof that

6

a perfectly harmonized districting plan can be created. Indeed, conditioning a § 2 plaintiff's right to relief upon his or her ability to create a letter-perfect districting plan would put the cart before the horse." (citation omitted)).

In moving for partial summary judgment here, plaintiffs submit the following illustrative redistricting plan (the "Illustrative Map"), developed by their expert, David R. Ely, which plaintiffs contend is evidence that a second majority-Latino district in Kern County is feasible:



(Hulett Decl., Ex. 2; *see also* Hulett Decl., Ex. 1.) The Illustrative Map can be distinguished from Kern County's Adopted Map in three notable ways: (1) it modifies but maintains District 5 as a majority-Latino district; (2) it combines certain cities north of Bakersfield, areas in the southern part of Bakersfield, and the City of Arvin, to create a second majority-Latino district (Illustrative District 1); and (3) it creates a single supervisorial district consisting of cities in the southwest part of Kern County and the eastern half of Kern County (Illustrative District 4). (*See* PUMF ¶ 13.) With plaintiffs' Illustrative Map in mind, the court proceeds below to assess whether summary judgment as to the first *Gingles* precondition is appropriate.

/////

1. Numerosity

In order to satisfy the numerosity requirement under *Gingles*, plaintiff must first demonstrate "that the minority population in the potential election district is greater than 50 percent." *Bartlett*, 556 U.S. at 19–20. The Ninth Circuit has held that the effective voting population of a minority group (i.e., its CVAP), rather than its total population, is the appropriate metric by which to measure its size. *Romero v. City of Pomona*, 883 F.2d 1418, 1425 (9th Cir. 1989), *abrogated on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990); *see also Montes*, 40 F. Supp. 3d at 1391 (E.D. Wash. 2014); *Cano v. Davis*, 211 F. Supp. 2d 1208, 1233 (C.D. Cal. 2002) ("The Ninth Circuit, along with every other circuit to consider the issue, has held that CVAP is the appropriate measure to use in determining whether an additional effective majority-minority district can be created." (citing *Romero* approvingly)), *aff'd*, 537 U.S. 1100 (2003). Here, while the parties disagree as to the precise size of the Latino CVAP in plaintiffs' illustrative districts, there is no dispute that the Latino CVAP in Illustrative District 1 constitutes a numerical majority. (*See* PUMF ¶ 14; *compare* Declaration of David R. Ely (Hulett Decl., Ex. 7), Ex. A tbl.Y (53.2–60.8% Latino CVAP), *with* Declaration of Dr. Douglas Johnson (Doc. No. 44), Ex. 11 (55–58% Latino CVAP).) Accordingly, the court concludes plaintiffs have satisfied the numerosity requirement with respect to their Illustrative Map.

2. Compactness

Plaintiffs must separately demonstrate that the relevant minority population is sufficiently "geographically compact" to constitute a voting majority in a second single-member district. *See Gingles*, 478 U.S. at 50. This inquiry focuses on the geographic dispersal of minority voters and,

/////
/////
/////
/////
/////
/////

more broadly, whether a reasonably compact majority-minority district can be drawn.³ "While no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *LULAC*, 548 U.S. at 433 (citations and internal quotations omitted). Other "traditional districting principles" typically include population equality, contiguity, respect for political subdivisions, protection of incumbents, and preservation of preexisting majority-minority districts. *See, e.g.*, *Easley v. Cromartie*, 532 U.S. 234, 239–40 (2001); *Abrams v. Johnson*, 521 U.S. 74, 94 (1997); *Shaw v. Reno*, 509 U.S. 630, 647, 651 (1993).

With respect to the legal standard for § 2 compactness, there is considerable dispute between the parties regarding the scope of the traditional districting principles relevant to this case and the extent to which such principles should impact the compactness analysis. The parties first urge the court to consider additional districting principles. Plaintiffs, relying on California law, argue that the court must also look to topography and geography in evaluating compactness. (*See* Doc. No. 57 at 6–7 (citing Cal. Elec. Code § 21500; *Legislature v. Reineke*, 10 Cal. 3d 396 (1973)).) Defendants, citing in part the Fifth Circuit's unpublished decision in *Gonzalez v. Harris County, Tex.*, 601 F. App'x 255 (5th Cir. 2015),⁴ identify several additional policy preferences

---

³ "Compactness" under § 2 is distinct from "compactness" in cases brought under the Equal Protection Clause. In the equal protection context, the *shape or size* of a district may be probative of whether "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*) (citations omitted). "Under § 2, by contrast, the injury is vote dilution, so the compactness inquiry embraces different considerations." *LULAC*, 548 U.S. at 433; *see also Gingles*, 478 U.S. at 50 n.17 ("[I]f the minority group is spread evenly throughout a multimember district . . . these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure.").

