1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# **<u>EXHIBIT 4</u>**

26

**Plaintiffs' Motion to Exclude the Testimony of Defendants'
Expert Witness, Dr. Jonathan N. Katz [FRCP 702]**

27

*Luna, et al. v. County of Kern, et al*., Case No. 1:16-cv-00568-DAD-JLT (E.D. Cal.)

28

1   Mark Nations, Esq. (S.B. No. 101838)
2   ACTING COUNTY COUNSEL
    Charles F. Collins, Esq. (S.B. No. 104318)
3   DEPUTY COUNTY COUNSEL
    1115 Truxtun Avenue, Fourth Floor
4   Bakersfield, California 93301
5   Telephone: (661) 868-3800
    Facsimile: (661) 868-3805
6   Email: mnations@co.kern.ca.us
7
8   NIELSEN MERKSAMER
       PARRINELLO GROSS & LEONI LLP
9        Marguerite Mary Leoni, Esq. (S.B. No. 101696)
         Christopher E. Skinnell, Esq. (S.B. No. 227093)
10       Hilary J. Gibson, Esq. (S.B. No. 287862)
11   2350 Kerner Boulevard, Suite 250
     San Rafael, California 94941
12   Telephone:  (415) 389-6800
     Facsimile:   (415) 388-6874
13   Email: mleoni@nmgovlaw.com
14   Email: cskinnell@nmgovlaw.com
     Email: hgibson@nmgovlaw.com
15
16   *Attorneys for Defendants*
     COUNTY OF KERN, *ET AL.*
17
18
19              IN THE UNITED STATES DISTRICT COURT
20           FOR THE EASTERN DISTRICT OF CALIFORNIA
21   OSCAR LUNA, *et al.*,                )   Case #1:16-cv-00568-DAD-JLT
22          *Plaintiffs*,                  )
                                          )   **DEFENDANTS' EXPERT**
23   vs.                                  )   **WITNESS DISCLOSURES:**
                                          )   **DECLARATION OF JONATHAN**
24                                        )   **N. KATZ, Ph.D. [FRCP 26(a)(2)]**
     COUNTY OF KERN, *et al.*,            )
25                                        )   JUDGE: Hon. Dale A. Drozd
           *Defendants*.                  )   COURTROOM: 5
26                                        )
27   _____ )
28

---

EXPERT DISCLOSURES UNDER FRCP 26(a)(2):                    CASE NO. 1:16-cv-00568-DAD-JLT
DECLARATION OF JONATHAN N. KATZ, Ph.D.

EXPERT REPORT FOR LUNA v. COUNTY OF KERN

Jonathan N. Katz

December 20, 2016

I was asked by counsel for the defendant to provide my opinions on the statistical analysis and conclusions of Dr. Morgan Kousser as detailed in his expert report. In making my findings, I have applied standard statistical methods, which I regularly employ in my research and which have been published in peer-reviewed journals.

A summary of my report and basic findings is as follows:

- Given the relatively integrated housing patterns in Kern County there are essentially no homogenous voting precincts, making any attempt at ecological inference (including both ecological regression and EI) suspect. Therefore, no scientifically valid conclusions can be drawn about how individuals of different racial and ethnic groups voted in local elections in the county.

- In addition, Dr. Kousser's analysis is plagued by several additional problems further raising doubt about whether any scientifically valid inferences may drawn from it.

In the next section of my report, I review my qualifications. The following section discusses the problem of identifying and making ecological inferences in Kern County given the available data. The final section raises several other concerns with Dr. Kousser's analysis.

## 1. QUALIFICATIONS

I am currently the Kay Sugahara Professor of Social Sciences and Statistics at the California Institute of Technology. I was also formerly on the faculty at the University of Chicago and a visiting Dr. at the University of Konstanz (Germany). A complete copy of my curriculum vitae is in the Appendix.

I received my Bachelor of Science degree from the Massachusetts Institute of Technology and my Masters of Arts and Doctor of Philosophy degrees, both in political science, from the University of California, San Diego. I have also done post-doctoral work at Harvard University and the Harvard-MIT Data Center. I am an elected fellow of both the American Academy of Arts and Sciences and the Society for Political Methodology. I am a former fellow of the Center for Advanced Study in the Behavioral Sciences.

I have written numerous articles published in the leading journals as set forth in my curriculum vitae. I am currently the co-editor of *Political Analysis*, the journal of the Society for Political Methodology[1], and I am a co-founding editor of the Political Science network (a collection of on-line journals). I sit on the editorial board of two leading journals, *Electoral Studies* and *Political Research Quarterly*, and I previously also served on the editorial board of the *American Journal of Political Science*. I have also served as a referee of manuscripts for most of the major journals in my fields of research and for the National Science Foundation.

