# EXHIBIT 1
**Plaintiffs' Motion to Exclude the Testimony of Defendants'
Expert Witness, Dr. Jonathan N. Katz [FRCP 702]**

*Luna, et al. v. County of Kern, et al.*, **Case No. 1:16-cv-00568-DAD-JLT (E.D. Cal.)**

___

REPLY DECLARATION OF DENISE HULETT                         CASE NO. 1:16-CV-00568-DAD-JLT

Atkinson-Baker Court Reporters
www.depo.com

```
            IN THE UNITED STATES DISTRICT COURT

          FOR THE EASTERN DISTRICT OF CALIFORNIA

                          - - -


OSCAR LUNA, et al.,             )
                                )
        Plaintiffs,             )
                                )
        vs.                     ) No. 1:16-cv-00568-DAD-JLT
                                )
COUNTY OF KERN, et al.,         )
                                )
        Defendants.             )
                                )




           DEPOSITION OF JONATHAN NEIL KATZ, Ph.D.

                   LOS ANGELES, CALIFORNIA

                  FRIDAY, FEBRUARY 3, 2017




ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: Stephanie Jackson Georgeanne, CSR No. 8322

FILE NO.  AB00539
```

                                                              1

Atkinson-Baker Court Reporters
www.depo.com

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
 3          FOR THE EASTERN DISTRICT OF CALIFORNIA
 4                         - - -
 5
    OSCAR LUNA, et al.,            )
 6                                 )
             Plaintiffs,           )
 7                                 )
             vs.                   ) No. 1:16-cv-00568-DAD-JLT
 8                                 )
    COUNTY OF KERN, et al.,        )
 9                                 )
             Defendants.           )
10                                 )
11
12
13
14
15      Deposition of JONATHAN NEIL KATZ, Ph.D., taken on
16   behalf of the Plaintiffs, at 634 South Spring Street,
17   11th Floor, Los Angeles, California 90014, commencing
18   at 8:58 a.m., on Friday, February 3, 2017, before
19   Stephanie Jackson Georgeanne, CSR No. 8322.
20
21
22
23
24
25
```

```
 1   A P P E A R A N C E S:

 2

 3   FOR PLAINTIFFS:

 4   MEXICAN AMERICAN LEGAL
     DEFENSE AND EDUCATIONAL FUND
 5   BY:  DENISE HULETT
     634 South Spring Street
 6   11th Floor
     Los Angeles, California 90014
 7   (213) 629-2512
     dhulett@maldef.org
 8
     FOR DEFENDANTS:
 9
     NIELSEN MERKSAMER PARRINELLO GROSS & LEONI, LLP
10   BY:  MARGUERITE MARY LEONI
                  and
11        CHRIS SKINNELL
     2350 Kerner Boulevard
12   Suite 250
     San Rafael, California 94901
13   (415) 389-6800
     mleoni@nmgovlaw.com
14   cskinnell@nmgovlaw.com

15   ALSO PRESENT:

16   DOMONIQUE ALCARAZ

17

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X
 2  WITNESS:  JONATHAN NEIL KATZ, Ph.D.
 3  Examination                                    PAGE
 4       By Ms. Hulett                              5
 5       By Mr. Skinnell                          114
 6
 7  EXHIBITS
 8  NUMBER         DESCRIPTION                     PAGE
 9    1     Defendants' expert witness              6
           disclosures:  Declaration of
10         Dr. Katz; 23 pages
11    2     List of cases in which Dr. Katz has     6
           testified
12
      3     Subpoena to testify at a deposition     9
13         in a civil action; 7 pages
14    4     Rebuttal report of Dr. Kousser,        53
           dated 1/13/17; 107 pages
15
      5     Article entitled "A Statistical        70
16         Model For Multiparty Electoral
           Data"; 19 pages
17
      6     Article entitled "Report on Texas      95
18         Congressional Redistricting:
           Minority Opportunities and Partisan
19         Fairness"; 30 pages
20    7     Notice of ruling on defendant's       103
           motion for summary judgement
21         and motions in limine Nos. 1, 2,
           and 3 in Case No. BC512736;
22         10 pages
23    8     Court's oral decision in Case         110
           No. 05-2-000273; 11 pages
24
25
```

4

Jonathan Neil Katz, Ph.D.
February 3, 2017

