1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>EXHIBIT 2</u>

**Plaintiffs' Motion to Exclude the Testimony of Defendants'
Expert Witness, Dr. Jonathan N. Katz [FRCP 702]**

***Luna, et al. v. County of Kern, et al.*, Case No. 1:16-cv-00568-DAD-JLT (E.D. Cal.)**

EXPERT REPORT FOR *BETHUNE-HILL V. VIRGINIA STATE BOARD OF ELECTIONS*

Jonathan N. Katz

April 10, 2015

I asked by legal counsel in this case to examine the reapportionment plan for the Virginia House of Delegates under the map enacted by the Virginia General Assembly in 2011 in HB 5005 as well under the map in place from 2001 until 2011, the Benchmark Map. In particular, I was asked to examine the geographical compactness and the racial composition of the legislative districts as well as voting patterns. I was to pay specific attention to the twelve challenged House districts (HDs 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95), which I will refer to as the "Challenged Districts". In particular, I was asked to assess whether African-Americans in these districts have the ability to elect the preferred candidate of their choice and whether it appears that the General Assembly packed African-Americans into these districts to dilute the voting strength of minorities in other districts. In addition to providing my own analyses and opinions, I was asked to provide my opinions on the analysis and conclusions of Dr. Stephen Ansolabehere as detailed in his expert report dated March 11, 2015. In making my findings, I have applied standard statistical methods, which I regularly employ in my research and which have been published in peer-reviewed journals

A summary of my report and basic findings is as follows:

- Dr. Ansolabehere's choice of the particular compactness measure used in his analysis is arbitrary and not justified. Using an alternative and more justified measure of compactness, I show that the HB 5005 map is as compact as the Benchmark map.

- Dr. Ansolabehere's ecological regression analysis of racially polarized voting is flawed using a discredited statistical method and does not examine the most relevant elections, those for the House of Delegates.

- I show that elections for the Virginia House of Delegates in the Contested Districts show substantial racially polarized voting using the currently accepted statistical methodology.

- In the Contested Districts, my analysis shows that a Black voting population of 55% predicts only an 80% chance of a Black candidate winning that district.

- I show that Dr. Ansolabehere's results on the inclusion of particular VTDs in the Contested districts is overwhelmingly predicted by its racial composition is incorrect as he did not account for geographical distance in his analysis.

In the next section of the report I review my qualifications. In section 2, I discuss and analyze the compactness of the legislative maps. Section 3 examines Dr. Ansolabehere's ecological regression analyses. The final section presents my own analysis of racial polarization and the racial packing of the Contested Districts.

1

# 1. QUALIFICATIONS

I am currently the Kay Sugahara Professor of Social Sciences and Statistics at the California Institute of Technology. I was also formerly on the faculty at the University of Chicago and a visiting Dr. at the University of Konstanz (Germany). A complete copy of my curriculum vitae is in the Appendix.

I received my Bachelor of Science degree from the Massachusetts Institute of Technology and my Masters of Arts and Doctor of Philosophy degrees, both in political science, from the University of California, San Diego. I have also done post-doctoral work at Harvard University and the Harvard-MIT Data Center. I am an elected fellow of both the American Academy of Arts and Sciences and the Society for Political Methodology. I am a former fellow of the Center for Advanced Study in the Behavioral Sciences.

I have written numerous articles published in the leading journals as set forth in my curriculum vitae. I am currently the co-editor of *Political Analysis*, the journal of the Society for Political Methodology[1], and I am a co-founding editor of the Political Science network (a collection of on-line journals). I sit on the editorial board of two leading journals, *Electoral Studies* and *Political Research Quarterly*, and I previously also served on the editorial board of the *American Journal of Political Science.* I have also served as a referee of manuscripts for most of the major journals in my fields of research and for the National Science Foundation.

I have done extensive research on American elections and on statistical methods for analyzing political science data. I am a member of the Caltech/MIT Voting Technology Project, serving as the co-director of the project from October 1, 2005 to September 30, 2010.

Over the past decade, I have testified or consulted in numerous elections cases for both Democratic and Republican clients involving the Federal Voting Rights Act, the evaluation of voting systems, or the statistical evaluation of electoral data. I have testified or consulted in court cases in both state and Federal courts in the states of Arizona, California, Florida, Georgia, Indiana, Illinois, Maryland, Michigan, Missouri, New Mexico, Nevada, Oklahoma, Texas, and Washington.

# 2. COMPACTNESS

Compactness is a concept related to whether or not a district is closely or neatly packed together. Shapes such as circles and hexagons are relatively compact, and so districts that look like them are considered to be more compact then winding districts with boarders that have many twists and turns. In an effort to quantify compactness, scholars have employed more than 20 distinct measures to evaluate legislative districts throughout the United States.[2] Unfortunately, these measures can

---

[1] Political methodology is the development of statistical and research tools in political science.

[2] See Niemi et al. (1990)

often lead to different conclusions about a given plans compactness.[3].

In Dr. Ansolabehere's report, he chose to use the *Reock* measure from this large array of compactness measures for his analysis, but he used no theoretical or empirical justification for its application in Virginia. There is no indication whether this measure is appropriate for the data at hand or instead whether it was cherry picked to support the plantiff's case.

Reock measure is based on the idea that a circle is the most compact geometric shape, and it therefore computes the ratio of the area of each district to the area of the minimum bounding circle enclosing that district. Unfortunately, Reock and similar measures based on circle geometry have several serious limitations. I discuss these flaws below.

Since the academic literature does not identify a definitive standard by which to evaluate compactness, the determination of whether or not the Challenged Districts and the remaining districts throughout the state should not be based on one *ad hoc* choice and certainly not on one measure alone. Further, if one measure were chosen it would likely not be Reock.

Thus, I provide here an alternative measure of compactness that is based on an academic standard used and cited in the academic literature almost *three times* as often as Earnest Reock's original paper, and that avoids key challenges befalling Reock and similar measures based on circle geometry. I first discuss the flaws of the Reock measure and then discuss the results from the better measure that I introduce.

## 2.1. *Inappropriateness of the Reock Measure for Virginia Districts*

The first important limitation of the Reock measure is that it consistently penalizes districts that are long and narrow, or that have long and narrow sections — even if these districts have fixed state borders or other reasons for these shapes. This occurs because a long district will necessarily produce a minimum bounding circle with a large diameter. Since the area of the resulting minimum bounding circle is a function of its diameter, a long district will typically produce a minimum bounding circle with an area much larger than its own. In fact, Virginia as a whole displays this elongated shape.

An example of this narrowness penalty can be seen in Figure 1 which displays the maps of Districts 4 and 66. While District 4 does not appear visually to be substantially more compact than District 66 — note especially the many turns and arms off the shape on the right —the latter has a much lower Reock score as a result of its narrower shape.[4] This happens because the Reocks measure ignores *everything* about the shape of the district except for the diamater of the bounding circle.

