1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT 2**

26

**Motion *In Limine* To Exclude Anticipated Testimony Of Dr. Johnathan Katz Regarding Zelig**

27

*Luna, et al. v. County of Kern, et al.*, **Case No. 1:16-cv-00568-DAD-JLT (E.D. Cal.)**

28

Atkinson-Baker Court Reporters
www.depo.com

1

2          IN THE UNITED STATES DISTRICT COURT

3         FOR THE EASTERN DISTRICT OF CALIFORNIA

4                      - - -

5

OSCAR LUNA, et al.,              )
6                                 )
          Plaintiffs,            )
7                                 )
          vs.                    ) No. 1:16-cv-00568-DAD-JLT
8                                 )
COUNTY OF KERN, et al.,          )
9                                 )
          Defendants.            )
10                                )

11

12

13

14

15      DEPOSITION OF JONATHAN NEIL KATZ, Ph.D.

16            LOS ANGELES, CALIFORNIA

17          FRIDAY, FEBRUARY 3, 2017

18

19

20

21

ATKINSON-BAKER, INC.
22  COURT REPORTERS
(800) 288-3376
23  www.depo.com

24  REPORTED BY: Stephanie Jackson Georgeanne, CSR No. 8322

25  FILE NO.  AB00539

1

Atkinson-Baker Court Reporters
www.depo.com

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3           FOR THE EASTERN DISTRICT OF CALIFORNIA
 4                          - - -
 5
    OSCAR LUNA, et al.,            )
 6                                 )
            Plaintiffs,            )
 7                                 )
            vs.                    ) No. 1:16-cv-00568-DAD-JLT
 8                                 )
    COUNTY OF KERN, et al.,        )
 9                                 )
            Defendants.            )
10                                 )
11
12
13
14
15      Deposition of JONATHAN NEIL KATZ, Ph.D., taken on
16   behalf of the Plaintiffs, at 634 South Spring Street,
17   11th Floor, Los Angeles, California 90014, commencing
18   at 8:58 a.m., on Friday, February 3, 2017, before
19   Stephanie Jackson Georgeanne, CSR No. 8322.
20
21
22
23
24
25
```

                                                            2

Atkinson-Baker Court Reporters
www.depo.com

```
 1    A P P E A R A N C E S:

 2

 3    FOR PLAINTIFFS:

 4    MEXICAN AMERICAN LEGAL
      DEFENSE AND EDUCATIONAL FUND
 5    BY:  DENISE HULETT
      634 South Spring Street
 6    11th Floor
      Los Angeles, California 90014
 7    (213) 629-2512
      dhulett@maldef.org
 8
      FOR DEFENDANTS:
 9
      NIELSEN MERKSAMER PARRINELLO GROSS & LEONI, LLP
10    BY:  MARGUERITE MARY LEONI
                   and
11         CHRIS SKINNELL
      2350 Kerner Boulevard
12    Suite 250
      San Rafael, California 94901
13    (415) 389-6800
      mleoni@nmgovlaw.com
14    cskinnell@nmgovlaw.com

15    ALSO PRESENT:

16    DOMONIQUE ALCARAZ

17

18

19

20

21

22

23

24

25
```

3

Atkinson-Baker Court Reporters
www.depo.com

```
1                          I N D E X

2   WITNESS:   JONATHAN NEIL KATZ, Ph.D.

3   Examination                                    PAGE

4         By Ms. Hulett                               5

5         By Mr. Skinnell                           114

6

7   EXHIBITS

8   NUMBER              DESCRIPTION                 PAGE

9     1         Defendants' expert witness           6
                disclosures:   Declaration of
10              Dr. Katz; 23 pages

11    2         List of cases in which Dr. Katz has   6
                testified
12

      3         Subpoena to testify at a deposition   9
13              in a civil action; 7 pages

14    4         Rebuttal report of Dr. Kousser,      53
                dated 1/13/17; 107 pages
15

      5         Article entitled "A Statistical      70
16              Model For Multiparty Electoral
                Data"; 19 pages
17

      6         Article entitled "Report on Texas    95
18              Congressional Redistricting:
                Minority Opportunities and Partisan
19              Fairness"; 30 pages

20    7         Notice of ruling on defendant's     103
                motion for summary judgement
21              and motions in limine Nos. 1, 2,
                and 3 in Case No. BC512736;
22              10 pages

23    8         Court's oral decision in Case       110
                No. 05-2-000273; 11 pages
24

