1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   OSCAR LUNA, ALICIA PUENTES,              No.  1:16-cv-00568-DAD-JLT
     DOROTHY VELASQUEZ, and GARY
12   RODRIGUEZ,

13                    Plaintiff,              FINAL PRETRIAL ORDER

14         v.

15   COUNTY OF KERN; KERN COUNTY
     BOARD OF SUPERVISORS; MICK
16   GLEASON, ZACK SCRIVNER,MIKE
     MAGGARD, DAVID COUCH, and
17   LETICIA PEREZ, in their official
     capacities as members of the Kern County
18   Board of Supervisors; JOHN NILON, in
     his official capacity as Kern County
19   Administrative Officer; and MARY B.
     BEDARD, in her official capacity as Kern
20   County Registrar of Voters,

21                    Defendants.

22

23         On October 16, 2017, the court conducted a final pretrial conference.  Attorneys Denise

24   Hulett and Tanya G. Pellegrini appeared on behalf of plaintiffs.  Attorneys Marguerite Leoni and

25   Christopher Skinnell appeared on behalf of defendants.  Having considered the parties' joint

26   pretrial statement and the views of counsel, the court now issues this final pretrial order.

27         Plaintiffs filed this action under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, on

28   April 14, 2016.  Plaintiffs allege that the 2011 redistricting plan of the Kern County Board of

Supervisors dilutes the voting strength of Latino voters by depriving them of a second district in which they could constitute a majority of the eligible voters and from which they could elect a candidate of their choice. Defendants deny that the 2011 redistricting plan of the Kern County Board of Supervisors violates Section 2 as interpreted by the United States Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and its progeny. Defendants have also asserted affirmative defenses, including laches and lack of ripeness. Finally, defendants contend that no supervisorial map can be drawn in Kern County that would have two majority Latino citizen voting age population districts without subordinating traditional districting considerations to racial ones in violation of Equal Protection.

## I.        JURISDICTION/VENUE

Jurisdiction with respect to plaintiffs' § 2 claim is predicated on 28 U.S.C. §§ 1331 and 1343. Jurisdiction over plaintiffs' claim for attorneys' fees, costs, expert witness fees, and associated costs and related non-taxable costs is based on 52 U.S.C § 10310(e) and 28 U.S.C. § 1920. Jurisdiction is not contested.

Venue is proper pursuant to 28 U.S.C. § 1391(b) because relevant and substantial acts occurred and will continue to occur within the Eastern District of California. Venue is not contested.

## II.        JURY

Both parties have requested a bench trial.

## III.        UNDISPUTED FACTS

1.        The events that are the subject of this lawsuit occurred in Kern County.

2.        Plaintiffs Oscar Luna, Alicia Puentes, Dorothy Velasquez, and Gary Rodriguez are Latino U.S. citizens and registered voters of Kern County who challenge the configuration of the current plan for election of members of the Kern County Board of Supervisors (the "Board of Supervisors" or the "Board").

3.        All of the plaintiffs reside either in 2011 Supervisorial District 1 or 4.

4.        Kern County is a political and geographical subdivision of the State of California established under the laws of the State of California, operating under the laws of

2

the State of California and created for the provision of government services.

5. The Kern County Board of Supervisors is the County's legislative body and is responsible for establishing county policies and the overall administration of the Kern County government.

6. Defendants Mick Gleason, Zack Scrivner, Mike Maggard, David Couch, and Leticia Perez are members of the Board of Supervisors of defendant Kern County. Each supervisor is sued in his or her official capacity.

7. From 2009 to February 2017, John Nilon was the County Administrative Officer for defendant Kern County and was responsible for enforcing the rules, regulations, and policies and ordinances enacted by defendant Board of Supervisors, and was responsible for supervising the redistricting map options and public workshops during the 2011 redistricting process undertaken by the defendant Board of Supervisors. Mr. Nilon is sued in his official capacity.

8. Defendant Mary B. Bedard is the Registrar of Voters for Kern County, responsible for conducting county elections in Kern County. Defendant Bedard is sued in her official capacity.

9. According to the 2010 United States Census, Kern County had a total population of 839,631 of whom approximately 49% were of Hispanic/Latino origin, 4% were Asian, and 5% were African American.

10. The U.S. Census Bureau's American Community Survey ("ACS") 1-year estimate concludes that in 2010, Kern County had a total citizen-voting age population ("CVAP") of 476,399 of whom an estimated 34% were Latino.

11. According to the 2000 United States Census, Kern County had a total population of 661,645 persons of whom 38% were of Hispanic/Latino origin.