⁴ The Fifth Circuit in *Gonzalez* held that

> when a locality adopts a redistricting plan according to certain traditional districting principles, . . . the district court must consider all such principles relied on by the locality, any opposition to such reliance by § 2 plaintiffs, and any traditional districting principles which § 2 plaintiffs may incorporate into their hypothetical plan in an effort to demonstrate comparable consistency with the plan.

601 F. App'x at 260.

purportedly relied upon by the County in developing its Adopted Map: (1) preservation of two supervisorial districts in east Kern County, (2) avoidance of dramatic change to existing district boundaries, and (3) preservation of District 5 as a majority-Latino district. (Doc. No. 41 at 8–9.) To the extent these foregoing considerations are not covered by the traditional districting principles previously described, and to the extent they are relevant, the court will consider them in its assessment of compactness in this case.

Perhaps more importantly, however, the parties dispute the extent to which any one or all of these traditional districting principles are to be considered in evaluating the compactness of a minority population. While the Supreme Court has acknowledged there is "no precise rule," *LULAC*, 548 U.S. at 433, this court nevertheless is mindful of the logical boundaries of the compactness inquiry. On the one hand, it has been long recognized that local legislative bodies—rather than federal courts—play the primary role in fashioning reapportionment plans. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 954 (1996) ("States attempting to comply with § 2 retain discretion to apply traditional districting principles and are entitled to a limited degree of leeway."); *Upham v. Seamon*, 456 U.S. 37, 40–41 (1982) (concluding that federal courts must defer to the legislative preferences absent a finding of a constitutional or statutory violation); *White v. Weiser*, 412 U.S. 783, 794–95 (1973) ("From the beginning, we have recognized that 'reapportionment is primarily a matter for legislative consideration and determination . . . .'" (quoting *Reynolds v. Sims*, 377 U.S. 533, 586 (1964))). In that regard, a determination of whether such plans violate § 2 must, at minimum, give *some* consideration to the principles that traditionally guide the redistricting process. *See, e.g.*, *LULAC*, 548 U.S. at 433 ("the inquiry *should take into account* traditional districting principles . . ." (emphasis added) (citations and internal quotations omitted)); *Bush*, 517 U.S. at 979 ("[A] district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is reasonably necessary."). In *LULAC*, for example, the Supreme Court evaluated the compactness of a newly drawn majority-Latino congressional district that included a 300-mile gap between two major Latino communities, one in the Austin, Texas area and one along the U.S.-Mexico border. *LULAC*, 548 U.S. at 432–34. The Court held that "the enormous geographical distance separating [two minority populations],

coupled with the disparate needs and interests of these populations—not either factor alone," rendered that district non-compact for § 2 purposes. *Id.* at 435.

On the other hand, "it would be unfair to require Plaintiffs to draw maps in strict accordance with the County's priorities. Under this scheme, the entire Section 2 analysis is infected by which traditional redistricting principles the County has prioritized, thereby precluding any meaningful review of the dilutive effect, if any, of the County's choice and application of its chosen redistricting principles." *Rodriguez v. Harris County, Tex.*, 964 F. Supp. 2d 686, 745 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez*, 601 F. App'x at 260–261. In other words, a § 2 claim challenges the propriety of the very process by which a legislative body fashioned a particular reapportionment plan—including its choice and application of certain districting principles. *See id.* (citing *De Grandy*, 512 U.S. at 1007).

Accordingly, while plaintiffs' Illustrative Map should reasonably comport with traditional districting principles, plaintiffs need not prioritize those principles in the same manner as the County did when it created the Adopted Map. *See id.* at 746; *see, e.g.*, *Perez v. Abbott*, ___ F. Supp. 3d ___, ___, No. SA-11-CV-360, 2017 WL 1450121, at *11 (W.D. Tex. Apr. 20, 2017) (holding that states cannot "claim that a single traditional districting principle . . . allows them to avoid drawing districts required by § 2 under the totality of circumstances.").