---

[1]Political methodology is the development of statistical and research tools in political science.

I have done extensive research on American elections and on statistical methods for analyzing political science data. I am a member of the Caltech/MIT Voting Technology Project, serving as the co-director of the project from October 1, 2005 to September 30, 2010.

Over the past decade, I have testified or consulted in numerous elections cases for both Democratic and Republican clients involving the Federal Voting Rights Act, the evaluation of voting systems, or the statistical evaluation of electoral data. I have testified or consulted in court cases in both state and Federal courts in the states of Arizona, California, Florida, Georgia, Indiana, Illinois, Maryland, Michigan, Missouri, New Mexico, Nevada, Oklahoma, Texas, Virginia, and Washington.

My rate for expert witness work in this case is $500.00 per hour.

## 2. IDENTIFYING ECOLOGICAL ESTIMATES

The fundamental problem with Dr. Kousser's analysis in his report in this case is a lack of statistical identification. In non-technical terms, statistical identification asks whether a given data set can lead to sensible estimates of some quantity of interest. In this case, the quantity of interest is an estimate of how individuals of different ethnic or racial groups voted given only aggregate data on election results in the county. As I will show, the estimates that Dr. Kousser produced are not well identified and, therefore, no valid statistical claims can be made regarding the presence of racially polarized voting with his analysis.

In order to see how Dr. Kousser's statistical estimates of voting behavior are not identified, I will first review the various methods for ecological inference – the technical term for inferring individual voting behavior from aggregate election results. I will show that in this case, his identification comes from an implausible assumption that underlies ecological regression that has been soundly rejected in the statistical literature. Finally, I will show that in a related analysis from the same Kern County election data, estimating the fraction of Latino voters who are registered as Democrats, where we know the true values, the estimates using the methods in Dr. Kousser's report lead to dramatically inaccurate estimates.

### 2.1. *Homogenous Precincts and the Method of Bounds*

A common starting point for ecological inference is to consider only homogeneous precincts. That is, we could examine the election results from precincts that are closest to racially homogeneous in character. For example, if a precinct were completely racially homogeneous, say with a population that was 100% Latino, then we know what fraction of Latinos voted for a given candidate in the precinct: it is just the share the given candidate got in the precinct. While this might be a useful starting point, as a statistical procedure it is problematic since it throws out most of the data unless most of the precincts are homogeneous.

2

However, we can use the intuition from the homogeneous precincts to place bounds on the level of support each group gives a candidate. Consider the following equation, which is true by definition, that relates the vote share of given candidate to the voting behavior of Latinos and Whites:

$$V_i = \lambda_i^L X_i + \lambda^W (1 - X_i), \tag{1}$$

where $V_i$ is the share of the vote a given candidate received in precinct $i$, $X_i$ is the fraction of Latinos in the precinct and therefore $(1 - X_i)$ is the fraction of White (or more correctly non-Latino) voters, assuming for the moment that there are only two groups in the electorate. $\lambda_i^L$ is the fraction of Latinos voting for the given candidate and similarly $\lambda_i^W$ is the fraction of Whites voting for the given candidate. In other words, the equation states the fact that the total vote share for a candidate must equal the proportion of Latino voters who support them multiplied by the proportion of the electorate that is Latino plus the proportion of the White voters who support the candidate multiplied by the proportion of the electorate which is White.

Now consider homogeneous Latino precincts again. In these precincts, $X_i = 1$, so that the equation simplifies to $V_i = \lambda_i^L$ as we stated above. However, from these precincts we can not say anything about the voting behavior of Whites because any proportion of Whites voting for a given candidate is consistent with the observed vote shares in these precincts. We can generalize this idea using Equation 1. Consider, for example, a precinct where $X_i = 0.6$, that is sixty percent of voters are Latino (and, therefore, 40% are White), and the candidate's vote share, $V_i$, is 0.5.

Since 60% of the voters are Latino and the given candidate got 50% of the vote, then at most $\frac{5}{6}$ths of the Latino voters could have voted for the candidate. If it were higher than this bound then the vote share in the precinct would have to be higher. On the other hand, even if all of the Whites voted for the candidate then at least $\frac{1}{6}$th of the Latinos would have had to vote for the candidate as well, otherwise the vote share would have been less than 0.5. Thus, we know that proportion of Latinos voting for the candidate, $\lambda_i^L$, must be greater than 1/6 and less than 5/6 and $\lambda_i^W$ can take on any value between zero and one. We actually know more than this: we know that the feasible values for this district must lie on the line segment, called a constraint line, defined by the bounds $(\frac{1}{6}, 1)$ and $(\frac{5}{6}, 0)$. Using standard algebra by plugging in $X_i = 0.6$ and $V_i = 0.5$, we find that $\lambda_i^W = -\frac{3}{2}\lambda_i^H + \frac{5}{4}$.