```
 1  for every analyses he did in his report.  There are
 2  numerous parameters that need to be set to do each run,
 3  and I don't know what parameter values he chose.
 4      Q.  Did you use the data that was provided to do
 5  your own analysis of these elections?
 6      A.  No.
 7      Q.  You could have done that, right?
 8      A.  It would be possible.
 9      Q.  Okay.  So on Page 1 of your report, it says
10  that you were hired to provide an opinion on the
11  statistical analysis performed by Dr. Kousser.
12          Is that the sum total of what you were retained
13  to do?
14      A.  Yes.
15      Q.  And you applied statistical -- I'm sorry, you
16  quote, "applied standard statistical methods."
17          Can you name those methods for me?
18      A.  Sure.  We've already enumerated some of them.
19      Q.  Okay.
20      A.  Regression analysis, homogenous precinct
21  analysis, Markov chain Monte Carlo, implementation of
22  ecological inference.
23      Q.  You don't plan to offer any opinion about the
24  mapping issues in this case, do you?
25      A.  I do not.
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1       Q.   Or about remedial issues should we get there?
 2       A.   No, I will not.
 3       Q.   Or about any of the Senate factors?
 4       A.   That is correct.
 5       Q.   Or about whether or not voting is racially
 6  polarized in Kern County elections.
 7       A.   Only insofar as Dr. Kousser's analysis bears on
 8  that question.
 9       Q.   And your main quarrel with him is the
10  reliability of those estimates as opposed to the
11  execution of the analysis, correct?
12       A.   No.  My quarrel is to the execution of the
13  analysis.  We should -- can you rephrase that?  Because
14  I'm not exactly sure what you mean by the difference
15  between execution analysis and the actual analysis.
16       Q.   That's fair.
17            Your quarrel with Dr. Kousser is the
18  reliability of the estimates he arrived at in
19  Kern County as opposed to how he executed his
20  analysis?
21       A.   Again, I don't quite -- I don't know how to
22  distinguish those two things.  I don't see them as
23  separate.
24       Q.   All right.  I think maybe we can come back to
25  that, but I think our -- and maybe I'll be able to ask
```

17

1  at a 90 percent homogeneous level, would you still say
2  that you have no way of knowing whether each one of
3  these candidates got half the vote from each group?
4       A.   Again, give me the dataset, I can look at it
5  and I can tell you.  But I can't -- again, these are
6  nonlinear estimates of the data.  So I can't -- I can't
7  do the thought experiment in my head to tell you how
8  they would move.
9       Q.   Well, you do say, though, you need a
10 substantial number of homogeneous precincts.
11           In Kern County, what would be the
12 substantial -- in this election, what would be
13 substantial enough for you to conclude that -- that --
14 that bounds information has helped you guard against
15 aggregation bias in this particular estimate?
16      A.   Again, I don't have a bright line rule, but
17 almost no homogeneous precincts means I can't do that.
18      Q.   And what about 30 percent homogeneous
19 precincts, would you feel better about this?
20      A.   I would feel better about it.  I would then
21 want to do additional diagnostics, and I would do what I
22 did here, which is look -- in the case where I can
23 actually look at the true answers for related data.
24      Q.   What about if you had 50 percent homogeneous
25 precincts, would you still need to look at the true