The Reock measure applies its penalty to long, narrow districts even when their shape is con-

---

[3]Altman (1998, chapter 5), Niemi et al. (1990), and Young (1988)
[4]Approximately 0.25 for District 66 and 0.41 for District 4



Figure 1: Maps of Districts 66 (Left) and 4 (Right) in HB 5005

strained by state lines, coastlines, or other features that cannot be altered in the process of drawing districts. District 1 illustrates this point as can be seen Figure 2. This district has a low Reock score[5] The area shaded in dark blue represents the area within District 1. The area shaded in light blue represents the only area in the minimum bounding circle that actually falls within the state of Virginia. All of the remaining area falls within Kentucky and Tennessee. While it is feasible to draw a district which contains all of the light blue area within this bounding circle, it is not feasible to draw a district that includes area in neighboring states.

In other words, Dr. Ansolabehere uses a measure that judges the compactness of District 1 badly because of the unalterable shape of Virginia. Clearly the shape of the entire state of Virginia cannot be changed as a result of this redistricting, and people living in neighboring states have nothing to do with the compactness of districts within Virginia.

As a result, the Reock score for District 1, as well as other districts similarly bordered by features that cannot be included in their area, will always be low. These low Reock scores, however, would not be indicative of any attempt to strategically include or exclude certain areas of the state.

Further, the Reock measure can likewise reward a district that is "arbitrarily misshapen", so long as it "meanders around within a confined area."[6] Districts 2 and 17 both serve to illustrate this point as can be seen in Figure 3. While District 17 appears *less* compact than District 2, District 17 scores *higher* on the Reock scale. This is because the maximum distance between any two points on the perimeter of District 17 is smaller than the maximum distance between any two points on the perimeter of District 2, producing a slightly smaller bounding circle[7]. The Reock

---

[5]Approximately 0.22 on the Reock scale.
[6]Young (1988)
[7]The diameter of the minimum bounding circle enclosing District 2 is approximately 38,999 miles, while the



Figure 2: Map of District 1 in HB 5005

minimum bounding circle, in this case, does not capture the fact that the shape of District 17 is at least as unusual as District 2.

Finally, it is crucial to note that minimum bounding circles are purely an abstraction that do not and logically cannot correspond to real districts within any state. Indeed, a statewide legislative district map comprised of perfectly compact, circular districts with high Reock scores would necessarily violate the principle of contiguous, non-overlapping districts. After all, a set of circles cannot tile a plane. That is, if you try to tile the state (or your kitchen floor) with circular shapes, you will left with large gaps between the circles.

In fact, the only way the Reock measure could be relevant to Virginia is if voters were legally permitted to cast ballots in multiple House of Delegates districts in the same election. This is because the only way to have perfectly compact districts by the Reock measure would be for them to be circles. The only way to avoid gaps, which would disenfranchise the voters living in these

_____
diameter of the bounding circle for District 17 is approximately 31,181 miles



Figure 3: Map of Districts 2 (Left) and 17 (Right) in HB 5005

unincorporated areas, would be for the circular districts to overlap.

The image on the bottom of Figure 4 represents the state of Virginia with the HB 5005 district boundaries outlined in grey. The image on the top represents the ideally compact minimum bounding circles around each district. While these may be useful for some theoretical purposes, in practice they produce illegal districts that both overlap and escape state boundaries. Thus satisfying the Roeck measure is impossible: No set of circular districts can produce a contiguous, non-overlapping district map without leaving territory that fell outside of the districts or used territory from outside of the state.

Thus, a better strategy is to use a measure that respects the geometry of each district, rather than comparing each district to a theoretically ideal shape. Below, I detail and implement an approach that relies exclusively on the actual shape of each state legislative district under both the Benchmark and HB 5005 maps.

### 2.2. *Alternative Measures of Compactness*

I now introduce a more appropriate measure of compactness, one that fits better with the geographic nature of the state of Virginia.

Instead of measuring the compactness of a district by encasing it in some idealized shape, a circle in the case of Reock measure discussed above, an alternative approach is based on examining the distribution of voters within the district. These are referred to as "moment-of-inertia" measures in literature.[8] Moment-of-inertia measures describe the spread of each voter in a district from its own

---

[8]see Niemi et al. (1990)

6



Figure 4: Minimum Bounding Circles for all of Virginia under HB 5005

"center of gravity". Intuitively, the "center of gravity" is the point in the district that minimizes the total distance from every home in district to this point. In particular, the alternative measure that I use to evaluate the Virginia House of Delegate maps is the Boyce-Clark measure.[9]

The Boyce-Clark measure of compactness is based on the mean distance from each district's center of gravity to the points on its perimeter. This measure is well-documented and widely used in the academic literature, with 178 citations (relative to 60 for Earnest C. Reock's original article documenting his minimum bounding circle measure). I calculate an improved Boyce-Clark measure using the following steps:

1. Determine the center of gravity for each district under the Benchmark Map and HB 5005

2. For each district, measure the distance from its center of gravity to each of the vertices on the perimeter of the district (see Figure 5). This represents a slight improvement to the original

---

[9]Boyce and Clark (1964)



Figure 5: Average Distance from Center of Gravity to District Vertices in District 11 of the Benchmark Map

Boyce-Clark approach, which recommends measuring the distances from the center of each district to points on its perimeter along a set of equally spaced radial lines. Using lines to the vertices rather than equally spaced lines to the perimeter makes the measure invariant to rotation. [10] By always drawing a line from the center of the district to each vertex, I ensure that I always capture the outermost vertices of each district.

3. Calculate the average distance from each vertex in the district to its center.

4. Calculate the absolute value of the percent difference between each center-vertex distance in the district and the average of all center-vertex distances in the district

5. For each district the modified Boyce-Clark measure represents the average of the differences between each center-vertex distance and the average for the district. This can be thought of as the average percent deviation from the mean among the distances from the center of each

---

[10]Consider a district shaped like a five pointed star, but with unequally spaced points. Under one set of equally spaced radial lines, I would capture some short distances from the center to the inner walls of the star and some long distances from the center to the outer points. But rotating the radial lines slightly might lead me to capture more of the longer distances from the center to the points, and fewer of the shorter distances. This would increase my estimate of the average distance from the center to the outermost points, and it might increase my estimate of the variation from that average.

district to its perimeter. Since this measure is scaled as a percentage, it is bounded between 0 and 1. The most compact district, under this measure, would have a score of 0.

A summary of my findings based on the modified Boyce-Clark measure are as follows:

1. In the Benchmark Map, the Challenged Districts had an average Boyce-Clark score of 0.46 whereas in HB 5005 they show an average Boyce-Clark score of 0.44. Since a smaller value on the Boyce-Clark scale indicates greater compactness, this represents an improvement of approximately 0.02 points on the Boyce-Clark scale, or 4%.