25
```

4

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    and, therefore, it is the decimal equivalent between

2    zero and one.  So .8 means that the county got

3    80 percent of the vote.

4        Q.  Does Gary King say anywhere in his book that

5    his method won't work well unless a substantial number

6    of precincts are homogeneous for each group we want to

7    study?

8        A.  Sure.  And I forget which chapter.  In

9    Chapters 8 and 9 where he talks about diagnostics and

10   testing, he, in fact, goes through cases where his

11   estimates do not work very well.

12       Q.  Can you point those out to me?

13       A.  I don't know the exact pages.

14       Q.  During a break, can you take a look and show me

15   where he says -- because that's -- I've sort of looked

16   at that a few times over the last year, and I understand

17   more every time I look at it.

18       A.  I'll do my best.  I don't know if I can -- it's

19   a long book, and I don't know if I can find a sentence

20   in realtime.

21       Q.  Well, you're right, it's probably somewhere in

22   Chapter 9.

23           But does he say anywhere in the book or the

24   articles that there's some bright line, "X" percent of

25   the precincts have to be "X" percent of one group in

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    order for the estimates to be reliable?

2         A.   No.  In fact, he gives a set of diagnostic

3    tools to look at the -- what he calls tomography lines,

4    to ask when the data seemed to suggest -- and we should

5    point out there's two parts that go on to determining

6    whether or not EI works well.  There's the bounds are

7    guarding its aggregation bias, but then we also need to

8    know how much aggregation bias there is.

9              Aggregation bias means how much systematic

10   variability there is across precincts in voting behavior

11   of a particular group, say, Latinos.  So in places where

12   there is not much aggregation bias, you can get away

13   with larger bounds.  That's why there is no bright line.

14   It is a function of the actual data you're looking at.

15        Q.   And he says one of the advantages of his

16   methodology is that you get to include more information

17   than you do in ecological regression; is that true?

18        A.   That is correct.

19        Q.   And that he says another advantage is you have

20   diagnostics to evaluate when those assumptions need to

21   be modified?

22        A.   Correct.

23        Q.   Did you do -- well, I think you already

24   answered me.

25              You didn't do any diagnostic tests on

Atkinson-Baker Court Reporters
www.depo.com

1    Dr. Kousser's analysis?

2        A.   No.  I did it by looking at the same voter --

3    the same distribution of voter data in registration

4    where we can do the ultimate diagnostic.  We can

5    actually look at the true value verus this estimate.

6        Q.   Oh, you're talking about your analysis of

7    partisan affiliation among Latinos?

8        A.   That's correct.

9        Q.   I'm talking about his analysis of the election.

10            Did you do any diagnostic tests that test --

11       A.   Other than looking -- so other than looking at

12   -- eyeballing the data and seeing that there are -- and

13   counting up that there is not many homogeneous Latino

14   precincts, no.  But that's sufficient because once

15   there's no homogeneous precincts, any aggregation bias

16   will widely affect the estimates.

17       Q.   When Gary King talks about diagnostic tests

18   that are available for ecological inference, he's

19   talking about something other than the eyeballing you're

20   talking about, correct?

21       A.   He's talking about tomography plots.

22       Q.   Did you do any tomography plots on

23   Dr. Kousser's analysis?

24       A.   Again, I thought it would be much easier to

25   explain to a judge by showing them in this data that the

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1   estimates are way off than having to explain what a

2   tomography plot is.

3       Q.  In Gary King's book, we keep -- we're going to

4   keep saying "Gary King's book."  It's The Solution to

5   the Ecological Inference Problem:  Reconstructing

6   Individual Behavior from Aggregate Data, by Gary

7   King and -- oh, 1997.

8           Does that sound right to you?

9       A.  That's correct.  He wrote it while I was at

10  Harvard.

11      Q.  All right.  Did you help him with this book?

12      A.  We had -- I didn't work -- we worked on other

13  projects together, but I saw early drafts and I gave him

14  comments.

15      Q.  I heard that you helped him with this book.

16          He included in this book several extensive

17  collections of real aggregated data, and then he

18  compared them to EI estimates, including, for example,

19  comparing the estimates of the levels of black and white

20  voter registration compared to the known answer in

21  public records, correct?

22      A.  He gave some examples.  I forget the exact

23  examples he gave.

24      Q.  Do you agree that those studies that he did

25  validated the methodology in general?

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1  data is important.  The bounds data doesn't get rid of

2  -- it guards against aggregation bias whether or not

3  it's present.

4       Q.  Is there any discussion in the statistical or

5  political science literature of a bright line criterion

6  for the percentage of homogeneous precincts that are

7  required for an EI estimate to be reliable?

8       A.  Again, the bright line comes from the

9  diagnostic test, the tomography plots.  I just used this

10  as an illustrative.

11       Q.  Explain to me how the tomography plots,

12  although they're prettier than ER, explain to me how

13  they give you a bright line.

14       A.  Again, they don't give you a bright line.

15  Again, what they give you is, by looking at the

16  tomography plots -- so the tomography plot is the

17  constraint line for each precinct; that is, the

18  plausible values that can be true given just knowing the

19  fraction of Democrats -- I'm sorry, the fraction of