12. Kern County is divided into five supervisorial districts.

13. Latinos comprise more than half of the CVAP in the current District 5.

14. Latinos do not comprise more than half the CVAP in any other current supervisorial district.

15. Both of the Latino majority districts in the *Thornburg v. Gingles*, 478 U.S. 30 (1986), prong one illustrative maps one[1] and two submitted by plaintiffs are estimated to have a higher Latino share of eligible voters than the single majority district in the map adopted by the Board of Supervisors in 2011. This is true whether measured by the 2010-2014 five-year ACS CVAP Tabulation or by the 2005-2009 Tabulation, which was the most recent that was available at the time the current districts were adopted.

16. Defendant Kern County is required to redistrict its five supervisorial districts every 10 years in order to comply with applicable state and federal laws.

17. Defendant Kern County redistricted its five supervisorial districts in 1981.

18. Defendant Kern County redistricted its five supervisorial districts in 1991, at which time the County created a majority Latino CVAP district, District 5.

19. In 1991, Mr. Nilon was employed by the County of Kern in the Office of the County Administrator, and was responsible for developing the redistricting map options and conducting the public workshops during the 1991 redistricting process undertaken by defendant Board of Supervisors.

20. In 2001, the Board of Supervisors redistricted the County's supervisorial districts, which preserved the majority Latino CVAP district created in 1991, District 5.

21. During the 2001 redistricting process, Assemblyman Dean Florez proposed a districting plan including a westside district including Delano, McFarland, Wasco, Shafter, Lost Hills, Buttonwillow, Taft, and Maricopa.

22. During the 2011 redistricting, participants at the Shafter workshop supported a westside district including Delano, McFarland, Wasco, Shafter, Lost Hills, Buttonwillow, Taft/Maricopa, and Frazier Park/Lebec/Pine Mountain Club, in a draft plan called Option 5.

/////

---

[1] The term "illustrative map one" in this pretrial order refers to the Illustrative Map that was the subject of plaintiffs' motion for partial summary judgment. (*See* Doc. No. 39.)

23. During the 2011 redistricting, at the August 2, 2011 public hearing, Steven Ochoa of MALDEF presented a redistricting map that included two districts with a majority of Latino eligible voters. Plaintiffs have stipulated that:

    (a)    the 2011 MALDEF proposed map included federal and state prisoners in the population base;

    (b)    the Board of Supervisors adopted a policy of excluding prisoners from the population base, in accordance with a 1991 opinion of the California Attorney General; and

    (c)    plaintiffs will not contend in this lawsuit that adoption of such a policy by the Board of Supervisors was improper.

24. Plaintiffs have also stipulated that they will not rely on the supervisorial redistricting map presented by Mr. Ochoa at the August 2, 2011, Board of Supervisors meeting:

    (a)    to support any contention that the first *Gingles* precondition (that Latinos in Kern County are "sufficiently numerous and compact to form a majority in a [second] single-member district") is met in this case;

    (b)    as a possible remedy, should liability be found in this case; or

    (c)    to support any claim that the Board of Supervisors acted with a discriminatory purpose during the 2011 redistricting process.

25. John Nilon, as the County Administrative Officer, provided staff support to the Board of Supervisors, and the County Administrative Office staff was responsible for public outreach and the public workshops conducted in connection with the 2011 redistricting process and for providing information, including redistricting plan options, to the Board of Supervisors.

26. County staff conducted between 15 and 20 public "workshops" in 2011 regarding redistricting. There are no formal minutes of the discussions that took place at those workshops. Contemporaneous notes of the discussions that took place have not been located.

27.  Plaintiffs Velasquez, Luna, and Puentes did not attended any of the public "workshops."

28.  Plaintiff Rodriguez attended the public "workshop" in Shafter.

29.  In July and August of 2011, Kern County held a total of four formal public hearings on supervisorial redistricting – two hearings on July 5, 2011, one on August 2, 2011, and one on August 9, 2011.

30.  None of the plaintiffs attended any of the four public hearings or sent any communication to the Board of Supervisors or County staff regarding the redistricting.

31.  The July 5, 2011 staff reports provided to each member of the Board of Supervisor members in connection with the public hearings on that date contained a "Summary of County Supervisorial Redistricting Workshops, May 17 – June 15, 2011," and the August 2, 2011 staff report provided to each member of the Board of Supervisors in connection with the public hearing on that date contained a "Public Workshops Summary."

32.  In 2011, Kern County staff acquired publicly available American Community Survey Latino voting age citizenship data (CVAP) for Kern County from the California Statewide Database, which is the official redistricting data repository of the State of California.

33.  The 2005-2009 American Community Survey CVAP data from the California Statewide Database was in the possession of County Counsel for legal review of the 2011 redistricting options.