With these limitations in mind, the court now addresses some of the evidence before it on summary judgment relevant to consideration of certain traditional redistricting principles.

      a.    *Maintaining Communities of Interest*

Looking at the distribution of the Latino population across Kern County, without regard to existing or proposed district lines, there is no doubt that Latinos are largely concentrated in the area encompassing Bakersfield, nearby communities surrounding Bakersfield, and communities to the north of Bakersfield. (*See, e.g.*, Hulett Decl., Ex. 3 (maps of Kern County illustrating Latino CVAP density by census block).) As noted above, plaintiffs present a hypothetical second majority-Latino district (District 1) in their Illustrative Map by combining several of these communities. Defendants argue that such a configuration amounts to a combination of distant and disparate populations, in a manner found to be non-compact by courts in other cases. (*See*

Doc. No. 41 at 3, 16–17 (citing *LULAC*, 548 U.S. at 433, and *Sensley v. Albritton*, 385 F.3d 591, 596–97 (5th Cir. 2004)).)[5] Accordingly, one critical question this court must answer is whether the Latino populations in the areas described above represent distinct communities of interest, rather than a single community of interest.

At the outset, there is some disagreement between the parties regarding what effect certain geographic designations—e.g., "urban," "rural," or "agricultural"—should have in defining communities of interest. Plaintiffs' expert, Mr. Ely, generally characterizes the area bounded by plaintiffs' Illustrative District 1 as "agricultural." (Doc. No. 39-1 at 10.) Defendants rebut this characterization by pointing out that much of the population in Illustrative District 1 actually resides in urban areas in the southern part of Bakersfield. (Doc. No. 41 at 17.) As the Supreme Court has suggested, such designations—and to some extent, distinctions among industries solely based on such designations—are of little import in defining a community of interest. *See LULAC*, 548 U.S. at 435 ("[I]n some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." (citing *Abrams*, 521 U.S. at 111–12)). Rather, in identifying communities of interest, this court must look to "socio-economic status, education, employment, health, and other characteristics." *LULAC*, 548 U.S. at 432; *see, e.g.*, *Bush*, 517 U.S. at 964 (describing exemplary "manifestations of community of interest" as including "shared broadcast and print media, public transport infrastructure, and institutions such as schools and churches"); *Perez v. Abbott*, No. SA-11-CV-360, 2017 WL 1406379, at *59–60, (W.D. Tex. Apr. 20, 2017) (finding communities of interest based on shared socioeconomic characteristics such as high poverty levels, geography, lack of adequate employment opportunities, health-related concerns, and certain regional challenges such as border security and flooding).

/////

---

[5] Alternatively, defendants contend that plaintiffs are limited by the allegation in their complaint that "the northern part of Kern County" constitutes "a second politically cohesive Latino community." (Doc. No. 41 at 14–15 (quoting Compl. ¶ 2).) The court finds this argument unavailing. The noted allegation in plaintiffs' complaint merely serves to identify distinct population centers; it does not amount to an admission that certain Latino populations in Kern County necessarily comprise more than one community of interest.

Here, plaintiffs have come forward with the deposition testimony of several witnesses suggesting that Latinos in Illustrative District 1 face similar issues related to economic development, unemployment, air and water pollution, environmental concerns over hydraulic fracturing, a lack of educational opportunities and low college success rates, public health, and crime. (*See* Doc. No. 39-1 at 11–12.) For example, plaintiff Gary Rodriguez, a longtime Kern County resident and schoolteacher, testified at deposition that many of these issues similarly affect the communities in Lost Hills, Wasco, Delano, McFarland, Shafter, Buttonwillow, Arvin, and Lamont. (*See* Hulett Decl., Ex. 9.) Dolores Huerta, a well-known labor and community organizer, further described regional employment patterns whereby farmworkers travel seasonally between the Arvin and Delano areas based on varying labor needs. (*See* Hulett Decl., Ex. 11.) Defendants do not appear to dispute the substance of this testimony, but they do point to evidence tending to distinguish the communities in Illustrative District 1. For example, defendants note an absence of any public comment during the County's last three redistricting processes in which Kern County residents associated the City of Arvin with any of the communities to the north of Bakersfield. (Doc. No. 41 at 15.) Defendants also argue that the roughly 40-mile distance between Arvin and those northern communities, a lack of regional public transit connecting the two population centers, and as a result, the divergent priorities in industrial and commercial development, militate against the finding of a single community of interest. (*See id.* at 15–16.) The evidence cited by defendants tends to call into question whether Latinos in Kern County actually share specific interests—rather than mere concern for broadly defined issues, such as the need for economic development.