Duncan and Davis (1953) fully developed the method of bounds outlined above to analyze ecological data. The advantage of their method of bounds is that it does not rely on any untestable assumptions. The problem, however, is that it can only be used in cases where there bounds are informative. This happens only when there are sufficient homogenous precincts. In many cases, including in Kern County, this is not the case. Formally, the methods of bounds estimate is not identified in the data from the Kern County elections.

3

## 2.2. *Ecological or Goodman's Regression*

An alternative approach that examines all precincts simultaneously was developed by Goodman (1959) and is perhaps the most commonly used procedure. It is referred to in the literature as ecological regression or Goodman's regression.

Like the method of bounds, it is based on the identity in Equation 1. It identifies the estimate by making the strong assumption that voting behavior does not vary across individuals or precincts. That is, the fraction of support for a given candidate for both Whites and Latinos was the same across all precincts and individuals in the district. A bit more formally, suppose that $\lambda_i^L = \lambda^L$ and $\lambda_i^W = \lambda^W$ for every precinct $i$. Then we could estimate these fractions by choosing the best fitting line to the precinct-level data. This is just a standard linear regression.

However, there is no free lunch, ecological regression allows one to identify the estimate across all districts and in any data set by making the heroic assumption of no variability of voting behavior across precincts and individuals, which is usually referred to as the *constancy assumption*. In fact, Goodman himself was extremely cautious in recommending use of ecological regression to infer individual relationships given this required assumption. He stressed that only "under very special circumstances" should ecological be relied upon to produce reasonable estimates (Goodman 1953: 664).

A more technical critique of ecological regression and its constancy assumption was made by Freedman et al. (1991). They develop an alternative model that they called the "neighborhood model". The full argument is highly technical and it is beyond the scope of this report. In brief, they show in aggregate election results this model is equivalent to Goodman's ecological regression level but has dramatic differences at the individual (or group level). That is, the aggregate data can not identify individual behavior except under untestable assumptions and different such assumptions lead to dramatically different estimates of individual behavior. Finally, King (1997) showed ecological regression can produce widely inaccurate estimates of group voting behavior. Thus the consensus of the statistical literature is to reject analysis based on ecological regression (see, for example, Schuessler 1991 or Flanigan and Zingale 1985).

## 2.3. *Ecological Inference/EI*

King (1997) has developed an alternative approach called Ecological Inference or EI. While the technical details are complex, its advantage is that it uses all available information to generate more accurate estimates of voting behavior from aggregate data. EI is basically a way to combine the regression approach of Goodman (1959) with the bounds from Duncan and Davis (1953). Further, it allows the estimates to vary (systematically) across precincts. The idea is we calculate the constraint lines for every precinct. We then choose as our estimate for a given precinct a point on

4

its constraint line near the center of the intersection of all of the other lines. The actual point chosen is based on a standard statistical model. We can then use these precinct estimates to calculate quantities of interest such as the average support level across the district.

It is important to note that since King's method relies heavily on the bounds information, it works well only when these bounds are informative — i.e., narrower than the entire range from 0 to 1. This will happen when more precincts have large proportions of each of the groups whose voting behavior we want to estimate. In other words, we will need a substantial number of precincts that are relatively homogenous for each ethnic group we want to study. When this is not the case, EI can go wildly wrong as noted by King himself (1997, see chapter 9).

The EI estimates are not well identified when the bounds are not informative because EI is then just a slight generalization of ecological regression in this case. It, therefore, relies on the same constancy assumption for identification that has been rejected in the statistical literature when bound data is unavailable. This can be seen in practice by the marked similarity of the estimates of Dr. Kousser both from his ecological regression and EI analyses presented in his report.

## 2.4. *Kern County Analysis*

The discussion thus far has been rather general about identification in ecological inferences with limited bound information. The key in practice is to show that there are not many homogenous precincts in the Kern County data. Dr. Kousser, in fact, claims the opposite : "[t]he precinct-level data that we are presented with usually shows some, but not perfect ethnic segregation." (page 4, paragraph 13 ). However, this is demonstrably a false claim about the data that Dr. Kousser provided as part of his discovery materials as used for his analysis.