```
 1   data?
 2           MR. SKINNELL:  I'm going to object ambiguous.
 3   When you say "homogeneous," are you referring to
 4   homogeneous Latino or homogeneous non-Latino?
 5           MS. HULETT:  You're right.
 6      Q.   If you had 50 percent homogeneous Latino and
 7   50 homogenous non-Latino, would you still need to look
 8   at the true value?
 9      A.   You'd probably be in pretty good shape if you
10   had half the datasets -- if half the precincts were
11   homogeneous one way and half for the other.
12      Q.   And what about if they were 30 percent each?
13      A.   Again, more so.  But there is no bright line,
14   but I can tell you that almost none is not enough.
15   Again, you'd have to look at the diagnostics.  One would
16   have to look at how the mixing is working in the
17   estimation; that is, is it converging easily.  There are
18   things one can look at to assess.  And, again, Dr. King
19   in his book gives examples of diagnostics and of tests
20   for convergence.
21      Q.   I want to look real quickly at another race,
22   Page 36 of Dr. Kousser's rebuttal report.
23           MR. SKINNELL:  I'm sorry, 36?
24           MS. HULETT:  Yes.
25      Q.   It's Table V-4 C, ecological inference analysis
```

1        You think that the votes cast and registration
2   has the same geographical distribution?
3        A.  No.  They're related because the pool of voters
4   comes from the pool of registrants.  It is the closest
5   we can get, and it's the closest we can get that has --
6   that we can verify a correct or almost correct answer.
7        Q.  Have you done any study of turn-out --
8   group-wide turn-out behavior in Kern County?
9        A.  I have not.
10       Q.  So you don't know how close that distribution
11  is between vote count and registration, correct?
12       A.  I have not done that analysis, no.
13       Q.  Okay.  Have you performed any other kind of
14  checks for aggregation bias on the Kern data other than
15  this one?
16       A.  No.
17       Q.  Okay.  You haven't performed any analysis of
18  whether a high Democratic registration of Anglos were
19  especially likely or unlikely to vote for
20  Spanish-surname candidates, have you?
21       A.  I personally did not.  I believe Dr. Kousser
22  did something similar to that demonstrating that there
23  was aggregation bias by that one cause.  There could be
24  other causes.
25       Q.  You did an article, which I have here -- I

69

Jonathan Neil Katz, Ph.D.
February 3, 2017

```
 1        Q.   Okay.
 2        A.   Although that's a very odd practice.  Normally
 3   when someone presents me with an article or set of --
 4             THE REPORTER:  I'm sorry?
 5             THE WITNESS:  Normally when someone submits an
 6   article to my journal or gives me an analysis, it's
 7   incumbent upon them to convince me their analysis was
 8   done properly.
 9   BY MS. HULETT:
10        Q.   Well, let's look at -- I want to ask you a
11   question right up that alley.
12             You did work -- worked on a case in Virginia.
13   The Bethune-Hill case is one of the cases that your
14   attorney gave me as a case you have worked on recently,
15   correct?
16        A.   Correct.
17        Q.   And tell me what you did in that case.
18        A.   Again, I haven't reviewed it.  We did some
19   voting -- looking for voting behavior of whites and
20   blacks in that case.  Most of my report was actually a
21   critique of Dr. Ansolabehere.  And I can never spell his
22   name.
23        Q.   A-n-s-o-l-a-b-e-h-e-r-e.
24             Who did you work for in that case?
25        A.   That's a complicated question.  Would you like
```

```
 1   the details?
 2        Q.   I just want to know who your client was in that
 3   case.
 4        A.   It is the weirdest case I have ever worked on.
 5   I was originally retained by the outside counsel for the
 6   attorney general of the State -- of the Commonwealth of
 7   Virginia, who was a Democrat.  Halfway through the
 8   trial, after close of discovery, the attorney general
 9   and his solicitor general was not happy with my report
10   because it actually was a proper defense of the plan.
11   The plan was passed by previous Republican
12   administration.  They wanted to fire me and exclude my
13   report.
14             The judge did not allow that to happen.  And
15   after being chastised, there was an agreement made by
16   which Republican intervenors paid my outstanding bill
17   and hired me to be their expert.  I told you it was a
18   complicated one.
19        Q.   So it is probably a good thing that you didn't
20   run an independent report in this case.
21        A.   I don't understand.
22        Q.   You said Dr. Ansolabehere was in that case also
23   testifying, correct?
24        A.   He was -- he was one of the lead expert
25   witnesses for the plaintiffs in the case.
```

Case 1:16-cv-00568-DAD-JLT   Document 116-2   Filed 10/09/17   Page 13 of 19
Atkinson-Baker Court Reporters
www.depo.com