2. In the Benchmark Map, the remaining 88 districts in the state had an average Boyce-Clark score of 0.46 whereas in HB 5005, the remaining 88 districts show an average Boyce-Clark score of 0.47. This represents a small decrease in compactness of approximately 0.01 on the Boyce-Clark scale, or 2%.

3. In the Benchmark Map, there is no appreciable difference in compactness between Challenged Districts and statewide districts. In HB 5005, compactness in the Challenged Districts is 0.03 points *higher* on the Boyce-Clark than it is statewide — i.e., are more compact.

4. 9 of 12 Challenged Districts saw increased in compactness in HB 5005, as did 39 of the remaining 88 districts in the state.

The complete set of findings from my compactness analysis can be found in the Appendix. A summary measure of the compactness across both the Benchmark and HB 5005 can be found in Table 2 and the results the Challenged Districts can be found in Table 3

## 3. DR. ANSOLABEHERE'S "ECOLOGICAL REGRESSION" ANALYSES

In order to estimate the voting behavior of African-Americans, Whites, and members of other races that vote for particular candidates, Dr. Ansolabehere uses a statistical technique called "ecological regression analysis". Ecological regression was invented more than a half century ago (Goodman, 1953). Since then, considerably better statistical procedures for ascertaining the voting preferences of minority groups have been invented and are now in widespread use throughout the academic literature and and in litigation in numerous voting rights cases. One well-documented indication of ecological regression's many failures is that it produces estimates for the share of each racial group who voted for a specific candidate that are logically impossible. In fact, this technique routinely estimates, for instance, that more than 100% of the white population within a particular district will have voted for a certain candidate. The sections that follow discuss the reasons for those results.

9

I replicate Dr. Ansolabehere's results in the analysis that follows, finding that many of the estimated vote shares he estimated are indeed outside of the 0%-100% interval and therefore logically impossible. In nearly every Challenged District, his method produces an estimate outside of possible bounds for each racial group's vote share limit. This defect in his approach is not discussed in the report, which instead hides the problem by rounding results outside of possible bounds to 0 or 1 and neglects to discuss the error.

If estimates that are logically impossible are so common in his results, the ones that are logically possible, but produced by the same procedure, certainly should not be trusted. In fact, all I know about these other estimates is that they are theoretically possible (something I knew without the analysis or without any data). In other words, a method that routinely produces some estimates that anyone would know are wrong does not inspire confidence that any other estimates are correct either. Several studies with access to data with the true proportions being estimated have shown that many of those numbers tend to be wrong as well.

### 3.1. *Determining Vote Share By Race*

A common starting point in the process of estimating the share of each racial group voting for a specific candidate is to consider only homogeneous districts. That is, I could examine the election results from districts that are closest to racially homogeneous in character. For example, if a districts were completely racially homogeneous, say with a population that was 100% African-American, then I know what fraction of African-Americans voted for a given candidate in the district: it is just the share the given candidate got in the district. While this might be a useful starting point, as a statistical procedure, it is problematic since it throws out most of the data unless most of the districts are homogeneous.

However, I can use the intuition from the homogeneous districts to place bounds on the level of support each group gives a candidate. Consider the following equation, which is true by definition, that relates the vote share of given candidate to the voting behavior of African-Americans and Whites:

$$V_i = \lambda_i^B X_i + \lambda^W (1 - X_i), \tag{1}$$

where $V_i$ is the share of the vote a given candidate received in district $i$, $X_i$ is the fraction of African-Americans in the district and therefore $(1 - X_i)$ is the fraction of White (or more correctly non-African-American) voters, assuming for the moment that there are only two groups in the electorate. $\lambda_i^B$ is the fraction of African-Americans voting for the given candidate and similarly $\lambda_i^W$ is the fraction of Whites voting for the given candidate. In other words, the equation states the fact that the total vote share for a candidate must equal the proportion of African-American voters who support them multiplied by the proportion of the electorate that is African-American plus the proportion of the White voters who support the candidate multiplied by the proportion of

the electorate which is White. In the case of only two groups e.g., African-Americans and Whites and only two candidates, then racially polarized voting occurs when $\lambda_i^B \neq \lambda_i^W$. The larger the difference between support levels, the greater the level of polarization. Duncan and Davis (1953) fully developed the method of bounds outlined above to analyze ecological data.

### 3.2. *Ecological (or "Goodman's") Regression*

One approach to estimating $\lambda_i^B$ and $\lambda_i^W$, the shares of African-American and White voters voting for a specific candidate, is referred to in the literature as ecological regression or Goodman's regression. This is the procedure that Dr. Ansolabehere uses in his report. Like the method of bounds, it is based on the identity in Equation 1. Suppose that the fraction of support for a given candidate for both Whites and African-Americans was the same across all precincts in the district. A bit more formally, suppose that $\lambda_i^B = \lambda^B$ and $\lambda_i^W = \lambda^W$ for every precinct $i$. Then I could estimate these fractions by choosing the best fitting line to the precinct-level data. This is just a standard linear regression, the most commonly used statistical procedure in the social sciences. From these estimates I could then compare the voting behavior between groups.

As I noted above, ecological regression can produce widely inaccurate estimates of group voting behavior.[11] First, the assumption that the fraction of group support is constant across every precinct is highly implausible. Second, ecological regression does not use the bounds information either at the district level (discussed above) nor even the overall bounds that the average fraction of a group's support for a given candidate must be between zero and one. For example, as I will see some of the elections examined here, ecological regression analysis produced negative estimates for the fraction of a group supporting a particular candidate, and estimates of more than 100% of a group supporting a particular candidate in some cases.

### 3.3. *Replication of Ecological Regression Results*

Dr. Ansolabehere's report presents ecological regression estimates of each Democratic candidates two-party vote share among African-Americans, Whites and members of other races in his Table 13. In this section, I replicate his procedure and report these results. I do not aggregate my elections by level of jurisdiction. My replication results show a series of logically impossible vote share estimate. Rather than rounding these to their logical minimum or maximum value, as Dr. Ansolabehere did, I display these results and highlight the ones that cannot possibly represent real vote shares. Taking the 2014 U.S. House election results under the Benchmark Map as an example, my estimates show that 114%, 103%, 107%, 102%, 109%, 108%, 104%, and 102% of the African American vote went

---

[11]See King (1997).



Figure 6: Ecological Regression Results, District 77

to the Democratic candidate in Districts 63, 69, 70, 71, 74, 80, 90, and 95, respectively.