20  Latino, the fraction of Anglos, and the vote shares.

21        If those -- if all those constraint lines

22  essentially cross in a -- there's a location that they

23  all cross in, there's enough information to pin things

24  down.  When there's not much bounds data, those

25  tomography lines do not overlap.

48

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1     Q.  So as I understand it, it's not that there's --

2  you don't have a bright line for saying there's got to

3  be a certain percentage of homogeneous precincts?  You

4  do the analysis regardless of them, and then you look to

5  see whether on the tomography cross the lines -- the

6  tomography plots the lines are all crossing at some

7  clumped up place?

8     A.  That is correct.  Or alternatively, where we

9  can do it -- as I did in this case, where we know the

10  truth, we can see how far off we are.

11     Q.  When you say on Page 5 that Dr. Kousser claims

12  the precinct data shows some but not perfect ethnic

13  segregation, you say that's a false claim.

14          You mean, just to be clear, when measured at a

15  90 percent voter turnout rate, correct?

16     A.  No.  I mean -- that is true at 90 percent.  But

17  it's true -- there's almost no precinct that has even

18  above 80 percent or 70 percent Latino on the data that

19  he provided me.

20     Q.  So if he uses a different measure of

21  homogeneity, suppose he uses 65, 70 percent, the claim

22  wouldn't necessarily be false that there is some ethnic

23  segregation?

24     A.  Again, I don't think, even in the colloquial

25  uses, that would count as homo- -- 65 percent is

1    homogeneous.  To be honest with you, I thought I was

2    being generous at 90 percent.  The bounds on a

3    90 percent precinct is approximately, in most election

4    data, plus or minus a range of 10 percentage points.

5        Q.  Well, you're ahead of me.  I was just going to

6    ask you about that.  You said that was a lax measure, 91

7    to 100 percent segregation.

8            Can you give me examples where you viewed the

9    higher measure of homogeneity?

10       A.  Again, I'm not using it.  I typically don't do

11   homogeneity.  I actually look at tomography plots and

12   actually look to see if my estimates look right.

13       Q.  Oh, I mean a higher measure of homogeneity to

14   see whether EI is going to be -- you're going to be able

15   to use EI.

16           You don't do that; you just do it and then look

17   at the tomography plots, correct?

18       A.  Yes.  I was doing this to try to illustrate the

19   problems with this data in as simple of terms as I could

20   while being statistically honest and fair.  And at

21   90 percent -- why I called it lax is because at

22   90 percent for most vote share totals, that means you

23   know Latino voting percentages, say, to ten -- a range

24   of ten points.  Given that these elections are mostly

25   determined by winners of much less than 10 percent,

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1   that's -- that's why I called that lax.

2       Q.  You didn't -- okay.

3           You said, I think before, that you didn't do

4   tomography plots on Dr. Kousser's analysis?

5       A.  No, I did not.

6       Q.  Okay.  Have you --

7       A.  Excuse me.

8           Madam Reporter, do you need to take a break?

9   I'm very fast.  So I know that I'm straining you.

10          MR. SKINNELL:  It's been an hour.

11          MS. HULETT:  We can take a break.

12              (A brief recess was taken.)

13  BY MS. HULETT:

14      Q.  I want to make sure I understand some sort of

15  conclusion from what we have just been talking about.

16  I'm going to go to Page 5, in the first full paragraph

17  on your report, about halfway down, you said -- quoted

18  this a few times, "In other words, we will need a

19  substantial number of precincts that are relatively

20  homogeneous for each ethnic group we want to study.

21  When this is not the case, EI can go wildly wrong as

22  noted by King himself."

23          So you are not saying that it will necessarily

24  go wrong, but that it can go wrong, and you are not

25  setting a -- you don't have a specific amount for the

Jonathan Neil Katz, Ph.D.
February 3, 2017

1   substantial number of precincts you would require, but

2   rather you look at the tomography plots to see if

3   something did go wrong; is that correct?

4        A.   Again, I would be much more specific than that.

5   The problem is, is without -- absent knowing the true

6   value, I can't know whether or not I've gone wrong.  The

7   problem is when the bounds are tight, as I said before,

8   we don't have to worry about aggregation bias.  In

9   general, I can't know if there is aggregation bias.

10  So I don't -- so it's in the worst of all worlds.  I

11  don't know if it is wrong or not.  I don't know what I

12  don't know.

13       Q.   The 90 percent criterion homogeneity that we

14  were talking about, is that a level that's accepted

15  generally by political scientists in your field?

16       A.   Again, I just did that for illustrative

17  purposes at very lax amount of standards.  It is a range

18  of 10 percentage points on vote shares -- estimated vote

19  shares.

20       Q.   But is there anything in the literature that

21  defines a homogeneous precinct as 90 percent or more of

22  one group?

23       A.   I have seen analyses where people have used

24  90 percent.  I have seen analyses where people have used

25  95 percent.  I have seen analyses where people have used

52

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1      A.  Like I said, the reason I chose to look actual

2   results is we can look in this case.  I should also note

3   that, again, you have to have homogeneity of both, in

4   this case, both groups are Latinos and non-Latinos, in

5   order to get correct estimates.  It is not sufficient to

6   just have one group have sufficient number of

7   homogeneous precincts.

8      Q.  And so because it depends on the aggregation

9   bias, you can't tell just by looking at what percentage

10   of precincts are homogeneous whether the ecological