34.  County staff was unable to merge the CVAP data from the American Community Survey with the data from the 2010 Census on the computer program used for the redistricting, and therefore could not provide attendees of the County's public redistricting workshops in 2011 with CVAP data from the American Community Survey.

/////

35. Since at least 1981, all Kern County supervisorial redistricting plans have had two supervisorial districts in east Kern County, Districts 1 and 2.

36. Since at least 1981, all Kern County supervisorial redistricting plans have had one district in west Kern County, District 4, including the communities of Wasco, Lost Hills, Buttonwillow, Taft, and Maricopa, among others.

37. Since 1991, all Kern County supervisorial redistricting plans have included a district uniting the south eastern part of Bakersfield with the community of Lamont and the City of Arvin to the immediate south of the City of Bakersfield.

38. Under the 1981 redistricting plan, the City of Arvin and the Community of Lamont were in District 2. Wasco was in District 4 and Delano was in District 1.

39. Since at least 1981, all Kern County supervisorial redistricting plans have divided the community of Oildale between Districts 1 and 3.

40. Since at least 1981, all Kern County supervisorial redistricting plans have placed Delano, McFarland, and Shafter in District 1, along with the City of Ridgecrest.

41. Elections for Board of Supervisors are non-partisan.

42. As required by California Elections Code §§ 1300 and 8140-8141, elections by-district to the Board of Supervisors require a majority vote. If no candidate receives a majority of the votes in a district, the two candidates receiving the most votes in the election proceed to a run-off election.

43. There are no official barriers to Latinos registering to vote, casting a ballot, or running for office in Kern County on account of race or national origin, except that plaintiffs contend that a dilutive electoral system does itself present a barrier to Latinos registering to vote, casting a ballot, or running for office.

44. There is currently no candidate slating process in Kern County.

45. Regular elections for the Kern County Board of Supervisors are held in even-numbered years.

46. Since 1994, a total of six (6) Latinos have run for election to the Kern County Board of Supervisors, of which 4 Latinos have been elected and re-elected to the

Kern County Board of Supervisors – Leticia Perez in 2012, re-elected in 2016 (District 5); Pete Parra in 1996, re-elected in 2000 (District 5); Michael Rubio in 2004, re-elected in 2008 (District 5); and Steve Perez in 1994, re-elected in 1998 (District 2).

47.   The ecological regression method of analysis, and the newer ecological inference method are two techniques for estimating racially polarized voting that have been accepted by some federal courts where estimates were found to be reliable.  *But see* Disputed Factual Issue No. IV.5 below.

IV.   DISPUTED FACTUAL ISSUES

1.   Whether the Board of Supervisors adopted a plan that divided a large and geographically compact Latino community of eligible voters between District 1 and District 4 where a second Latino eligible voter citizen voting age majority district could have been drawn in 2011 in accordance with standards set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and *LULAC v. Perry*, 548 U.S. 399 (2006).

2.   Whether Latinos are sufficiently geographically compact to constitute the majority of the citizen voting age population in two of five Supervisorial districts, including all the issues pertaining thereto as briefed by the parties in connection with plaintiffs' motion for partial summary judgment.  (*See* Doc. Nos. 39, 41, 57.)

3.   Whether Latino voters in Kern County vote cohesively in local and statewide elections.

4.   Whether Anglo voters usually vote sufficiently as a bloc to defeat Latino voters' preferred candidates in local and statewide elections.

5.   Whether ecological regression and ecological inference are capable of producing reliable estimates of voting behavior in Kern County.

6.   Whether the 2011 Districting plan for the Board of Supervisors denies Latinos an equal opportunity to participate in the political processes and to elect candidates of choice.

8

7.   The extent of any history of official discrimination in Kern County affecting the right of Latinos to register, vote, or participate in the democratic process.

8.   The extent to which Kern County has used voting practices or procedures that may enhance the opportunity for discrimination against Latino voters.

9.   The extent to which Latinos in Kern County bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.

10.  The extent to which Latinos have been elected to public office in Kern County.

11.  Whether there is, and has historically been, a lack of responsiveness on the part of County Supervisors to the particularized needs of the Latino residents of Kern County.

12.  Whether the policies underlying the adoption of the 2011 Supervisorial Plan are tenuous.

13.  Whether the number of districts in which Latinos form the majority of the citizens of voting age is roughly proportional to its share of the population in Kern County as per *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006) (*LULAC*), and *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994), and if so, whether that consideration would not "overcome the other evidence of vote dilution for Latinos" in Kern County. *LULAC*, 548 U.S. at 438.

14.  Whether illustrative map two also has a higher share of eligible voters than the single majority district in the map adopted by the Board of Supervisors in 2011.