Because the evidence presented by the parties on summary judgment reveals a material dispute about whether a hypothetical second majority-Latino district would encompass a single community of interest and because that dispute in turn involves disputed issues of fact, summary judgment is inappropriate and resolution of this issue must be left for trial.

        b.     *Preserving Kern County's Preexisting Majority-Latino District*

Relatedly, defendants posit that in order to create a second majority-Latino supervisorial district, Kern County would run afoul of a traditional districting principle by disrupting the core

13

of District 5, the preexisting majority-Latino district. *See, e.g.*, *Sensley*, 385 F.3d at 598. Specifically, plaintiffs' Illustrative District 1 includes areas south of Bakersfield, such as Arvin, which are currently within the majority-Latino District 5 in Kern County's Adopted Map. While the contours of District 5 in plaintiffs' Illustrative Map are not identical to those in the Adopted Map, there is no dispute that plaintiffs' Illustrative District 5 remains a majority-Latino district. Rather, the central question in considering this districting principle is whether the Latino populations being added to or subtracted from District 5 are so distinct from the rest of Kern County that redrawing District 5 would amount to a dismantling of a majority-Latino district. Accordingly, to find compactness, the court must consider whether those Latino populations share a community of interest with other Latino populations in Kern County.

For the same reasons as discussed above with respect to communities of interest, the inquiry as to this consideration involves disputed issues of facts such that summary judgment is not warranted.

        c.    *Preserving Two Districts in East Kern County and Minimizing Change*

Finally, the court considers two additional districting principles specific to Kern County: the desire to retain two supervisorial districts in eastern Kern County and to avoid dramatic change in drawing new district boundaries. Defendants first present evidence showing that since at least 1981, the eastern half of Kern County has been represented by two supervisors, as opposed to one under plaintiffs' Illustrative Map. (Doc. No. 41 at 22–23.) During the 2011 redistricting process, Allan Krauter, then an analyst for the County, and defendant John Nilon, then the County Administrative Officer, recall that a number of Kern County residents expressed concerns that it would be extremely difficult for one supervisor to adequately represent the entirety of eastern Kern County, were it to comprise a single district. (*See* Declaration of Allan Krauter (Doc. No. 43) ¶ 28; Declaration of John Nilon (Doc. No. 47) ¶ 24.)[6] Defendants further

---

[6] Separately, defendants argue that there is a disputed issue of material fact with regard to whether the single east Kern County district in plaintiffs' Illustrative Map (District 4) is itself compact. While an illustrative redistricting plan as a whole may be considered in carrying out the *Gingles* inquiry, specific concerns about the compactness of non-majority-minority districts are better left to the remedial phase of this litigation, absent a clear constitutional or statutory violation.

14

argue that Kern County has for decades adhered to a broader principle that new maps should maintain the core of existing districts and minimize changes. (Doc. No. 41 at 23.) These principles, defendants contend, help preserve relationships between elected officials and their constituents over time. (*Id.*)

The County's local districting preferences are certainly relevant to consideration of the issue of compactness. *See Gonzalez,* 601 F. App'x at 260. However, adherence to past electoral boundaries must have some limits. To the extent the County desires to leave existing district boundaries as unchanged as possible, that principle cannot effectively override any finding of § 2 liability. Population and demographic changes over time, for example, must also be taken into account. *See, e.g.*, *Gonzalez,* 601 F. App'x at 260 ("[M]aintaining traditional boundaries is a recognized traditional districting principle . . . . But if a shift in population or some other intervening factor renders the importance of maintaining such boundaries marginal, a district court may find this particular principle unpersuasive in the compactness assessment."). Here, disputed factual issues remain as to whether recent changes to the population in Kern County minimize the importance of these districting principles. Those issues can only be resolved at trial.

In light of the foregoing discussion regarding traditional districting principles, it is clear there is considerable evidence that the court must weigh and underlying factual disputes that it must decide before resolving the issue of compactness. *See, e.g.*, *Sensley*, 385 F.3d at 595–97 (characterizing as "factual issues" the factors considered by the district court in assessing compactness under § 2). Accordingly, at this stage of the litigation, the court cannot conclude, as a matter of law, that plaintiffs have met their burden to satisfy the first *Gingles* precondition. *See Soremekun*, 509 F.3d at 984 ("[T]he movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.").

/////
/////
/////
/////
/////

15

**CONCLUSION**

For the reasons set forth above, plaintiffs' motion for partial summary judgment (Doc. No. 39) is denied.

IT IS SO ORDERED.

Dated: **June 1, 2017**

_____
UNITED STATES DISTRICT JUDGE