Table 1: Number of Homogenous (> 90%) Latino Precincts in Voter Data for Kern County Supervisor Elections used by Dr. Kousser

| Year | District | Number | Percent |
|------|----------|--------|---------|
| 2012 (Primary) | 5 | 1 | 0.94% |
| 2012 (Primary) | 1 | 2 | 1.48% |
| 2010 (Runoff) | 2 | 0 | 0.00% |
| 2010 (Primary) | 2 | 0 | 0.00% |
| 2004 (Primary) | 4 | 0 | 0.00% |

Table 1 simply tabulates the number of homogenous Latino precincts in the Kern County Supervisor Elections that Dr. Kousser analyzed in the data that he provided. I should note that I have used a very lax measure of homogeneity, requiring a precinct only to have greater than 90%

Latino voters in constructing this table.[2]  Even with this lax standard for homogeneity, we see that there are few, if any, precincts that have a relatively homogenous Latino voter populations. In fact, three of the elections have none and the remaining two had only one or two homogenous precincts. This is no where near enough bounds data to reasonably identify estimates of individual voting behavior and, therefore, no statistically valid conclusions may be drawn from Dr. Kousser's analysis of these data.



Figure 1: *EI Estimates of the fraction of Latinos who are Registered as Democrats in Kern County in the June elections from 2010 to 2016. The center dot represents the point estimate and the error bars provide the 95% confidence interval for the estimate. The true value from the registration rolls is denoted by the letter "L".*

Further, we can show that this lack of identification for ecological inference can lead to estimates that are wildly inaccurate in the Kern County election data. Of course, we can not do this with the elections that Dr. Kousser examined because we do not know how Latinos actually voted. However, we can look at registration data where by Spanish surname matching we know fairly accurately the number of Latinos, for example, who are registered as Democrats. We can then compare the estimates of from either EI or ecological regression to the true values. Now clearly choosing to register for a given party is not the same as voting in a non-partisan supervisor election. However, recall that the identification concerns come not from the vote choice (or party choice for registration data), but instead from the geographical distribution of voters of differing ethnic and racial groups across the county. The distribution of the registration data is very similar to the election data

---

[2]This is a lax notion of homogeneity because most of the elections Dr. Kousser analyzed involve more than two candidates and, therefore, vote totals that are well less than a half. The ten percent of non-Latinos in the precinct could dramatically alter the vote totals, so the bounds are still somewhat large.

because actual voters come from the pool of registered voters.

    The EI estimates of the fraction of Latinos who are registered in Kern County as Democrats in the June elections from 2010 to 2016 are displayed graphically in Figure 1. The center dot on the chart is the point estimate and the bars around it are the "95% confidence intervals." When a statistical estimator is well identified, the true value should be contained in this confidence interval almost always. As you can see, the EI estimates do not perform well at all. The true values for each election are are shown in the figure by the letter "L". As you can see the true fraction of Latinos registered as Democrats is around 55%, but all of the estimates are in the high 70s. That is, EI is significantly over-estimating the fraction of Latinos who are registered as Democrats. And perhaps a more disconcerting finding in this analysis is that the confidence intervals do not contain the true value in any of the four elections examined.



Figure 2: *Ecological Regression Estimates of the fraction of Latinos who are Registered as Democrats in Kern County in the June elections from 2010 to 2016. The center dot represents the point estimate and the error bars provide the 95% confidence interval for the estimate. The true value from the registration rolls is denoted by the letter "L".*

    A similar story can be seen in the same analysis done using ecological regression. These results can be found in Figure 2. The estimates from this analysis are also systematically too large and the true values are well outside the reported confidence intervals for all of the elections analyzed. As expected, however, the ecological regression and EI results are very similar because there is no bounds information for EI to help identify the estimates.

    The actual numerical estimates and their confidence intervals for both the EI and ecological regression analysis of the registration data may be found in Table 2.

Table 2: EI and Ecological Regression Estimates of the Fraction of Latinos who are Registered as Democrats in Kern County in June Elections, 2010 to 2016

| Year | True Value | EI Estimate | Ecological Regression Estimate |
|---|---|---|---|
| 2016 | 54.5% | 77.5% (75.8, 79.1) | 73.8% (71.4, 76.2) |
| 2014 | 52.5% | 74.8% (73.0, 76.6) | 71.1% (68.4, 73.7) |
| 2012 | 54.3% | 76.9% (74.9, 78.9) | 73.8% (71.0, 76.5) |
| 2010 | 56.2% | 78.1% (76.1, 80.2) | 74.4% (71.3, 77.4) |

## 3. OTHER PROBLEMS WITH DR. KOUSSER'S REPORT

The identification problem discussed above is the most serious issue with Dr. Kousser's analysis. However, there are several other serious problems with his analysis that raise concern about its scientific validity:

1. Related to the identification issues already discussed above, many of Dr. Kousser's ecological regression estimates are impossible values (i.e., negative or greater than 100%). For example, Dr. Kousser estimates that -16.7% of Latinos voted for James Welling in the 2010 election for the District 2 seat on the Kern County Board of Supervisors (p.19, Table V-2). There are numerous other examples in his tables. These out of bounds estimates are the types of warning signs that Goodman (1959) wrote about as implying that the underlying assumption of his estimator were not met.