```
 1          Q.   And you reran his estimates in that case,
 2   didn't you?
 3          A.   Yes.
 4          Q.   In a way that you didn't do in this case,
 5   correct?
 6          A.   That's correct.  Although -- I actually should
 7   modify that.  I have to go back and look at my report.
 8   We actually looked at a larger -- I didn't use his data.
 9   We looked at a larger universe of cases than
10   Dr. Ansolabehere had looked at.
11          Q.   All right.  But you did your own EI analysis?
12          A.   In that case, yes.
13          Q.   Did you also do an ecological regression
14   analysis or just the EI?
15          A.   I think -- I don't remember.  Sometimes we put
16   it in the appendix.  I think we did to show that we were
17   getting out-of-bounds results.
18          Q.   Do you recall what the percent of -- 90 percent
19   homogeneous black precincts was in that analysis?
20          A.   I do not without going back and looking at my
21   data.  So, no.
22          Q.   Did you have occasion to testify in that case
23   about the lack of homogenous precincts in the way that
24   you're testifying about it here?
25          A.   Not that I recall.  As I said, the brunt of my
```

```
 1   testimony that was taken was actually mostly on -- as in
 2   this case, was a critique of what Dr. Ansolabehere had
 3   done.  And the main portion of that was related to his
 4   analysis, if I recall correctly, of how you built out of
 5   precincts.  There was a question about how the
 6   legislature drew certain districts and whether they
 7   could have drawn them differently.  He presented some
 8   novel analysis which ultimately the court did not
 9   accept.
10        Q.   I'm debating whether to ask you about Texas.  I
11   think I'll ask you a few questions about Texas because I
12   think we can be done before lunch, hopefully.
13             When I say "Texas," I'm going to take you way,
14   way back to 2001.
15        A.   When I was a wee lad.
16        Q.   Yes.
17             In that case, you worked for Texas, right?
18        A.   No.  In that case, I worked for Democratic
19   intervenors.  I believe the ultimate client was the
20   house -- the Democratic caucus -- the members of the
21   congressional -- Democratic congressional delegation
22   from Texas.
23        Q.   Okay.  And I have your report from that case.
24        A.   I believe I had two reports in that case.
25        Q.   Oh, it is on top.  I only have one.
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.  Again, they were separate analyses and separate
 2   questions.
 3        Q.  Okay.
 4        A.  Are we done with this report or not?
 5        Q.  Yes.
 6            I'm going to ask you a couple questions about
 7   the Santa Clarita Communities College District.
 8            Who did you work for there?
 9        A.  I worked for the defendant, same counsel.
10        Q.  And what were your conclusions there?
11        A.  Again, without -- I haven't looked at that
12   report.  I don't recall.
13        Q.  Okay.  Do you recall whether you used
14   ecological regression or ecological inference?
15        A.  Again, results are almost always based on -- my
16   findings almost based on --
17            THE REPORTER:  Can you please slow down?
18            THE WITNESS:  I'm so sorry.  My findings were
19   all based on ecological inference.  If I did ecological
20   regression at all, it would be as a challenge to
21   something that the opposing expert did.
22   BY MS. HULETT:
23        Q.  And is your work in this case included on this
24   jump drive you gave me?
25        A.  The report is.
```