I similarly show several cases in which the share of votes from members of other races won by the Democratic candidate is negative in multiple elections under the Benchmark Map and HB 5005. For example, In the 2009 gubernatorial race in District 95, an ecological regression approach produces estimates indicating that the Democratic candidate won -106% of the vote among members of other races. The Democratic candidate likewise won -30% of their vote in the 2010 U.S. House election and -2% of their vote in the 2012 U.S. Senate race. (see Figure 6). Note that the Democratic candidate's share of the African-American vote in this district is over 100% in all but three elections under the Benchmark map, as well as in three elections under HB 5005.

Figure 7 provides a detailed depiction of ecological regression results for every Challenged District in both the Benchmark and HB 5005. A summary of the finding for these districts are:

**District 63**   Dr. Ansolabehere's report indicates that 100% of the African-American vote went to the Democratic candidate for governor in 2013 under HB5005. My results indicate that the true estimate from his methodology, rounded to 100% in his report, is 106%. Clearly, this is impossible. Similarly, Dr. Ansolabehere's report indicates that the average share of the African-American vote going to the Democratic candidate in federal elections under the benchmark map is 100%. In fact, my results show that the ecological regression procedure yields estimates of *over* 100% of the African-American vote share going to the Democratic candidate in *every* federal election I analysed

12



Ecological Regression for HD 63
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(a) District 63

Ecological Regression for HD 69
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(b) District 69

Ecological Regression for HD 70
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(c) District 70

Ecological Regression for HD 71
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(d) District 71

Ecological Regression for HD 74
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(e) District 74

Ecological Regression for HD 75
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(f) District 75

Ecological Regression for HD 77
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(g) District 77

Ecological Regression for HD 80
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(h) District 80

Ecological Regression for HD 89
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(i) District 89

Ecological Regression for HD 90
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(j) District 90

Ecological Regression for HD 92
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(k) District 92

Ecological Regression for HD 95
Benchmark
HB5005
IMPOSSIBLE REGION
Race
Blacks
Whites
Other Races

(l) District 95

since 2008. This is also impossible.

**District 69**   Dr. Ansolabehere's report indicates that 100% of the African-American vote went to the Democratic candidate for governor in 2013 under the benchmark map. My results indicate that the true estimate, rounded to 100% in his report, is 101%. This is impossible. Similarly, Dr. Ansolabehere's report indicates that the average share of the African-American vote going to the Democratic candidate in federal elections under the benchmark map is 100%. In fact, my results show that the ecological regression procedure yields estimates of *over* 100% of the African-American vote share going to the Democratic candidate in my of the federal elections I analyzed since 2008. This is also impossible.

**District 74**   Dr. Ansolabehere's report indicates that 100% of the African-American vote went to the Democratic candidate for governor in 2013 under both the Benchmark Map and HB5005. My results indicate that the true estimates, rounded to 100% in his report, are 105% for each map. This is impossible. Similarly, Dr. Ansolabehere's report indicates that the average share of the African-American vote going to the Democratic candidate in federal elections under both the Benchmark Map and HB5005 is 100%. In fact, my results show that the ecological regression procedure yields estimates of *over* 100% of the African-American vote share going to the Democratic candidate in *every* federal election I analyzed since 2008 under the Benchmark Map. This is also impossible.

**District 77**   Dr. Ansolabehere's report indicates that 100% of the African-American vote went to the Democratic candidate for governor in 2013 under both the Benchmark Map and HB5005. My results indicate that the true estimates, rounded to 100% in his report, are 104% and 101% for the Benchmark Map and HB5005, respectively. This is impossible.

**District 89**   Dr. Ansolabehere's report inidicates that 100% of the African-American vote went to the Democratic candidate for governor in 2013 under both the Benchmark Map and HB5005. My results indicate that the true estimates, rounded to 100% in his report, are 103% and 100% for the Benchmark Map and HB5005, respectively. The first result is impossible. Similarly, Dr. Ansolabehere's report indicates that the average share of the African-American vote going to the Democratic candidate in federal elections under both the Benchmark Map and HB5005 is 100%. In fact, my results show that the ecological regression procedure yields estimates of *over* 100% of the African-American vote share going to the Democratic candidate in all but one federal election I analyzed since 2008 under the Benchmark Map. This is also impossible.

**District 90**   Dr. Ansolabehere's report indicates that 100% of the African-American vote went to the Democratic candidate for governor in 2013 under the Benchmark Map. My results indicate that the true estimate, rounded to 100% in his report, is 103%. This is impossible. Similarly, Dr.

14

Ansolabehere's report indicates that the average share of the African-American vote going to the Democratic candidate in federal elections under the Benchmark Map is 100%. In fact, my results show that the ecological regression procedure yields estimates of *over* 100% of the African-American vote share going to the Democratic candidate in all but one federal election I analyzed since 2008 under the Benchmark Map. This is also impossible.

**District 92**   Dr. Ansolabehere's report indicates that the average share of the African-American vote going to the Democratic candidate in federal elections under the Benchmark Map and HB5005 is 100%. In fact, my results show that the ecological regression procedure yields estimates of *over* 100% of the African-American vote share going to the Democratic candidate several federal elections under the Benchmark Map and HB5005. This is impossible.

**District 95**   Dr. Ansolabehere's report indicates that 100% of the African-American vote went to the Democratic candidate for governor in 2013 under the Benchmark Map and HB5005. My results indicate that the true estimates, rounded to 100% in his report, are 102% and 101% for the Benchmark Map and HB5005, respectively. This is impossible. Similarly, Dr. Ansolabehere's report indicates that the average share of the African-American vote going to the Democratic candidate in federal elections under the Benchmark Map is 100%. In fact, my results show that the ecological regression procedure yields estimates of *over* 100% of the African-American vote share going to the Democratic candidate in *every* federal election I analyzed since 2008 under the Benchmark Map. This is also impossible.

## 4. RACIAL POLARIZATION

Central to the question of whether or not increasing the African-American voting eligible population was warranted in the Challenged Districts is an examination of whether or not African-Americans had the ability to elect the candidate of their choice prior to the redrawing of the district map. Undertaking that examination presents the same challenge that Dr. Ansolabehere addressed using ecological regression. That is, I must first estimate the share of African-Americans, Whites and members of other races voting for particular candidates and address the degree of apparent polarization between groups. I do this using ecological inference (EI)[12], a technique that is bounded by both overall turnout and the real shares of district population belonging to each racial group. Unlike ecological regression, ecological inference does not produce impossible results and it uses considerably more information available in the data. A summary of the methodology, along with a discussion of its results, appear below.

---

[12]King (1997)

15

## 4.1. *Ecological Inference*

EI combines information from Duncan and Davis (1953) method of bounds with a statistical model to estimate average support for a particular candidate among members of different racial groups throughout a district. The advantage of EI is that it uses information from all districts and allows a comparison of results between districts. Since EI is constrained by the deterministic bounds calculated in Duncan and Davis (1953) approach, estimates obtained through EI inference never indicate impossible vote shares.