11   inference is going to reasonably identify estimates of

12   voting behavior, right?

13      A.  Correct.  What you can say is when you have

14   large numbers of homogeneous precincts for all groups

15   under the analysis, you don't have to worry about

16   aggregation bias.  When you don't have that, aggregation

17   bias may or may not cause your estimates to be wildly

18   off; and you don't know without eliminating all possible

19   causes of aggregation bias.

20      Q.  By requiring a substantial number of

21   homogeneous precincts in order to have some confidence,

22   it seems to me that you're severely limiting the number

23   of jurisdictions where these estimates can be

24   calculated, aren't you?

25      A.  Again, all I can tell you is give me a

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1        A.   Of my report or Dr. Kousser's report?

2        Q.   I'm sorry, your report.

3             -- you say, last sentence in that top

4    paragraph, "This is nowhere near enough bounds data to

5    reasonably identify estimates of individual voting

6    behavior and, therefore, no statistically valid

7    conclusions may be drawn from Dr. Kousser's analysis of

8    these data."

9             Am I to understand -- is that because you have

10   no way of detecting how much aggregation bias is there?

11       A.   That is true.  And the reason is because one

12   can -- you have to rule out something that you don't

13   observe.  How do you -- you have to prove the negative,

14   which is --

15       Q.   No.  I get that.

16       A.   So, yes.

17       Q.   No.  It was very helpful to me when you said

18   that the bounds data guards against the aggregation bias

19   whether it is there or not.  It helps me to understand

20   what you're talking about.

21            So you can't tell whether a single one of the

22   estimates provided by Dr. Kousser is a reasonable

23   estimate from the data that you have?

24       A.   I don't think that's an accurate reflection of

25   what I said.  Given the data, I can draw no reasonable

56

Atkinson-Baker Court Reporters
www.depo.com

1    inferences.  Again, it is back to this I don't know what

2    I don't know.  They could be wildly off.  They could be

3    luckily right on.  There is no way of knowing that; and,

4    therefore, I don't know how you draw a reasonable

5    conclusion from that.

6         Q.  Okay.  In Figure R-2 on Dr. Kousser's rebuttal

7    at Page 21, it is a regression line for the contest for

8    secretary of state.  Dr. Kousser says that the line

9    demonstrates that the weighted regression -- that the --

10   I'm sorry, that the graph -- the figure demonstrates

11   that the weighted regression line is more heavily

12   dependent on precincts at both ends of the horizontal

13   axis than it is on the 26 percent that is in the middle.

14        What is your reaction to that observation?

15        A.  Is this weighted regression?

16        Q.  Yes.

17        A.  Then that's false.

18        Q.  Why is that?

19        A.  Because almost all the data -- if you look --

20   again, I would have to look at the actual numbers.  But

21   given the darkness and complete overlap in almost all of

22   the data, the regression line is fitting this -- it is

23   being driven almost exclusively by the range of the low

24   end.

25             In fact, what Dr. Kousser needed to do to make

57

Atkinson-Baker Court Reporters
www.depo.com

1   at a 90 percent homogeneous level, would you still say

2   that you have no way of knowing whether each one of

3   these candidates got half the vote from each group?

4        A.  Again, give me the dataset, I can look at it

5   and I can tell you.  But I can't -- again, these are

6   nonlinear estimates of the data.  So I can't -- I can't

7   do the thought experiment in my head to tell you how

8   they would move.

9        Q.  Well, you do say, though, you need a

10  substantial number of homogeneous precincts.

11           In Kern County, what would be the

12  substantial -- in this election, what would be

13  substantial enough for you to conclude that -- that --

14  that bounds information has helped you guard against

15  aggregation bias in this particular estimate?

16       A.  Again, I don't have a bright line rule, but

17  almost no homogeneous precincts means I can't do that.

18       Q.  And what about 30 percent homogeneous

19  precincts, would you feel better about this?

20       A.  I would feel better about it.  I would then

21  want to do additional diagnostics, and I would do what I

22  did here, which is look -- in the case where I can

23  actually look at the true answers for related data.

24       Q.  What about if you had 50 percent homogeneous

25  precincts, would you still need to look at the true

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    data?

2         MR. SKINNELL:  I'm going to object ambiguous.

3    When you say "homogeneous," are you referring to

4    homogeneous Latino or homogeneous non-Latino?

5         MS. HULETT:  You're right.

6         Q.  If you had 50 percent homogeneous Latino and

7    50 homogenous non-Latino, would you still need to look

8    at the true value?

9         A.  You'd probably be in pretty good shape if you

10   had half the datasets -- if half the precincts were

11   homogeneous one way and half for the other.

12        Q.  And what about if they were 30 percent each?

13        A.  Again, more so.  But there is no bright line,

14   but I can tell you that almost none is not enough.

15   Again, you'd have to look at the diagnostics.  One would

16   have to look at how the mixing is working in the

17   estimation; that is, is it converging easily.  There are

18   things one can look at to assess.  And, again, Dr. King

19   in his book gives examples of diagnostics and of tests

20   for convergence.

21        Q.  I want to look real quickly at another race,

22   Page 36 of Dr. Kousser's rebuttal report.

23        MR. SKINNELL:  I'm sorry, 36?

24        MS. HULETT:  Yes.

25        Q.  It's Table V-4 C, ecological inference analysis

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1  of the 2012 board of supervisors, District 1.  Sam