15.  Whether since at least 1991, all Kern County supervisorial redistricting plans have placed incorporated and unincorporated East Bakersfield south of Highway 178 in District 3 and/or 5.

16.  Whether since at least 1981, no Kern County supervisorial redistricting plan has split the City of Shafter into two districts.

/////

/////

V.    DISPUTED EVIDENTIARY ISSUES/MOTIONS IN LIMINE

Plaintiffs' Evidentiary Issues

1.    The court has heard and denied plaintiffs' motion *in limine* to preclude Dr. Jonathan N. Katz's testimony at trial.  Plaintiffs do not intend to bring a motion *in limine* to exclude the testimony of Dr. Douglas Johnson based on Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999).  However, plaintiffs do intend to bring a motion *in limine* to exclude the testimony of Dr. Douglas on the grounds that such testimony is untimely.

2.    Plaintiffs intend to bring a motion *in limine* to preclude portions of the testimony of *Lorelei Oviatt* as untimely and irrelevant to the liability phase of the proceedings.

3.    If defendants call Jorge Gonzales as a witness, plaintiffs may bring a motion to exclude his testimony as a former employee of plaintiffs' counsel, specially retained in anticipation of litigation, and as a former assistant to Steven Ochoa, a current MALDEF employee about whom the parties have reached a stipulation that precludes his testimony for purposes other than authentication.

4.    Plaintiffs intend to bring a motion *in limine* to preclude portions of Teresa Hitchcock's testimony to the extent that the scope of Ms. Hitchcock's testimony is beyond defendants' December 15 Disclosures, or "Communities of Interest in Kern County and official responsiveness to issues of concern to the minority group."

5.    Plaintiffs may bring motions in limine to exclude documents under Federal Rules of Evidence.

6.    Plaintiffs anticipate that they may wish to demonstrate the operation of Maptitude for Redistricting—the software used by David Ely and Dr. Johnson—to the court. Defendants do not object to this *per se*, but wish to preserve any objections that may arise with respect to particular applications.

Defendants' Evidentiary Issues

1.　The court has already heard and denied defendants' motions *in limine* to preclude portions of David Ely's testimony, portions of Dr. Albert Camarillo's testimony, and Dr. Morgan Kousser's testimony based on Federal Rules of Evidence 401 and 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999).  In this regard, the court denied defendants' motion *in limine* to exclude or limit the testimony of Dr. Camarillo (Doc. No. 99), denied defendant's motion *in limine* to exclude or limit the testimony of Dr. Kousser without prejudice to a motion to strike following the testimony of Dr. Kousser with respect to the use of the computer software, Zelig (Doc. No. 95), and denied defendants' motion *in limine* to exclude or limit the testimony of Mr. Ely (Doc. No. 97).  (Doc. No. 124.)

2.　Defendants also intend to bring motions to preclude portions of the testimony of plaintiffs, plaintiffs' experts, and witnesses Sam Ramirez and Dolores Huerta under FRCP 26(a)(2)(B) and FRE 602 and 701, among others.

3.　Defendants intend to bring motions to exclude from evidence several documents disclosed by plaintiffs on multiple grounds, including, among others, Rule 26(e), Rule 37(e), and FRE 901.

4.　Defendants anticipate that they may wish to demonstrate the operation of Maptitude for Redistricting—the software used by David Ely and Dr. Johnson—to the Court.  Plaintiffs do not object to this *per se*, but wish to preserve any objections that may arise with respect to particular applications.

As stipulated to by counsel, the parties shall file motions *in limine* relating to the issues referenced above no later than **November 14, 2017.**  Opposition to any motions *in limine* shall be filed no later than **November 21, 2017**, and any replies shall be filed no later than **November 28, 2017**.  Upon receipt of any opposition briefs, the court will notify the parties if it will hear argument on these motions prior to the first day of trial.

/////

VI.     SPECIAL FACTUAL INFORMATION

None.

VII.    RELIEF SOUGHT

Plaintiffs seek a declaration from this court that the current redistricting plan violates the Voting Rights Act, an injunction prohibiting Kern County from holding any further elections under its unlawful electoral system, and an order mandating a redistricting plan for the election of members to the Board of Supervisors that comports with the Voting Rights Act, 52 U.S.C § 10301.  Plaintiffs also seek attorneys' fees and costs.

VIII.   POINTS OF LAW

Undisputed Points of Law.  The parties do not dispute the following points of law:

1.      This is an action under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, which is applicable to Kern County.

2.      Section 2 of the Voting Rights Act of 1965, 52 U.S.C §10301, applies nationwide and prohibits voting practices and procedures that result in the denial or abridgment of the right of any citizen to vote on account of race, color, or membership in a language minority group.