2. Dr. Kousser did not provide adequate replication materials for his analysis as required by all the top peer-reviewed journals that publish quantitative analysis in statistics and the social sciences. For example, the *American Political Science Review*, the flagship political science journal, requires "Authors of accepted papers with quantitative, experimental, and simulation results will be required to submit data sets, software and code, and all information needed for reproducing their findings to ..."[3] All that was provided was one page of a partial code snippet for one sub-analysis. I do not know if any parameters or data manipulations were

---

[3]APSR Submission Guidelines (Updated August 26, 2016), available at `http://www.apsanet.org/ APSR-Submission-Guidelines-August-2016`

made prior to analysis for anything else. In short, there is no way to exactly replicate his findings are required for any scientifically valid data analysis.

3. I do note that what little code that was provided seems incorrect. In particular, the order that the data was passed to the estimation routines to do his EI analysis (contained in the R packages Zelig and eiPack) is specified in the wrong order.

4. Dr. Kousser presents no analysis to verify his results or to show that estimators converged. For example, there is no discussion of goodness of fit or other statistical measures of performance. Further, EI is estimated by Markov Chain Monte Carlo, a statistical estimation technique that uses simulation methods. This estimation requires the setting of tuning parameters that need to be adjusted to assure that the simulation results have converged and this convergence needs to be checked. Again with out his code and logs, I do not know what tuning parameters were used or what methods were employed to test for convergence of the simulations. This is particularly problematic since Dr. Kousser notes in his own report that he needed to use some workarounds to get the EI analysis to work (see page 14, paragraph 27), but provides no details about them.

5. Dr. Kousser examined several election contests that do not seem comparable in anyway to voting for a county supervisor. For example, he includes analyses of Democratic primary elections that are restricted to a subset of eligible voters unlike the supervisor races. These statewide elections are much higher profile again making them dissimilar.

## 4. DECLARATION AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief. Executed on 20 December 2016 in Pasadena, California.

Jonathan N. Katz

# 5. REFERENCES

Duncan, Dudley and Beverly Davis. 1953. "An Alternative to Ecological Correlation." *American Sociological Review* 64:610–625

Flanigan, William H. and Nancy H. Zingale. 1985. "Alchemist's Gold: Inferring Individual Relationships from Aggregate Data." *Social Science History* 9(1): 71–91.

Freedman, David, Stephen P. Klein, Jerome Sacks, Charles A. Smyth, Charles G. Everett. 1991. "Ecological Regression and Voting Rights. " *Evaluation Review* 15(6): 673–711.

Goodman, Leo 1959. "Some Alternatives to Ecological Correlation." *American Journal of Sociology* 64:610–625.

Goodman, Leo 19553. "Ecological Regressions and the Behavior of Individuals." *American Sociological Review* 19:663–664.

King, Gary. 1997. *A Solution to the Ecological Inference Problem.* Princeton, NJ: Princeton University Press.

Schuessler, Alexander A. 1999. "Ecological Inference." *PNAS* 96(19): 10578–10581.

A. CURRICULUM VITAE

# Jonathan N. Katz

D.H.S.S. (228-77)
California Institute of Technology
Pasadena, CA 91125
(626)395-4191
e-mail: jkatz@caltech.edu

## Education

Ph.D.     University of California, San Diego.  Political Science, June 1995.

M.A.      University of California, San Diego.  Political Science, June 1992.

S.B.      Massachusetts Institute of Technology.  Applied Mathematics
          June 1990.

## Academic Appointments

Kay Sugahara Professor of Social Sciences and Statistics, California Institute of
    Technology,
    January 2012 – Present.

Professor of Social Sciences and Statistics, California Institute of Technology,
    June 2009 – December 2011.

Professor of Political Science, California Institute of Technology,
    November 2003 – May, 2009.

Gastprofessur in der Rechts-, Wirtschafts- und Verwaltungswissenschaftlichen Sektion,
    Universität Konstanz,
    April 2003 – July 2003.

Associate Professor of Political Science, California Institute of Technology,
    April 1998 – August 1998 and July 2000 – October 2003.

Assistant Professor of Political Science, University of Chicago,
    September 1998 – June 2000.

Assistant Professor of Political Science, California Institute of Technology,
    July 1995 – March 1998.