```
 1        Q.  What?
 2        A.  My report is.
 3        Q.  Okay.  Do you recall whether you mentioned the
 4   effect of lack of homogeneous precincts on the analysis
 5   in that report or not?
 6        A.  I don't recall.
 7        Q.  Okay.  Well, probably when I review those
 8   things, it will become clear to me.  I can't look at
 9   them until after we're done here.
10             So I did have a notice of ruling that was
11   filed, and I want to mark this as exhibit.  It was filed
12   on July 7, 2014.  The notice of ruling in that case, it
13   is notice of ruling on defendant's motion of summary
14   judgement and motions in limine Nos. 1, 2, and 3.
15             (The aforementioned document was marked
16          by the court reporter as Exhibit+ 7 for
17          identification; attached hereto.)
18   BY MS. HULETT:
19        Q.  And on Page 2, it says "The court, having taken
20   defendant's summary judgement motion under submission on
21   May 1, 2014, adopted its tentative ruling, attached as
22   Exhibit A, as the court's final ruling on June 13, 2014,
23   finding defendant's oral arguments in response to that
24   tentative ruling unpersuasive.  And indeed attached is
25   A.  And A is the tentative ruling that the court refers
```

103

```
 1                REPORTER'S CERTIFICATE
 2
 3         I, STEPHANIE JACKSON GEORGEANNE, CSR No. 8322,
 4    Certified Shorthand Reporter, certify:
 5         That the foregoing proceedings were taken
 6    before me at the time and place therein set forth, at
 7    which time the witness was put under oath by me;
 8         That the testimony of the witness and all
 9    objections made at the time of the examination were
10    recorded stenographically by me and were thereafter
11    transcribed;
12         That the foregoing is a true and correct
13    transcript of my shorthand notes so taken.
14         Signature requested.
15         I further certify that I am not a relative or
16    employee of any attorney or any of the parties nor
17    financially interested in the action.
18         Dated this February 14, 2017.
19
20
21
22         _____
23              Certified Shorthand Reporter
24
25
```

121

ERRATA SHEET

| PAGE | LINE | CORRECTION |
|---|---|---|
| INDEX | 10 | Exhibit 1 is only 22 pages – the 23rd page is really the first page of Exhibit 6 |
| INDEX | 4 | Exhibit 4 is 106 pages, not 107 |
| INDEX | 23 | Exhibit 8 is 10 pages, no 11 |
| 7 | 12 | "the – I'm referred to cases…" |
| 12 | 10 | "the literature it's as a …" |
| 33 | 13 | "number to being begin" |
| 37 | 5 | "versus" |
| 39 | 5 | "transit true answer" |
| 78 | 12 | "which is a programming language" |
| 79 | 1 | "the default values" |
| 79 | 17 | "in notes to" |
| 92 | 9 | "solicitor general was were not" |
| 102 | 7 | "Santa Clarita Communities Community College District" |
| 103 | 14 | "judgement" |
| 103 | 20 | "judgement" |
| 103 | 25 | Should be bold – still part of the question |
| 104 | 1 | Same – should be bold |
| 105 | 4 | "True Treu" |
| 113 | 10 | "away a way" |

SIGNATURE: _____   DATE: 3/13/17

Case 1:16-cv-00568-DAD-JLT   Document 116-2   Filed 10/09/17   Page 19 of 19
Atkinson-Baker Court Reporters
www.depo.com

```
 1   STATE OF                          )
                                       )  SS.
 2   COUNTY OF                         )
 3
 4
 5        I, the undersigned, declare under penalty of
 6   perjury that I have read the foregoing transcript, and I
 7   have made any corrections, additions, or deletions that
 8   I was desirous of making; that the foregoing is a true
 9   and correct transcript of my testimony contained
10   therein.
11        Executed this __13__ day of __March____, 2017
12   at _____Pasadena_____, _California_____
13            (City)               (State)
14
15
16
17
18
19        _____
              JONATHAN NEIL KATZ, Ph.D.
20
21
22
23
24
25
```

120