To assess the extent of racial polarization in the Challenged Districts, I run ecological inference on general elections for seats in the Virginia House of Delegates in 2007, 2009, 2011, and 2013. Elections for seats in the Virginia House of Delegates are the only ones relevant to the question of racial polarization for several reasons. Governments across the country are becoming increasingly divided and it cannot be assumed that votes for an executive or statewide office are identical to votes in a legislative election.

In some situations, is may be possible to use one to help predict the other, but the issue at hand is only about the Virginia House of Delegates, and so if other election data are to be used, their relationship to election results from the Virginia House of Delegates elections must be demonstrated first. Dr. Ansolabehere offered no evidence of any connection between his analysis of Presidential, Congressional, and Gubernatorial elections and the those for House of Delegates. For one simple example, rates of uncontested elections in Virginia are quite high, but there exists no "uncontested distict" results for Federal or statewide elections in Dr. Ansolabehere's data.

Thus, instead, I focus on elections at the level of government for that are central to the case, the Virginia House of Delegates.

One clear indication of racial polarization is the relative willingness of African-American and White voters, respectively, to vote for African-American candidates. Several studies have shown that, White voters are less likely to support African-American officeholders. [13] Thus if racial polarization exists in a district, we would expect to see lower levels of White vote share going to African-American candidates. Dr. Ansolabehere's report does not examine the extent to which White voters in the Challenged Districts are willing to support African-American candidates for legislative office, and the answer to this question is central to racial polarization.

To examine this question, I estimate the voting behavior of the various ethnic groups using EI in competitive elections for seats in Challenged Districts of the Virginia House of Delegates in which an African-American Democrat ran against a White non-Democrat. I compare my results to estimates for competitive elections for seats in the Virginia House of Delegates in which a White Democrat ran against a White non-Democrat. Figure 8 graphically presents the estimates. The

---

[13]see, for example, Gay (2001).



Figure 8: EI estimates of voting behavior in contested Challenged Districts in the Virginia House of Delegates elections.

complete results with associate measures of statistical uncertainty[14] are given in the Table 4 of the Appendix. In fact, I find that African-American Democrats running against White non-Democrats receive, on average, 91% of the African-American vote and 52% of the White vote. By contrast, White Democratic candidates running against White non-Democrats receive, on average, 94% of the African-American vote and 65% of the White vote. As importantly, *the average percentage of Whites who vote for a Democrat decreases by 13 percentage points when the Democratic candidate is African-American compared to when they are White.* The lower levels of White vote share won by African-American candidates indicates the presence of racial polarization. The reluctance of White voters to support African-American candidates implies that higher levels of African-American voters in the Challenged Districts appears necessary to ensure greater descriptive representation for African-Americans in the Virginia House of Delegates.

### 4.2. *Evaluating the Claim of Racial Packing of Districts*

One of the central claims in Dr. Ansolabehere's report is that Black voting age population in the Challenged Districts increased more than necessary under the map in HB 5005. I evaluate this claim by examining the likelihood of electing an African-American candidate to the Virginia House

---

[14]Formally the 95% confidence intervals.



Figure 9: Probability of Electing an African-American State Legislator at Various Levels of African-American Voting Age Population

of Delegates in districts with varying levels of African-American voting age population. I do this by estimating a logistic regression in which the response variable is a binary indicator of whether or not the winner of each general election for a seat in the Virginia House of Delegates was an African-American, and the explanatory variable is the African-American voting age population in the district. Figure 9 summarizes the results. If raising the African-American voting age population to a level of 55% represents a case of excessive racial packing, then probability of electing an African-American candidate in a district with 55% African-American voting age population should be at or near 100%. In fact, the probability of electing an African-American to the Virginia House of Delegates in a district with an African-American voting age population of 55% is approximately 80%, which means African-American candidates will lose one out of every five elections in these "packed" majority-minority districts. Since there is a significant gap between this result and a guaranteed win for each African-American running in these districts, it is difficult to argue that these districts have been packed.

4.3. *Effect of Race and Party on Likelihood of Inclusion of VTDs in 12 Challenged Districts*

Another claim in Dr. Ansolabehere's report is that the racial composition is a stronger predictor than Democratic vote share of the inclusion of a particular VTDs into one of the 12 Challenged

18

Districts. Dr. Ansolabehere's claim is based on a regression analysis he conducted that shows that the effect of the Black percentage of the voting age population (BVAP) has a 7 to 13 times larger effect on the likelihood of VTD be included into a challenged district than the average Democratic vote share (see point 127 and Table 11 in his report). Unfortunately, I show that this regression is fundamentally misspecified and thus the key conclusions are likely incorrect.

In Dr. Ansolabehere's analysis, he neglects to adjust for the fact that precincts near the baseline districts are more likely to be included by the legislature in order to keep the districts compact and contiguous. That is, the legislature is not free to arbitrarily choose any given VTD to be in a particular district since this could result in non-compact and non-contiguous district. In other words, his specifications assume that VTDs that are very far away from any Challenged District are equally likely to be included in a district as those that border it.

I thus include each VTD's geographic distance to each of the 12 Challenged Districts (as measured by centroid distance) under the Benchmark map as one of the control variables. Dr. Ansolabehere fails to include any similar control. I also control for whether a VTD was previously in a Challenged District under the benchmark map. I present the results from two separate specifications of this analysis:

1. A linear probability model that simultaneously controls for the Black voting age population and Democratic vote share

2. Two separate linear probability models where the first uses Black voting age population only and the second the Democratic vote share only.

In the first model (which is as similar as possible to Dr. Ansolabehere's original model after fixing the geographical constraint problem above), the interpretation of the coefficient on Black voting age population is the effect of increasing Black voting age population on the probability for inclusion holding Democratic vote share constant. This specification attempts to compare VTDs with the same level of Democratic vote share.

However, if BVAP and Democratic vote share are related such that one automatically increases as a result of the other, then a comparison holding one variable constant, as he does, does not make much sense since one variable cannot change without changing the other. Thus, we include the second specification that does not assume the effect of one holding the other constant. In the two models in the second specification, I attempt to capture just the effect of BVAP and Democratic vote share separately. The two specifications are simply different ways of approaching the problem with two different sets of assumptions.

Table 1 shows the results of the two specifications. In the first specification, after properly controlling for distance from the 12 Challenged Districts, the difference between the effect of BVAP and average Democratic vote is small (0.021) and not statistically significant (the standard error of the difference is 0.063). The difference is nowhere near the magnitude in Dr. Ansolabehere's biased

19

Table 1: **Party and Race as Predictors of the likelihood of inclusion of VTDs in one of 12 Challenged Districts, Regression estimates (linear probability model)**

|  | Specification 1 | Specification 2 | |
|---|---|---|---|
| BVAP | **0.157** (0.033) | **0.249** (0.022) | |
| Average Democratic Vote | **0.136** (0.035) | | **0.256** (0.024) |
| Control for VTD in Challenged District Under Benchmark | Yes | Yes | Yes |
| Control for Distance from 12 Benchmark Challenged Districts | Yes | Yes | Yes |

regression. In the second specification, separately estimating the effect of BVAP and average Democratic vote shows that the average Democratic vote actually has a slightly higher coefficient than BVAP.