2  Ramirez, according to Dr. Kousser, got 63.1 -- is

3  estimated to have received 63.1 percent of the Latino

4  vote and 2 percent of the non-Hispanic white and black

5  vote.

6       You have -- you cannot -- I'm right that you

7  cannot have confidence in either one of those estimates,

8  correct?

9       A.  That is correct.  I don't believe -- I do not

10  put -- there's not enough -- I put no statistical

11  credence in any of these estimates.

12      Q.  Can you tell me whether the Latino estimate is

13  probably true values higher or lower than 63?

14      A.  Again, I told you you can't know that.

15      Q.  And you can't tell me whether the non-Hispanic

16  estimate is higher or lower probably than two percent?

17      A.  That's correct.

18      Q.  And the aggregation bias, if present, could be

19  enough to make the difference between the Latino and the

20  non-Latino support for Sam Ramirez no longer

21  statistically significant?

22      A.  Again, anything is possible.  I don't know

23  anything about the -- I have no reliable estimates of

24  the behaviors.  So I don't know what actually happened

25  in the election.

64

Atkinson-Baker Court Reporters
www.depo.com

1          Q.  And you can't tell me the likelihood that

2     aggregation bias has or has not caused those numbers to

3     be statistically significant when they're not?

4          A.  Again, this analysis with no bounds data is

5     subject to possible aggregation bias which you can't

6     quantify.  I don't know what the answer would be.

7          Q.  And I want to look at one more countywide race

8     on Page 47, Table VI-4, on Page 47 of Dr. Kousser's

9     rebuttal report.  It's the 2014 assessor's race where

10    Dr. Kousser estimates that Lupe Esquivias,

11    E-s-q-u-i-v-i-a-s, is estimated to have received 68.1

12    percent of the Latino vote, but only 4.8 percent of the

13    Anglo vote.

14          And just to put this in context, Dr. Kousser

15    says on Page 20 of his report -- here is the chart --

16    that in 2014, one percent of the precincts -- the Latino

17    precincts were homogeneous by your 90 percent

18    definition, and 20 percent -- by your 90 percent

19    definition, 27 percent were homogeneous non-Latino,

20    non-Asian.

21          The 27 percent homogeneous non-Latino

22    precincts, do they give you any more confidence in the

23    4.8 estimate for non-Latinos than you have in the 68.1

24    percent for Latinos?

25          A.  As I previously stated, no, because the

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1  estimates are interrelated.  So you need homogeneous

2  precincts for both groups to get reasonable estimates.

3       Q.  Okay.  And you can't tell me whether the

4  non-Latino estimate is likely to be higher or lower?

5       A.  That is correct.

6       Q.  And so, again, in your mind, it's entirely

7  possible that the estimate for Mr. Esquivias was 50

8  percent Latino, 50 percent non-Latino?

9       A.  It's possible.  I don't know.

10       Q.  I know you're hoping that horse is dead.

11  Almost.

12       A.  I am a very patient person.  Don't worry.

13       Q.  You use ecological inference in analyzing

14  voting behavior, correct?

15       A.  I have.

16       Q.  Okay.  Is there another method, besides

17  ecological inference or ecological regression, that you

18  prefer?

19       A.  I don't understand the question.

20       Q.  Another method that I just haven't heard about

21  for estimating voting behavior?

22       A.  My preference is to have individual level data.

23  But absent having individual level data, EI is the best

24  currently available.

25       Q.  We can agree that there is -- we have a secret

66

Atkinson-Baker Court Reporters
www.depo.com

1    ballot here, right?

2         A.  Yes.

3         Q.  Okay.

4         A.  But there are surveys.

5         Q.  Yeah.  I won't get into that.  I have my own

6    opinion about those surveys.  We would all prefer to

7    have individual level data, but we don't.

8              Is there any other method, aside from

9    ecological regression or ecological inference, that you

10   know of to estimate group-wide voting behavior?

11        A.  Yes.

12        Q.  What's that?

13        A.  It is a modification by Quinn and his

14   co-author.  I forget the piece.  I would view it as a

15   modification or as a sort of extension of King's

16   estimate.  It's relatively recent, coming out in the

17   last five years.

18        Q.  Do you prefer it?

19        A.  I haven't used it, and I haven't studied it

20   widely.  Like I said, I view it not as an alternative

21   but as an extension.  Actually, instead of working with

22   the percentages, it works with the raw counts.  And

23   there's pluses and minuses for either approach.

24        Q.  Okay.  So let's talk about your analysis for

25   just a moment.

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1            You, as I understand, calculated the ecological

 2    inference estimates as a fraction of Latinos who are

 3    registered in Kern County as Democrats, and then you

 4    compared them to the true value; is that true?

 5        A.   That's correct.

 6        Q.   And you used both ecological inference and

 7    ecological regression to do that?

 8        A.   That's correct.

 9        Q.   And you used registration data only to conduct

10    that analysis, I mean, as opposed to vote count or CVAP?

11        A.   Yes, it was registration data.  Name match

12    registration data.  I think -- I didn't collect the

13    data, but from the statewide database.

14        Q.   So you would agree with me that choosing to

15    register is not the same as choosing to vote, correct?

16        A.   Correct.

17        Q.   So tell me what is the logic of demonstrating

18    the estimate of the proportion of Latinos who are

19    Democrats to show aggregation bias.  Tell me the logic

20    of that.

21        A.   Certainly.  It's the -- first of all, they're

22    related.  So the pool of voters come from the pool of

23    registrants.  So they are the same -- they have the same

24    rough geographical distribution.

25        Q.   Wait.  Wait.
```