3.      In *Thornburg v. Gingles*, the U.S. Supreme Court set out a framework for determining whether a districting plan dilutes minority voting strength in violation of Section 2.  In *Gingles*, the Supreme Court established a two-step inquiry for analysis of vote dilution claims.  478 U.S. at 50–51.  First, the minority group must be able to demonstrate:  (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "that it is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate."  *Id.*

4.      The *Gingles* prong one demonstrative map must "take into account" nonracial traditional redistricting criteria.  *LULAC*, 548 U.S. 399.

/////

12

5. The candidate of choice of Latinos need not be Latino him- or herself. *Ruiz v. City of Santa Maria*, 160 F.3d 543, 551 (9th Cir. 1998).

6. The second step of the inquiry requires the court "to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality whether the political process is equally open to minority voters." *Gingles*, 478 U.S. at 79 (citations and internal quotation marks omitted). The Senate Judiciary Committee, in a report accompanying the 1982 amendments to the Voting Rights Act, provided a non-exclusive list of factors that a court may consider in determining "whether the challenged practice impermissibly impairs the ability of the minority group to elect their preferred representatives." *Ruiz*, 160 F.3d at 550.

7. These factors include, but are not limited to:

   (a) the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

   (b) the extent to which voting in government elections is racially polarized;

   (c) the extent to which the state or political subdivision has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);

   (d) exclusion of minorities from a candidate slating process;

   (e) the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

   (f) the use of overt or subtle racial appeals in political campaigns; and

/////

13

1    (g)    the extent to which minorities have been elected to public office in the

2           jurisdiction.

3    8.    Additional factors are "whether there is a significant lack of responsiveness on the

4          part of elected officials to the particularized needs" of the minority group and

5          "whether the policy underlying the . . . use of such voting qualification,

6          prerequisite to voting, or standard, practice or procedure is tenuous."  S. Rep. at

7          29; *see also Gingles*, 478 U.S. at 48 n.15.

8    9.    The Senate Factors are "neither comprehensive nor exclusive."  *Gingles*, 478 U.S.

9          at 45.  Accordingly, plaintiffs "need not prove a majority of these factors, nor even

10         any particular number of them in order to sustain their claims."  *Ga. State*

11         *Conference of NAACP v. Fayette County*, 950 F. Supp. 2d 1294, 1298 (N.D. Ga.

12         2013); *see also Gomez v. City of Watsonville*, 863 F.2d 1407, 1412 (9th Cir. 1988)

13         (noting these factors are not intended to be "used as a mechanical 'point counting'

14         device," and "[t]he failure of plaintiff to establish any particular factor is not

15         rebuttal evidence of no violation") (internal quotation marks, citation, and

16         alterations omitted).

17   10.   Plaintiffs have the burden of proof of all required elements of a cause of action for

18         violation of Section 2 of the federal Voting Rights Act.  *Gingles*, 478 U.S. at 50 &

19         n.17; *Feldman v. Reagan*, 843 F.3d 366, 385 n.18 (9th Cir. 2016) (en banc).

20   11.   Under Section 2, remedial voting districts must be drawn in accordance with

21         traditional redistricting criteria.

22   12.   The equal protection clause prohibits the use of race as the predominant criterion

23         in the drawing of remedial electoral districts, unless such a use of race as the

24         predominant criterion is narrowly tailored to serve a compelling state interest.

25   Disputed Points of Law.  The parties raise disputes with respect to several other points of

26   law, enumerated below.  Trial briefs addressing these points more completely were to be filed

27   with this court no later than **November 14, 2017** in accordance with Local Rule 285 and both

28   parties have timely filed their trial briefs with the court.

14

1.    Whether, based on the totality of the circumstances, it is shown that the political processes leading to election in Kern County are not equally open to participation by Latinos in that Latinos have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

2.    While the parties agree that "traditional redistricting criteria" in legislative redistricting, and in the remedial phase of a Section 2 lawsuit are jurisdiction-specific, they disagree on the extent to which that is true with respect to the *Gingles* prong 1 analysis, as briefed by the parties in connection with plaintiffs' motion for partial summary judgment. (*See* Doc. Nos. 39, 41, 57.)

3.    Whether plaintiffs, in producing their illustrative maps, have carried their burden of demonstrating Latinos are sufficiently geographically compact within the meaning of the first *Gingles* prong to constitute the majority of the citizen voting age population in two of five Supervisorial districts, meeting the requirements of *Gingles* and its progeny.

4.    Whether and to what extent racial voting patterns in Kern County in statewide and other exogenous elections are relevant in determining whether local supervisorial elections in Kern County are racially polarized within the meaning of the second and third *Gingles* prongs.