Post-Doctoral Fellow in Positive Political Economy, Harvard University,
    July 1994 – June 1995.

Jonathan N. Katz                                                                    2

**Administrative Appointments**

Chair, Division of the Humanities and Social Sciences,
    California Institute of Technology
    August 2007 – June 2014.

Director, Ronald and Maxine Linde Institute of Economic and Management Sciences,
    California Institute of Technology
    January 2013 – March 2014.

Executive Officer for the Social Sciences, California Institute of Technology,
    January 2007 – July 2007.

Director of Graduate Studies, Division of the Humanities and Social Sciences, California
    Institute of Technology,
    July 2001 – December 2006.

**Honors and Awards**

Elected Fellow of the American Academy of Arts and Sciences, 2011.

Elected Inaugural Fellow of the Society for Political Methodology, 2008.

Center for the Advanced Study in the Behavioral Sciences Fellowship, 2005–2006.

John M. Olin Foundation Faculty Fellow, 1999–2000.

Pi Sigma Alpha award for Best Paper Presented at the 1998 Midwest Political Science
    Association Meetings.

CQ Press Award for Best Paper in Legislative Politics Presented at the 1996 Annual
    Meeting of the American Political Science Association.

National Science Foundation Graduate Research Fellow, 1991–1994.

Brooke/Cole Award for Best Graduate Student Paper Presented at the 1993 Midwest
    Political Science Association Meetings.

University of California Regents Fellow, 1990–1991.

Jonathan N. Katz                                                                                   3

## Publications

### Books

*Elbridge Gerry's Salamander: The Electoral Consequences of the Reapportionment Revolution.* (with G. Cox). New York: Cambridge University Press. 2002.

### Articles in Refereed Journals

Government Partisanship, Labor Organization and Macroeconomic Performance: A Corrigendum (with N. Beck, R.M. Alvarez, G. Garrett, and P. Lange). *American Political Science Review.* 87(4):945–949. 1993.

What To Do (and Not To Do) with Times-Series–Cross-Section Data in Comparative Politics (with N. Beck). *American Political Science Review.* 89(3):634–647. 1995.

Careerism, Committee Assignments and the Electoral Connection (with B. Sala). *American Political Science Review.* 90(1):21–33. 1996.

Why Did the Incumbency Advantage in U.S. House Elections Grow? (with G. Cox). *American Journal of Political Science.* 40(2):478–497. 1996.

Nuisance vs. Substance: Specifying and Estimating Time-Series–Cross-Section Models (with N. Beck). *Political Analysis.* 6:1–36. 1996.

Taking Time Seriously: Time-Series–Cross-Section Analysis with a Binary Dependent Variable (with N. Beck and R. Tucker). *American Journal of Political Science.* 42(4):1260–1288. 1998.

A Statistical Model for Multiparty Electoral Data (with G. King). *American Political Science Review.* 93(1):15–32. 1999.

The Reapportionment Revolution and Bias in U.S. Congressional Elections (with G.Cox). *American Journal of Political Science.* 43(3):812-840. 1999.

Post-stratification without population level information on the post-stratifying variable, with application to political polling (with C. Reilly and A. Gelman). *Journal of the American Statistical Association.* 96(453):1–11. 2001.

Throwing Out the Baby With the Bath Water: A Comment on Green, Yoon and Kim (with N. Beck). *International Organization.* 55(2):487–498. 2001.

A Fast, Easy, and Efficient Estimator for Multiparty Electoral Data (with J. Honaker and G. King). *Political Analysis.* 10(1):84–100. 2002.

The Mathematics and Statistics of Voting Power (with A. Gelman and F. Tuerlinckx). *Statistical Science*. 17(4): 420–435. 2002.

Standard Voting Power Indexes Don't Work: An Empirical Analysis (with A. Gelman and J. Bafumi). *British Journal of Political Science*. 34: 657–674. 2004.

Indecision Theory: Quality of Information and Voting Behavior (with P. Ghirardato). *Journal of Public Economic Theory*. 8(3): 379–399. 2006

Comment on 'What To Do (and Not To Do) with Times-Series–Cross-Section Data in Comparative Politics' (with N. Beck). *American Political Science Review*. 100(1):676–677.

Gerrymandering Roll-Calls in Congress, 1879-2000 (with G.W. Cox). *American Journal of Political Science*. 51(1):108-119. 2007.

Random Coefficient Models for Time-Series-Cross-Section Data: Monte Carlo Experiments (with N. Beck). *Political Analysis*. 15(2):182–195. 2007.

Comment on 'Estimating incumbency advantage and its variation, as an example of a before-after study'. *Journal of the American Statistical Association*. 103(482):446–448. 2008.