20

## 5. REFERENCES

Boyce, Ronald and W.A.V. Clark.  1964.  "The Concept of Shape in Geography".  *Geographical Review*. 54(4):561-571.

Duncan, Dudley and Beverly Davis. 1953. "An Alternative to Ecological Correlation." *American Sociological Review* 64:610–625

Gay, Claudine 2001. "The Effects of Black Congressional Representation on Political Representation." *American Political Science Review*. 95(3):589–602

Goodman, Leo 1959. "Some Alternatives to Ecological Correlation." *American Journal of Sociology* 64:610–625.

King, Gary.  1997.  *A Solution to the Ecological Inference Problem*.  Princeton, NJ: Princeton University Press.

King, Gary; Ori Rosen; and Martin A. Tanner.  1999.  Binomial-Beta Hierarchical Models for Ecological Inference. *Sociological Methods & Research*, 28(1):61–90.

Rosen, Rosen, Wenxin Jiang; Gary King; and Martin A. Tanner. 2001 "Bayesian and frequentist inference for ecological inference: The R C case." *Statistica Neerlandica*, 55(2):134-156.

APPENDIX

*Data Sources*

1. VTD-level 2010 Census data, which was used to create the Centroid distance data set, was obtained from the Harvard Election Data Archive at `http://thedata.harvard.edu/dvn/dv/eda/faces/study/StudyPage.xhtml?globalId=hdl:1902.1/15551&studyListingIndex=1_6914dbd8a0d4058ef169639c3805`

2. A crosswalk between the Benchmark and HB5005 maps at the VTD level was obtained from the Missouri Census Data Center at `http://mcdc.missouri.edu/websas/geocorr12.html`

3. Election results data was obtained from the Virginia Department of Elections (`http://elections.virginia.gov/index.php/resultsreports/election-results/`) with a direct link to the datasets at `https://voterinfo.sbe.virginia.gov/SBE_CSV/ELECTIONS/ELECTIONRESULTS/`

*Compactness*

Table 2: **Modified Boyce-Clark Compactness Measures**

|  | Benchmark Map | HB5005 | Difference |
|---|---|---|---|
| Average Compactness, Challenged Districts | 0.464 | 0.439 | -0.025 |
| Most Compact District, Challenged Districts | 0.364 | 0.308 | -0.056 |
| Least Compact District, Challenged Districts | 0.522 | 0.503 | -0.019 |
| Districts Less Compact After HB5005, Challenged Districts | - | 3 | - |
| Average Compactness, Remaining Districts | 0.46 | 0.471 | 0.011 |
| Most Compact District, Remaining Districts | 0.239 | 0.217 | -0.022 |
| Least Compact District, Remaining Districts | 0.606 | 0.632 | 0.027 |
| Districts Less Compact After HB5005, Remaining Districts | - | 49 | - |

Table 3: **Modified Boyce-Clark Compactness Measures for Challenged Districts**

| District | Benchmark Map | HB5005 | Difference | Percent Change |
|---|---|---|---|---|
| 63 | 0.364 | 0.371 | 0.007 | 0.019 |
| 69 | 0.422 | 0.423 | 0.001 | 0.002 |
| 70 | 0.434 | 0.432 | -0.002 | -0.005 |
| 71 | 0.438 | 0.425 | -0.014 | -0.031 |
| 74 | 0.464 | 0.382 | -0.082 | -0.176 |
| 75 | 0.379 | 0.477 | 0.098 | 0.259 |
| 77 | 0.496 | 0.468 | -0.028 | -0.057 |
| 80 | 0.511 | 0.491 | -0.020 | -0.038 |
| 89 | 0.512 | 0.489 | -0.022 | -0.044 |
| 90 | 0.506 | 0.308 | -0.198 | -0.391 |
| 92 | 0.521 | 0.499 | -0.022 | -0.042 |
| 95 | 0.522 | 0.503 | -0.019 | -0.036 |
| Challenged Districts | 0.464 | 0.439 | -0.025 | -0.045 |
| Remaining Districts | 0.460 | 0.471 | 0.011 | 0.024 |
| Average Differences | 0.004 | -0.032 | -0.036 | -0.069 |

22

*EI Results*

Table 4: **Ecological Inference Estimates and 95% Confidence Interval**

| Democrat Race | Opponent Race | Year | District | Voter Race | Estimate | 2.5% | 97.5% |
|---|---|---|---|---|---|---|---|
| Black | White | 2009 | 71 | Blacks | 0.941 | 0.899 | 0.966 |
| Black | White | 2009 | 71 | Other Races | 0.662 | 0.516 | 0.872 |
| Black | White | 2009 | 71 | Whites | 0.721 | 0.696 | 0.761 |
| Black | White | 2009 | 80 | Blacks | 0.907 | 0.885 | 0.929 |
| Black | White | 2009 | 80 | Other Races | 0.579 | 0.425 | 0.678 |
| Black | White | 2009 | 80 | Whites | 0.358 | 0.309 | 0.397 |
| Black | White | 2009 | 90 | Blacks | 0.908 | 0.870 | 0.943 |
| Black | White | 2009 | 90 | Other Races | 0.662 | 0.547 | 0.764 |
| Black | White | 2009 | 90 | Whites | 0.353 | 0.301 | 0.413 |
| Black | White | 2011 | 75 | Blacks | 0.883 | 0.854 | 0.915 |
| Black | White | 2011 | 75 | Other Races | 0.579 | 0.458 | 0.731 |
| Black | White | 2011 | 75 | Whites | 0.414 | 0.371 | 0.451 |
| Black | White | 2011 | 95 | Blacks | 0.918 | 0.808 | 0.983 |
| Black | White | 2011 | 95 | Other Races | 0.582 | 0.488 | 0.686 |
| Black | White | 2011 | 95 | Whites | 0.569 | 0.472 | 0.697 |
| Black | White | 2013 | 71 | Blacks | 0.975 | 0.949 | 0.992 |
| Black | White | 2013 | 71 | Other Races | 0.730 | 0.400 | 0.951 |
| Black | White | 2013 | 71 | Whites | 0.771 | 0.705 | 0.838 |
| Black | White | 2013 | 75 | Blacks | 0.883 | 0.835 | 0.914 |
| Black | White | 2013 | 75 | Other Races | 0.466 | 0.381 | 0.567 |
| Black | White | 2013 | 75 | Whites | 0.348 | 0.309 | 0.408 |
| Black | White | 2013 | 95 | Blacks | 0.890 | 0.834 | 0.925 |
| Black | White | 2013 | 95 | Other Races | 0.562 | 0.413 | 0.792 |
| Black | White | 2013 | 95 | Whites | 0.627 | 0.562 | 0.666 |
| White | White | 2007 | 69 | Blacks | 0.929 | 0.864 | 0.969 |
| White | White | 2007 | 69 | Other Races | 0.862 | 0.791 | 0.934 |
| White | White | 2007 | 69 | Whites | 0.675 | 0.598 | 0.780 |
| White | White | 2009 | 74 | Blacks | 0.931 | 0.894 | 0.957 |
| White | White | 2009 | 74 | Other Races | 0.679 | 0.492 | 0.773 |
| White | White | 2009 | 74 | Whites | 0.552 | 0.504 | 0.627 |
| White | White | 2013 | 69 | Blacks | 0.973 | 0.940 | 0.992 |
| White | White | 2013 | 69 | Other Races | 0.748 | 0.613 | 0.838 |
| White | White | 2013 | 69 | Whites | 0.731 | 0.666 | 0.825 |