68

1          You think that the votes cast and registration

2    has the same geographical distribution?

3         A.   No.   They're related because the pool of voters

4    comes from the pool of registrants.   It is the closest

5    we can get, and it's the closest we can get that has --

6    that we can verify a correct or almost correct answer.

7         Q.   Have you done any study of turn-out --

8    group-wide turn-out behavior in Kern County?

9         A.   I have not.

10        Q.   So you don't know how close that distribution

11   is between vote count and registration, correct?

12        A.   I have not done that analysis, no.

13        Q.   Okay.   Have you performed any other kind of

14   checks for aggregation bias on the Kern data other than

15   this one?

16        A.   No.

17        Q.   Okay.   You haven't performed any analysis of

18   whether a high Democratic registration of Anglos were

19   especially likely or unlikely to vote for

20   Spanish-surname candidates, have you?

21        A.   I personally did not.   I believe Dr. Kousser

22   did something similar to that demonstrating that there

23   was aggregation bias by that one cause.   There could be

24   other causes.

25        Q.   You did an article, which I have here -- I

Atkinson-Baker Court Reporters
www.depo.com

1   would have noted by looking at the code if any cases

2   were excluded.  But since I didn't see that, there is no

3   way I could have known that.

4         Q.  Did you read Appendix C to Dr. Kousser's report

5   about the instructions he received from Dr. Honaker?

6         A.  I skimmed it.

7         Q.  Does Dr. Kousser's explanation temper your

8   criticism of what he provided a bit or help you

9   understand what he provided a bit?

10        A.  No.  For me, when I -- when I evaluate someone

11  else's quantitative analyses these days in 2017, we

12  expect to see the exact code used to generate every

13  number in someone's article.  He did not provide that.

14        Q.  Is that something that you think he has and

15  withheld; or from the explanation that you saw in his

16  rebuttal, he doesn't have it to give?

17        A.  Whether or not he has it or -- I actually think

18  he doesn't have it.  But regardless, that's not

19  acceptable practice for what is considered data

20  accessibility and research transparency, which is a

21  standard adopted by, for example, the American Political

22  Science Association, a standard adopted by all of the

23  leading journals.

24        Q.  You did have data that told you the electoral

25  results by precinct for each election analyzed, correct?