5.    Whether racial voting patterns in Kern County in elections for partisan office are relevant in determining whether local non-partisan elections in Kern County are racially polarized within the meaning of the second and third *Gingles* prongs.

6.    Whether elections involving only candidates who are themselves Latino, are relevant in determining whether elections in Kern County are racially polarized within the meaning of the second and third *Gingles* prongs.

7.    The elements of the definition of legally significant racially polarized voting.

8.    The standard for determining whether Latino voters are "politically cohesive" within the meaning of the second *Gingles* prong.

9. The standard for determining whether non-Latino voters vote as a bloc.

10. The parties dispute the extent to which the "special circumstances" doctrine is relevant with respect to elections in which Latinos cohesively supported a candidate who lost.

11. The parties dispute whether, if it were shown that Kern County used voting practices or procedures that may enhance the opportunity for discrimination against Latino voters, it is necessary for plaintiffs to show that those practices or procedures have actually resulted in discriminatory effects on Latino voters.

12. Relatedly, the parties dispute whether it is necessary for plaintiffs to show that the state law requirement for a majority vote has actually impeded the ability of Latino voters to elect their candidates of choice.

13. Whether plaintiffs' claims are barred by laches.

14. Whether plaintiffs' claims are unripe.

15. Whether a supervisorial districting map can be drawn in Kern County without subordinating traditional redistricting criteria in violation of the Equal Protection Clause of the Fourteenth Amendment.

16. Whether the 2011 districting plan unlawfully dilutes the Latino vote and thus compliance with Section 2 provides a compelling interest to justify race-conscious remedial relief. *Ruiz*, 160 F.3d at 559 (citing *Bush v. Vera*, 517 U.S. 952, 978 (1996); *Miller v. Johnson*, 515 U.S. 900, 921 (1995)).

IX.   ABANDONED ISSUES

None.

X.   WITNESSES

Plaintiffs' witnesses are those listed in **Attachment A**.  Defendants' witnesses are those listed in **Attachment B**.  Each party may call any witnesses designated by the other.

A. The court will not permit any other witness to testify unless:

(1) The party offering the witness demonstrates that the witness is for the purpose of rebutting evidence that could not be reasonably anticipated at

16

the pretrial conference, or

    (2)    The witness was discovered after the pretrial conference and the proffering party makes the showing required in paragraph B, below.

  B.    Upon the post pretrial discovery of any witness a party wishes to present at trial, the party shall promptly inform the court and opposing parties of the existence of the unlisted witnesses so the court may consider whether the witnesses shall be permitted to testify at trial. The witnesses will not be permitted unless:

    (1)    The witness could not reasonably have been discovered prior to the discovery cutoff;

    (2)    The court and opposing parties were promptly notified upon discovery of the witness;

    (3)    If time permitted, the party proffered the witness for deposition; and

    (4)    If time did not permit, a reasonable summary of the witness's testimony was provided to opposing parties.

## XI.    EXHIBITS, SCHEDULES, AND SUMMARIES

Plaintiffs' exhibits are listed in **Attachment C**. At trial, plaintiffs' exhibits shall be identified as PX and listed numerically, e.g., PX-1, PX-2. Defendants' exhibits are listed in **Attachment D**. At trial, defendant's exhibits shall be identified as DX and listed numerically, e.g., DX-1, DX-2. To the extent the parties plan to introduce identical exhibits, they shall designate such exhibits as joint exhibits. At trial, joint exhibits shall be identified as JX and listed numerically, e.g., JX-1, JX-2. All exhibits must be pre-marked.

The parties must prepare two exhibit binders for use by the court at trial, with side tabs identifying each exhibit in accordance with the specifications above. Each binder shall have an identification label on the front and spine.

As stipulated to by counsel, the parties must exchange exhibits by **October 27, 2017**. The parties agreed to file their exhibit list with the court on **November 14, 2017** and have done so with the filing of a plaintiffs' exhibit list, a defendants' exhibit list and a joint exhibit list. (Doc. Nos. 135, 138, 139.) As stipulated by the parties, the list filed with the court on that date shall

now be the governing witness lists without waiver of any objections to any exhibits listed therein. Any objections to exhibits are due to be filed with the court no later than **November 28, 2017**.

    A.    The court will not admit exhibits other than those identified on the exhibit lists referenced above unless:

        (1)    The party proffering the exhibit demonstrates that the exhibit is for the purpose of rebutting evidence that could not have been reasonably anticipated, or

        (2)    The exhibit was discovered after the issuance of this order and the proffering party makes the showing required in paragraph B, below.