Correcting for Survey Misreports using Auxiliary Information with an Application to Estimating Turnout (with G. Katz). *American Journal of Political Science*. 54(3):815–835. 2010.

An Empirical Bayes Approach to Estimating Ordinal Treatment Effects (with R.M. Alvarez and D. Bailey). *Political Analysis*. 19(1):20–31. 2011.

Implementing Panel Corrected Standard Errors in R: The pcse Package (with D. Bailey). *Journal of Statistical Software*. 42(1):1–11. 2011.

Modeling Dynamics in Time-SeriesCross-Section Political Economy Data (with N. Beck). *Annual Review of Political Science*. 14:331–352. 2011.

Estimating Partisan Bias of the Electoral College Under Proposed Changes in Elector Apportionment (with A.C. Thomas, A. Gelman, and G. King). *Statistics, Politics and Policy*. 0:1–13. 2012.

Of Nickell Bias and Its Cures: Comment on Gaibulloev, Sandler and Su (with N. Beck and U. Mignozzetti ). *Political Analysis*. 22:274–278. 2014.

## Other Articles

Empirically Evaluating the Electoral College (with A. Gelman and G. King) in A. Crigler, et al (editors), *Rethinking the Vote: The Politics and Prospects of American Election Reform.* New York: Oxford University Press. 2004.

Detecting Electoral Fraud: The Case of 2002 General Election in Georgia (with R.M. Alvarez) in R.M. Alvarez, T.E. Hall, and S.D. Hyde (editors), *Election Fraud: Detecting and Deterring Electoral Manipulation.* Washington, DC: Brookings. 2008.

Fraud or Failure? What Incident Reports Reveal about Election Anomalies and Irregularities (with D.R. Kiewiet, T.E. Hall, R.M.Alvarez )in R.M. Alvarez, T.E. Hall, and S.D. Hyde (editors), *Election Fraud: Detecting and Deterring Electoral Manipulation.* Washington, DC: Brookings. 2008.

Machines Versus Humans: The Counting and Recounting of Pre-scored Punchcard Ballots (with R.M. Alvarez, E.K. Hartman, and S. Hill) in R.M. Alvarez, L. Atkeson, and T.E. Hall (editors), *Confirming Elections: Creating Confidence and Integrity through Election Auditing.*   Palgrave Macmillan. 2012.

Asymptotics in A. Bryman, et al (editors), *Encyclopedia of Social Science Research Methods.* Thousand Oaks, CA: Sage Publications. Forthcoming.

Whats Age Got to Do with It? Supreme Court Appointees and the Long Run Location of the Supreme Court Median Justice (with M. Spitzer), *Arizona State Law Journal.* Forthcoming.

## Work in Progress and Conference Papers

Scheduling Auctions and Proto-Parties in Legislatures (J. Copic)

The Constitution of Tyranny (with M. McCubbins)

Measuring Democracy and the Rule of Law via Statistical Learning (with M. McCubbins and J. Lehner)

Estimating the Effect of Corporate Governance (with M. McCubbins and J. McMullin)

Accounting for Heterogeneity in Economic Voting: A Hierarchical Mixture Regression Analysis (with G. Katz)

Synthetic Controls and the Nature of Observational Data in Political Science (with C. McCubbins)

Strategic Entry in U.S. House Elections (with G. Cox)

A New Approach to Measuring the Racial Impact of Redistricting? (with A. Gelman and G. King)

The Impact of Majority-Minority Districts in Congressional Elections (with D. Bailey).

Aggregation and Dynamics of Survey Responses: The Case of Presidential Approval (with R.M. Alvarez). Caltech Social Science Working Paper No. 1103.

How Much Does a Vote Count? Voting Power, Coalitions, and the Electoral College (with A. Gelman). Caltech Social Science Working Paper No. 1121.

Auctioning off the Agenda: Bargaining in Legislatures with Endogenous Scheduling Control (with J. Copic). Caltech Social Science Working Paper No. 1266.

The Effect of Voter Identification Laws on Turnout (with R.M. Alvarez and D. Bailey). Caltech Social Science Working Paper No. 1267R.

Scheduling Auctions and Proto-Parties in Legislatures (with J. Copic). Caltech Social Science Working Paper No. 1387 Under review.

## Grants

John Randolph Haynes and Dora Haynes Foundation Faculty Fellowship, 2005–2006.

National Science Foundation Grant (SES-0213549), Co-Principal investigator, Project title: " Modeling Issues with Time-Series–Cross-Section Data" , 2002-2004.

DAAD (German Academic Exchange Service) *Learn German in Germany* fellowship, Summer, 1998.