*Curriculum Vitae*

# Jonathan N. Katz

D.H.S.S. (228-77)
California Institute of Technology
Pasadena, CA 91125
(626)395-4191
e-mail: jkatz@caltech.edu

## Education

Ph.D.        University of California, San Diego. Political Science, June 1995.

M.A.         University of California, San Diego. Political Science, June 1992.

S.B.         Massachusetts Institute of Technology. Applied Mathematics
             June 1990.

## Administrative Appointments

Chair, Division of the Humanities and Social Sciences,
      California Institute of Technology
      August 2007 – June 2014.

Director, Ronald and Maxine Linde Institute of Economic and Management Sciences,
      California Institute of Technology
      January 2013 – March 2014.

Executive Officer for the Social Sciences, California Institute of Technology,
      January 2007 – July 2007.

Co-director, Caltech/MIT Voting Technology Project, October 2005 – September 2010.

Director of Graduate Studies, Division of the Humanities and Social Sciences, California
      Institute of Technology,
      July 2001 – December 2006.

## Academic Appointments

Kay Sugahara Professor of Social Sciences and Statistics, California Institute of
      Technology,
      January 2012 – Present.

Professor of Social Sciences and Statistics, California Institute of Technology,
      June 2009 – December 2011.

**Jonathan N. Katz**                                                                                          2

Professor of Political Science, California Institute of Technology,
    November 2003 – May, 2009.

Gastprofessur in der Rechts-, Wirtschafts- und Verwaltungswissenschaftlichen Sektion,
    Universität Konstanz,
    April 2003 – July 2003.

Associate Professor of Political Science, California Institute of Technology,
    April 1998 – August 1998 and July 2000 – October 2003.

Assistant Professor of Political Science, University of Chicago,
    September 1998 – June 2000.

Assistant Professor of Political Science, California Institute of Technology,
    July 1995 – March 1998.

Post-Doctoral Fellow in Positive Political Economy, Harvard University,
    July 1994 – June 1995.

**Honors and Awards**

Elected Fellow of the American Academy of Arts and Sciences, 2011.

Elected Inaugural Fellow of the Society for Political Methodology, 2008.

Center for the Advanced Study in the Behavioral Sciences Fellowship, 2005–2006.

John M. Olin Foundation Faculty Fellow, 1999–2000.

Pi Sigma Alpha award for Best Paper Presented at the 1998 Midwest Political Science
    Association Meetings.

CQ Press Award for Best Paper in Legislative Politics Presented at the 1996 Annual
    Meeting of the American Political Science Association.

National Science Foundation Graduate Research Fellow, 1991–1994.

Brooke/Cole Award for Best Graduate Student Paper Presented at the 1993 Midwest
    Political Science Association Meetings.

University of California Regents Fellow, 1990–1991.

Jonathan N. Katz                                                                              3

**Publications**

*Books*

*Elbridge Gerry's Salamander: The Electoral Consequences of the Reapportionment Revolution.* (with G. Cox). New York: Cambridge University Press. 2002.

*Articles in Refereed Journals*

Government Partisanship, Labor Organization and Macroeconomic Performance: A Corrigendum (with N. Beck, R.M. Alvarez, G. Garrett, and P. Lange). *American Political Science Review.* 87(4):945–949. 1993.

What To Do (and Not To Do) with Times-Series–Cross-Section Data in Comparative Politics (with N. Beck). *American Political Science Review.* 89(3):634–647. 1995.

Careerism, Committee Assignments and the Electoral Connection (with B. Sala). *American Political Science Review.* 90(1):21–33. 1996.

Why Did the Incumbency Advantage in U.S. House Elections Grow? (with G. Cox). *American Journal of Political Science.* 40(2):478–497. 1996.

Nuisance vs. Substance: Specifying and Estimating Time-Series–Cross-Section Models (with N. Beck). *Political Analysis.* 6:1–36. 1996.

Taking Time Seriously: Time-Series–Cross-Section Analysis with a Binary Dependent Variable (with N. Beck and R. Tucker). *American Journal of Political Science.* 42(4):1260–1288. 1998.

A Statistical Model for Multiparty Electoral Data (with G. King). *American Political Science Review.* 93(1):15–32. 1999.

The Reapportionment Revolution and Bias in U.S. Congressional Elections (with G.Cox). *American Journal of Political Science.* 43(3):812-840. 1999.

Post-stratification without population level information on the post-stratifying variable, with application to political polling (with C. Reilly and A. Gelman). *Journal of the American Statistical Association.* 96(453):1–11. 2001.

Throwing Out the Baby With the Bath Water: A Comment on Green, Yoon and Kim (with N. Beck). *International Organization.* 55(2):487–498. 2001.

A Fast, Easy, and Efficient Estimator for Multiparty Electoral Data (with J. Honaker and G. King). *Political Analysis.* 10(1):84–100. 2002.

The Mathematics and Statistics of Voting Power (with A. Gelman and F. Tuerlinckx). *Statistical Science*. 17(4): 420–435. 2002.

Standard Voting Power Indexes Don't Work: An Empirical Analysis (with A. Gelman and J. Bafumi). *British Journal of Political Science*. 34: 657–674. 2004.

Indecision Theory: Quality of Information and Voting Behavior (with P. Ghirardato). *Journal of Public Economic Theory*. 8(3): 379–399. 2006

Comment on 'What To Do (and Not To Do) with Times-Series–Cross-Section Data in Comparative Politics' (with N. Beck). *American Political Science Review*. 100(1):676–677.

Gerrymandering Roll-Calls in Congress, 1879-2000 (with G.W. Cox). *American Journal of Political Science*. 51(1):108-119. 2007.

Random Coefficient Models for Time-Series-Cross-Section Data: Monte Carlo Experiments (with N. Beck). *Political Analysis*. 15(2):182–195. 2007.