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1       A.  I believe so.  But, again, I don't know if they

2   were manipulated in any way or how they were read in.

3   But, yes, I received what Dr. Kousser purports to be all

4   the data he used.  I have no reason to doubt him.

5       Q.  And you could have taken that data and done an

6   EI run yourself, correct?

7       A.  Yes.

8       Q.  Okay.  And then you could have run all the

9   diagnostic tests on your analyses, correct?

10      A.  In principle, yes.

11      Q.  And then you could have seen whether or not it

12  matched Dr. Kousser's estimates?

13      A.  Correct.  Although it would have been quite

14  difficult because, again, there's numerous parameters

15  that need to be set, and he didn't tell me which

16  parameters he chose.

17      Q.  What do you mean by "parameters"?  Give me an

18  example, please.

19      A.  Again, estimation is done for EI by simulation.

20  So you need to set two numbers, which is the number --

21  it's called a burn-in, b-u-r-n, dash, i-n; that is, how

22  many observations of the simulation are used to

23  basically start up the simulation and then are excluded,

24  and then how many -- how many iterations of the

25  simulation were used to actually make inferences; that

Atkinson-Baker Court Reporters
www.depo.com

1   is to get the --

2        Q.   Wait.  Stop.

3             Number of observations in each election is the

4   number of precincts; no?

5        A.   So I should be clear.  Number of iterations of

6   the simulation.

7        Q.   Okay.  You know how to do an ecological

8   inference analysis?

9        A.   I do.

10       Q.   And if I handed you the underlying data for the

11  precinct composition from the statewide database and I

12  handed you election results, you could have run an

13  EI analysis, correct?

14       A.   I could not have replicated exactly what

15  Dr. Kousser did.  There are other things I need to know.

16  But, yes, I could run an analysis.

17       Q.   You could run an analysis, and you could come

18  up with estimates?

19       A.   Correct.

20       Q.   And then you could compare those estimates to

21  Dr. Kousser's and see if they were far off?

22       A.   Certainly.

23       Q.   And you could have done diagnostics on your own

24  run?

25       A.   Correct.

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.  Okay.

 2        A.  Although that's a very odd practice.  Normally

 3   when someone presents me with an article or set of --

 4            THE REPORTER:  I'm sorry?

 5            THE WITNESS:  Normally when someone submits an

 6   article to my journal or gives me an analysis, it's

 7   incumbent upon them to convince me their analysis was

 8   done properly.

 9   BY MS. HULETT:

10        Q.  Well, let's look at -- I want to ask you a

11   question right up that alley.

12            You did work -- worked on a case in Virginia.

13   The Bethune-Hill case is one of the cases that your

14   attorney gave me as a case you have worked on recently,

15   correct?

16        A.  Correct.

17        Q.  And tell me what you did in that case.

18        A.  Again, I haven't reviewed it.  We did some

19   voting -- looking for voting behavior of whites and

20   blacks in that case.  Most of my report was actually a

21   critique of Dr. Ansolabehere.  And I can never spell his

22   name.