    B.    Upon the discovery of exhibits after the discovery cutoff, a party shall promptly inform the court and opposing parties of the existence of such exhibits so that the court may consider their admissibility at trial. The exhibits will not be received unless the proffering party demonstrates:

        (1)    The exhibits could not reasonably have been discovered earlier;

        (2)    The court and the opposing parties were promptly informed of their existence;

        (3)    The proffering party forwarded a copy of the exhibits (if physically possible) to the opposing party. If the exhibits may not be copied the proffering party must show that it has made the exhibits reasonably available for inspection by the opposing parties

XII.    <u>DISCOVERY DOCUMENTS</u>

    The parties may use the following discovery documents at trial:

    1.    Plaintiffs' Initial Disclosures

    2.    Plaintiffs' First Supplemental Disclosures

    3.    Plaintiffs' Second Supplemental Disclosures

    4.    Defendants' Initial Disclosures

    5.    Defendants' First Supplemental Disclosures

    6.    Defendants' Second Supplemental Disclosures

7.  Defendants' Third Supplemental Disclosures

8.  Defendants' Fourth Supplemental Disclosures

9.  Plaintiffs' Expert Disclosures and Reports, including supplemental disclosures and reports

10. Defendants' Expert Disclosures and Reports, including supplemental disclosures and reports.[2]

11. Defendants' Responses to Requests for Admissions, Set One

12. Defendants' Responses to Requests for Admissions, Set Two

13. Defendants' Responses to Interrogatories, Set One

14. Defendants' Responses to Interrogatories, Set Two

15. Defendants' Responses to Requests for Production, Set One

16. Defendants' Responses to Requests for Production, Set Two, and Request for Documents in Deposition Notice of Lorelei Oviatt

17. Each of Plaintiffs' Responses to Requests for Admissions, Set One

18. Each of Plaintiffs' Responses to Interrogatories, Set One

19. Each of Plaintiffs' Responses to Requests for Production, Set One

20. Transcripts of Board of Supervisors Public Hearings/Meetings on July 5, 2011, August 2, 2011, and August 9, 2011

21. Deposition Transcripts, Errata Sheets, Certifications, and Exhibits

Counsel must lodge with the court any deposition transcript to be used at trial no later than fourteen (14) days before trial. The parties may lodge such transcripts electronically.

XIII. FURTHER DISCOVERY OR MOTIONS

The parties filed *Daubert* motions challenging the admissibility of the following experts: (1) Jonathan N. Katz, defendants' expert witness; (2) Albert M. Camarillo, plaintiff's expert

---

[2] Supplemental disclosures include defendants' Amended Expert Witness Disclosures issued March 24, 2017 in which defendants withdrew Tom Brunell as an expert witness. Because Mr. Brunell will now not be testifying at trial, the transcript of his deposition would appear to be inadmissible hearsay and will not be admitted into evidence at trial absent some other applicable hearsay exception.

witness; (3) J. Morgan Kousser, plaintiff's expert witness; and (4) David R. Ely, plaintiffs' expert witness.   A hearing on these motions was held on October 16, 2017.  The court has (1) denied plaintiff's motion *in limine* to exclude the testimony of Jonathan N. Katz (Doc. No. 102); (2) denied defendant's motion *in limine* to exclude or limit the testimony of Albert M. Camarillo (Doc. No. 99); (3) denied defendant's motion *in limine* to exclude or limit the testimony of J. Morgan Kousser without prejudice to a motion to strike following the testimony of Dr. Kousser with respect to the use of the computer software, Zelig (Doc. No. 95); and (4) denied defendants' motion *in limine* to exclude or limit the testimony of David R. Ely (Doc. No. 97).  (Doc. No. 124.)

The parties do not anticipate making any further discovery related requests or pretrial motions at this time, other than anticipated motions *in limine* identified above.

XIV.   <u>STIPULATIONS</u>

The parties stipulate to the authenticity of the documentary evidence from the official records of the Kern County Board of Supervisors to be introduced at trial, while reserving the right to all other applicable evidentiary objections.

Plaintiffs have stipulated that Plaintiff Alicia Puentes will not testify at trial.

Plaintiffs have also stipulated that:

    (a) the 2011 MALDEF proposed map included federal and state prisoners in the population base;

    (b) the Board of Supervisors adopted a policy of excluding prisoners from the population base, in accordance with a 1991 opinion of the California Attorney General,

    (c) the Plaintiffs will not contend in this lawsuit that adoption of such a policy by the Board of Supervisors was improper.

Plaintiffs have further stipulated that they will not rely on the supervisorial redistricting map presented by Mr. Ochoa at the August 2, 2011, Board of Supervisors meeting:

    (a) to support any contention that the first *Gingles* precondition (that Latinos in Kern County are "sufficiently numerous and compact to form a majority in a [second]

20

single-member district") is met in this case;

    (b) as a possible remedy, should liability be found in this case; or

    (c) to support a claim that the Board of Supervisors acted with discriminatory purpose during the 2011 redistricting process.