National Science Foundation Grant (SBR-9729899), Co-Principal investigator, Project title: " Strategic Redistricting and Its Political Consequences", 1998–1999.

IBM University Equipment Grants Program, . Co-principal investigator. Project title: "Individuals and Aggregates: New Computational Techniques for Testing Models of Politics", 1996–1997.

John Randolph Haynes and Dora Haynes Foundation Faculty Fellowship, 1996–1997.

## Editorial Board Service

Co-Editor, *Political Analysis*
    January 2010 – Present.

Guest Manuscript Editor, *Proceedings of the National Academy of Sciences*, January 2014.

Jonathan N. Katz                                                                                           7

Member, Editorial Board of *Political Research Quarterly*
    June, 2000 – Present.

Member, Editorial Board of *Electoral Studies*
    January, 2002 – Present.

Member, Editorial Board of *American Journal of Political Science*,
    January 2006 – January, 2010.

Member, Editorial Board of *Political Analysis*
    July, 2001 – December 2009.

**Other Professional Activities**

Scientific Advisor, Global Consequences Inc., October, 2014 – January, 2016.

Statistical Advisor, Dispute Resolution Data, LLC., August, 2015 – September 2016.

Member, Advisory Board of Daegu Gyeongbuk Institute of Science and Technology
    (Republic of Korea), August 2012 – August, 2014.

Member, University Advisory Council of the Pohang University of Science and
    Technology (Republic of Korea), October 2008 – October, 2012.

Founding Co-editor, Political Science Network (PSN), January 2007 – Present.

Member, Caltech/MIT Voting Technology Project, October, 2003 – Present.

Member, Expert Panel on Measles Mortality Estimates, World Health Organization, 2004.

December 2, 2016

*Luna, et al. v. County of Kern, et al.,* U.S. District Court – E.D. California (Bakersfield)
Case Number: 1:16-cv-00568-DAD-JL

## PROOF OF SERVICE

I, the undersigned, declare under penalty of perjury that:

I am a citizen of the United States employed in the County of Marin.  I am over the age of 18 and not a party to the within cause of action.  My business address is 2350 Kerner Blvd., Suite 250, San Rafael, CA 94901.  I am readily familiar with my employer's practices for collection and processing of correspondence for mailing with the United States Postal Service and for pickup by Federal Express.

On December 20, 2016, I served a true copy of the foregoing **DEFENDANTS' EXPERT WITNESS DISCLOSURES: DECLARATION OF JONATHAN N. KATZ, Ph.D. [FRCP 26(a)(2)]** on the following parties in said action, by serving:

| | |
|---|---|
| Thomas A. Saenz<br>Denise Hulett<br>Matthew J. Barragan<br>MEXICAN AMERICAN LEGAL DEFENSE<br>AND EDUCATIONAL FUND<br>634 S. Spring St., 11th Floor<br>Los Angeles, CA 90014<br>Telephone: (213) 629-2512<br>Facsimile:  (213) 629-3120<br>E-Mail: tsaenz@maldef.org<br>E-Mail: dhulett@maldef.org<br>E-Mail: mbarragan@maldef.org<br><br>*Counsel for Plaintiffs* | |

  X   BY U.S. MAIL: By following ordinary business practices and placing for collection and mailing at 2350 Kerner Blvd., Suite 250, San Rafael, CA 94901, a true copy of the above-referenced document(s), enclosed in a sealed envelope; in the ordinary course of business, the above documents would have been deposited for first-class delivery with the United States Postal Service the same day they were placed for deposit, with postage thereon fully prepaid.

_____ BY FACSIMILE: By transmitting by facsimile machine to the above party(ies) at the above facsimile number(s).

_____ BY ELECTRONIC SERVICE: By transmitting by email to the above party(ies) at the above email addresses.

1    ___    BY OVERNIGHT DELIVERY:
             FEDERAL EXPRESS: By following ordinary business practices and placing for
2           pickup by FEDERAL EXPRESS at 2350 Kerner Blvd., Suite 250, San Rafael, CA
             94901, copies of the above documents in an envelope or package designated by
3           FEDERAL EXPRESS with delivery fees paid or provided for.

4    ___    U.S. MAIL, EXPRESS MAIL: By placing the above documents in the United States
             Mail for Express Mail delivery at San Rafael, California, in a sealed envelope
5           addressed as above, with Express Mail postage thereon fully prepaid.

6    ___    BY PERSONAL SERVICE: By causing said envelope to be personally served on said
             party(ies) by _____ Courier Service.
7

8           Executed in San Rafael, California, on December 20, 2016.

9           I declare under penalty of perjury, that the foregoing is true and correct.

10

11                                               Keri L. Harmon

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---
PROOF OF SERVICE