Comment on 'Estimating incumbency advantage and its variation, as an example of a before-after study'. *Journal of the American Statistical Association*. 103(482):446–448. 2008.

Correcting for Survey Misreports using Auxiliary Information with an Application to Estimating Turnout (with G. Katz). *American Journal of Political Science*. 54(3):815–835. 2010.

An Empirical Bayes Approach to Estimating Ordinal Treatment Effects (with R.M. Alvarez and D. Bailey). *Political Analysis*. 19(1):20–31. 2011.

Implementing Panel Corrected Standard Errors in R: The pcse Package (with D. Bailey). *Journal of Statistical Software*. 42(1):1–11. 2011.

Modeling Dynamics in Time-SeriesCross-Section Political Economy Data (with N. Beck). *Annual Review of Political Science*. 14:331–352. 2011.

Estimating Partisan Bias of the Electoral College Under Proposed Changes in Elector Apportionment (with A.C. Thomas, A. Gelman, and G. King). *Statistics, Politics and Policy*. 0:1–13. 2012.

Of Nickell Bias and Its Cures: Comment on Gaibulloev, Sandler and Su (with N. Beck and U. Mignozzetti ). *Political Analysis*. 22:274–278. 2014.

*Other Articles*

Empirically Evaluating the Electoral College (with A. Gelman and G. King) in A. Crigler, et al (editors), *Rethinking the Vote: The Politics and Prospects of American Election Reform*. New York: Oxford University Press. 2004.

Detecting Electoral Fraud: The Case of 2002 General Election in Georgia (with R.M. Alvarez) in R.M. Alvarez, T.E. Hall, and S.D. Hyde (editors), *Election Fraud: Detecting and Deterring Electoral Manipulation*. Washington, DC: Brookings. 2008.

Fraud or Failure? What Incident Reports Reveal about Election Anomalies and Irregularities (with D.R. Kiewiet, T.E. Hall, R.M.Alvarez )in R.M. Alvarez, T.E. Hall, and S.D. Hyde (editors), *Election Fraud: Detecting and Deterring Electoral Manipulation*. Washington, DC: Brookings. 2008.

Machines Versus Humans: The Counting and Recounting of Pre-scored Punchcard Ballots (with R.M. Alvarez, E.K. Hartman, and S. Hill) in R.M. Alvarez, L. Atkeson, and T.E. Hall (editors), *Confirming Elections: Creating Confidence and Integrity through Election Auditing*. Palgrave Macmillan. 2012.

Asymptotics in A. Bryman, et al (editors), *Encyclopedia of Social Science Research Methods*. Thousand Oaks, CA: Sage Publications. Forthcoming.

Whats Age Got to Do with It? Supreme Court Appointees and the Long Run Location of the Supreme Court Median Justice (with M. Spitzer), *Arizona State Law Journal*. Forthcoming.

**Work in Progress and Conference Papers**

Expected Returns and Synthetic Firms (with M. McCubbins and J. McMullin)

Synthetic Controls and the Nature of Observational Data in Political Science (with C. McCubbins)

Reassessing the Link between Voter Heterogeneity and Political Accountability: A Latent Class Regression Model of Economic Voting (with G. Katz)

Evaluating alternative models to account for misclassified dependent variables in binary choice models (with G. Katz)

Strategic Entry in U.S. House Elections (with G. Cox)

A New Approach to Measuring the Racial Impact of Redistricting? (with A. Gelman and G. King)

Moderation in the Pursuit of Moderation is No Vice: The Clear but Limited Advantages of Being a Moderate for Congressional Elections (with A. Gelman)

The Impact of Majority-Minority Districts in Congressional Elections (with D. Bailey).

Aggregation and Dynamics of Survey Responses: The Case of Presidential Approval (with R.M. Alvarez). Caltech Social Science Working Paper No. 1103.

How Much Does a Vote Count? Voting Power, Coalitions, and the Electoral College (with A. Gelman). Caltech Social Science Working Paper No. 1121.

Auctioning off the Agenda: Bargaining in Legislatures with Endogenous Scheduling Control (with J. Copic). Caltech Social Science Working Paper No. 1266.

The Effect of Voter Identification Laws on Turnout (with R.M. Alvarez and D. Bailey). Caltech Social Science Working Paper No. 1267R.

Scheduling Auctions and Proto-Parties in Legislatures (with J. Copic). Caltech Social Science Working Paper No. 1387 Under review.

## Grants

John Randolph Haynes and Dora Haynes Foundation Faculty Fellowship, 2005–2006.

National Science Foundation Grant (SES-0213549), Co-Principal investigator, Project title: " Modeling Issues with Time-Series–Cross-Section Data" , 2002-2004.

DAAD (German Academic Exchange Service) *Learn German in Germany* fellowship, Summer, 1998.

National Science Foundation Grant (SBR-9729899), Co-Principal investigator, Project title: " Strategic Redistricting and Its Political Consequences", 1998–1999.

IBM University Equipment Grants Program, . Co-principal investigator. Project title: "Individuals and Aggregates: New Computational Techniques for Testing Models of Politics", 1996–1997.

John Randolph Haynes and Dora Haynes Foundation Faculty Fellowship, 1996–1997.

## Editorial Board Service

Co-Editor, *Political Analysis*
    January 2010 – Present.

Member, Editorial Board of *Political Research Quarterly*
    June, 2000 – Present.

Member, Editorial Board of *Electoral Studies*
    January, 2002 – Present.

Member, Editorial Board of *American Journal of Political Science*,
January 2006 – January, 2010.

Member, Editorial Board of *Political Analysis*
July, 2001 – December 2009.

## Other Professional Activities

Member of the Scientific Advisory Board, Global Consequences Inc., October, 2014 –
Present.

Guest Manuscript Editor, *Proceedings of the National Academy of Sciences*, January 2014.

Member, Advisory Board of Daegu Gyeongbuk Institute of Science and Technology
(Republic of Korea), August 2012 – Present.

Member, University Advisory Council of the Pohang University of Science and
Technology (Republic of Korea), October 2008 – Present.

Founding Co-editor, Political Science Network (PSN), January 2007 – Present.

Member, Caltech/MIT Voting Technology Project, October, 2003- Present.

Member, Expert Panel on Measles Mortality Estimates, World Health Organization, 2004.

Treasurer, Political Methodology Section of the American Political Science Association.
August 2003 – September 2008.

Section Organizer and Member of the Program Committee for 2004 Annual Meeting of
the American Political Science Association.

Member, Steering Committee of the USC-Caltech Center for the Study of Law & Politics,
July 2000 – Present.

Member of Program Committee for Fourteenth Summer Political Methodology
Conference.

Instructor, ICPSR Summer Program in Quantitative Methods, University of Michigan,
1994 and 1995.

February 13, 2015