23        Q.  A-n-s-o-l-a-b-e-h-e-r-e.

24            Who did you work for in that case?

25        A.  That's a complicated question.  Would you like
```

91

Atkinson-Baker Court Reporters
www.depo.com

1    the details?

2         Q.   I just want to know who your client was in that

3    case.

4         A.   It is the weirdest case I have ever worked on.

5    I was originally retained by the outside counsel for the

6    attorney general of the State -- of the Commonwealth of

7    Virginia, who was a Democrat.  Halfway through the

8    trial, after close of discovery, the attorney general

9    and his solicitor general was not happy with my report

10   because it actually was a proper defense of the plan.

11   The plan was passed by previous Republican

12   administration.  They wanted to fire me and exclude my

13   report.

14            The judge did not allow that to happen.  And

15   after being chastised, there was an agreement made by

16   which Republican intervenors paid my outstanding bill

17   and hired me to be their expert.  I told you it was a

18   complicated one.

19        Q.   So it is probably a good thing that you didn't

20   run an independent report in this case.

21        A.   I don't understand.

22        Q.   You said Dr. Ansolabehere was in that case also

23   testifying, correct?

24        A.   He was -- he was one of the lead expert

25   witnesses for the plaintiffs in the case.

Atkinson-Baker Court Reporters
www.depo.com

1        Q.  And you reran his estimates in that case,

2    didn't you?

3        A.  Yes.

4        Q.  In a way that you didn't do in this case,

5    correct?

6        A.  That's correct.  Although -- I actually should

7    modify that.  I have to go back and look at my report.

8    We actually looked at a larger -- I didn't use his data.

9    We looked at a larger universe of cases than

10   Dr. Ansolabehere had looked at.

11       Q.  All right.  But you did your own EI analysis?

12       A.  In that case, yes.

13       Q.  Did you also do an ecological regression

14   analysis or just the EI?

15       A.  I think -- I don't remember.  Sometimes we put

16   it in the appendix.  I think we did to show that we were

17   getting out-of-bounds results.

18       Q.  Do you recall what the percent of -- 90 percent

19   homogeneous black precincts was in that analysis?

20       A.  I do not without going back and looking at my

21   data.  So, no.

22       Q.  Did you have occasion to testify in that case

23   about the lack of homogenous precincts in the way that

24   you're testifying about it here?

25       A.  Not that I recall.  As I said, the brunt of my

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1    testimony that was taken was actually mostly on -- as in
 2    this case, was a critique of what Dr. Ansolabehere had
 3    done.  And the main portion of that was related to his
 4    analysis, if I recall correctly, of how you built out of
 5    precincts.  There was a question about how the
 6    legislature drew certain districts and whether they
 7    could have drawn them differently.  He presented some
 8    novel analysis which ultimately the court did not
 9    accept.
10         Q.  I'm debating whether to ask you about Texas.  I
11    think I'll ask you a few questions about Texas because I
12    think we can be done before lunch, hopefully.
13             When I say "Texas," I'm going to take you way,
14    way back to 2001.
15         A.  When I was a wee lad.
16         Q.  Yes.
17             In that case, you worked for Texas, right?
18         A.  No.  In that case, I worked for Democratic
19    intervenors.  I believe the ultimate client was the
20    house -- the Democratic caucus -- the members of the
21    congressional -- Democratic congressional delegation
22    from Texas.
23         Q.  Okay.  And I have your report from that case.
24         A.  I believe I had two reports in that case.
25         Q.  Oh, it is on top.  I only have one.
```

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    carry downstairs.

2           MR. SKINNELL:  That's why I hesitated.

3           MS. HULETT:  If you give me one minute to look

4    through my outline, I think we're done.

5           Off the record.

6               (A brief recess was taken.)

7           MS. HULETT:  I have no further questions at

8    this time.  And I gather from your break that you do.

9           MR. SKINNELL:  Just a couple, very few.

10

11                    EXAMINATION   +

12   BY MR. SKINNELL:

13       Q.  Dr. Katz, in the course of the questioning, I

14   think you testified that the way you typically figure

15   out how many homogeneous precincts you need to remain

16   statistically valid estimates is by running a tomography

17   plot on the data.  And you also testified you didn't do

18   that here with Dr. Kousser's estimates.

19           So how can you feel confident that you know how

20   many homogeneous precincts, you know, whether he has

21   enough or not?

22       A.  So to answer that, I think it's useful to

23   understand what a tomography plot is.  So a tomography

24   plot is a way to visualize the constraints.  Now, we

25   already talked about one set of constraints which come

Atkinson-Baker Court Reporters
www.depo.com

1   about by ethnic or racial homogeneity.  So a precinct

2   that is 100 percent Latino, I know exactly how the

3   Latinos in that precinct voted in that election.  There

4   is another constraint, which is the vote constraint.

5   It, too, is bound between zero and 100, or in my

6   language, zero and one.

7           And so when there are lopsided elections, those

8   also provide constraints.  So obviously if a candidate

9   won 90 percent of the vote, I know pretty much that

10  almost everyone in the precinct -- in that precinct, I

11  know pretty much everyone in that precinct had to have

12  voted for that candidate.

13          In this case, since it's all multi-candidate

14  elections, there's no blow-away elections.  So the

15  tomography plot is a way to visualize how these two

16  constraints overlap.  But given that there's basically

17  no blow-away elections, there's not much constraint

18  information being generated by the vote shares.  So all

19  the bounds information is coming from the racially

20  homogeneous precincts.

21     Q.  So then you're saying it isn't necessary to do

22  a tomography plot --

23     A.  I don't think so in this case.

24          MS. HULETT:  Could you finish that question

25  before he says, "I don't think so."  It is not necessary

115

Jonathan Neil Katz, Ph.D.
February 3, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, STEPHANIE JACKSON GEORGEANNE, CSR No. 8322,

 4   Certified Shorthand Reporter, certify:

 5          That the foregoing proceedings were taken

 6   before me at the time and place therein set forth, at

 7   which time the witness was put under oath by me;

 8          That the testimony of the witness and all

 9   objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12          That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14          Signature requested.

15          I further certify that I am not a relative or

16   employee of any attorney or any of the parties nor

17   financially interested in the action.

18          Dated this February 14, 2017.

19

20

21

22   _____

23             Certified Shorthand Reporter

24

25
```

121

Jonathan Neil Katz, Ph.D.
February 3, 2017