XV.   <u>AMENDMENTS/DISMISSALS</u>

None.

XVI.  <u>SETTLEMENT</u>

On March 16, 2017, the parties participated in a settlement conference with Magistrate Judge Jennifer L. Thurston presiding. The case did not settle at that time and the parties have been unable to reach a resolution of this matter. No further settlement conference will be scheduled absent a joint request for such a conference by the parties.

XVII.  <u>JOINT STATEMENT OF THE CASE</u>

None.

XVIII. <u>SEPARATE TRIAL OF ISSUES</u>

The parties jointly request bifurcation of the liability and remedy phases of trial.

Defendants request separate trial of the *Thornburg v. Gingles* preconditions before taking evidence under the totality of the circumstances. Plaintiffs' oppose bifurcation in this manner as several of their witnesses address both the *Gingles* prongs and the Senate Factors, and would have to be recalled. The court finds plaintiffs' position in this regard to be practical and appropriate.

XIX.  <u>IMPARTIAL EXPERTS/LIMITATION OF EXPERTS</u>

The parties do not request appointment of impartial experts.

XX.   <u>ATTORNEYS' FEES</u>

Plaintiffs will seek attorneys' fees, costs, expert witness fees and associated costs and related non-taxable costs if they prevail and will do so by way of motion in accordance with Local Rule 54-293.

XXI.  <u>TRIAL PROTECTIVE ORDER AND REDACTION OF TRIAL EXHIBITS</u>

The parties do not request any special handling of trial exhibits and the parties stipulate that they will preserve all exhibits for purposes of possible appeal.

XXII. <u>MISCELLANEOUS</u>

None.

XXIII. <u>ESTIMATED TIME OF TRIAL/TRIAL DATE</u>

A bench trial is set for **December 5, 2017** at 1:00 p.m. in Courtroom 5 before the Honorable Dale A. Drozd. Trial is anticipated to last **10 to 11** days. The parties are directed to Judge Drozd's standard procedures available on his webpage on the court's website.

Counsel are to call Renee Gaumnitz, courtroom deputy, at (559) 499-5652, one week prior to trial to ascertain the status of the trial date.

XXIV. <u>TRIAL BRIEFS</u>

As noted above, trial briefs were due on **November 14, 2017** and have been filed by both parties.

IT IS SO ORDERED.

Dated: __**November 21, 2017**__

_____
UNITED STATES DISTRICT JUDGE

Attachment A: Plaintiffs' Witnesses

1. Oscar Luna, Wasco, CA

2. Dorothy Velasquez, Delano, CA

3. Gary Rodriguez, Shafter, CA

4. Dolores Huerta, Bakersfield, CA

5. Sam Ramirez, Delano, CA

6. Mick Gleason, Bakersfield, CA

7. Zack Scrivner, Bakersfield, CA

8. Mike Maggard, Bakersfield, CA

9. David Couch, Bakersfield, CA

10. Leticia Perez, Bakersfield, CA

11. John Nilon, Bakersfield, CA

12. Mary B. Bedard, Bakersfield, CA

13. Allan Krauter, Bakersfield, CA

14. Teresa Hitchcock, Bakersfield, CA

15. Lorelei H. Oviatt, Bakersfield, CA

16. Jon McQuiston, Bakersfield, CA

17. Ray Watson, Bakersfield, CA

18. Karen Goh, Bakersfield, CA

19. Alan Christensen, Bakersfield, CA

20. Albert M. Camarillo, Plaintiff's expert witness, Department of History, Stanford University, Stanford, CA

21. J. Morgan Kousser, Plaintiff's expert witness, Altadena, CA

22. David R. Ely, Plaintiffs' expert witness, San Gabriel, CA

23. Douglas M. Johnson, Defendants' expert witness Glendale, CA

24. Jonathan N. Katz, Defendants' expert witness, DHSS 228-77, Pasadena, CA

25. Kim Salas, Bakersfield, CA

26. Karen Rhea, Bakersfield, CA

Attachment B: Defendants' Witnesses

1. Defendants incorporate plaintiffs' Witness List, above.

2. Jorge Gonzalez, Los Angeles, CA

3. Richard Chapman (foundation), Bakersfield, CA

4. Matthew Constantine (foundation), Bakersfield, CA

5. Douglas M. Johnson, Defendants' expert witness Glendale, CA

6. Jonathan N. Katz, Defendants' expert witness, DHSS 228-77, Pasadena, CA

7. Lorelei H. Oviatt, Bakersfield, CA