UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE


OSCAR LUNA, et al.,              )
                                 )
              Plaintiff,         )   No. 16-CV-568-DAD
                                 )
vs.                              )   BENCH TRIAL
                                 )      DAY 8
COUNTY OF KERN, et al.,          )
                                 )
              Defendant.         )
_____   )

Fresno, California              Thursday, December 14, 2017




REPORTER'S TRANSCRIPT OF PROCEEDINGS








Volume 8,  Pages 1259 through 1414, inclusive



KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiffs:        Mexican American Legal Defense
                           and Educational Fund
                           BY:  **DENISE HULETT**
                           and **TANYA PELLEGRINI**
                           and **JULIA A. GOMEZ**
                           634 S. Spring Street
                           11th Floor
                           Los Angeles, California  90014


For the Defendants:        Nielsen Merksamer Parrinello
                           Gross & Leoni
                           BY:  **CHRISTOPHER SKINNELL**
                           and **MARGUERITE LEONI**
                           and **JAMES BAROLO**
                           2350 Kerner Boulevard
                           Suite 250
                           San Rafael, California 94901

1                              <u>INDEX</u>

2

<u>DEFENDANT'S WITNESSES</u>:

3
  **LORELEI OVIATT**                                      1265
4   CONTINUED DIRECT EXAMINATION BY MS. LEONI              1265
    CROSS-EXAMINATION BY MS. GOMEZ                         1288
5   **WILLIAM MICHAEL MAGGARD**                            1289
    DIRECT EXAMINATION BY MS. LEONI                        1290
6   **JONATHAN NEIL KATZ**                                 1319
    DIRECT EXAMINATION BY MR. SKINNELL                     1319
7   CROSS-EXAMINATION. BY MS. HULETT                       1347
    REDIRECT EXAMINATION BY MR. SKINNELL                   1384
8   RECROSS-EXAMINATION BY MS. HULETT                      1389
    **KIMBERLY SALAS**                                     1390
9   DIRECT EXAMINATION BY MS. LEONI                        1390
10                              * * * * *

11

12

13

14

15                            EXHIBITS

16   <u>DEFENDANT'S</u>                                 Received
     573                                                1287
17   621                                                1323
     622                                                1324
18

19                              * * * * *

20

21

22

23

24

25

1   Thursday, December 14, 2017                    Fresno, California

2   8:34 a.m.

3          THE COURT:  Ms. Leoni, you may continue.

4          MS. LEONI:  Yes, Your Honor.  I do have one

5   preliminary matter.

6          THE COURT:  Yes.

7          MS. LEONI:  With regard to PX 167, pages 160 to 164.

8   And this is the US Commission on Civil Rights report.

9          THE COURT:  Yes.

10         MS. LEONI:  "Mexican Americans in the Administration

11  of Justice."

12         THE COURT:  What we talked about --

13         MS. LEONI:  Yes.  The defense withdraws its objection

14  based on authenticity, but it maintains the objection based on

15  hearsay.

16         THE COURT:  All right.  Then in light of the

17  withdrawal of the authenticity objection, I will also -- and

18  I've overruled the hearsay objection.  But I'm also

19  then -- remind me.  I admitted it as an ancient document?

20         MS. HULETT:  That's correct.

21         THE COURT:  I'm now admitting it also as an official

22  record.

23         MS. HULETT:  Yes, Your Honor.

24         THE COURT:  I'm forgetting the numbers.

25         MR. BAROLO:  167, 160 to 164.

1    THE COURT:  No, I remember.  I was talking about

2    different numbers.

3    MR. BAROLO:  Oh, okay.

4    THE COURT:  Thanks for the attempt, though.  803 -- I

5    need all the help I can get.  I'm admitting it both under -- I

6    originally admitted it only under 803(16) over the hearsay

7    objection.  I'm now admitting it under both 803(8) and

8    803(16).

9    All right.

10    MS. LEONI:  Okay, Your Honor.  I have another small

11    housekeeping matter that I think may be of assistance to

12    everybody in the courtroom.

13    THE COURT:  Yes.

14    MS. LEONI:  I hadn't prepared yesterday because the

15    exhibit had not been objected to and I had not been prepared

16    to provide the pictures that would be helpful to the Court.

17    So I'd like to pull up, once again, DX 573.10 and PX 134.

18    All right.  And I think that Your Honor can

19    see -- it's so much better on paper.  See if we can get a -- I

20    need more than that, Eric.  I need to be up higher.

21    Okay.  That's pretty good.  Now, Your Honor, the

22    bottom map is a Census tract map.  And it reflects the Census

23    tracts that in Illustrative 2 are moved from District 3 to

24    District 1.  And this area that is blank is this area.  Which

25    is not moved.  All right?  The -- you can almost -- you can

1    see the contours of the Census tract that comes this way.

2            THE COURT:  Got it.

3            MS. LEONI:  Okay?  And that reflects this.  My line

4    up here is not as nice as it could be.  But I thought these

5    two maps viewed together would be of assistance to the Court.

6            THE COURT:  It's not a perfect match.  I mean,

7    there's little areas that are covered by the Census tracts

8    that aren't covered by the district boundaries.

9            MS. LEONI:  There's small differences, yes, Your

10   Honor.

11           THE COURT:  There's some areas in the district

12   boundaries that aren't covered by the Census map.

13           MS. LEONI:  It's fairly close.

14           THE COURT:  It's rough --

15           MS. LEONI:  And Your Honor, we will make an attempt

16   to perhaps bring even a better visual.  We didn't have time to

17   do it last night.

18           THE COURT:  I think I've got it.

19           MS. LEONI:  You see what you're looking at?

20           THE COURT:  I actually think that yesterday I had

21   sort of exactly that view in mind.

22           MS. LEONI:  Good.

23           THE COURT:  That it wasn't a perfect match, but it

24   was a general match.

25           MS. LEONI:  Your Honor, we pulled the whole Census

1   tract to be --

2          THE COURT:  No, I understand.

3          MS. LEONI:  Not to be inconclusive.

4          THE COURT:  Yeah.

5          MS. LEONI:  All right.  Thank you, Your Honor. And I

6   have a few little cleanup items with the witness, and then

7   we'll proceed to finish up her testimony.

8                          **LORELEI OVIATT**,

9   called as a witness on behalf of the Defendants, having been

10  previously sworn, testified as follows:

11                  CONTINUED DIRECT EXAMINATION

12  BY MS. LEONI:

13  Q.  Ms. Oviatt, I believe you testified that at the visioning

14  process, the East Bakersfield visioning process that was

15  conducted by the supervisor for District 3, that the

16  supervisor from District 5 also attended.  And from a planning

17  perspective, what would be her interest in attending a

18  charrette, a visioning charrette in a different district?

19  A.  Those two districts are right next door to each other.

20  They share infrastructure.  It is not unusual for a supervisor

21  from the district that is adjacent, for example, in District 1

22  or 2, Supervisor Gleason and Supervisor Scrivner often show up

23  for something in the other person's district.  And it is also

24  normal between 3 and 5, Supervisor Perez and Supervisor

25  Maggard.

1    Q.  Is this because they're urban areas?

2    A.  Well, in the case of District 3 and 5, yes, they're urban

3    areas.  So when we're talking about a neighborhood and we're

4    talking about a park.  There are people in, you know, adjacent

5    districts who go and use that park.

6    Q.  Okay.  And then I'd like to go -- I want to make sure I

7    understood your testimony correctly.  We were talking about

8    the City of Arvin and the unincorporated community of Lamont.

9    And I believe you said, in response to a question, that Arvin

10   does not provide services to Lamont.  And by that testimony,

11   did you mean to say that they have no relationship?

12   A.  I didn't.

13   Q.  Could you explain the relationship between Arvin and

14   Lamont?

15   A.  I thought the question was about services.  But if we're

16   talking about relationship inside community, Arvin -- Arvin

17   has done a lot with economic development.  As all cities have.

18   And they have done economic development studies.  And they

19   have shown that -- I don't remember the exact statistics from

20   their economic study, but it's more than half of their people

21   work in Bakersfield.

22          And as I noted earlier, Arvin is very interested in

23   the retail opportunities down at Tejon Ranch, which is about

24   maybe 11 or 12 miles away to the south in regards to their

25   opportunities to attract retail opportunities to Arvin that

1  could be an offshoot from the outlets at Tejon.  They have

2  outlet stores down there, perhaps they would open a regular

3  store in Arvin.  So Arvin's focus has been on diversification,

4  and their main employer, as I mentioned, is Grimmway.  So

5  Grimmway is the main employer in Lamont and the main employer,

6  as far as I know, in Arvin.

7  Q.  All right.  I'd like to pull up an exhibit, DX 561.  And

8  why don't we start with page 1.

9       Are you familiar with Kosmont Companies?

10 A.  I am just a general consultant who does consulting for

11 cities on diversification efforts, primarily focused on retail

12 I believe.  Commercial types of opportunities.

13 Q.  This retail plan, could you look through it and let me

14 know if it is the type of study you would ordinarily rely on

15 in analysis of the economic climate in a particular locality?

16 A.  Yes, it is.

17 Q.  And I'd like to go to page 30 of the report.

18      What does this -- these two charts tell you?

19 A.  Well, this is actually two charts which obviously they

20 took from the US Census Bureau statistics, that show that the

21 people who live in Arvin, primarily -- there's 26 percent who

22 actually work in Bakersfield.  And then kind of a gradual list

23 here.  I do note that some of them travel as far as Delano,

24 but that's one percent of the employees.

25      Please notice down at the bottom, Lancaster.

1 Lancaster is actually in Los Angeles County.  It isn't even in

2 Kern County.  And there's a certain percentage that actually

3 commute to Tehachapi.  Now, on the right side, it appears that

4 what they're looking at is where do people who work in the

5 City actually come from.  I'm not sure that that tells us much

6 because I don't know what "come from" means.  But this is a

7 way of -- in most of these economic studies, this is the way

8 of letting the City know perhaps they should do more work on

9 recruiting inside their city to have them come work for the

10 City of Arvin.

11 Q.  According to these charts, are there a significant

12 percentage of residents and employees in Arvin who commute to

13 Delano?

14 A.  No.  One percent is -- that could even be a rounding

15 error.  But the majority of these people live either in Arvin,

16 Bakersfield city limits or Lamont, which is obviously only a

17 few miles away.

18 Q.  And Shafter?

19 A.  Shafter is a little higher, but you'll notice it also has

20 San Jose and other places that are -- San Jose is not in Kern

21 County.

22 Q.  All right.  Thank you.  Are there any other commentary

23 that you may have from this exhibit?

24 A.  You know, you asked me about the -- you asked me about how

25 is agricultural changing.  This is an example.  All of these

1  cities, along with the County of Kern, are looking to see how

2  can we diversify, how can we attract different types of

3  fulfillment centers or logistical centers.

4       But in a small city like Arvin, they're actually

5  interested in getting sit down restaurants.  They're

6  interested in getting a Red Lobster.  They're interested, at a

7  very much smaller scale, at growing their community.  Those

8  are the types of things that we struggle to attract in our

9  cities.  It's not -- you know, whereas Los Angeles is

10  interested in looking at major industries.  We're still at the

11  level of trying to get the kinds of amenities that communities

12  need so that they can walk to a restaurant, so that they can

13  walk to a dry cleaner, so they can actually have some quality

14  of life.

15  Q.  Now, you mentioned that Grimmway Farms is the big employer

16  right there in Arvin and Lamont.  Have there been other

17  efforts between these communities to acquire services, for

18  example, health clinics, senior housing, anything along those

19  lines?

20  A.  Well, if you scroll farther through this, I believe you

21  will find that the health industry is one of the largest

22  employers.  The second largest -- or the first largest

23  employer in Arvin is the school districts.  And I believe the

24  second is clinics.  And so we have been working, the Kern

25  County Planning & Natural Resources is working in Lamont with

1  a private non-profit affordable housing developer who's also

2  gone to the State of California, where a grant -- and we are

3  putting some money into that.  For a major complex that would

4  have veterans housing, senior housing as well as urgent care

5  clinics.

6         And that study -- one of the reasons that I know

7  about this study in Arvin was because during that evaluation

8  of that project, we looked to see where were people going to

9  come from to use that Lamont clinic.  What was the area of

10  draw for that type of health.  And so we looked at Arvin, we

11  looked at Lamont.  Greenfield.  We looked at East Bakersfield.

12  But primarily, because of transportation, it's a Lamont,

13  Greenfield, Arvin area.

14  Q.  Thank you.  Now, in discussing the economic sectors in the

15  various cities in Kern County, I didn't hear you mention

16  prisons.  Are prisons a significant element of the economy in

17  any of the Kern County cities?

18  A.  One of the reasons I didn't mention prisons is, you know,

19  in the past they -- we have -- these cities went out and

20  attracted a lot of prisons.  But there were changes in the way

21  that prisons are funded, meaning who was actually going to be

22  in those prisons.  So we do have a lot of prisons, which

23  provide for worker -- employees who buy houses and live in

24  these communities.  So we have prisons outside Wasco, Arvin,

25  California City, Tehachapi, some of them are State Prisons,

1  such as the one in Tehachapi.  But some of them are private

2  prisons.

3  Q.  Is there a prison in Arvin?

4  A.  Prison, yes.

5  Q.  In Arvin?

6  A.  No.  Not in Arvin, sorry.  Sorry.

7  Q.  And how --

8  A.  Wasco.  Sorry.

9  Q.  I'm sorry.  How about in Lamont?

10  A.  No.

11  Q.  All right.  And then in -- if I understood your testimony,

12  the County is working on a general plan revision.  And one of

13  the new elements is going to be the Healthy Communities.  And

14  in connection with that work, do you have occasion to review

15  health statistics in the county?

16  A.  Yes.  The idea behind the Healthy Communities element is

17  that we have a high rate of obesity county-wide.  We have a

18  high rate related to diabetes.  The communities have brought

19  up teen pregnancy.  And what we are doing is attempting to

20  feed those all through a land use viewpoint.  How are we

21  building our communities?  What are the things that are

22  lacking in our communities?  How can we actually make -- you

23  know, how can we make an impact on those metrics?  Obesity and

24  diabetes are a little clearer than teen pregnancy.  But there

25  are issues regarding if a teen does get pregnant, are they

1    able to find health care?

2         So one of our new initiatives is actually mapping

3    where are the clinics, what are the transportation linkages to

4    clinics, is there affordable and easily accessed health care

5    for teens who are attempting to either get contraception, get

6    updates.  It's an unfortunate topic, but it was just a

7    presentation at the Board of Supervisors.  We have some of the

8    highest rates of STDs among young people in Kern County.

9         And while traditionally, maybe 20 years ago, the

10   planning department would never engage in these kinds of

11   conversations, we have now moved into an era where we are

12   actually looking at how are all those things integrated?  And

13   some of this is driven by the Government Code that now

14   mandates that general plans look at these types of issues.

15   Q.  In your study of these issues, have you found that

16   diabetes is concentrated in a particular part of the county?

17   A.  There are higher rates in certain communities, but it is

18   county-wide.  We have an obesity issue in our deserts as well

19   as our valley.  And as well as teen pregnancy rates are very

20   high in eastern Kern.

21   Q.  And does that also go with diabetes?

22   A.  Yes.  And other kinds of health, such as it is true that

23   asthma is more prevalent in the valley portion.  But

24   county-wide, we also have a problem with Valley Fever.

25   Q.  Okay.  Thank you.  Now I'd like to talk about

1   infrastructure a bit.  You talked at length in your testimony

2   yesterday about the infrastructure needs county-wide.  Are

3   there communities in the county that can be distinguished from

4   others because of infrastructure needs in the unincorporated

5   area?

6   A.   Most of the unincorporated communities were started back

7   in the, you know, many, many years ago.  The '50s, the '60s,

8   the '70s and '80s.  And in those days, we built houses, we

9   allowed commercial construction without having to pave roads.

10  And definitely without curb and gutter and sidewalk.  And if

11  they -- even if they did pave the road, by this time it is

12  substandard.  And so we have many thousands of miles of what

13  are called local streets.  There's three different kinds of

14  streets besides the freeway.  There are the large arterials,

15  which are 200 feet.  They are main streets, such as here in

16  Fresno, Van Ness Avenue or Tulare Avenue.  In Kern County,

17  those streets are such as Weedpatch Highway or the main roads.

18          The second is called the collector, which is 90 feet.

19  That's another feeder road.  But then the roads that people

20  live on, that their houses are actually on are called local

21  streets.  They're normally 60 feet wide, sometimes they're not

22  even 60 feet wide.  And those are the streets that most

23  residents are concerned about getting sidewalk, curb and

24  gutter and paving.

25  Q.   And how do these matters get addressed in the

1  unincorporated areas of the county?

2  A.  Well, we continue to struggle.  Our money has been in the

3  roads department and the transportation funding has been

4  diverted by the State of California for many, many years.  So

5  we are 600 million dollars in the hole of money that we didn't

6  get.  So it's really on an as-needed basis.  The first

7  priority is always to maintain the collectors and arterials.

8  And local streets, if they're paved and in what we call the

9  County maintenance system, which means they have to be fully

10 paved, sidewalk and curb and gutter and they're in the county

11 maintenance system, then we're at a lower level of just making

12 sure they're safe.  Meaning major potholes.  And they come to

13 the attention, the roads department has facilities in all

14 parts of the county.  And they also take complaints.  But one

15 of the number one things that I hear at community meetings and

16 I receive questions about is "How can I get my road paved?"

17 Q.  All right.  And what are the resources available, the

18 fiscal resources available for paving a road in the

19 unincorporated area?

20 A.  Well, one of the resources is called a -- it's a grant

21 that comes through the Air District that is transportation

22 money.  And the idea, of course, is that if we pave the roads,

23 we'll hold down the dust.  But that money is very, very

24 limited.  And so we -- you know, the need is much, much

25 greater.  But the roads department has gone out and gotten

1   these grants to pave the road.  But they also have to add

2   money to that, so it's like a matching grant.

3         Second, the residents can get together themselves.

4   And we have brought in the roads department to make this

5   presentation.  They can make a presentation to the residents,

6   who can then tax themselves, agree to tax themselves.  It

7   would be on their property tax assessments.  And that way

8   raise the money and the roads department would pave their

9   roads, that they would then be maintaining them.

10        The third way is that they can then come to the Board

11  of Supervisors and ask for the roads to be made private.

12  These are public access easements.  They could vacate that

13  road, make it private, put their money together and pave the

14  road.  But by making it private, there would be less traffic.

15  Therefore, the maintenance costs could go down.

16        And those are the -- and then, you know, the Board of

17  Supervisors has been struggling with this.  We are not what's

18  called a self-help county.  So under the transportation rules

19  of the federal government money and the State, if you are a

20  county that has passed a sales tax for transportation, you are

21  called a self-help county and you get priority.  Kern County

22  has consistently three times now voted down such a sales tax.

23  Therefore, we are at the lower end of the priority list.

24  Q.  Very good.  Can CDBG funds be used for infrastructure in

25  unincorporated areas?

1  A.  It can.  But normally we also need more money from the

2  roads department.  As a reminder, in any one district there

3  may only be 230 -- you know, like $200,000.  Paving a road and

4  putting in curb, gutter and sidewalk under Community

5  Development Block Grant has to be for residential.  And the

6  community itself must qualify.  So it has to be 51 percent low

7  income.  Not 50 percent or 48 or 49.

8          This is very frustrating for the board members and

9  for the community because when you drive down a street that's

10  49 percent low income, it doesn't look any different than a

11  street that's 51 percent.  But those are the Federal Housing &

12  Urban Development rules.  That's based on the Census.  It's

13  based on the community, American Community Surveys.  And so we

14  have communities that need this, but I can't use the money

15  there.

16  Q.  I'd like to highlight a couple of communities that were

17  discussed by the plaintiffs in their case.  There was

18  commentary that the Mexican Colony had infrastructure needs

19  and that is in the incorporated area.  Could CDBG funds be

20  used there to address those need?

21  A.  I think you said it was in the incorporated.  It's in the

22  unincorporated --

23  Q.  Thank you.

24  A.  -- Kern County.  It actually doesn't qualify.  It does not

25  have 51 percent.  It is one of the painful things about my

1  job, that the more people get jobs and the more that

2  they're -- the more people we put to work, the less qualified

3  the community becomes.  But they still have these needs.

4         So we have looked at Mexican Colony, just as we, at

5  the beginning of every year, look at all communities.  They

6  have paving in portions of Mexican Colony.  What they don't

7  have is sidewalks.  There are also portions of projects which

8  are very difficult.  So even if we have a community that

9  qualifies, when we go in, there are people who have built

10  things into the easements illegally.  They've built fences,

11  they've built illegal buildings.  There's all sorts of things

12  that happen inside a big county like ours.  So there's also a

13  sensitivity that, you know, we have to have everybody agree

14  along that street that we're going to tear down their illegal

15  garage in order to put in whatever we're putting in.

16  Q.  What about the City of McFarland?

17  A.  The City of McFarland is not a cooperative city.  Meaning

18  that they go directly to the State of California to get their

19  whatever Community Block Grant money they can get.  That is a

20  competitive process.  And that was McFarland's choice.  And we

21  are actually -- the HUD rules say that we cannot put our

22  money -- we are forbidden to put our money into a City that is

23  not a cooperative city.  This was a change in the federal law

24  many years ago to prevent some fraud that was happening with

25  larger cities back east, which were kind of coercing cities

1 into deals that didn't really work.

2      And so if you are not a city that's in our

3 cooperative -- and you cannot become a cooperative city once

4 you leave for two years.  So once you leave, such as the City

5 of Arvin just left our -- just left our cooperative about a

6 year ago.  And they're now trying to get grants from the

7 State.  Wasco has just come back.  They have not been with us

8 for many, many years and Wasco just decided to come back into

9 our system.

10 Q.  We also heard testimony that South Shafter has -- is

11 attempting to get its sewer system integrated with the City's

12 sewer system.  South Shafter, am I correct, is unincorporated?

13 A.  It is unincorporated.

14 Q.  And what are the issues in South Shafter, why has that

15 project not progressed?

16 A.  So South Shafter, before 2009 -- and I don't have the

17 exact date.  We actually made great progress after many years

18 on their water.  So the City of Shafter is not interested in

19 annexing this community, but they are willing to extend their

20 services for sewer and water.  The issue with the sewer, which

21 we've been working on, and every single year we put

22 together -- we look for grants and we put together design.  It

23 could cost almost a million dollars to connect up that

24 community.

25      To connect up a community of homes, everybody has to

1  agree.  Because you are literally going into their front yard,

2  tearing out their trees, tearing out whatever they've put in

3  their front yard to put a sewer main in to connect them to the

4  main road.  In addition, you have to -- if they have a septic

5  system, which they do, you have to abandon their septic

6  system, which sometimes means tearing up their yard.  And they

7  have to agree to a small assessment on their property taxes.

8         We have not been able to get everybody in South

9  Shafter to agree to that.  We have not been able to find the

10  million dollars needed.  The State of California no longer

11  gives grants for these kinds of projects.  Self-Help

12  Enterprises, which is an extraordinary organization that

13  actually works with communities, continues to look for money

14  and continues to look for the opportunity.  But we can't get a

15  grant until we have everybody in the community agreeing to

16  this.  And Self-Help helps us with Spanish translation, going

17  door to door.  And we will not give up on South Shafter.  Once

18  again, this year, we looked at it again and we will continue

19  to look for the money.

20  Q.  All right.  Now, is the City of Shafter a cooperative

21  community with the County?

22  A.  Yes, they are.

23         THE COURT:  Can I go back to paved roads for a

24  second?

25         THE WITNESS:  Uh-huh.

1    THE COURT:  I have this general sense from what you

2  testified to, that with respect to paved -- paving roads

3  throughout the county, that there's very little money.  And

4  even if those places where there might be sources of some

5  money, which wouldn't be enough, that even that money is

6  severely limited by restrictions on who qualifies and who

7  doesn't, which in the end makes it -- I have the sense, that

8  if I lived on a street without a paved road in Kern County and

9  I -- as you said, you frequently get questions, "How do I get

10  my road paved?"  The answer would be "That's gonna be a big

11  problem."

12    THE WITNESS:  That is correct, Your Honor.  I would

13  only also say that we normally tell them, let's look at where

14  you live.  There are communities --

15    THE COURT:  There are --

16    THE WITNESS:  There are communities where we've made

17  progress.

18    THE COURT:  And that hit the sweet spot in terms

19  of --

20    THE WITNESS:  That's correct.

21    THE COURT:  -- yes, the funds are limited, here are

22  the various sources.  And actually, you're in a spot where

23  you -- we might be able to get something accomplished?

24    THE WITNESS:  Correct.

25    THE COURT:  But those are not -- those areas are not

1  extensive compared to the amount of Kern County in need of

2  paving.

3         THE WITNESS:  That's correct.

4         MS. LEONI:  And that might be --

5         THE COURT:  That's a general, just painting with a

6  broad brush.

7         THE WITNESS:  That is.

8         THE COURT:  That's kind of the state of affairs, a

9  little bit bleak.

10        MS. LEONI:  Now, we've --

11        THE WITNESS:  Correct.  It's one of our number one

12  challenges in my department.

13 BY MS. LEONI:

14 Q.  Ms. Oviatt, we've talked about three communities, Mexican

15 Colony, McFarland and South Shafter, are there any

16 unincorporated communities in the County with these issues,

17 for example, South Taft?

18 A.  South Taft has these issues.  We have made progress.  We

19 are working on a project right now.  One of the other

20 challenges, however, is that you can use roads money in a

21 commercial area, which we normally don't do since we

22 have -- we want the businesses to try and do that.  But we

23 have put money in there.  But you can't use Community Block

24 Grant money.  So if it's a residential area, we can do it.  If

25 it's a commercial area, like a downtown area, we can't.  And

1  that's part of what's so -- part of South Taft is more in the

2  commercial area.

3  Q.  Are there needs in your home city Boron?

4  A.  My home city is Rosamond, not Boron.

5  Q.  I'm so sorry.

6  A.  That's okay.  I'll claim Boron.  There is, but it doesn't

7  qualify for Community Block Grant money.  There are low income

8  people there, but not enough.  People like me skew the number

9  up and we don't make the 51 percent.  We have done -- we have

10  another program in eastern Kern when the renewable energy

11  companies contribute money.  And so we've done some things

12  with the downtown.

13      Boron is a community that does qualify and we've done

14  some projects in there.  But once again, you know, it is the

15  legacy of the past.  And we have stopped that legacy, at least

16  in the last 20 years, when developers came in and said, you

17  know, "I'm in a rural area, I don't want to pave the roads.  I

18  just want to put some gravel down.  People love that kind of

19  stuff."

20      The Board of Supervisors has said, you know, every

21  day I have people coming to me and many of them are, you know,

22  the residents, but many of them are LA transplants who come

23  and buy houses in the mountains and say, "Can I get my road

24  paved?  Can I get my road snow plowed?"  And we say, "No.

25  It's on you."  So it's a rural issue.

1       We have put more infrastructure into places like East

2   Bakersfield.  Because of its urban connection, it can qualify.

3   There are City of Bakersfield projects which are planning to

4   do things.  We managed to get our money.  And then, of course,

5   we did the infrastructure bank loan in East Bakersfield.

6   Q.  We'll get to that.  Which is an interesting topic.  And

7   just to finish up kind of in an overview of the county.  Are

8   there infrastructure needs in Inyokern?

9   A.  Yes.  As a matter of fact, we have 432 homes that have

10  failing septic systems that we are connecting up to -- no, I'm

11  sorry.  A failing water system that's critically overdrafted.

12  And we are getting them a new well.  And so we are putting

13  money into that project.  Sorry.  It wasn't a septic system,

14  it was a failing water well.

15  Q.  Okay.  Thank you.  I want to ask about a specific property

16  that we've been talking about, or community that we have been

17  talking about off and on during our conversation.  And we've

18  defined it as East Bakersfield.  And I'd ask you to use the

19  definition that we set, the geographical definition.  Although

20  I understand, from your testimony, that -- and I recognize

21  that people outside of that area also consider themselves

22  eastern.  But I want to use the geographical definition for

23  this -- these few questions.

24      And the area we're talking about is the area, once

25  again, east of Mount Vernon, north of Brundage.  Generally

1    south of 178, generally in that area.

2    A.    Okay.

3    Q.    To your knowledge, is this area eligible for CDBG funds?

4    A.    It is.    It pencils out at some place around 58 percent,

5    well over the 51 percent.

6    Q.    All right.    Now, in the 2011 redistricting, this area was

7    moved from District 5 to 3.    When that occurs, did East

8    Bakersfield lose its eligibility?

9    A.    No.

10   Q.    Now, we talked about an I-Bank loan.

11   A.    Uh-huh.

12   Q.    Does that I-Bank loan affect a particular district in Kern

13   County?

14   A.    Yes.    It affects the -- it affects District 5.

15   Q.    And can you give us the history of that I-Bank loan?

16   A.    Supervisor Rubio, who was the previous supervisor for

17   District 5, wanted to do a very large paving project.    So the

18   Board, at his recommendation, took out a loan from the

19   Infrastructure Bank, which has a very, very low interest rate,

20   and put up for collateral the Juvenile Justice Facility for

21   the County as collateral for 7.4 million dollars that was then

22   used to put curb, gutter and sidewalk and paving into East

23   Bakersfield, into the area that you just outlined.

24          But it has to be paid back for 20 years.    We have

25   nine years left.    And so that payment, which is about $500

1    thousand, it's going to go down to about 435,000 as we go

2    down.  But at the beginning it was 600,000.  Comes from the

3    Community Development Block Grant for District 5.  So while

4    District 5 gets almost a million dollars, most -- a larger

5    percentage, that $500,000 comes off the top to repay the

6    I-Bank loan because that was the agreement the other board

7    members made when they voted for this.  That this money would

8    not come from the general fund.

9            If the Community Development Block Grant is cut by

10   Congress, which this year it was actually slated for total

11   elimination.  Either we would lose our Juvenile Justice Center

12   or the general fund would have to find that money.  And so

13   that's why the Board has directed that that payment has to

14   come first.  But all of that paving has been done 11 years

15   ago.

16   Q.  That project is complete?

17   A.  That project is complete and those people have -- and I

18   would just note that people -- the citizens are committed to

19   their communities, but they have very short memories.  11

20   years might as well be 1100 years to point out that we paved

21   something.  There's such an overwhelming immediate need inside

22   our communities that no matter how much we do, there's always

23   more to do.  So the fact that we put all that money in East

24   Bakersfield, I understand that for the residents it's like,

25   "Okay, but what did you do in 2016?"

1   Q.  Do the supervisors ever cooperate in projects using CDBG

2   moneys?

3   A.  Yes.  For example, three of the supervisors, because of

4   our fiscal emergency these last two years, are contributing

5   funding for public safety.  This is to keep our -- keep some

6   deputies on the street.  We have rising crime rates.  And to

7   keep our substations open.  So that Supervisor Couch,

8   Supervisor Maggard -- for Supervisor Maggard, it's to get

9   deputies in East Bakersfield.  For Supervisor Scrivner, it's

10  to -- for deputies in Mojave.  And for Supervisor Couch, it's

11  Buttonwillow and Lost Hills.  And so they have put part of

12  their Community Block Grant money into that project for last

13  year and this coming fiscal year.

14       In addition, Supervisor Maggard and Perez are

15  collaborating on a pedestrian safety project.  Their

16  facilities in East Bakersfield, we have some pedestrian safety

17  issues where we've had some unfortunate fatalities and not

18  being able to cross the street safely.  And so the roads

19  department is contributing money and they are contributing

20  money for that project.

21       MS. LEONI:  All right.  Your Honor, may I take one

22  moment to review my notes?

23       THE COURT:  Of course.

24       MS. LEONI:  Thank you.  It's been a long day and a

25  half.

1     THE COURT:  Yes.

2     MS. LEONI:  With the indulgence of the Court.

3     Your Honor, I have no more questions on direct.  But

4  I would like to introduce DX 578, which is Ms. Oviatt's bio

5  and move it into evidence.

6     THE COURT:  Any objection?

7     MS. GOMEZ:  No objection, Your Honor.

8     THE COURT:  DX 578 is admitted.

9     MS. LEONI:  And we already have the map in.  That has

10 been unobjected to; right?

11    MR. BAROLO:  Well, it hasn't been moved into

12 evidence.

13    MS. LEONI:  Oh, okay.  I move 573 into evidence as

14 well, Your Honor.  These were the maps we talked about.

15    THE COURT:  573 in its entirety?

16    MS. LEONI:  Yes.

17    THE COURT:  Any objection?

18    MS. GOMEZ:  No objection.  I believe 573 is the East

19 Bakersfield employment.

20    MS. LEONI:  Yes.

21    MS. GOMEZ:  No objection.

22    MS. LEONI:  Thank you, Your Honor.

23    THE COURT:  573 in its entirety is admitted.  That's

24 1 through 10.

25    (Defendants' Exhibit 573 was received.)

1    MS. LEONI:  Thank you.

2    THE COURT:  Cross-examination.

3                    CROSS-EXAMINATION

4  BY MS. GOMEZ:

5  Q.  Good morning, Ms. Oviatt.

6  A.  Good morning.

7  Q.  I'd just like to put up DX 573 back on the screen.  We're

8  on page 5.  And I just want to clarify for us.  So the top

9  table we should disregard; correct?

10  A.  This top table, you should.

11  Q.  And we should just focus on the second table?

12  A.  Correct.

13  Q.  And could you zoom to the graph.  The bottom graph.  And

14  then this bottom graph is a representation of the second

15  table; correct?

16  A.  Correct.

17  Q.  Okay.  And I just have one question for you.  Did you

18  provide any materials or data to the County Administrative

19  Office in connection with the 2011 redistricting?

20  A.  I did not.

21    MS. GOMEZ:  Thank you.  No further questions.

22    THE COURT:  Any redirect?

23    MS. LEONI:  I have no redirect, Your Honor.

24    THE COURT:  May Ms. Oviatt be excused?

25    MS. LEONI:  Yes, Your Honor.  My witness, next

1  witness was instructed to be here at 9:30.  And I so apologize

2  to Your Honor.  I thought we were going to have --

3      THE COURT:  All right.  Thank you, Ms. Oviatt.

4      MS. LEONI:  I apologize.

5      THE COURT:  We'll take a recess and convene as soon

6  as the witness arrives.  Who is the next witness?

7      MS. LEONI:  The witness is the supervisor from

8  District 3, Mike Maggard.  I apologize to you.

9      THE COURT:  Just let Renee know as soon as he's here.

10 If he gets here a little early, we'll start a little early.

11     MS. LEONI:  Thank you, Your Honor.

12    (Recess.)

13     THE COURT:  And the defendants' next witness.

14     MS. LEONI:  Yes.  Our next witness is Mike Maggard,

15 who is the incumbent supervisor in District 3.

16                **WILLIAM MICHAEL MAGGARD**,

17 called as a witness on behalf of the Defendants, having been

18 first duly sworn, testified as follows:

19     THE CLERK:  Please have a seat.  State your full name

20 for the record and spell it.

21     THE WITNESS:  My full name is William Michael

22 Maggard.  Spell all three?  W-I-L-L-I-A-M M-I-C-H-A-E-L

23 M-A-G-G-A-R-D.

24 ///

25 ///

1    DIRECT EXAMINATION

2    BY MS. LEONI:

3    Q.  Good morning, Supervisor Maggard?

4    A.  Good morning.

5    Q.  What is your address?

6    A.  497 Panorama Drive, Bakersfield, California.

7    Q.  Can we pull up Plaintiffs' Exhibit 134.

8        Can you indicate on this map where that address is?

9    A.  If you look at the 3 in the middle of the map, to the

10   right -- or just above it is China Grade Loop and it goes to

11   the right and then crosses down.  It goes directly south and

12   then turns east.  That's panorama drive where it turns east.

13   Q.  And have you always lived at that address?

14   A.  I have for about 30 years.  I've lived further in East

15   Bakersfield before that.

16   Q.  Okay.  Were you born in East Bakersfield?

17   A.  Yes.

18   Q.  And where were you born?

19   A.  901 -- well, at the hospital.  But I lived at -- the home

20   I went to after the hospital was 901 Chelsea Street.

21   Q.  And where is that located?

22   A.  That is -- if you -- let's see.  If you go to the right,

23   maybe fourth of the map, there is 178 and then down below 178

24   to Niles Street.  Go to Niles and Fairfax and it's just south

25   and east of the corner of Niles and Fairfax.

1   Q.   You can touch the map and it will make an arrow.

2   A.   Oh, okay.  It's about right there.

3   Q.   You got a dot.  Most people get an arrow.

4        And did you grow up there?

5   A.   Yes.

6   Q.   You still have family in East Bakersfield?

7   A.   I do.

8   Q.   What is your position with Kern County?

9   A.   I am a member of the Kern County Board of Supervisors.

10  Q.   And what district do you represent?

11  A.   The 3rd District.

12  Q.   And how long have you represented the 3rd District?

13  A.   About 11 years.

14  Q.   In what year were you first elected to the 3rd District

15  office?

16  A.   2006.

17  Q.   And what did you do before you were on the Board of

18  Supervisors?

19  A.   You mean politically or professionally?

20  Q.   Politically.  I'm going to walk backwards in time a bit

21  here.

22  A.   Okay.  I was a member of the Bakersfield City Council.

23  Q.   And what district did you represent?

24  A.   The 3rd Ward.

25  Q.   And where -- if you run your finger across this map, it

1  will make a line.  Can you indicate more or less how the 3rd

2  Ward relates to the 3rd District?

3  A.  It went down out in that part of town, came back roughly.

4  Q.  Okay.  Thank you.  How long did you serve on the City

5  Council?

6  A.  Eight years.

7  Q.  And what did you do prior to that?

8  A.  I was a member of the Bakersfield City School District

9  Board of Trustees.

10  Q.  With whom did you serve on that Board of Trustees?

11  A.  Pete Parra.  Irma Carson.  Ken weir.  Ralph Anthony.

12  Q.  Is Irma Carson African American?

13  A.  Yes.

14  Q.  And is Pete Parra, to your knowledge, Latino?

15  A.  Yes.

16  Q.  And after Pete Parra went off the board, who succeeded him

17  to the board?

18  A.  I believe Lillian Tafoya.

19  Q.  And were those members of the Board of Trustees, to your

20  knowledge, elected at large city-wide in Bakersfield?

21  A.  Bakersfield City School District seats are -- in my time

22  were at large.

23  Q.  Now, where is Oildale?

24  A.  Oildale is north of the river -- want me to draw another

25  circle?

1  Q.  Yeah.  If we -- well, we can clear this one.  So let's do

2  that.  Where is Oildale?

3  A.  I went a little bit too far.  Sorry.

4  Q.  Do you want to start over?

5  A.  Yes.

6  Q.  Okay.  Now, before we get to Oildale, can you tell me a

7  little bit about the character of District 3?

8  A.  District 3 is the smallest geographically of the five

9  districts, but of similar population size.  It represents

10 largely East Bakersfield, Oildale and then some of west

11 Bakersfield.  The areas of East Bakersfield and Oildale are

12 very similar economically.  There are some pockets of areas

13 that are middle class, a few in East Bakersfield that

14 are -- that you would call middle to maybe upper class.  But

15 much of Oildale and much of East Bakersfield are, I will

16 represent, poor folks.  Folks I grew up with.

17 Q.  Can you tell me a little bit about Oildale?

18 A.  Oildale is suburb of Bakersfield.  It has a great deal of

19 pride in the fact that it's Oildale, it's not Bakersfield.  It

20 has its own zip code.  Many things that give an identity to

21 Oildale.  But it is an area that struggles economically.  And

22 there's very significant unemployment there.  There's very

23 significant issues with child neglect and issues like that.

24 Q.  Is it historically an integrated neighborhood?

25 A.  If you go back 50 years ago, Oildale was predominantly

1    Anglo and it had a reputation for being very Anglo.  But that

2    has changed over the years.  It is now a much more diverse

3    population with a cross-section of racial residents.

4    Q.  Now, when you started as a representative of District 3 on

5    the Board of Trustees, did you conduct a visioning process in

6    Oildale?

7    A.  Do you mean as a member of the Board of Supervisors?

8    Q.  I'm so sorry.  Board of Supervisors, yes.

9    A.  Yes.  One of the first things I did was conduct what we

10   call a charrette.  That's a French word for an artist's

11   depiction of -- through an artist's mind what a view is.  So

12   we conducted a charrette for Oildale that laid out -- we

13   brought the communities together.  Hundreds of people came and

14   participated in it.  And asked them to brainstorm about what

15   they would like the community to be.  They developed a vision

16   for what they would like it to be.

17   Q.  And what was the outcome of that session?

18   A.  Well, they had many ideas.  They'd like to see jobs.  They

19   would like to see a town square to kind of capture their

20   identity and improvement of the business district in Oildale.

21   They wanted improved bike lanes, job training, children's

22   programs.  This is kind of funny.  The number one shopping

23   experience they wanted was they wanted a Nordstroms.  There is

24   not a place in Kern County with the economic base that we can

25   get a Nordstroms.  But Oildale, one of our very poorest areas,

1  wanted a Nordstroms.

2  Q.  Well, as we've learned, visioning is a wish list.

3  A.  Yes.

4  Q.  Have you been able to make progress on the Oildale vision?

5  A.  A great deal of progress.

6  Q.  And have civic organizations grown out of the bringing the

7  community together?

8  A.  Yes.  East Bakersfield -- sorry.  Oildale has -- if they

9  have -- they have several strengths.  One is a real community

10 identity.  But another one is there are numerous organizations

11 in Oildale that come together for trying to improve their

12 community.  And they participated in that program and have

13 embraced it and ran with it in various ways as they've -- I've

14 implemented many of the things through my role in government.

15 The communities implemented other things with their role in

16 community groups.

17 Q.  Okay.  I want to ask you a little bit about your civic

18 engagement in Oildale.  Do you get involved with the community

19 there?  For example, with events on holidays or anything along

20 those lines?

21 A.  Yes.  We just participated in the Christmas parade.  They

22 have their own Christmas parade.  It's a walking parade.  No

23 motorized vehicles.  We did that just last weekend.  Took a

24 picture of me with -- myself with Santa Claus and sent it to

25 my grandson.  He asked is that a real picture with pops.

1   Q.   Real Santa Claus?

2   A.   Real Santa Claus, yeah.  And he sent his -- he had his mom

3   text me his wish list to make sure I got it to Santa Claus.

4        One of the premier events that we do in Oildale is

5   called Trunk or Treat.  And it's the Halloween event.  Much of

6   that area, within that circle, is not well lit.  It's -- there

7   not -- there's not -- there aren't very many street lights, so

8   there are very dark neighborhoods.  And there's lots of dogs

9   that roam around.  It's not a safe environment for children at

10  night time.

11       So along this town square that we developed, we call

12  Centennial Square in Oildale.  At Centennial Square and along

13  this linear park that we developed as a response to the

14  charrette process, we conduct this Trunk or Treat event.  So

15  it's on Halloween or the few days leading up to it, depending

16  on when the weekend is before Halloween.  And we line up many

17  cars along both sides of the road.  There's a little frontage

18  road there that is between the linear park and where the store

19  fronts are.  We line up cars and open up the trunks of those

20  cars and then children trick or treat from trunk to trunk.

21  That's why it's called Trunk or Treat.  And it has become the

22  go to event in Oildale.  There are 1,000 to 1500 kids a year

23  come to that event.  And it's all free.

24  Q.   That's nice.  Before we move on to other parts of your

25  district, do you go to church in your -- is your church

1  located in your district?

2  A.  It is.

3  Q.  And where is that church located?

4  A.  Right there.  Near the corner of South Mount Vernon and

5  East Brundage Lane.

6  Q.  You're very good with the dots.

7  A.  Thanks.  I'm so precise, right?

8  Q.  Yeah.  What is the nature of the congregation there?

9  A.  This is a big number.  5 to 6,000 people go to that campus

10 on a given Sunday.  About 30,000 people watch the services on

11 a given Sunday.  There are numerous campuses.  And they're in

12 even other communities.  But it has an online church that's

13 developed from it.  But at that location, 5 to 6,000 people

14 come each Sunday to services there.  It is probably 60 to 70

15 percent Hispanic.  Maybe five percent African American.  And

16 most of the rest of it I'd say is Anglo.

17 Q.  You have a diverse congregation.

18 A.  Oh, very.

19 Q.  Now, East Bakersfield is currently also in your district;

20 is that correct?

21 A.  It is.

22 Q.  Can you tell us a little bit about East Bakersfield.

23 A.  East Bakersfield is where I grew up.  It's home to me.

24 I've lived in East Bakersfield my entire life.  Where I live

25 now is about three miles from where I grew up on Chelsea

1    Street.  East Bakersfield is -- has always been a working

2    class kind of a neighborhood.  My father was a lineman for the

3    phone company.  And he had three jobs at once, but that was

4    his predominant job.  And it's full of people like that.  The

5    guy across the street worked with the phone company.  You

6    know, it's -- working folks.  But it's -- it has -- if there

7    is a predominance of one ethnic group or another, it's

8    predominantly Hispanic.

9    Q.  Does it have similarities with Oildale?

10   A.  Very similar.

11   Q.  Could you describe some of those?

12   A.  Okay.  Unemployment is an issue.  If there is an issue

13   that -- this isn't an issue that government tackles very

14   often.  But in my interaction with people in both East

15   Bakersfield and Oildale, if I would capture the number one

16   thing that they need it's hope.  They need a way to hope for a

17   future that's different than the present that they have.  And

18   that's -- that is almost identical in both East Bakersfield

19   and Oildale.

20   Q.  Are there infrastructure needs in East Bakersfield?

21   A.  Yes.

22   Q.  Are there infra -- well, go ahead, I don't want to stop

23   you.

24   A.  There are infrastructure needs.  The County's building

25   standards when most of East Bakersfield and Oildale were both

1 developed didn't call for curbs, gutters, sidewalks or street

2 lights.  So many areas do not have those.

3 Q.  Are Oildale and East Bakersfield similar in the need for

4 infrastructure?

5 A.  Very similar.

6 Q.  Now, your district, if I'm not mistaken in looking at this

7 map, is very close to District 5; is that correct?

8 A.  We share common borders, yes.

9 Q.  Do you have an opportunity to work with the District 5

10 supervisor on projects?

11 A.  Yes.  In several ways.

12 Q.  Can you describe some of the projects in which you're

13 working together?

14 A.  Tuesday of next week, on the 20th, we are -- 18,

15 19 -- Wednesday of next week, on the 20th, we are meeting

16 together for a task force that Supervisor Perez and I have

17 served on for several years now.  For transportation and

18 pedestrian safety.  That's an issue that we have done much

19 together with.

20      We've also worked on -- along the borders of between

21 the 5th and the 3rd District, there's a lot of blight in both

22 districts.  And we very often have worked together to remedy

23 those blighted neighborhoods and do what we call code

24 enforcement.  When homes are not meeting standards of what the

25 codes say that they should be, we go in and, like, for

1   example, if a home is burned, you have to -- there's a

2   standard by which it has to be cleaned up.

3        Along Virginia Avenue, which is -- runs east and west

4   and it runs through the 5th District and then into the 3rd

5   District.  We have worked together on a pedestrian safety

6   project to improve handicap access and sidewalks so people

7   won't be walking on the street.  And one of the things that we

8   have done most effectively is the GET bus system, Golden

9   Empire Transit.

10       Golden Empire Transit serves largely the 5th and the

11  3rd district because most of the poor folks in the greater

12  Bakersfield area live in those districts.  And Golden Empire

13  Transit did a survey and they decided in their survey that

14  they would change their routes.

15       The consequence of changing those routes were that it

16  was very disruptive to the folks that use public transit in

17  the 3rd and the 5th District.  And it, for example, along

18  Union Avenue, which is in the 5th District.

19       It moved the bus stop away from the -- it's called

20  BARC, it's an association that helps mentally --

21  developmentally disabled folks.  It's a -- it employees them,

22  trains them, has -- it's a great center for them.  Jim Baldwin

23  is the fellow who's the head of it.  And the move

24  unfortunately made it so the bus stop in front of BARC was not

25  in front of BARC anymore.  And it caused an outcry in our

1 community because it denied, for example, many people to get

2 many places around town.

3      But the part that Supervisor Perez and I collaborated

4 on was trying to get BARC -- trying to get to change those bus

5 stops back so that people like this young man named Joey, that

6 went to BARC, this developmentally disabled center. And so we

7 talked -- I came up with a strategy of using the tragedy that

8 occurred for this guy named Joey, that Joey couldn't go to

9 BARC anymore because Joey can't ride the bus anymore because

10 Joey had to cross streets, it was too dangerous for him to get

11 on the bus.

12      So bottom line is we worked together and formed this

13 committee which resulted in us applying -- Supervisor Perez

14 and I applying pressure towards the GET system so that they

15 would put those bus stops back. That was very, very

16 successful.

17      And then this Virginia Avenue corridor I just

18 mentioned was the direct result of the collaboration of this

19 new -- we -- frankly, we replaced a few of the -- we arranged

20 so that a few of the board members -- yet some resigned, some

21 were replaced when their term ended. And it reinvigorated

22 GET. So that's something that had very profound effects on

23 our community that Supervisor Perez and I did together.

24 Q. Have you ever had an opportunity to contribute some of

25 your CDBG funds to needs in the 5th District?

1  A.  Yes.  The 5th District CDBG funds are significantly

2  constrained by a financing arrangement that Supervisor Perez'

3  predecessor a couple of times removed, Michael Rubio, an

4  arrangement he made.  So her district has very little

5  available CDBG dollars.  So in our last -- a year ago, when we

6  did our budget hearing -- we've done one since then.  But a

7  year ago when we did our budget, there were insufficient

8  deputies, the Sheriff's Department, because of the budget

9  constraints we had, was not patrolling enough in East

10 Bakersfield.  So I offered to put up my CDBG funds from the

11 3rd District to provide for extra deputy patrols in both the

12 5th and the 3rd Districts.

13 Q.  Do you have occasion where residents of the 5th District

14 might call you for assistance on a particular matter?

15 A.  That happens often.

16 Q.  And what would be the instances, like an example of when

17 you might get a call from the 5th District?

18 A.  Along Columbus Avenue, which is a common border between

19 the 3rd and the 5th, up in -- just point to that general area.

20 About there.  And along that part of it.  There is -- there

21 are some blighted neighborhoods.  And that blight was

22 splashing, so to speak, on both sides of Columbus.  And she

23 and I would respond to those calls.  But those constituents

24 would call me and I would assist in doing things in the 3rd

25 District.  And then I would contact Supervisor Perez' office

1   and say, there's an address in your district, do you want me

2   to include it in the sweep as we try to clean up this part of

3   it?  And we've cooperated that way numerous times.

4           There's another one on Owens Street, which is well

5   into the 5th District.  It is not near my border.  But on

6   Owens Street, if it's important to show you where that is,

7   it's about -- let's see.  Oh, I made an arrow.  Didn't I?

8   Sorry.  Actually that arrow is pretty close to where it is.

9   And it was a burned out house that was a real problem in the

10  neighborhood.  And I said I'd -- you know, people call me

11  about it.  Do you want me to run with it or do you want me to

12  back off and let your office take care of it?  Yeah, please,

13  will you run with it, she said.  So I did.

14  Q.  All right.  Now I want to move on to the visioning process

15  again.  Have you conducted a similar process in East

16  Bakersfield?

17  A.  Yes.  We did a charrette in East Bakersfield as well.

18  Q.  And did that result in a vision for that neighborhood as

19  well?

20  A.  It did.  We -- again, numerous ideas were expressed.

21  Desires from the residents of East Bakersfield.  And we --

22  what you do with a charrette is you make a long list of all

23  the things that you think the neighborhood wants.  And then

24  what can you accomplish and what can you find money for.  And

25  then you try to, you know, pick those off one at a time.  So

1    we've done numerous improvement projects in East Bakersfield.

2    Q.  So the vision has resulted in progress in -- to meet the

3    goals of the neighborhood?

4    A.  Yes.

5    Q.  Can you maybe name one or two?

6    A.  Sure.  The -- where I grew up, a moment ago I told you on

7    Chelsea Street, is near Pioneer Park.  Parks are -- parks,

8    schools and churches are kind of the centers around which

9    neighborhoods coalesce regardless of ethnicity, in both

10   Oildale and East Bakersfield.  And Pioneer Park, which is the

11   park I grew up playing at, it was two blocks -- a block from

12   my house on Chelsea.  We've done substantial improvements

13   there.  There's a water spray park now, a walking path, much

14   better lighting in the park.  Many improvements to that.

15          Then if you go down closer to where my church is, at

16   the corner of Larry Street and Potomoc, there is a park called

17   Potomac Park.  And Larry Street is significant because that's

18   where my cousins lived.  And I spent many, many, many days

19   either -- I either played at Pioneer Park or Potomac Park.  I

20   played Little League at Potomac Park for example.  So that's

21   where my cousins lived on Larry Street.  And that park was not

22   in the 3rd District before the last changes were made.  It had

23   been seriously neglected.  When it became my park, I jumped on

24   improving that park as well.

25          Then there are improvements we've done along Niles

1  Street.  That's the business corridor of the 3rd District.

2  Niles Street goes through the 5th District and then at Mount

3  Vernon, as it goes east, it becomes the 3rd District.  We've

4  made numerous improvements along Niles Street and trying to

5  improve the shopping center.

6          One of the interests of this shopping center

7  is -- the Hillcrest Shopping Center it's called.  I grew -- I

8  was -- grew up, that's the stores we went to.  Thrifty Mart.

9  I was a box boy at Thrifty Mart.  I worked in the Hillcrest

10  Shopping Center.  My wife who's also from East Bakersfield

11  worked at the new Wienerschnitzel across the street.  This is

12  where we grew up.

13          One of the visions that came out of it was to develop

14  a -- like a Latino mercado area where we could have food

15  trucks and things like that that we could kind of reinvigorate

16  the area.  That idea has struggled some.  The reason for it is

17  there's about 40 different property owners.  And I have not

18  been successful yet getting them all on the same page about

19  sharing some of their common property to do these.  But we

20  made street improvements there.

21          And then along Oswell, the -- which is the main

22  corridor into East Bakersfield from Highway 178.  Right here.

23  And the visioning process, the charrette took place right

24  there.  Along Oswell there, the east side of Oswell is what's

25  called the Bakersfield Country Club neighborhood.  A

1  relatively affluent and upscale neighborhood.  The west side

2  of Oswell is not, it's a regular East Bakersfield

3  neighborhood.

4          So the east side of Oswell had been improved,

5  landscaping, a very nice appearance.  The west side was

6  basically -- much of that part of Bakersfield has a hill and

7  that hill was denuded and without landscaping and full of

8  trash and just looked like it was eroding.  So they wanted

9  that to be improved.  So we have just completed, about six

10  months ago, a new wall and many improvements along there.

11  That's very popular in the area.  So a few examples.

12  Q.  Thank you.  Now, there's been a suggestion in this case

13  that East Bakersfield should be removed from District 3 and

14  included in a district with Delano.  Do you have any views on

15  the appropriateness of that fit?

16  A.  I don't think it would fit.  Delano is a substantially

17  different community.  It's, what, 25 -- I don't know how many

18  miles it is.  25, 30 miles away.  It's a long ways away.  I

19  think it's a very significantly different community than is

20  East Bakersfield.

21  Q.  Does it have to do perhaps with the incorporation of

22  Delano?

23  A.  Well --

24          MS. PELLEGRINI:  Objection, Your Honor, leading.

25          THE COURT:  Sustained.  Rephrase.

1  BY MS. LEONI:

2  Q.  Is Delano an incorporated city?

3  A.  It is.  Delano is the second largest incorporated city in

4  Kern County.

5  Q.  Is the area that we are talking about in East Bakersfield

6  incorporated?

7  A.  Parts of East Bakersfield are incorporated in the City of

8  Bakersfield and parts are not.

9  Q.  Is the East Bakersfield neighborhood that we're talking

10 about, however, close to the City of Bakersfield?

11 A.  You mean geographically?  Yes.  They're -- there is no

12 distinction among -- if people that live in East Bakersfield

13 said they live in Bakersfield, there's no distinction about

14 that.

15 Q.  And would transportation provide any challenges if this

16 area were --

17 A.  That would be a significant issue.  There are doctors and

18 access to medical facilities, shopping, the hospital, Kern

19 Medical Center, our County hospital, all those are in East

20 Bakersfield.  One of the real difficulties that Delano suffers

21 from is how to get people in Delano to medical care.  And

22 that's -- it is so separated geographically that there's a

23 significant struggle with how to get to their appointments.

24 And they might have to spend all day on a bus making many

25 connections.  There is a regional transportation system we

1  have that delivers people, but, yeah, that's -- transportation

2  is a significant issue.

3  Q.  All right.  I want to talk a little bit about the 2011

4  redistricting process.

5  A.  Okay.

6  Q.  And just a preliminary question.  At the time of that

7  process, which started in January, if you recall, 2011, and

8  went through August.  Actually early August, August 9th.  Did

9  you know that then Leticia -- did you know Leticia Perez at

10  the time?

11  A.  I knew there was a Planning Commissioner named Leticia

12  Perez.  And she was a Public Defender.  I did not know her.

13  Q.  Did you know she was planning to run for the Board of

14  Supervisors?

15  A.  I did not.

16  Q.  Now, the area we're talking about that's known as East

17  Bakersfield was moved into District 3 from District 5 during

18  the 2011 redistricting.  Do you think that was a good fit?

19  A.  Well, I have a different perspective on that.  I have

20  lived in East Bakersfield and represented East Bakersfield for

21  many years.  So I already represented East Bakersfield.  So a

22  larger portion of East Bakersfield, a new area within East

23  Bakersfield was moved into the 3rd District.  But the 3rd Ward

24  in the City and the 3rd District in the county, I already

25  represented the dominant part of East Bakersfield.

1  Q.  And just to go back a little bit more to your background.

2  Before you embarked on your career as an elected, what was

3  your profession?

4  A.  I have been a CPA all of my professional life.  Certified

5  Public Accountant.  I still am a CPA.

6           THE COURT:  I'm sorry.  Could we go back?  Because

7  I'm not sure I -- I'm not sure I understood the response.

8           MS. LEONI:  Happy to do so, Your Honor.

9           THE COURT:  Because you -- the question was, from Ms.

10  Leoni, was:  "The area we're talking about that's known as

11  East Bakersfield was moved into District 3 from District 5

12  during the 2011 redistricting.  Do you think that was a good

13  fit?"

14           And then I think your answer was:  "Well, not all of

15  it."

16           I had a disconnect there.  I wasn't quite sure what

17  you were trying to tell us.

18           THE WITNESS:  Could I draw on the map?

19           THE COURT:  Yes.  Can we erase?

20           THE WITNESS:  Generally this area was added to the

21  3rd District.  I represented -- I believe I already

22  represented down to Oswell.  That might be off by a street or

23  two.  But that area was added to East Bakersfield.  But much

24  of East Bakersfield was already in the 3rd District.  For

25  example, the area where I grew up here has been in the 3rd

1   District as long as I -- one of the things I used to say in my

2   campaign is I've lived in the 3rd District my entire life

3   except for ten months when I lived on Miller Street, which is

4   barely out of the 3rd District.  So much of it was

5   already -- has been in the 3rd District all along and a little

6   bit of East Bakersfield was added to it.

7           THE COURT:  So the area that was moved from D 3 to D

8   5 in 2011, do you think that was a good fit?

9           THE WITNESS:  Your Honor, do you mean moved from D 5

10  into D 3?

11          THE COURT:  I'm sorry.  Was moved into D 3 from D 5.

12  That was the question.

13          THE WITNESS:  Yes, sir.  I think that is a very good

14  fit.  That is the area that --

15          THE COURT:  That small square that you --

16          THE WITNESS:  Yes.  And the area that is around my

17  church, around Larry Street, Potomac Park where I grew up.  I

18  think that's a very good fit.  Served by the same fire

19  station.  It's the same school high school district.  Yeah, I

20  think it's a very good fit.

21          THE COURT:  You may continue.

22          MS. LEONI:  Thank you.

23  Q.  Now, Supervisor Maggard, you were elected to the Board of

24  Supervisors in 2006.  Am I correct about that date?

25  A.  Yes.  I was sworn in in January of 2007, but the election

1   was June as I recollect, 2006.

2   Q.  A little bit of background.  So you were elected in the

3   2001 redistricting then?

4   A.  Yes.

5   Q.  Do you have an impression of how the 2011 redistricting

6   compared to the 2001?

7         Oh, can I set a little bit of background?  And you

8   were also on the Board of Supervisors when the 2011

9   redistricting occurred?

10  A.  I was on the Board of Supervisors in 2011, yes.

11  Q.  Do you have a recollection how the plan adopted in 2011

12  compared to the plan adopted in 2001?

13  A.  I don't know how the plan was adopted in 2001 because I

14  wasn't there.

15  Q.  I'm talking about the characteristics of the districts,

16  the shape of the districts.

17  A.  Oh.  I believe in '11, some of East Bakersfield was added

18  to it.  That area that I indicated.  My -- the 3rd District

19  was below the mean population so it needed to gain new people.

20  So it gained a number of folks from that area.  And then it

21  moved further into Rosedale and picked up areas there with new

22  population as well.  Because I had -- my district needed a

23  rise in population.

24  Q.  And how did this shape of the districts compare to

25  2000 -- if you have any recollection.

1 A.  My -- I haven't pondered this.  So this might not be

2 exactly right.  But this area here was added to pick up new

3 people.  And that area there was added to pick up new people.

4 Q.  All right.  And the map overall -- and you don't need to

5 speculate if you can't remember.  I just was -- the question

6 was whether the map overall, from 2001 and 2011, were similar

7 in your view?

8 A.  I viewed them as being very similar.

9 Q.  Now, at the time the Board of Supervisors adopted the 2011

10 redistricting plan, did you believe it was in compliance with

11 the Voting Rights Act?

12 A.  Yes.  We went to great lengths to ask staff what are the

13 standards that we're supposed to meet?  And then have we

14 meticulously met those standards.

15 Q.  And did you pose these questions in an open public

16 hearing?

17 A.  Yes.  I was the chair then and I remember.  It is often

18 my -- the pattern of my -- the way I conduct myself in public

19 hearings to say something like, "Have we met this standard?

20 Do we -- are there any findings we need to have in the record

21 to make sure that we have given evidence to the fact that we

22 have met whatever the requirements are?"

23 Q.  And did you receive assurances that --

24 A.  I did.  Staff assured us that we had met those standards.

25 Q.  Now, recently did a matter come before the board that

1 indirectly pertained to State legislation that was called

2 Senate Bill -- or known as Senate Bill 54?

3 A.  It did.

4 Q.  Now, the first of those matters to come before you, what

5 were the circumstances?  Was it an agenda item?  How did that

6 matter come up?

7 A.  Our sheriff, Donny Youngblood, was -- at the time I

8 believe that he either was the State Chairman of the Sheriffs

9 Association or the National Chairman of the Sheriffs

10 Association.  And he asked us to agendize the question as to

11 whether or not we would -- he wanted us to declare -- Sheriff

12 Youngblood wanted us to agendize the question would we

13 declare, as he would like us to, Kern County as a

14 non-sanctuary county.

15 Q.  Did the Board of Supervisors vote to agendize that item?

16 A.  We refused to agendize the item.

17 Q.  Then did the matter come back before you another time?

18 A.  He -- the sheriff came before us again and asked us to

19 discuss the matter.  And we had a significant public

20 discussion about it when he requested that we would do that

21 again.

22 Q.  And did that discussion result in a direction that the

23 Board determined to take with regard to SB 54?

24 A.  Yes.

25 Q.  And what was that direction?

1  A.  The Board made it very clear, four of the five board

2  members, made it -- well, yeah, four of the five board members

3  made it very clear that we did not want to declare ourselves

4  as a non-sanctuary city.  I said, for example, "We are not now

5  nor have we ever been a sanctuary county or city and,

6  therefore, there is no reason for us to make a declaration of

7  something that we are not now nor have ever been nor do any of

8  us ever intend to become a non-sanctuary county."  So we did

9  not make that declaration.

10        We did, however, expose, during our hearing, numerous

11  concerns about SB 54.  Particularly about public safety, about

12  curtailments of the ability of the sheriff to -- Sheriff's

13  Department and local law enforcement to interact with the

14  federal government.  There was a list of crimes that they

15  could talk about, but there was a list of crimes that they

16  could not talk to the federal government about.  And our

17  concern was that any curtailment of that dialogue

18  would -- could have the effect of eroding public safety.

19        So I also expressed some concerns about the price tag

20  for SB 54, would be foisted upon local government.  That's the

21  way Sacramento does many things.  And local government gets

22  the bill.  I didn't think it was fair for that cost to be

23  passed along to us.

24        So bottom line is that we had this big discussion,

25  and at the end of that discussion wrote -- we directed the

1    County to write a letter that opposed SB 54.  And under these

2    public safety concerns.  And it was much -- it drew many of

3    the same concerns that the Sheriffs' Association and other law

4    enforcement agencies had.  But -- so we wrote a letter

5    opposing SB 54 and asked for some concessions.

6    Q.   And did a committee or representatives of the board then

7    carry that letter or present that letter in Sacramento?

8    A.   Yes.  Our chairman, Zack Scrivner, carried that letter and

9    delivered it in Sacramento.

10   Q.   And who was his team member on that?

11   A.   Supervisor Perez.

12   Q.   And to your knowledge, I don't want you to speculate, did

13   the meetings -- after the meetings in Sacramento, were there

14   changes to SB 54?

15   A.   I don't remember being briefed on any significant changes

16   that occurred.

17   Q.   All right.  Then I don't need to ask you to speculate

18   about that.

19        Supervisor Maggard, are you a lawyer?

20   A.   I am not.

21   Q.   And just one additional background question.  What is your

22   ethnic background?

23   A.   The predominant ethnic background in my family is American

24   Indian.  Cherokee specifically.

25   Q.   And were your grandparents the first to come to Kern

1  County?

2  A.  Yes.

3       MS. PELLEGRINI:  Objection.  Leading.

4  BY MS. LEONI:

5  Q.  What was the occupation --

6       THE COURT:  Overruled.  I'll let her lead.

7       MS. LEONI:  Thank you.

8  Q.  And what was the occupation of your mother?

9  A.  My mother was a school secretary.

10 Q.  Did she ever have time that she -- oh, not your mother.

11 I'm sorry.  Your grandmother.

12 A.  Oh, my grandmother.  My grandmother, who was half blood

13 American Indian, was a waitress most of her life.  And then

14 she became a nanny.  She took care of children.

15 Q.  Did she ever work in the fields?

16 A.  Yes.  She picked cotton and worked in the fields in

17 Oklahoma.

18 Q.  Did she work in the fields in Kern County?

19 A.  She was older by the time she came to Kern County and so I

20 don't believe she did.  She was in a car accident and lost her

21 knee cap in her right knee, so she had this -- it's a little

22 bit awkward.  She had this wire that you could feel in her

23 knee.  And she couldn't bend over to do the work anymore after

24 that.

25       MS. LEONI:  All right.  Okay.  All right, Your Honor,

1   I have no further questions at this time.

2            THE COURT:  Cross-examination.

3            MS. PELLEGRINI:  Your Honor, may I have just one

4   minute?

5            THE COURT:  Yes.

6            MS. PELLEGRINI:  Thank you.

7            THE COURT:  Tell you what, let's take a ten-minute

8   recess.

9            MS. PELLEGRINI:  Thank you, Your Honor.

10      (Recess.)

11           THE COURT:  And cross-examination, counsel.

12           MS. PELLEGRINI:  Your Honor, we have no questions for

13  Supervisor Maggard.

14           THE COURT:  All right.  May the witness be excused?

15           MS. LEONI:  Your Honor, I must apologize.  I have one

16  more question.

17           THE COURT:  Okay.  You can re-open.

18           MS. LEONI:  Thank you.

19  Q.  Supervisor Maggard, during the SB 54 related proceedings

20  of the Board of Supervisors, was there an opportunity when you

21  publicly intervened during board discussions on behalf of

22  Supervisor Perez?

23  A.  There was.

24  Q.  Can you describe that incident, please.

25  A.  There was a great deal of testimony before the Board from

1  both sides about crime and the consequences of crime in the

2  neighborhoods.  And some statements were said, by some members

3  of the audience, that Supervisor Perez didn't care about

4  public safety and supporting law enforcement.  And I didn't

5  think that was appropriate.

6          So I made a comment, something to the extent of "It's

7  outrageous and inappropriate that anyone would allege that

8  Supervisor Perez did not support public safety or the safety

9  of her community and law enforcement.  I've seen evidence of

10 that in her votes publicly and privately."  And I said, "It's

11 equally outrageous and inappropriate that anyone in this

12 courtroom would allege that other members of this board are

13 xenophobic or racist."

14         MS. LEONI:  No further questions.  Thank you, Your

15 Honor.

16         THE COURT:  Any cross?

17         MS. PELLEGRINI:  No questions, Your Honor.

18         THE COURT:  May the witness be excused?

19         MS. PELLEGRINI:  Yes, Your Honor.

20         THE COURT:  Thank you, supervisor.

21         THE WITNESS:  Thank you, sir.

22         THE COURT:  And the defendants' next witness.

23         MR. SKINNELL:  Your Honor, defendants call Dr.

24 Jonathan Katz.

25

1    **JONATHAN NEIL KATZ**,

2    called as a witness on behalf of the Defendants, having been

3    first duly sworn, testified as follows:

4           THE CLERK:  Please have a seat.  State your full name

5    for the record and spell it.

6           THE WITNESS:  My name is Jonathan Neil Katz.

7    J-O-N-A-T-H-A-N.  Neil, N-E-I-L.  Katz, K-A-T-Z.

8                        DIRECT EXAMINATION

9    BY MR. SKINNELL:

10   Q.  Good morning, Dr. Katz.  I would like to start by bringing

11   up DX 621 if I could, please.

12          Can you identify the document for the Court, Dr.

13   Katz?

14   A.  It's the first page of my curriculum vitae.

15          MS. HULETT:  Excuse me, Your Honor.  Plaintiffs have

16   no problem with Dr. Katz being designated as an expert witness

17   under the rules.  We have no objection.

18          MR. SKINNELL:  Well --

19          THE COURT:  I mean, if you want to --

20          MR. SKINNELL:  I would like to -- I'll be brief.  I

21   don't want to try the Court's patience, but I would like to

22   just --

23          THE COURT:  You may.

24          MR. SKINNELL:  Okay.

25   Q.  Is this --

1    THE COURT:  Accept the stipulation that Dr. Katz is

2  an expert, but if you want to lay a bit of ground work as to

3  what his background is, that would be fine.

4    MR. SKINNELL:  I appreciate that, Your Honor.

5  Q.  Dr. Katz, is this a current and complete version of your

6  curriculum vitae?

7  A.  I believe so, yes.

8  Q.  And what briefly is your profession?

9  A.  My title is the Kay Sugahara, K-A-Y new word Sugahara,

10  S-U-G-A-H-A-R-A, Professor of Social Sciences & Statistics at

11  the California Institute of Technology.  My research is at the

12  intersection of political science, economics and statistics.

13  I primarily develop statistical tools and apply those to

14  quantitative studies of public policy.

15  Q.  And what academic degrees do you hold?

16  A.  I was undergraduate at MIT in applied math.  And I have a

17  Ph.D. in political science from the University of California

18  San Diego.

19  Q.  And did you do any postdoctoral work?

20  A.  I was a Postdoctoral Fellow at Harvard University.

21  Q.  Have you held any fellowships?

22  A.  Several.  I'm Elected Fellow of the American Academy of

23  Arts & Sciences.  I'm an Inaugural Fellow of the Society for

24  Political Methodology.  I've been a visiting Fellow at the

25  Center for Advanced Study in the Behavioral Sciences.  There

1 are probably more.

2 Q. Other than your current position at CalTech, what other

3 positions -- academic positions have you held?

4 A. I was previously on the faculty of the University of

5 Chicago. And I've been a visiting professor at the University

6 of Konstanz in Germany.

7 Q. Have you ever been an editor or a referee in any academic

8 publication?

9 A. I currently co-edit through the end of this month the

10 Journal of Political Analysis, which is the Journal of the

11 Society for Political Methodology. And I've served on -- over

12 my career, I think, five editorial boards of various journals.

13 Q. All right. And have you -- I see, having looked through

14 your resume here, that you also -- there's a reference to

15 serving as the co-director of the CalTech MIT voting

16 technology program -- project. What is that?

17 A. It was a project that was found in the aftermath of the

18 2000 presidential election. As you recall, we all learned

19 what a hanging chad was. It was a joint project to study ways

20 to improve voting equipment. So from an engineering point of

21 view, but also social science study of what generates poor

22 outcomes, poorly designed ballots, poorly designed voting

23 systems.

24 Q. All right. And have you published any books or articles

25 that would be relevant to your testimony in this case?

1  A.  Yes.  I have a book co-authored with Gary Cox on the

2  reapportion revolution, which track the impact of the Supreme

3  Court's decisions in the mid 1960s on Congressional elections.

4  I have a number of other published articles related to that.

5  Q.  Okay.  Thank you.  Have you ever given expert testimony in

6  a redistricting or voting rights cases?

7  A.  Yes, I have.  On numerous occasions.

8  Q.  And do you remember roughly how many times?

9  A.  I think I've given testimony or been deposed on the order

10  of 20.  I don't -- it's been -- it goes back to 1999.  So a

11  while.

12  Q.  But give or take --

13  A.  Yes.

14  Q.  -- 20.  Okay.  And what's the most recent case that you

15  worked on?

16  A.  The Bethune case in the Commonwealth of Virginia.

17  Q.  And did you address issues of ecological regression and

18  ecological inference in that case?

19  A.  I did.

20  Q.  And did you address questions about the appropriate data

21  to use for analyzing elections for racially polarized voting

22  using those techniques?

23  A.  Yes, I did.

24  Q.  And have you done so in other cases?

25  A.  Yes, I have.

1  Q.  And can you just give me an idea of maybe some of

2  what -- what some of those other cases would have been.

3  A.  Other cases.  With regard to voting rights.  The Santa

4  Clarita Community College District, which was a case revolved

5  around California Voting Rights Act case.  Other cases.  I

6  keep them as states.  I've worked in Florida, although that

7  was a partisan gerrymandering case.  I've been -- Illinois.

8  Michigan.  Those were both Congressional maps.  New Mexico,

9  that was -- my part in the New Mexico cases were revolving

10  around partisan gerrymandering claims.

11          MR. SKINNELL:  Thank you.  Your Honor, I'd like to

12  move DX 621 into evidence, please.

13          THE COURT:  Any objection?

14          MS. HULETT:  No objection.

15          THE COURT:  DX 621 is admitted.

16      (Defendants' Exhibit 621 was received.)

17          MR. SKINNELL:  And consistent with the stipulation of

18  counsel, I'd like to have Dr. Katz recognized as an expert

19  under Rule 702 on the topics of statistical analysis,

20  including ecological regression and ecological inference on

21  quantitative political science and on the analysis of

22  elections using those techniques.

23          MS. HULETT:  No objection.

24          THE COURT:  He will be so recognized as an expert in

25  those fields.

1    MR. SKINNELL:  All right.  Thank you.

2  Q.  Can we bring up DX 622, please.  Dr. Katz, can you tell

3  the Court what this document is?  Do you recognize this

4  document?

5  A.  I do.  It's my expert report in this case.

6  Q.  All right.  And per the stipulation of the parties from a

7  couple of days ago, I would like to move DX 622 into evidence.

8    THE COURT:  Any objection?

9    MS. HULETT:  No objection.

10    THE COURT:  622 is admitted.

11    (Defendants' Exhibit 622 was received.)

12  BY MR. SKINNELL:

13  Q.  Dr. Katz, I'd like to turn to the substance of your report

14  in this case.  What were you retained to do?

15  A.  I was retained to evaluate the plaintiffs' expert's report

16  and findings.

17  Q.  Plaintiffs' expert Dr. Kousser?

18  A.  That's correct.

19  Q.  And did you read Dr. Kousser's report?

20  A.  I did.

21  Q.  And did you read his rebuttal report?

22  A.  I have.

23  Q.  Did you attend his deposition?

24  A.  I did.

25  Q.  So you're familiar with the opinions he's expressed in

1  this case?

2  A.  Yes.  He's been my colleague for 20 plus years.

3  Q.  Okay.  Thank you.  I want to start with something simple.

4  Can you tell me how ecological regression works?

5  A.  Okay.  Well, I'll try to be simple.  So ecological

6  regression was a technique developed in the 1950s by Goodman.

7  And it's based on a sort of fundamental accounting identity

8  about election results.  And I'm going to take the simple case

9  of only two groups, say Latinos and Anglos.  So I observe the

10  vote share for a candidate in the election.  Right?  Say the

11  Democratic candidate, it's a partisan election.

12         Then the fraction of votes that the Democratic

13  candidate received has to be equal to the fraction of votes

14  that Latinos cast for the Democratic candidate times the

15  fraction of Latinos in the district or in the precinct plus

16  the fraction of whites who vote, the Anglos who vote for the

17  Democratic candidate times the fraction of their demographic

18  share in the district or precinct.

19  Q.  Okay.  And is ecological regression widely used by

20  academic statisticians?

21  A.  It was once.  It is not much any longer.

22  Q.  Why is that?

23  A.  It makes a problematic assumption, which is that the

24  voting behavior of these groups is constant or the same across

25  all precincts, which is probably not true.  Generally

1 verifiably not true.  And there's been some new work developed

2 in the 1990s by Gary King called ecological inference that

3 generalizes ecological regression and includes other

4 information.

5 Q.  All right.  Dr. Kousser talked a little bit about the

6 issue of impossible results with ecological regression.  Now,

7 when he testified, he said that the -- that impossible

8 results, a number below zero or above 100 percent, was really

9 a sign that regression -- there was a strong correlation

10 between the two factors being considered.  Do you agree with

11 that?

12 A.  No.  In fact, this is actually pointed out by the

13 developer of the technique, Goodman, in the 1950s.  That when

14 you got these results that were out of bounds, that is voting

15 more than 100 percent or less than zero, was, in fact, an

16 indication that the underlying assumptions of the model were,

17 in fact, not being met.

18 Q.  And what were the assumptions that he was referring to?

19 A.  The key assumption is that there's constant rates of

20 voting by groups across precincts.  And in particular what's

21 called aggregation bias, that is there is no systematic

22 variation in voting rates for, say, the Democratic candidate

23 across precincts in a district.

24 Q.  And how does aggregation bias relate to the constancy

25 assumption?

1 A.  Well, constancy assumption is a way to rule out

2 aggregation bias.  If you assume that there's no variation,

3 then there can be no systematic variation.  And so it's gone.

4 Q.  And when you say "systematic variation," what does that

5 mean?

6 A.  So systematic variation means things -- so our

7 model -- say, for example, the model only includes, say, the

8 fraction of Latinos and the fraction of Anglos in the

9 precinct.  But suppose it's the case that Latinos in

10 district -- in precinct one are -- have lower education levels

11 on average to voters, Latino voters in precinct 20.  And we

12 know that higher voters with higher education levels tend to

13 vote differently than voters with lower education levels.

14 That's systematic variation that we didn't measure in our

15 model.

16 Q.  All right.  And how does aggregation bias, what impact

17 does aggregation bias have on the reliability of ecological

18 regression estimates?

19 A.  It invalidates them.

20 Q.  And can you test for the presence of aggregation bias in

21 voting data?

22 A.  Well, yes, to be clear, so if all we have is -- the answer

23 is no.  We can look for a problematic signs.  Such as Goodman

24 pointed out, out of bound estimates.  We can look for cases

25 where we can verify the results, say, for example, the example

1 of my expert report, where I look at registration rates where

2 we actually know -- we have good estimates of registration

3 rates by ethnic group and we can compare those to our

4 estimates from ecological regression or ecological inference

5 to those known bench marks.

6 Q. All right. I want to turn to DX 622, page 9, please.

7 Before I get into this. Is this method of looking at

8 registration rates one that has been used before in the

9 academic literature?

10 A. Yes. In fact, Gary King, who developed ecological

11 inference and is a pioneer in this study of this type of data,

12 in his book spends an entire chapter or two doing this sort of

13 verification where he has -- he looks at aggregated work, he

14 actually knows the true values. And registration data is one

15 of those examples.

16 Q. And so looking here at page 8 of your report. Does this

17 table show the results of -- maybe I'll take a step back.

18 What did you do to produce this table?

19 A. So I was provided data on the precincts in Kern County.

20 And we -- I included five precincts we knew from Census name

21 matching of voter names, estimates of their ethnicity or

22 racial composition. And it also included the true fraction,

23 also by registration by Census name matching, Latinos and

24 non -- registered as Democrats or other things.

25　　　　　And so what we then did here, using the same

1 technique Dr. Kousser used to estimate the voting patterns, we

2 looked to see could we duplicate, could we get good estimates

3 of the registration rates by race in the Kern County data for

4 the elections 2010 to 2016.

5 Q. All right. And where did you get -- who provided you with

6 those data?

7 A. This data, I believe, is collected by Clark Benson. No,

8 no, I'm sorry. Doug Johnson. Sorry. I work with

9 two -- different consultants in different cases. Doug

10 Johnson.

11 Q. All right. And what does this table show with respect to

12 ecological regression?

13 A. Well, I think it's probably easiest we just walk through

14 the table and explain it.

15 Q. All right. Please do.

16 A. So obviously the year column is fairly self-explanatory.

17 The true value comes from the aggregated up name match data.

18 So, for example, we see in 2016 that the estimate is -- the

19 value is that there's 54.5 percent of Latinos are estimated

20 are registered as Democrats.

21      Then the next two columns provide the point estimates

22 that come both from EI, the ecological inference technique

23 that Gary King developed, and then ecological regression, the

24 technique developed by Goodman in the 1950s.

25      The numbers -- so the point estimate is the sort of

1   highest likelihood that's, for example -- for EI, the estimate

2   is that there's 77.5 percent of Latinos were registered as

3   Democrats.  Quite a bit higher than the true value of 54.5

4   percent.  But because these are statistical estimates, we

5   actually don't know that value.  There's statistical

6   uncertainty.

7          So below that, in the bracketed values, is what's

8   called the 95 percent confidence interval.  It's a measure of

9   statistical uncertainty.  It says that with high probability,

10  the true value should be in the range of 75.8 to 79.1.  You

11  can see that we spectacularly failed given that 54.5 is

12  nowhere near that 95 percent confidence interval.  The

13  estimate for ecological regression is a little bit lower,

14  73.8.  Its confidence interval runs, for the 2016, from 71.4

15  percent to 76.2 percent.  Also much too high given the actual

16  numbers.

17  Q.   Now, Dr. Kousser testified earlier that he doesn't dispute

18  the accuracy of the results that you got here.  But he

19  believes that it fails to address the underlying cause of the

20  missed estimates.  Do you remember reading about this in his

21  rebuttal report?

22  A.   Yes.

23  Q.   And what does he say is the cause of this problem?

24  A.   Well, his claim is that there's voting behavior

25  different -- registration is different than voting behavior.

1    And actually what's going on here, however, is that it's the

2    underlying data that's the problem.  And both EI and, to a

3    lesser extent, ecological regression do much better when there

4    is homogeneous precincts.  That is, when there's precincts

5    that are almost all Latino or almost all -- or almost all

6    Anglo.  And unfortunately, in the Kern County data that's not

7    true.  Might be good for public policy point of view that Kern

8    County is not segregated, but from a statistical point of view

9    analyzing this type of data, it's quite problematic.

10   Q.  All right.  Now, Dr. Kousser also testified that

11   regardless of whether there's aggregation bias in the -- in

12   your estimates, in the registration estimates, that there's no

13   reason to think that that's true in voting -- because his

14   table showed that the Latinos -- or I'm sorry, non-Latinos who

15   live in the more integrated precincts don't vote the same as

16   Latinos even though they may register the same.  Does that

17   make sense to you?

18   A.  Again, I don't believe -- given that there are no

19   homogeneous precincts, I don't believe the estimate.  So the

20   foundation of that claim is false.

21   Q.  All right.  He also said that looking at your results

22   here, the constancy assumption actually seems to be pretty

23   good for Latino voters.  It's not for non-Latino voters, but

24   it is for Latino voters.

25   A.  Again, this table can't tell you anything about the

1 constancy assumption.  That's an assumption you made to do the

2 estimates to get ecological regression.  All you can see, a

3 failure, but clearly that assumption needs to have failed

4 because if it were true, then we would have gotten reasonable

5 estimates of the true values.

6 Q.  All right.  Have you ever testified about your -- to these

7 criticisms of ecological regression before?

8 A.  I believe so.

9 Q.  All right.  Do you recall if they've ever been accepted by

10 a court before?

11 A.  Yes.  Again, the concern in the Bethune case, which has

12 been a long case.  There's actually two separate trials.  But

13 part of the -- my critique of the originals plaintiffs' expert

14 was they based their entire report on racially polarized

15 voting on ecological regression.  And the Court ended up not

16 accepting those findings based on my testimony.

17 Q.  All right.  So it sounds like your testimony, if I

18 understand you correctly, is that statisticians at this point

19 really don't use ecological regression much any more, they use

20 ecological inference?

21 A.  That's correct.

22 Q.  And so how does ecological inference differ from

23 ecological regression?

24 A.  So I told you -- we described ecological regression as

25 coming from this accounting identity.  That we have to -- the

1  total votes has to equal the total votes coming from Latinos

2  and Anglos.  There's other information.  We've already

3  mentioned in here, homogeneous precincts.  But the answer is

4  in homogeneous precincts, that is a precinct that is 100

5  percent Latino, I know exactly how the Latinos voted.  I can

6  just read it off the Secretary of State's report.  In that

7  precinct, 78 percent of Latinos voted for a given candidate.

8  I would know that for certain.

9         Duncan and Davis developed about -- developed a

10  technique called the method of bounds.  I can actually

11  generalize it.  So not just the case where I know the value

12  obviously at 100 percent.  But suppose I backed it down.  If I

13  back it down to 90 percent, then I know that I can put strong

14  bounds with no assumptions about what the fraction of -- the

15  fraction of -- how Latinos must have voted.  Their true voting

16  favor must live in these bounds.  Problem is that the bounds

17  get very wide very quickly.  So as you move away from 100

18  percent Latino precincts, the bounds become very large.  In

19  fact, can get basically to be anything plausible, which is

20  anything between zero and 100 percent quite quickly.

21         What ecological inference does is it combines the

22  information from Goodman's regression, which makes

23  this -- with his method of bounds.  And it generalizes the

24  assumption in ecological regression, which it doesn't assume

25  that voting behavior of Latinos is the same in every precinct.

1    It allows it to vary.  However, it doesn't.  But the key here,

2    and this is why EI is even problematic in this case, is it

3    still makes the assumption of no aggregation bias.  That is,

4    there can't be the case that there's systematic variation in,

5    say, Latino voting behavior across the precincts in a given

6    district.

7    Q.   In what ways does ecological inference -- in what ways is

8    it the same as ecological regression?

9    A.   Well, in that assumption that there's no -- there's no

10   aggregation bias, there's no systematic.  However, because

11   ecological inference uses bounds information, these bounds --

12   even when the assumptions are not strictly true, if the bounds

13   are informative, that is there are homogeneous precincts, EI

14   often won't be too far off from the truth even though it's a

15   little bit biased.  I think the -- yeah.

16   Q.   I believe that Dr. Kousser -- well, let me -- first of

17   all, let me take a step back.  Why do you define a homogeneous

18   precinct as a 90 percent plus precinct?

19   A.   Two.  This is often used in the redistricting litigation

20   as sort of a benchmark for 90.  But I know even at 90 percent

21   Latino, the bounds can be quite large.  But that's usually

22   taken as a -- that was what was done in the *Gingles* case by

23   Bernard Grofman.

24   Q.   I'm sorry, when you say "that was done," what are you

25   referring to?

1 A.   Bernard Grofman, who was an expert in the case that

2 led -- the *Gingles* case, was the expert presented voting

3 rights analysis, including homogeneous precincts analysis.

4 And he used a cut off of 90 percent to describe homogeneous

5 precincts.

6 Q.   And how does Gary King define a homogeneous precinct in

7 his book on ecological inference?

8 A.   He actually means it by its nature.  Homogeneous means 100

9 percent; that is, there is no heterogeneity.

10 Q.   All right.  Now, I think Dr. Kousser's rebuttal report

11 says, you know, look, there may not be a lot of homogeneous

12 Latino precincts, but we have a lot of homogeneously

13 non-Latino precincts, less than ten percent Latino.  Doesn't

14 that sort of address the problem?

15 A.   No.  Again, because that helps you pin down the behavior

16 of Anglos.  But it doesn't pin down the behavior of

17 non-Latinos -- I'm sorry, of non-Anglos.  And then you also

18 have -- it actually has a spill over effect because of this

19 add up constraint.  If my estimate is off for any one of the

20 groups, that affects the estimates for the other groups, even

21 with homogeneous precincts.

22 Q.   Can you explain a little bit more how does that work?

23 A.   Well, again, let's go back to this fundamental accounting

24 identity that the total number of votes has to equal the total

25 number of votes that come from Anglos and total number of

1 votes that come from Latinos.  If I get a bad estimate for one

2 group, how the statistical estimator works is it's going to

3 push up -- say the estimate is systematically too low, it's

4 going to force the other estimate to be higher to make sure

5 that the total vote gets closer to the actual observed vote.

6 Q.  All right.  Now, Dr. Kousser said in his report -- and he

7 testified on the stand earlier this week, that he's comforted

8 that his results are model independent and, therefore,

9 presumably more accurate because his ecological inference

10 results and his ecological regression results are so similar.

11 Do you agree with that?

12 A.  No.  That's actually a misunderstanding of what "model

13 independent results" mean.  So model independent results is a

14 statistical term.  It means that we can make findings with no

15 substantive assumptions.  So, for example, in the homogeneous

16 precincts, in the 100 percent Latino precincts, I can make

17 model independent estimates.  I know exactly how they -- I

18 didn't need to make any assumptions.

19        So that's not model independent.  In fact, both

20 ecological inference and ecological regression make the same

21 assumption with regard -- well, they make similar assumptions,

22 which is there is no aggregation bias in the data.  What EI

23 has that ecological regression doesn't have is because it uses

24 the bounds information when it exists, it guards against it a

25 little bit.  But it still makes that assumption.

1  Q.  And how does it guard against it?

2  A.  Well, let's -- maybe an analogy might be helpful. So let's

3  pretend you're shooting pool.  Right?  And if I'm going to

4  shoot pool and the ball I want to hit is very close to the

5  pocket, and my -- and the cue ball is very close to it, right?

6  I can be a little off and the ball still goes in.  So a little

7  error is not magnified.  I can make a little bit of error and

8  it still goes in.  If I move the cue ball all the way back to

9  the other side of the pool table, now any small change, any

10  error in my angle that I hit the ball is magnified as it goes

11  along.

12       The same thing goes on with these estimates.  If you

13  think about the scatterplots that we, I think, have been shown

14  in court.  What you're trying to do is predict the -- how a

15  100 percent Latino precinct would vote.  If we don't observe

16  very many of those, any minor variation in the slope of that

17  line, that regression line, is going to be magnified when you

18  go that -- when you're extrapolating that far out.  It's just

19  like moving the cue ball to the other end of the table.

20  Right?

21       So the model -- why EI gets robust is as we get

22  closer, so that there are homogeneous precincts, it's just

23  like -- it's, again, exactly analogous to the pool example.

24  EI could be a little bit off, but it's like there's

25  guardrails.  I can't be that far off.  I'm still going to hit

1    the pocket.

2    Q.  All right.  Can we go back to DX 622, please, page 9.

3    Now, looking again at this table here that you've done of the

4    EI and ER estimates.  How far apart are those estimates?

5    A.  I'm sorry.  Could -- how far apart are which estimates?

6    Q.  The EI and the ER.

7    A.  They look to be off by a difference of four to five

8    percentage points.

9    Q.  All right.  And how far off are they from reality?

10   A.  They're all -- they're both between around 20 to 23

11   percent percentage points off.

12   Q.  What if you added weighted ecological regression to the

13   mix?  I mean, that would be a third type of model, that might

14   give you a little bit more confidence if it was similar to?

15   A.  No.  Again, weighted -- all weighted results are doing,

16   it's just -- it's going to shift the lot line slightly,

17   because it's going to give more weight to precincts that have

18   higher voter turnout.  But it's still making the fundamental

19   same false assumption that's driving these results and still

20   the case that with the weighted data, there's still no

21   homogeneous Latino precincts.

22   Q.  Okay.  Can we go to DX 594, please.  Page 34.  I'll

23   withdraw that.  Can we go back to DX 622, page 9, please.  I'm

24   sorry.  Page 9 of report, page 10 of the exhibit.

25          Now, you say here in paragraph 5, "Dr. Kousser

1          examined several election contests that do not seem

2          comparable in any way to voting for a county

3          supervisor.  For example, he includes analyses of

4          Democratic primary elections that are restricted to a

5          subset of eligible voters unlike the supervisor

6          races.  These state-wide elections are much higher

7          profile again making them dissimilar."

8          What do you mean by that?

9    A.  Again, there's a long literature in political science

10   studying -- empirically studying elections and how voters vote

11   and their turnout rates and their choices are different in

12   high profile versus low profile elections, in non-partisan

13   versus partisan elections.  And so behavior is not comparable.

14   Q.  And is this a type of criticism that you've ever made

15   before?

16   A.  It has.  In the Bethune case, I raised the same issue.

17   Q.  Can you describe in that case what the issue was?

18   A.  Again, plaintiffs' experts looked at several state-wide

19   elections for governor and some presidential elections in

20   establishing their findings about whether or not there was

21   racially polarized voting.

22   Q.  Dr. Kousser testified last week that, in his view, the

23   most reliable way to replicate his results, in the way he said

24   social scientists would do it, is to re-run his -- using his

25   data, re-run a reliable program like eiPack.  First of all, is

1 that a correct statement?  Is that how social scientists would

2 do it?

3 A.  No, that's not the accepted standard for quantitative

4 studies in political science or social sciences generally.

5 The current standard at most respectable journals requires

6 complete replication files.  That is, the exact data and code

7 that was used to generate the results.  And again, this is key

8 because in a narrative, like a report, it's easy to forget or

9 not -- subtle choices made about manipulating data or setting

10 tuning parameters.  You can't -- computers are very literal.

11 So you can't leave those steps out.  So if you provide me with

12 the exact code you ran, I can then infer exactly what you did.

13 Q.  Okay.  Now, leaving aside what journals do.  Why didn't

14 you re-run Dr. Kousser's regressions in this case?

15 A.  Again, because it became obvious, taking a look at the

16 data, that there -- given there are no homogeneous precincts

17 for Latinos, that these -- that you wouldn't get reliable

18 estimates of voting behavior.  And with this aggregate data.

19 Q.  All right.  When you run ecological inference, what

20 program do you use?

21 A.  I will be very specific.  So I -- the analysis I do is in

22 a program which is called R, just the letter R.  And there's

23 a -- the main set of analyses is a program, set of library

24 that is called EI -- that's lower case EI and then pack,

25 P-A-C-K.

1  Q.  You don't use Zelig?

2  A.  I do not use Zelig.

3  Q.  Why don't you use Zelig?

4  A.  Zelig is a front end or a user interface that tries to

5  unify and make R, which is a complicated program language,

6  easier to use in a more systematic way.  The problem for EI,

7  which is a complicated estimation procedure, it restricts what

8  you can -- how you can set parameters and how you can do

9  things that makes it seem like you can get an answer when you

10  need to change things around.  And it doesn't have that

11  flexibility.  So the standard way you make something easier to

12  use is like training wheels, you don't let people do things.

13  That's what Zelig does, it restricts the set of parameters you

14  can set that you might need, for example, to get the model to

15  converge.

16  Q.  All right.  I think Dr. Kousser said that when he's using

17  Zelig, really he's just using eiPack and R.

18  A.  That's true somewhat.  In the sense that Zelig calls

19  eiPack to do its estimation.  But it does so with a set of

20  default parameters, which for well behaved data, for good

21  data, might work.  But might -- but in more complicated data

22  or more problematic data might not.

23  Q.  All right.  You mentioned, just a second ago, the concept

24  of convergence.  Can you explain what convergence is in

25  connection with ecological inference?

1   A.   Yeah.  I will do my best.  So first convergence is -- all

2   these modern estimators work by simulation methods.  Sampling

3   from some distribution.  I'm going to give you an example in a

4   second.  And so we'll say our estimates have converged when

5   that sampling mimics the properties to a high degree of

6   certainty, to the true distribution.

7        So that's all very abstract.  Let's think about a

8   much simpler case.  Suppose I want to know whether a coin was

9   fair.  Okay?  So I could sample from that.  How do I sample

10  from it?  I could just flip the coin.  So I flip it once and

11  say heads comes up.  That's not much information.  I could

12  calculate the probability of getting heads.  It's one.  I got

13  one heads.  I flipped it once and it came up heads.  So that

14  hasn't converged yet.

15       I could flip it a second time and so now the

16  probability -- which is the diffusion that we're trying to

17  get -- could either be it could come up heads again, in which

18  case I think the probability that the coin is a false -- two

19  headed coin is one or I -- it could be come up with zero, in

20  which case now we're at -- it's 50/50.  Have -- one flip came

21  up positive -- one flip came up heads, one flip came up tails.

22       I could do it a third time.  Right?  As I do this,

23  it's going to converge to the two distribution.  And so in the

24  case of a point two distribution is just the probability of

25  getting a heads.  And we'll say convergence means that

1 basically one more flip, one more additional piece of data

2 doesn't change my estimate.  Any changes in the noise of what

3 I care about.  That's what we mean by convergence.  But

4 clearly, at any point along the string I could have reported a

5 number.

6          With EI, we're doing the same thing.  But in a much

7 more complicated, it's not just coin flipping, we have

8 a -- it's a multi-dimensional space and it's a distribution

9 that's continuous.  So it looks more like a -- if you remember

10 like the bell curves from a normal distribution.  But now in,

11 say, in multi dimensions, more than two dimensions.

12          But the same idea, the same idea of convergence is

13 that we sample enough from our estimator, from our statistical

14 procedure, such that we don't think any additional draws are

15 going to change my inferences.  That's what convergence means

16 in a not technical term.  We get -- I could write down

17 technical terms, but I think I'd put everyone to sleep.

18 Q.   Thank you.  Does every ecological inference run

19 convergence?

20 A.   No.

21 Q.   Dr. Kousser testified if you run ecological inference and

22 it doesn't converge, then eiPack wouldn't give results and so

23 you would know.  Is that correct?

24 A.   No, it's false.  It's just like the example of the coin

25 flipping, at any point along my path of flipping coins, I

1    could tell you the estimate of the probability of getting

2    heads.  Right?  That's a number.  That's just calculating the

3    number of times I observed heads over the total number of

4    flips.

5           So your computer will usually tell you the current

6    estimate, that is the current mean of this distribution.  Even

7    if it's only done one draw that hasn't converged.  Two draws

8    hasn't converged but it would still give me an estimate.  So,

9    in fact, you have to ascertain whether or not convergence has

10   occurred.

11   Q.  And how do you do that?

12   A.  There are both visual techniques and suggested tests in

13   literature.

14   Q.  All right.  In your view, given the default parameters for

15   Zelig, how likely is it do you think that Dr. Kousser's

16   results converged?

17   A.  Zero.

18   Q.  And can you explain why?

19   A.  Because, again, while I didn't do the estimates on his

20   data, trying to get the registration data, the estimates that

21   I presented in table -- I forgot what table number that is.

22   Q.  Can you go to DX 622 page 9.

23   A.  In Table 2 of my report, these were very difficult to get

24   to converge.  I actually had to dramatically both increase the

25   number of iterations from the defaults that eiPack chooses and

1  had to set some other axiliary parameters, tuning parameters

2  to get it to converge.  Which would not be set by default in

3  Zelig.

4  Q.  But your results did converge here?

5  A.  Yes.

6  Q.  I want to go back.  I think at your deposition, you said

7  that a typical way of trying to assess whether there are

8  enough homogeneous proceeds to make reliable estimates would

9  be to run a tomography plot.

10  A.  That is correct.

11  Q.  And can you -- did you run any tomography plots in this

12  case?

13  A.  I didn't print any out.  No, I didn't look at any

14  tomography plots.  Because in this case we have much better

15  than looking -- I don't need to look at diagnostics of my EI

16  estimates, I can actually just compare them to the true known

17  values.  I have the best gold -- the gold standard.

18  Q.  Okay.  Now, at your deposition, you told plaintiffs'

19  counsel that you don't know if Dr. Kousser's numbers are

20  correct.  That they might be.  What did you mean by that?

21  A.  Well, again, I like to try to be quite specific in the

22  claims I can make.  And given the data, I don't believe

23  any -- given the aggregate level data that he analyzed, I

24  don't believe any reasonable estimates of voting behavior can

25  be made.  That means that all we can strictly say from a

1 statistical point of view is the data is not informative about

2 whether or not there is racially polarized voting in Kern

3 County.  One might bring to bear other data that could do

4 that, but this data could not answer that question.

5 Q.  All right.  So his numbers might be right.  Maybe he is

6 showing racially polarized voting?

7 A.  And it could be -- I think the analogy I gave you when we

8 talked about this was it's like my watch being broken.  So

9 twice a day it will be correct, but that's not -- wouldn't

10 want to base my life and my schedule on getting to court on

11 time on a broken watch.

12 Q.  All right.  Now, just to be clear.  You're not saying that

13 these statistical methodologies can never work to estimate

14 polarized voting; correct?

15 A.  No, I've used them frequently.

16 Q.  All right.  Have you used them in California?

17 A.  Yes.

18 Q.  And you found that they worked?

19 A.  In the elections that I studied, yes, they had some

20 homogeneous precincts.

21 Q.  So your claims are limited to the data that is available

22 in this case?

23 A.  That is correct.

24         MR. SKINNELL:  I don't think I have any more

25 questions, Your Honor.

1    THE COURT:  Cross-examination.

2    MS. HULETT:  Yes, Your Honor.

3    THE WITNESS:  Could I have another bottle of water,

4  please?

5    MR. SKINNELL:  Your Honor, may I approach?

6    THE COURT:  Oh, yes.  No.  You have to throw it.

7    MR. SKINNELL:  That might be more dangerous.

8    THE COURT:  See what kind of arm you have.

9    MR. SKINNELL:  There's a reason I'm a lawyer and not

10  a baseball player.

11                    CROSS-EXAMINATION.

12  BY MS. HULETT:

13  Q.  Good morning, Dr. Katz.

14  A.  Good morning.

15  Q.  First of all, we looked at Exhibit 621, your CV.  Your

16  curriculum vitae doesn't include any of the cases you've

17  testified in; correct?

18  A.  That's correct.

19  Q.  And your attorney gave me four cases.  Romo versus

20  Detzner, the Bethune-Hill, and the Santa Clarita and Maestas

21  versus Hall.  I found an old Texas case.  But that leaves

22  about 15.  I think you said you worked on 20 cases.

23  A.  Over 20 years.  I think those -- the cases chosen, counsel

24  can answer.

25    MR. SKINNELL:  We were providing, pursuant to the

1    rules, the cases in the last four or five years.

2              MS. LEONI:  Yeah.

3              MS. HULETT:  No, I'm not challenging that.  That's

4    fine.

5    Q.  I was just wanting to ask you whether, in any of those

6    cases, you presented testimony as to the exact number of

7    homogeneous precincts that were present in order to determine

8    whether ecological inference would work?

9    A.  I don't believe so because in none of those cases was that

10   an issue.  There was, in fact, racial segregation in the data.

11   Q.  So you counted the precincts to see how homogeneous they

12   were or you didn't?  I'm confused.

13   A.  I looked at the underlying data and in those cases didn't

14   find any problem when I did my analysis.

15   Q.  So there were substantial numbers of homogeneous

16   precincts?

17   A.  Again, I don't recall every case I worked on over the last

18   20 years, but yes, that is my general recollection.

19   Q.  Can you tell me a case where you had a substantial number

20   of 90 percent homogeneous precincts on both sides of the

21   equation?

22   A.  Sure.  The most recent Bethune case.

23   Q.  And how many of the precincts were over 90 percent black

24   in the Bethune-Hill case?

25   A.  I couldn't tell you the exact number.

1    Q.  And can you tell me how many were 90 percent Anglo?

2    A.  Again, I couldn't tell you the exact number.

3    Q.  You also said you used data from Doug Johnson, from Dr.

4    Johnson in this case.

5    A.  That's correct.

6    Q.  And are you aware that he got that data from the

7    Spanish -- I mean from the state-wide database and then did

8    adjustments on a Spanish surname count?

9    A.  I'm not aware of how he modified the data.

10   Q.  I think -- you were provided in this case with the data

11   that Dr. Kousser used, the unadjusted Spanish surname data

12   that he used in each election that he analyzed, including the

13   number of total voters in each precinct, the number of Spanish

14   surname voters and the votes cast for each candidate; correct?

15          MR. SKINNELL:  Your Honor, I apologize for

16   interrupting.  But I want to object to the question --

17          THE COURT:  Excuse me.  I apologize.

18          MR. SKINNELL:  Bless you.  I want to object that the

19   questions about Dr. Johnson adjusting the data provided to Dr.

20   Katz assumes facts that aren't in evidence.

21          THE COURT:  Well, I could have counsel rephrase the

22   question.  But I don't really see the point.  You are unaware

23   of -- you answered you were unaware of what Mr. Johnson did to

24   the data and whether he made any adjustments; correct?

25          THE WITNESS:  That is correct, Your Honor.

1      THE COURT:  I mean, that's -- that's the only value

2  of the testimony.  He doesn't -- he's unaware.  Johnson's

3  testifying.  I'm sure I'm going to hear about what he did or

4  didn't do.

5  BY MS. HULETT:

6  Q.  So but in addition to the data you used, you were provided

7  in this case with the data that Dr. Kousser used.

8  A.  Yes.

9  Q.  That was from the state-wide database.  Correct?

10  A.  Yes, at some point.  I don't recall exactly when, yes.

11  Q.  And that data was complete in that it had -- for each

12  election he analyzed, it had the number of total voters, the

13  number of Spanish surname voters in each precinct and the

14  votes cast for each candidate in each precinct; correct?

15  A.  I didn't hand verify every one of his files, so I

16  can't -- but in general they looked complete.

17  Q.  Okay.  You have no reason to doubt that the data you

18  received is the data he used; correct?

19  A.  I do not.

20  Q.  And with that data, you could have performed your own

21  analysis of the 22 elections in Dr. Kousser's report using

22  either ecological regression or ecological inference; correct?

23  A.  Yes, I could have.

24  Q.  And then you could have compared them to his results?

25  A.  That is correct.

1  Q.  And then you could have run diagnostics on your own runs;

2  correct?

3  A.  Correct.

4  Q.  And prior to your deposition, you have not performed

5  either analysis on those elections; correct?

6  A.  That is true.

7  Q.  I'm going to ask a little different question.  In your

8  analysis, the gold standard one of the Latino Democratic

9  registration.  You never tried to do that estimation using the

10  default parameters in eiPack or you did?  I was a little

11  confused.

12  A.  I never used the default parameters.  I do a -- if you

13  look at my code, there is a pilot run, which searches the

14  space for improved tuning parameters.  Which were then run.

15  So I run those.

16        I then run the main runs on those improved tuning

17  parameters.  And I then -- but then you have to choose what's

18  called the number of iterations.  That is how many times I

19  flip the coin.  Those I increased.  And the estimates showed

20  what are called high auto correlation.  And so there's another

21  parameter, which is called thinning, which I had also had to

22  then set to reduce the amount of auto correlation in the runs.

23  Q.  I understand you have your own parameters and they're

24  different from the default parameters in eiPack.  My question

25  was:  Did you ever, as a matter of curiosity, use eiPack's

1 default parameters, run your partisan analysis and see if it

2 changed it in any way?

3 A.   No.  It wouldn't have.  Because it wouldn't have

4 converged, so I don't -- I couldn't have gotten converge -- I

5 barely got convergence with the parameters I used.  The

6 defaults which are much lower would not have converged.  I

7 don't need to run it to know that.  It's a nest egg.

8 Q.   What exactly couldn't you get to converge on the -- you

9 did or you didn't use the default parameters and that's what

10 did or did not converge?

11 A.   So one of the default parameters is, I believe, on Zelig

12 in the eiPack is that it only samples from -- it only flips

13 the coin, has 2,000 iterations.  That -- since convergence is

14 actually a cut point, so I could have sampled more but I have

15 to sample at least that.  If you look at my code, I sampled

16 100,000 times.  So I can tell you that with certainty, 1,000

17 times was not enough to get convergence.  Without ever having

18 done this -- without ever having run the analysis at 1,000.

19 Q.   Okay.  So you didn't run it at 1,000?

20 A.   That is correct.

21 Q.   Now, I want to ask you a little bit about the Bethune-Hill

22 case.  In that case, most of your report in that Bethune-Hill

23 versus Virginia State Board of Education, most of your

24 analysis was a critique of Dr. Ansolabehere.  Is that correct?

25 A.   Ansolabehere.

1   Q.   Ansolabehere.

2   A.   Tough name.

3   Q.   And most of your report was a critique of his analysis;

4   correct?

5   A.   Correct.

6   Q.   And in that case, you did re-run his estimates; correct?

7   A.   I generated alternative estimates.  I didn't re-run his

8   estimates.  He did ecological regression, I provided

9   ecological inference looking at a larger set of district -- of

10  house of -- house of delegates elections.  Among other things.

11  The --

12  Q.   So you did ecological inference of a larger universe of

13  elections than Dr. Ansolabehere did?

14  A.   I would say a different set.  He focused a lot on some

15  state-wide races and did not look at -- and didn't look at

16  House of Delegates elections.  I looked at House of Delegates

17  elections using ecological inference whereas he used

18  ecological regression.

19  Q.   You did run ecological regression analysis in that case,

20  but it was just to show that his results contained impossible

21  results; correct?

22  A.   Right.  Because he didn't give the full -- he just -- he

23  gave truncated results.  And so I ran my own analysis just to

24  show what the actual -- how off they were.

25  Q.   And you never received data from Dr. Ansolabehere in that

1    case; correct?

2    A.  I'm sure I did.  But -- so now we're going back two and a

3    half, three years.  So I don't recall exactly what I received.

4    But it would have been very surprising had I not received

5    data.  And I would have commented on it.

6    Q.  Could we pull up, please, Plaintiffs' Exhibit 271, page

7    83.  This is the bench trial transcript, your testimony in the

8    bench trial transcript of your testimony in Bethune-Hill

9    versus Virginia State Board of Elections.  And I'd like to

10   start at line 22 on page 83.

11        "And again" -- I'm sorry.  I'm sorry.  I'm going to

12   have to come back to that.  The question says you didn't

13   receive the data, but there's another -- could I go to the

14   next page.  I'm sorry.  I'll have to come back to that.

15        You also testified in that case that ecological

16   inference solves some of the problems and makes better use of

17   the available data, similar to what you testified today on

18   direct.  Correct?

19   A.  That is correct.  And as I state in my report as well.

20   Q.  Now, in that Bethune-Hill versus State Board of Elections

21   case, the Democrats, who were your original clients, didn't

22   like the results you got and they tried to fire you and

23   exclude your report; correct?

24   A.  Yes.  It was a very complicated case.  So recall

25   politically what happened in Virginia is the plan was drawn

1  when there was a Republican Governor and a Republican

2  controlled legislature.  In the intervening years, once the

3  case was filed, a Democrat had been elected Governor and

4  Attorney General.  The suit was filed, the Attorney General

5  felt obliged to defend the map enacted into law, even though

6  it was not a map they cared for.  They retained outside

7  counsel, who then retained me to do an analysis.  I was told

8  by -- although I was not present, I was told that the Attorney

9  General was not happy that I presented analysis and report

10 that was actually created a plausible defense for the map.

11 And they asked to have me fired.  This was done after

12 discovery.  After close of discovery.

13         Clearly the Republican intervenors objected.  And

14 offered to hire me, in fact, offered to cover the cost of my

15 work which had not yet been paid.  And so then I was retained

16 by Republican intervenors.  So it was the oddest case I've

17 ever been involved in.

18 Q.  And the judge wouldn't let them exclude the report that

19 you did because it didn't -- they didn't like the results you

20 got; correct?

21 A.  That's a legal question.  I -- so I -- but yes, the answer

22 is that the judge -- it was after discovery, so it was fair

23 game.

24 Q.  Meaning the judge didn't let them exclude it?

25 A.  That's correct.

1 Q. And when you testified about your ecological inference

2 racial polarization results in that Bethune-Hill case, you

3 didn't testify at all about the presence or absence of

4 homogeneous precincts in Virginia or in the elections you

5 analyzed; correct?

6 A. It wasn't an issue in that case.

7 Q. And your report in that case contained no analysis about

8 the number of homogeneous black precincts or homogeneous white

9 precincts; correct?

10 A. It didn't mention anything in particular because it was

11 not an issue for the data.

12 Q. I'd like to move to Texas for a moment. In the Texas

13 case, the Congressional redistricting case that took place in

14 challenging the 2001 Congressional districts, you performed an

15 ecological inference analysis; correct?

16 A. Yes. Well, though we're now stretching my memory. That

17 was 16 years ago.

18 Q. And you can't remember whether or not -- because it was 16

19 years ago, you can't remember whether or not there were

20 homogeneous Latino precincts in that case; correct?

21 A. That is correct. I haven't looked -- I have not looked at

22 that data. In fact, I no longer have that data unfortunately.

23 The computer died in the intervening years.

24 Q. Oh. But in your report in that case, there was no

25 analysis of the number of homogeneous precincts on either

1  side, Latino or Anglo; correct?

2  A.  Again, I don't believe that was an issue in that case.

3  But I don't recall one way or the other to be honest with you.

4  Q.  But there was no analysis in your report of the number of

5  homogeneous Anglo or Latino precincts; correct?

6  A.  Not that I recall.  But I really have not reviewed that

7  report in 16 years.

8  Q.  And in that case, you found that you could be, quote,

9        "confident that the voting behavior of Anglos and

10       Hispanics differed significantly using standard

11       statistical criteria because the confidence levels do

12       not overlap."

13       Correct?

14  A.  Again, that sounds correct, but I feel a little wary -- I

15  feel a little uncomfortable talking about a report I wrote 16

16  years ago that I haven't reviewed.

17  Q.  Sure.  I understand that.  Could we pull up Plaintiffs'

18  Exhibit 265, please.  Is this the report you wrote in that

19  case?

20  A.  It looks that way.  One of the reports.  There was

21  actually a couple.

22  Q.  Could we please go to page 15.  The language I just quoted

23  appears at the bottom of -- sorry.  Hang on.  Please go down

24  one.  Yeah, at the bottom.  Go back to 15, I'm sorry.  It

25  says, "However, we can be confident that the voting behavior

1     of Anglos and Hispanics differed significantly using

2     standard statistical criteria because the confidence

3     intervals do not overlap."

4     Is that your --

5  A.  Yes, that's correct.  That's what it says.

6  Q.  Now, I want to ask you about Santa Clarita for a moment.

7  In the Santa Clarita Community College District case, that

8  wasn't too long ago; correct?

9  A.  No, it was a few years ago.

10  Q.  And you worked for the same attorneys you're working for

11  in this case?

12  A.  That is correct.

13  Q.  And in that case, Dr. Kousser testified for plaintiffs and

14  you testified for defendants.

15  A.  That is correct.

16  Q.  And in the Santa Clarita case, you performed your own

17  racially polarized voting analysis using both ecological

18  regression and ecological inference; correct?

19  A.  Correct.

20  Q.  And you concluded that there was no racially polarized

21  voting in the elections you examined; correct?

22  A.  I believe that's the case.

23  Q.  And although you noted the data limitations in that case,

24  you employed the, quote, "best available statistical methods

25  to analyze the aggregate election results."  Is that correct?

1  A.  That sounds like something I would have said, yes.

2  Q.  And in the Santa Clarita report, you included no count of

3  how many of the precincts were homogeneous Latino or

4  homogeneous Anglo?

5  A.  Not that I recall.

6  Q.  Now, the Court in that case rejected your conclusion

7  because of the limited number of relevant elections in your

8  analysis; correct?

9  A.  I have no idea what the Court found.

10  Q.  Could we pull up Plaintiffs' Exhibit 261 at page 3.  This

11  is a tentative opinion that I believe was later adopted by the

12  Court on a summary judgment motion, we've talked about it

13  earlier during Dr. Kousser's testimony.

14          And on this page, it says, "However, the Court notes

15          that Dr. Katz' conclusions of no statistically

16          significant evidence of RPV is based upon an

17          examination of the limited number of relevant

18          elections which severely limits the validity of

19          statistic inferences."

20  MR. SKINNELL:  Your Honor, we would ask that the rest

21  of that paragraph be read, please.

22          THE COURT:  Can you blow it up?

23          MS. HULETT:  Can you blow it up a little bit?  There

24  are citations, do I need to read the citations?

25          MR. SKINNELL:  You don't.

1    MS. HULETT:  "The focus on Latino candidates, which

2         the Court has determined to be irrelevant, renders

3         Dr. Katz' conclusion insufficient to carry

4         defendant's initial burden to establish that

5         plaintiffs cannot demonstrate RPV.  The parties'

6         arguments as to whether the data and conclusions are

7         probative or reliable really seek the Court to

8         evaluate and weigh the evidence at the summary

9         judgment stage, which is not appropriate."

10   Q.  Is that consistent with your recollection in this case?

11   A.  I've never seen this document before in my life.

12   Q.  The plaintiffs in that case also hired another consultant,

13   Paul Mitchell, who also did a racially polarized voting

14   analysis which resulted in the conclusion that voting was

15   polarized.  Do you recall that?

16   A.  Never seen that report.

17   Q.  Could you scroll back to page 2.  At the bottom paragraph,

18   could you please zoom in a little bit on this.  The report

19   says that "Defendant objects to the report and deposition of

20        Paul Mitchell and to the declaration of Dr. Kousser.

21        The objections are sustained.  As to Mitchell, there

22        is no evidence submitted for his qualifications for

23        his testimony."

24        MR. SKINNELL:  Your Honor, we would ask that the rest

25   of that paragraph be read too, please.

1      MS. HULETT:  It's not about Paul Mitchell.

2      THE COURT:  You can do it on redirect if you want to.

3      MR. SKINNELL:  All right.  Thank you.

4  BY MS. HULETT:

5  Q.  So you don't recall that Paul Mitchell found that voting

6  was polarized in that case and that plaintiffs sought to have

7  this report excluded?

8  A.  I didn't even know such a report existed or who Paul

9  Mitchell is.

10  Q.  All right.  Could you scroll up a little bit.  Oh, wait.

11     THE COURT:  You said "plaintiffs."

12     MS. HULETT:  I'm sorry?

13     THE COURT:  You said "plaintiffs."  Did you mean to

14  say "the defendants"?

15     MS. HULETT:  No, I meant to say "plaintiffs."

16     THE COURT:  Hmm.

17     MS. HULETT:  The paragraph --

18     THE COURT:  Then you lost me.

19     MS. HULETT:  All right.

20  Q.  The paragraph that begins "expert analysis."  Oh, I'm

21  sorry.  You're right.  "Defendants."  I do apologize.  Let me

22  back up.

23     The paragraph under number 4, "Expert Analysis."

24     "The determination of a violation of the CVRA

25     requires expert analysis concerning election data.

1    Citations.  Both parties have submitted declarations

2    from experts analyzing elections data.  Defendant

3    relies on Jonathan Katz and plaintiffs rely on J.

4    Morgan Kousser, Ph.D.  In addition, the Court notes

5    there is evidence that defendant retained a

6    consultant to analyze RPV which resulted in the

7    conclusion of RPV."  And citations.

8    "Defendant objects to the report and deposition of

9    Paul Mitchell and to the declaration of Dr. Kousser.

10    The objections are sustained."

11    You don't recall that the attorneys that hired you

12   also had Dr. Paul Mitchell do an analysis that concluded that

13   there was racially polarized voting?

14   A.  As I testified, I have no idea that such analysis was

15   done.  I have never seen it.

16    MR. SKINNELL:  Your Honor --

17    MS. HULETT:  I'm done with that.

18    MR. SKINNELL:  I would object that this misstates the

19   record.

20    THE COURT:  Like I said --

21    MR. SKINNELL:  All right.

22    THE COURT:  You've got redirect.  I don't know.

23    MR. SKINNELL:  It's difficult when he doesn't

24   remember.  So --

25    MS. LEONI:  I don't think she's done.

1    MS. HULETT:  Not your turn yet.

2    MR. SKINNELL:  I'm sorry.  My apologies.

3    MS. HULETT:  I'm almost done.

4    THE COURT:  Ms. Hulett was just trying to tell you

5  that she was done with that paragraph.

6    MR. SKINNELL:  That line.  I apologize.

7  BY MS. HULETT:

8  Q.  In addition to the --

9    THE COURT:  Wait.  I went to a trial and a fight

10  broke out.  It's like going to a hockey game.  All of a sudden

11  there was a scrum.

12    THE WITNESS:  What's more interesting is when you go

13  to a boxing game and a hockey game breaks out.

14    THE COURT:  All right.  Here we go.

15    MS. HULETT:  Your Honor, just for a moment.  I've

16  been given the correct citation that I thought I had before to

17  the Bethune-Hill bench trial transcript.  If we could pull up

18  page 271.  There it is.

19  Q.  My question was.  And I think your answer was that you

20  didn't recall.  My question was:  In that case, you had not

21  received data from Dr. Ansolabehere?

22  A.  Again, I don't recall.  We didn't --

23  Q.  And at the bottom of page 82 of Plaintiffs' Exhibit 271,

24  which is the bench trial transcript of your testimony in that

25  case.  The question at line 22 is:

1      "Before we get to the simple stuff, the ecological

2      inference and ecological regression, let's do try

3      something more simple.  Do you think that professor

4      A. used the right" -- could we go to the next

5      page -- "data in his analysis?"

6      Your answer was:  "I have two concerns with the data

7      he used.  First, we were never -- myself and my RAs

8      were never able to exactly match the number of

9      precincts he found.  And we never received his data,

10     so I have no way of verifying why that was so."

11   A.   Ah.  That will be -- thank you for recalling my -- for

12   refreshing my recollection.

13   Q.   All right.  Thank you.  So in addition to the work that

14   you produced in this case in your report, you also did some

15   other preliminary work for defense counsel in this case;

16   correct?

17        MR. SKINNELL:  Your Honor, we object.  We objected at

18   the deposition that there were some preliminary analyses that

19   Dr. Katz did that do not form the basis of his opinions here.

20   And that they were under the attorney -- excuse me, the

21   attorney work product.

22        THE COURT:  What's the question?

23        MS. HULETT:  The question is did he do additional

24   work that was not produced in this case that was relevant to

25   Kern County, that pertained to Kern County?

1    THE COURT:  And your objection is attorney work

2  product?

3    MR. SKINNELL:  Yes, Your Honor.  As I said, it was

4  preliminary work that did not relate to the opinions he's

5  expressing in this case.

6    THE COURT:  What's your response, Ms. Hulett?

7    MS. HULETT:  The question is only did he do it.  I

8  would like to know what that work was.  But there's an

9  objection pending.

10    MR. SKINNELL:  Your Honor --

11    THE COURT:  There's no way for me to rule on that

12  without knowing.  You want an in camera review?

13    MR. SKINNELL:  If I might have a moment, Your Honor.

14    THE COURT:  Yes.

15    MR. SKINNELL:  I do want to say that we have produced

16  all of the work that Dr. Katz has performed and that relates

17  to his opinions in this case.

18    THE COURT:  But let's just say everything that

19  relates to his opinions?

20    MR. SKINNELL:  Yes.

21    THE COURT:  I mean, I --

22    MR. SKINNELL:  And everything that underlies his

23  opinions.  All of the data, all of the analysis that he's

24  performed.

25    THE COURT:  And I guess then the question really is

1  trying to get to whether there were any -- any review

2  undertaken that resulted in information in any way

3  questioning -- or calling in -- raising possible questions

4  about whether it was inconsistent with that opinion.  It seems

5  to me that's difficult for me to rule on without knowing what

6  it is.

7          MR. SKINNELL:  Your Honor --

8          THE COURT:  I'm -- do you understand what I'm -- how

9  do I know without knowing?

10         MR. SKINNELL:  I understand Your Honor's question.  I

11 wonder if I might have a moment to consult.

12         THE COURT:  It's sort of the same as with, oh, in the

13 criminal law context, the assertion of the Fifth Amendment

14 privilege.  Oft times the Court's required to take -- hear

15 from the parties in camera, both with respect to

16 attorney/client privilege, work product, Fifth Amendment

17 privilege issues to understand whether or not the question

18 calls for a response that would invoke the privilege.

19         You're telling me, no, we've turned over everything

20 relevant to the opinion.  I suppose I could accept that at

21 face value.  I suspect that's ultimately where I would come

22 out even after I hear it.  But how do I know?

23         MR. SKINNELL:  Your Honor --

24         MS. LEONI:  May we have a moment, Your Honor?

25         THE COURT:  Yes.

1       MR. SKINNELL:  I wonder if we might just take a few

2  minute recess?

3       THE COURT:  Sure.

4       MR. SKINNELL:  Thank you, Your Honor.

5       THE COURT:  I'm just going to wait in the hallway.

6     (Recess.)

7       THE COURT:  And I understand from Renee that defense

8  counsel is requesting that they be allowed to make an in

9  camera showing with respect to the assertion of work product

10  privilege.

11       MS. LEONI:  Yes.

12       THE COURT:  Plaintiffs have any position in that

13  regard?

14       MS. HULETT:  No, that would be fine, Your Honor.

15       THE COURT:  All right.  I will make a comment.  And

16  that is that although the -- I've been told that the privilege

17  was asserted at deposition.  If there had been a motion to

18  compel before the magistrate judge assigned to the case, this

19  issue perhaps could have been resolved prior to trial.  And

20  there was not one.  Not inclined -- I actually posed the

21  question in my own mind, can you waive an objection to an

22  assertion of privilege?  I don't know the answer to that

23  question.  And I couldn't find an answer in the few minutes

24  that I had.  I don't want to rule on the basis of waiver

25  because I'm just uncertain.

1    So I think what I would like to do is I would like to

2  excuse plaintiffs' counsel from the courtroom as well as any

3  other non-witnesses.  Well, any witness except this one.

4  Ma'am, if I could ask you to step outside, too.  We've got one

5  other witness.  And then we'll send someone out to let you

6  know after I've conducted the in camera review.

7    MS. HULETT:  Thank you, Your Honor.

8    (Proceedings were held in camera, not transcribed herein.)

9    (The following proceedings were held in open court at

10    2:36 p.m.)

11    THE COURT:  Let the record reflect we are back in the

12  presence of all counsel and the courtroom is re-opened.  And

13  this part of the transcript should remain unsealed and public.

14    And Ms. Hulett, you may continue.  The last question

15  that was pending to Dr. Katz on cross-examination

16  was -- shoot, I had it right here.

17    "So, in addition to the work that you produced in

18  this case in your report, you also did some other preliminary

19  work for defense counsel in this case; correct?"

20    There was an objection on work product -- attorney

21  work product privilege grounds.  I am overruling that

22  objection.  Dr. Katz, you may answer the question.

23    THE WITNESS:  Yes.

24  BY MS. HULETT:

25  Q.  What work did you do?

1   A.   I examined some races that counsel provided to me.

2   Q.   Which races were those?

3   A.   I don't -- the supervisorial races in the last decade.

4   And the sheriff's race and a judge's race.  I don't remember

5   the exact ones.

6   Q.   I'm sorry.  I didn't get the --

7   A.   And a sheriff's race and a judge's race.  To be honest

8   with you, I don't recall the exact races.  I did this more

9   than a year ago and I haven't reviewed them since.

10  Q.   A sheriff's race, a judge's race and was there a third?

11  A.   I said the supervisorial races that are in question.

12  Q.   And when you say you examined them, what do you mean by

13  that?

14  A.   I analyzed -- I did the EI analysis of them.

15  Q.   EI analysis, ecological inference?

16  A.   That is correct.

17  Q.   What program did you use to do that analysis?

18  A.   R and eiPack.

19  Q.   What parameters did you use to run those?

20  A.   Again, I can't recall.  I did this a year ago.

21  Q.   Do you remember whether you used the default parameters in

22  eiPack?

23  A.   That I most certainly did not.

24  Q.   Do you remember the results?

25  A.   Only in broad strokes.

1  Q.  Did you do the exact same supervisorial races that Dr.

2  Kousser did?

3  A.  Again, I'm not sure of the exact races I ran without going

4  back and looking at my code and analysis, which I don't have

5  here.

6  Q.  And were they races that were run in the last 10, 15

7  years?

8  A.  That's my recollection, but, again, without looking at my

9  code, I don't really remember.

10  Q.  And do you recall whether they were racially contested

11  elections?

12  A.  That I don't recall.

13  Q.  Which sheriff's race did you do?

14  A.  I don't recall which one it was.  I'm sorry.

15  Q.  And you don't recall the judge's race?

16  A.  No, I don't.

17  Q.  When did you do this?

18  A.  More than a year ago.  Before I received anything from Dr.

19  Kousser.

20  Q.  I'm sorry?  I didn't hear the last part.

21  A.  More than a year ago.  Before I received anything from Dr.

22  Kousser's report.

23  Q.  Dr. Kousser produced his first report, I think, on

24  November 14th and then a revised on November 22nd.  So it's

25  your testimony that it was prior to that -- to November 14th?

1   A.  Yes, that's correct.

2           MS. HULETT:  I may come back to this.

3   Q.  Let's get back to the analysis that you did do -- did

4   produce in this case about the partisan Democrat

5   analysis -- Democratic Latino analysis.

6   A.  Do you mean the analysis of registration data?

7   Q.  That's what I meant.  You didn't provide tomography plots

8   for that analysis; did you?

9   A.  I did not.

10  Q.  And you didn't provide log files for this data?

11  A.  I provided all code necessary to replicate this analysis.

12  Q.  What about log files for Stata?

13  A.  I don't use Stata.

14  Q.  What do you use for ecological regression?

15  A.  R.  And all the code was provided.

16  Q.  You provided the single R code; correct?

17  A.  Correct.  The exact R code I ran and would generate this

18  exact same numbers again.

19  Q.  Okay.  It's your opinion that -- I'm going to move for a

20  minute to your views on necessary numbers of homogeneous

21  precincts.  It's your opinion that you need substantial

22  homogeneous precincts for both groups to make reasonable

23  estimates because they're interrelated; is that correct?

24  A.  To be correct, it's among all groups under the analysis.

25  So if you divided it into Asian, Latino and Anglo, then you

1 would need homogeneous precincts for all those groups in order

2 to get reasonable estimates.

3 Q.  And you haven't set a bright line number of precincts for

4 what's substantial in this case.  But if half of the precincts

5 were 90 percent homogeneous Latino and the other half were 90

6 percent homogeneous Anglos, you think you'd probably be in

7 pretty good shape; is that right?

8 A.  Again, I -- you can't say -- I can't make statements about

9 hypothetical data.  There's lots of things that go into

10 estimates.  That sounds like it would be enough, but it would

11 depend on the exact dataset, which I would have to analyze.

12 Q.  I'm going to ask you a hypothetical.  If you had a

13 jurisdiction that had 1,000 precincts in it.  And they were

14 all the same size.  990 of them are homogeneous Anglo

15 precincts.  The rest are not homogeneous anything.

16 A.  Can you refresh the numbers again, please?

17 Q.  1,000 precincts all the same size.  All but ten of them

18 are homogeneous Anglo precincts.

19 A.  Uh-huh.

20 Q.  Ten are not homogeneous anything.

21 A.  Okay.

22 Q.  You don't believe that, even under those circumstances,

23 you'd be likely to get reliable estimates for Anglo voting

24 behavior because those ten non-homogeneous precincts could

25 make a difference in the Anglo estimates; is that correct?

1 A.   There are conditions under which that would be true, yes.

2 Q.   And it's also your opinion that the only way to ensure

3 that there's no aggregation bias, even if all the precincts

4 were 100 percent homogeneous, is if every person of a

5 particular type, Anglo or Latino, were identical in their

6 voting behavior across every precinct?

7 A.   That's not an accurate characterization of what

8 aggregation bias is or what I'm assuming.

9 Q.   Could I please have deposition at page 46.  Dr. Katz, this

10 is your deposition in this case.  It's Exhibit -- Plaintiffs'

11 Exhibit -- I'll get that number for you.  It's just for

12 impeachment, we're not seeking to have it admitted.

13         And at line 20, I asked you the question:

14         "Okay.  Aggregation bias would not impact my

15         estimates if all of the precincts were 100 percent

16         homogeneous Latino or Anglo; right?"

17         Your answer was:  "The only way you can ensure that

18         there's zero aggregation bias is if every person of a

19         particular type, Anglo or Latino, were identical in

20         their voting behavior across every precinct."

21         Was that your testimony?

22 A.   That's the definition of aggregation bias, yes.

23 Q.   Okay.  And that's because factors separate from race, like

24 socioeconomic status, impact voting; is that correct?

25 A.   May impact voting.

1 Q.  May impact voting.  Now, you spoke about Gary King and his

2 book and his tests.  But he never says anywhere in his book

3 that there is some bright line percent of homogeneous

4 precincts that are necessary for his ecological inference

5 estimates to be reliable; does he?

6 A.  He gives no bright line, but he does the analysis I did on

7 the registration data.  Which is he takes data on the same

8 scale where there's a true benchmark known.

9 Q.  But no where in his book does he say "My EI won't work

10 unless you have a substantial number of homogeneous precincts"

11 and then define that as a bright line; does he?

12 A.  He defines no bright lines.

13 Q.  And you referenced Dr. Grofman in the *Gingles* case.

14 A.  Correct.

15 Q.  And now I'm not -- I'm not as much focusing on the number

16 of precincts as the 90 percent figure.  I just want to clear

17 up something.  Dr. Grofman in *Thornburg versus Gingles*, when

18 he identified homogeneous precincts as those that were 90

19 percent of one race or another, that was for the purpose of

20 selecting precincts to use for homogeneous precinct analysis;

21 correct?  It wasn't for the purpose of looking to see how

22 reliable his ecological regression estimates were.

23 A.  He was using that threshold for his homogeneous analysis.

24 The reason he did the homogeneous analysis was as a check

25 against his ecological regression results.  Because

1 they -- the homogeneous precinct analysis requires less

2 assumptions.  It's model -- it's relatively model independent.

3 Q.  Right.  So he was -- but he was selecting precincts to use

4 for the homogeneous precinct analysis?

5 A.  That is correct.

6 Q.  You would agree with me that, in general, absent knowing

7 the true value, you can't know if there's aggregation bias;

8 can you?

9 A.  You can define a direct evidence of aggregation bias

10 without knowing the true value.  No, let me rephrase that.

11 There is no direct evidence of it.  There is indirect evidence

12 of it.  But yes, you are correct.  That's the problem.  You

13 have to assume no aggregation bias for these results to be

14 true.

15 Q.  And that's -- so you wouldn't know whether an ecological

16 inference analysis has actually gone wrong or not without

17 knowing the true value?

18 A.  Again, that's not correct.  What I stated is you have more

19 homogeneous precincts, the estimates are guarded against the

20 aggregation bias and they are probably close to correct.  But,

21 no, in general, you cannot tell whether or not there's

22 aggregation bias without auxiliary information.  Either true

23 values or some other information.

24 Q.  Could you pull up, please, page 52.  And I may be drawing

25 a fine line here.  But -- actually we have to go back one page

1   to the beginning of the question to be fair here.  Oh, my.

2   Can you go down to the beginning of the question.  On page 51.

3   There we go.

4           "I want to make sure I understand some sort of

5           conclusion from what we have just been talking about.

6           I'm going to go to page 5, in the first full

7           paragraph on your report, about halfway down, you

8           said -- quoted this a few times, 'In other words, we

9           will need a substantial number of precincts that are

10          relatively homogeneous for each ethnic group we want

11          to study.  When this is not the case, EI can go

12          wildly wrong as noted by King himself.'

13          "So you are not saying that it will necessarily go

14          wrong, but that it can go wrong, and you are not

15          setting a -- you don't have a specific amount for the

16          substantial number of precincts you would require,

17          but rather you look at the tomography plots to see if

18          something did go wrong; is that correct?"

19          And your answer is:  "Again, I would be much more

20          specific than that.  The problem is, without --

21          absent knowing the true value, I can't know whether

22          or not I've gone wrong.  The problem is when the

23          bounds are tight, as I said before, we don't have to

24          worry about aggregation bias.  In general, I can't

25          know if there is aggregation bias.  So I don't -- so

1       it's in the worst of all worlds.  I don't know if it

2       is wrong or not.  I don't know what I don't know."

3       Is that your testimony?

4  A.  Yes.

5  Q.  And because it depends on the aggregation bias, you can't

6  tell by looking at what percentage of precincts are

7  homogeneous, whether or not the ecological inference is going

8  to reasonably identify estimates of voting behavior; right?

9  A.  Again, that's not an accurate characterization.  As

10  there's more -- as there are more homogeneous precincts,

11  aggregation bias becomes less of a problem for EI.

12  Q.  Could I go to your deposition, please.  Page 54, line 8.

13  The question that I asked you:

14       "And so because it depends on the aggregation bias,

15       you can't tell, just by looking at what percentage of

16       precincts are homogeneous, whether the ecological

17       inference is going to reasonably identify estimates

18       of voting behavior; right?"

19       Your answer was:  "Correct.  What you can say is when

20       you have large numbers of homogeneous precincts for

21       all groups under the analysis, you don't have to

22       worry about aggregation bias.  When you don't have

23       that, aggregation bias may or may not cause your

24       estimates to be wildly off.  And you don't know

25       without eliminating all possible causes of

1          aggregation bias."

2     Q.   Is that your testimony?

3     A.   Yes.

4     Q.   And so given the data that we have here in Kern County,

5     you can draw no reasonable inferences as to whether Dr.

6     Kousser's estimates are wildly off or right on; is that

7     correct?

8     A.   I can tell you that the bounds are not informative and

9     therefore the estimates may be wildly off as they are in the

10    registration data.

11    Q.   And they may be right on?

12    A.   Possibly.  By luck.

13    Q.   And so, for instance, if we choose one of Dr. Kousser's

14    Latino estimates, you can't tell just by looking at the data

15    whether that Latino estimate is likely to be higher or lower

16    than he estimates?

17    A.   Can't make -- can make no -- that is correct.

18    Q.   You -- in analyzing voting behavior, you use ecological

19    inference, I believe you testified; correct?

20    A.   That's correct.

21    Q.   You would agree with me that absent having individual

22    level data, ecological inference is the best currently

23    available that we have?

24    A.   That is correct.

25    Q.   In your analysis of registration, Democratic registration

1 among Latinos, you used registration, Spanish surname

2 registration data, not vote count data; correct?

3 A. That is correct.

4 Q. And you would agree with me that choosing to register is

5 not the same as choosing to vote?

6 A. They're related but they're not the same thing.

7 Q. And you also agree that votes cast and registration

8 doesn't have the same geographical distribution; isn't that

9 correct?

10 A. It can vary, I didn't look into that.

11 Q. And you haven't done any study of group-wide turnout

12 behavior in Kern County as opposed to registration; have you?

13 A. I have not.

14 Q. So you don't know how close that distribution is between

15 vote count and registration; do you?

16 A. I -- at this time I do not.

17 Q. And the partisan analysis is the only check for

18 aggregation bias that you performed on the Kern data; correct?

19 A. That is correct.

20 Q. I want to ask you a question about model dependency. I

21 understand that you think that Dr. Kousser's model dependent

22 argument is -- you don't agree with it.

23 A. It's incorrect.

24 Q. But you do agree that there is a marked similarity between

25 Dr. Kousser's EI estimates and his ER estimates; correct?

1  A.  Similar, yes.

2       MS. HULETT:  Your Honor, can I have one moment with

3  my co-counsel, please?

4       THE COURT:  Definitely.

5       MS. HULETT:  I have one more question.  You might

6  guess what that is.

7  Q.  In the races that you analyzed over a year ago before you

8  got Dr. Kousser's report, I think you testified that you

9  couldn't recall specifics about those analyses, but you do

10 recall broad strokes.  What are those broad strokes that you

11 recall?

12 A.  All I recall is from the supervisor races I looked at,

13 they were similar in findings to Dr. Kousser's point

14 estimates.

15      MS. HULETT:  I may be done.  I am.  Thank you,

16 doctor.

17      THE COURT:  Before you leave, Ms. Hulett, just to

18 expedite things.  I had one question that I wanted to ask Dr.

19 Katz, to give both sides a chance to followup if they have

20 any.

21      So, Dr. Katz, as I've indicated to you, I'm certainly

22 no statistician.  And I certainly don't understand everything

23 that either you or Dr. Kousser have tried to educate me on.

24 It's going to take a lot longer, I think, than that.

25      THE WITNESS:  A few years of courses, I think.

1    THE COURT:  No magic wand; huh?

2    THE WITNESS:  I wish.

3    THE COURT:  Not even at CalTech.

4    THE WITNESS:  Nope.

5    THE COURT:  But if I understand the gist of what

6  you're telling me.  It is that in Kern County, given the lack

7  of a sufficient number of homogeneous precincts, that no

8  analysis that you could run, either EI or ER, if you ran it,

9  would in your opinion provide you with results that you should

10  rely upon.

11    THE WITNESS:  Close.  What I would say is a little

12  more nuanced, if I might.  Given only the aggregate level data

13  that I've seen in this case, that is the last roughly decade

14  of supervisorial elections, you would need to bring

15  supplementary material, supplementary data to try to pin down

16  those estimates.  It would be very difficult.  It's not

17  obvious how to do it.

18    So I think it's possible, although saying that I, off

19  the top of my head, can't tell you what -- how one might go

20  about doing that.  Is that helpful at all, Your Honor?

21    THE COURT:  Uh-huh.  And so in -- whether it's in

22  Kern County or some other county across the country, or some

23  other Assembly District, if you don't have a sufficient number

24  of homogeneous precincts, defined by at least 90 percent, at

25  least, then, judge, statisticians are of no use to you.

1       THE WITNESS:  Again, they're not of no use to you.

2  You'd have to find ancillary material to try and validate, as

3  we did with registration.  So it could be that you -- you

4  could be in the lucky situation that there doesn't appear to

5  be much aggregation bias, at least in the, say, registration

6  data we can find.  Or you then have to be in a position of

7  finding other information, be it surveys, other elections,

8  other ways of trying to tease out to get this effect down.

9  But it's not obvious how to do it.  It's a very difficult

10  task.

11       THE COURT:  Any followup to my question?

12       MS. HULETT:  No, Your Honor.  Thank you.

13       THE COURT:  All right.  Redirect.

14       MR. SKINNELL:  Your Honor, two preliminary things.

15  First of all, I wanted to correct the record regarding the

16  tentative ruling from the Santa Clarita case.

17       THE COURT:  Oh.  Yeah, go right ahead.

18       MR. SKINNELL:  Contrary to what Ms. Hulett said.  The

19  Court did not ultimately adopt that tentative ruling.  It was

20  a strange fact pattern.  We were counsel for defendants.  It

21  was issued.  The Court did ultimately rule on the summary

22  judgment motion, but that tentative ruling never became final.

23  The Court never ended up giving any explanation for it.  And I

24  explained all of the background at Dr. Katz' deposition.

25       But I just want the record clear on that.  Not that

1    it particularly bears on this case, but it has been an issue

2    in other instances.

3         The other thing I wanted to say --

4         THE COURT:  Just as long as we're going to dance on

5    that pin.  So is what you're telling me it was issued as a

6    tentative.

7         MR. SKINNELL:  Correct.

8         THE COURT:  But never adopted, rejected.  The case

9    was disposed of by some other order.

10        MR. SKINNELL:  Ultimately it was settled, Your Honor.

11        THE COURT:  Okay.

12        MR. SKINNELL:  There was a ruling that the summary

13   judgment motion was denied, but no opinion was ever issued.

14   The tentative ruling was not adopted.  It was just a one-line

15   motion denied.

16        THE COURT:  Okay.  So it was -- the tentative,

17   though, did go on the Court's docket?

18        MR. SKINNELL:  Yes, it did.

19        THE COURT:  But it was never the basis of the final

20   decision?

21        MR. SKINNELL:  That's correct, Your Honor.

22        THE COURT:  Got it.

23        MR. SKINNELL:  Okay.  And again, I realize that has

24   little bearing on our proceedings here, but it has come up in

25   other proceedings I've dealt with.

1  The second point is I'm about to ask Dr. Katz a

2  question.  And I want it understood that I'm asking it because

3  the Court has overruled our work product objection and I don't

4  mean to waive that objection for appeal.

5  REDIRECT EXAMINATION

6  BY MR. SKINNELL:

7  Q.  But my question is:  Dr. Katz, do you believe that the

8  estimates that you produced in your preliminary

9  work -- your -- this is your thing, you know what you're

10  doing.  Do you trust that those were accurate -- those would

11  accurately have reflected reality in Kern County?

12  A.  No, I don't.

13  Q.  During the cross-examination, you mentioned in the

14  Virginia case that you worked on, that you didn't report the

15  number of homogeneous precincts in Virginia in your report.

16  And you said it was because that wasn't an issue.  Can you

17  explain why that wasn't an issue in that case?

18  A.  Yes.  The center of the Bethune case was 12 majority

19  minority black districts in that House of Delegates.  Given

20  the racial segregation within the state of Virginia,

21  specifically in the Richmond area, which is where almost all

22  these districts are, there were many basically almost

23  homogeneous black districts within the city boundaries and

24  then almost homogeneous white precincts in the surrounding

25  suburbs.

1  Q.  Okay.  And regarding the questioning about whether or not

2  aggregation bias could still be present even though there were

3  lots and lots and lots of homogeneous precincts.  Plaintiffs

4  counsel was asking you, "you're saying that that can't get rid

5  of aggregation bias."  Is that the point of your testimony

6  here?

7  A.  No.  So aggregation bias -- so both EI and ER assume no

8  aggregation bias.  They do so in slightly different ways.  But

9  two final points I think for the Court to concern itself with.

10 What bounds do and what --

11        THE COURT:  That was a polite way of saying he's not

12 going to get this anyway, so don't bother.

13        THE WITNESS:  No, I did not mean it that way, Your

14 Honor.

15        THE COURT:  But you would be right.  I'm not -- I'm

16 not questioning that.  I'm thanking you.

17 BY MR. SKINNELL:

18 Q.  Your Honor, I've been working with Dr. Katz for years.

19 And there's still lots of things I --

20 A.  So they both make similar but slightly different

21 assumptions that rule out aggregation bias.  What EI has going

22 for it is that because it uses the bounds data, the bounds

23 data sort of guards you -- think of it like a -- let's go back

24 to the analogy.  Think of the pool table.  So suppose you had

25 a kid's pool table so you put some guards around, you made the

1  table smaller.  That makes it easier to get in the pocket.

2  And that's exactly what having homogeneous precincts are

3  doing.  There still could be aggregation bias.  That is, my

4  child could still hit the cue ball slightly off angle.  But

5  the guards are making it easier to get in the pocket.  And

6  that's what's going on here.  So aggregation bias is an

7  assumption.  Bounds data is one way to make sure that it's not

8  a problem for generating plausible estimates.

9          THE COURT:  So I'm sorry.  But if I --

10         MR. SKINNELL:  Please.

11         THE COURT:  If I understand what your position is.

12  It's ER has no bounds.

13         THE WITNESS:  That is correct.

14         THE COURT:  Therefore, least reliable.  EI imposes

15  some artificial bounds.

16         THE WITNESS:  I wouldn't call them artificial, but

17  they're bounds that are in the data.

18         THE COURT:  All right.  Somewhat more reliable.

19  Still not very precise.

20         THE WITNESS:  In certain circumstances, that's true,

21  Your Honor.

22         THE COURT:  Most precise?  Hey, 100 percent

23  homogeneous districts, precincts across the board, every

24  fricking one of them.

25         THE WITNESS:  I believe, Your Honor, another --

1    THE COURT:  Shooting fish in a barrel.  Can't get
2  that one wrong, right?
3    THE WITNESS:  Or the other is we do away with secret
4  ballot.  Those are the two.
5    THE COURT:  All right.  And the higher number of
6  homogeneous precincts, maybe somewhere in between --
7    THE WITNESS:  Right, with a high --
8    THE COURT:  -- EI and every precinct is 100 percent
9  homogeneous.
10    THE WITNESS:  That's exactly right, Your Honor.
11    THE COURT:  I think he's -- in terms of understanding
12  what Dr. Katz is saying, I think I've got that much of it.
13    MR. SKINNELL:  All right.  Thank you, Your Honor.  Do
14  you have any --
15    THE COURT:  No.
16  BY MR. SKINNELL:
17  Q.  Dr. Katz, plaintiffs' counsel asked about the *Gingles* case
18  and Dr. Grofman's work.  And the fact that in that case, when
19  he was polling those homogeneous precincts, he was doing it
20  for homogeneous precinct analysis and not for his ecological
21  regression.  Were those unrelated to each other?
22  A.  No.  As I think I tried to state.  Dr. Grofman was doing
23  the homogeneous precinct analysis, which froze out most of the
24  data as a check on the estimates he was getting from
25  ecological regression.  And that was the norm, as I understood

1  it, in Dr. Grofman's data.  This is the mid early '80s.

2  Q.  So before ecological inference became a viable

3  methodology?

4  A.  Hadn't been published yet.

5  Q.  Okay.  So then probably not.  Can we bring up DX 622,

6  please, and go to page five?  I'm sorry.  Page six.  And zoom

7  in on that table there, please.

8          Now, plaintiffs' counsel asked you about, you know,

9  do you have a bright line on what constitutes a substantial

10  number of precincts.  And you said no you don't have a bright

11  line.  But would you consider one precinct to be a substantial

12  number?

13  A.  No.

14  Q.  How about two?

15  A.  No.

16  Q.  Presumably then not zero?

17  A.  Zero is definitely not.

18  Q.  Definitely not.  Okay.  Regarding your statement that was

19  read to you from your deposition.  "I don't know what I don't

20  know."  Does that mean that you don't have any sense of

21  whether these estimates are accurate or not or is it just --

22  how likely it is that they are close or spot on or what have

23  you?

24  A.  I think, as demonstrated with the registration data, which

25  is close to voting data, I think they were probably well off.

1  Q.  All right.  And regarding the question about whether there

2  is the same geographic distribution between registration and

3  voting.  Is there a reason -- even assuming that there is some

4  difference there, reason to assume that that means there's

5  aggregation bias in the registration precincts and not in the

6  voting precincts?

7  A.  It would be hard to tell a story that I'm aware of, given

8  what I know about analyzing voting behavior, for registration

9  and for elections, that would affect only registration and not

10  voting.

11         MR. SKINNELL:  I don't think I have anything further,

12  Your Honor.

13         THE COURT:  Any recross?

14                    RECROSS-EXAMINATION

15  BY MS. HULETT:

16  Q.  I think just one question.  The table that we were just

17  looking at.  In any of the 20 jurisdictions, the 20

18  jurisdictions that you've worked in have been all across the

19  country; correct?

20  A.  Yes.

21  Q.  But in none of those jurisdictions did you create a table

22  that counted the number -- that you can recall, that counted

23  the number of homogeneous precincts; have you?

24  A.  No.

25         MS. HULETT:  That's all.  Thank you.

1    THE COURT:  Any re-redirect?  No.  May Dr. -- yes or
2  no?

3    MR. SKINNELL:  No, Your Honor.

4    THE COURT:  Standing to ask a question or standing to
5  say no.

6    MR. SKINNELL:  No.

7    THE COURT:  Okay.  May Dr. Katz be excused?

8    MS. HULETT:  Yes, Your Honor.

9    MR. SKINNELL:  Yes, Your Honor.

10    THE COURT:  Thank you very much, doctor.

11    THE WITNESS:  Thank you.  Happy holidays.

12    THE COURT:  Same to you.

13    Defendants' next witness.  Are we okay going for a
14  while since we --

15    MS. LEONI:  Yes, Your Honor.  Your Honor, defendants
16  call Ms. Kim Salas.

17                    **KIMBERLY SALAS**,

18  called as a witness on behalf of the Defendants, having been
19  first duly sworn, testified as follows:

20    THE CLERK:  Please have a seat.  State your full name
21  for the record and then spell it.

22    THE WITNESS:  My full name is Kimberly Salas,
23  K-I-M-B-E-R-L-Y.  Last name Salas, S-A-L-A-S.

24                    DIRECT EXAMINATION
25  BY MS. LEONI:

1   Q.  Good afternoon, Ms. Salas.

2   A.  Good afternoon.

3   Q.  May I ask you to -- well, first of all, let's start

4   pulling up Exhibit 104, page 1.

5           Ms. Salas, can you state your address for the record?

6   A.  Sure.  My address is 2622 Century Drive, Bakersfield

7   California 93306.

8   Q.  And Ms. Salas, looking at this map, can you

9   indicate -- you can touch it with your finger and it will make

10  an arrow.  It doesn't have to be precise, but where it is that

11  you live.

12          Okay.  And have you always lived in that location?

13  A.  No.

14  Q.  Can you show us where else you have lived on this map?

15  A.  Sure.  I've lived -- oh, let's --

16  Q.  Do you want to start over?

17  A.  No, I'm just looking for Edison as far as the relationship

18  on Fairfax Road.

19  Q.  Edison Highway, I'm going to put my finger on it.  Is

20  right -- is here?  Is this Edison Highway?

21  A.  Oh, there it is.  Okay.  Sorry.  So then I lived about

22  here.  I've always lived here.  And then I was born and raised

23  about here.

24  Q.  These tiny dots.  Your Honor, can you see them?

25          THE COURT:  I see the one up by Panorama.  Oh, yeah,

1    now I see them.

2            THE WITNESS:  There should be four dots.

3            THE COURT:  One off of Fairfax and one east of

4    California on Niles west of Oswell.

5            THE WITNESS:  Yes.

6    BY MS. LEONI:

7    Q.  So is it fair to say that you've always lived in

8    Bakersfield?

9    A.  Yes.

10   Q.  And how long has that been?

11   A.  45 years of my life.

12   Q.  And is it also fair to say that you've always lived in

13   East Bakersfield?

14   A.  Yes.

15   Q.  And what is your current job, Ms. Salas?

16   A.  I'm currently the bilingual secretary for the Migrant

17   Education Program with the Kern County Superintendent of

18   Schools.

19   Q.  And getting to know you a little better, I understand that

20   you're not a secretary that sits at the desk.

21   A.  No.  I am quite active.

22   Q.  What is your job?

23   A.  What I do is I have a coordinator.  In order to be a

24   coordinator -- because we're with Office of Education, she is

25   a certified teacher.  So she has her credentials for

1  administration.  But being her secretary, she often refers to

2  us as "Kim and I."  So we are active in the areas, the school

3  districts that she's responsible for.

4  Q.  And what does the job entail?  What areas is she

5  responsible for?

6  A.  She's responsible for Vineland School District, Lamont

7  School District, Greenfield School -- and I'm speaking in

8  school districts specifically.  Arvin and McFarland and, I

9  believe, that's around it.  But in that program, which we run

10 through the Migrant Education Program, we actually run a

11 summer program, which is from the day they get out of school

12 through when they get back to school as well as a home base

13 tutoring.  And I am in charge of our tutors that do go out

14 into those districts, specifically to the students' houses.

15 Q.  And what is the group that you serve, you said it was a

16 Migrant Education Program?

17 A.  Correct.  So migrant children that have worked -- you

18 know, their parents, of course, work in the fields and they

19 follow the crops around the state.  One that I can speak to

20 specifically is the Sunset Camp on Vine -- on Sunset

21 Boulevard.  There they run about May, they come in

22 from -- generally the Coachella Valley.  And then some from

23 Mexico.  They attend our summer program.  And then

24 they -- these families tend to leave around August because

25 they are migratory.  So we run -- we make home visits as well

1 to those camps to ensure that the kids are getting -- the

2 students are getting their English, their math and science.

3 And provide tutors out there as well.  So the big push is

4 through the summer, like I said, because we do get an influx.

5 Go ahead.

6 Q.  Because the children are here, is that --

7 A.  The students.  Correct.  And we don't want to disrupt

8 their learning process.  We feel that if they're here, we

9 need -- we have recruiters, so we do have -- in Migrant

10 Education Program, we do have recruiters and support service

11 aides.

12         THE COURT:  Can I ask you to slow down just a bit.

13         THE WITNESS:  Sure.  My mother has told me the same

14 thing.

15         THE COURT:  Now you've been told both by your mother

16 and by a judge.

17         THE WITNESS:  A federal judge.  At any rate, we -- if

18 these students come, we want to make sure that they are kept

19 up with English, math and science.  We -- like I said, we have

20 recruiters and support service aides.  And their main job is

21 to assess and evaluate and qualify these families.  So just

22 because you say you've moved doesn't necessarily mean that you

23 would qualify for the program.

24 BY MS. LEONI:

25 Q.  And your role is to bring children, migrant children into

1  the program to help them to tutor, you're a tutoring service?

2  A.  Our recruiters bring our students into the program.  They

3  do have a database that we keep track of them through the

4  California Department of Education.  And they -- the

5  recruiters would give us an active list.  So therefore, that

6  list can change depending upon the movement of the students.

7  From that list, then we generate the tutoring services.

8  Q.  And in connection with your responsibilities, I -- if I

9  understood your testimony correctly, you're in charge of the

10  tutors.

11  A.  Correct.  They -- yes, their hours.  They pre- and post-

12  assess the students through the Department of Education.  They

13  will assess them regarding their math and their language

14  skills.  And once our -- we have a 12 week home base tutoring

15  program right now that's just wrapping up, they will

16  post-assess them to see if there's any gains or losses.

17  Q.  Do your professional responsibilities often take you to

18  Arvin and Lamont?

19  A.  Yes.  Arvin, Lamont, any district that we need -- my

20  coordinator -- since Vineland School District, the

21  superintendent has given the migrant program specifically to

22  my coordinator.  And she is directly responsible for that

23  program that we put out there.  So there's a lot of

24  traveling -- for those of you that are unfamiliar with the

25  area, Vineland is between Arvin and Lamont basically.

1  Q.  Okay.  Thank you.  Now, before working with the Migrant

2  Education Program, did you have a different position?

3  A.  Yes.

4  Q.  And what was that?

5  A.  Still through the Kern County Superintendent of Schools.

6  I worked for Foster Youth Services.  It's an

7  organization -- it's not an organization.  It's an office

8  Dream Center, it's called the Dream Center.  And it's a one

9  stop shop for foster youth.  Emancipated foster youth usually

10  between the ages of 18 to 25 years old.  In the past they used

11  to just be dumped on the street, after they turn 18, from a

12  group home or from a foster home.  But now it allows them to

13  get services up to 25 years of age.  And so I was the intake

14  receptionist there at that center.

15  Q.  Okay.  And then prior to your job with the Dream Center.

16  What was your position?

17  A.  Prior to that, I started the Dream Center 2015.  2013, I

18  was a district representative for Senator Michael Rubio.

19  Q.  And how long did that last?

20  A.  In 2013, about 21 days.

21  Q.  And what happened?

22  A.  When I went -- February 1st was my first day back at the

23  senate office.  And Supervisor -- Senator Rubio resigned with

24  the -- at the legislature.

25  Q.  And prior to being with Senator Rubio for the 20-day

1    stint.

2    A.   I worked for the Kern County Fire Fighters Association.

3    That is their bargaining unit on the fire department.

4    Q.   And what did you do with them?

5    A.   I was their office administrator.  But they also did hire

6    me for political purposes, to help with campaigns and whatnot.

7    Q.   Was there a particular campaign that you did help with?

8    A.   Yes.  In 2012, when I started with them, it was with

9    Leticia Perez' supervisorial campaign, specifically working

10   with the fire fighters to help her.

11   Q.   Okay.  And then did you work with Michael Rubio yet prior

12   to being with the fire fighters?

13   A.   Yes.  I did work for his supervisorial staff.  I was his

14   special assistant from 2005 to September 2010.

15   Q.   And before that?

16   A.   I worked for Senator Dean Florez.

17   Q.   And did you work for Senator Dean Florez also when he was

18   an assembly person?

19   A.   Correct.  I came on as assembly staff in 2000 and then he

20   won the senate seat I believe in 2002.

21   Q.   And that takes us almost --

22   A.   15 years.

23   Q.   17 years.

24   A.   Yeah, 17 years.  In 2000.  You're correct.

25   Q.   All right.  What did you do for Michael Rubio's

1   supervisorial campaign?

2   A.   So his campaign, I ran his data, his post-precinct list

3   together.   Coordinated volunteers and we canvassed.

4   Q.   And did you canvass door to door?

5   A.   Yes.

6   Q.   And who did Senator Michael Rubio, at the time, run

7   against?

8   A.   At the time, in 2004, it was an early primary.  So it was

9   a March 2004 primary and we ran against the incumbent Pete

10  Parra.

11  Q.   And this was for which supervisorial district?

12  A.   District 5.

13  Q.   Do you have a recollection that that campaign was a hard

14  fought campaign?

15  A.   Yes.  It was -- Supervisor Parra was a two term incumbent,

16  so we were taking on someone that had been in there for eight

17  years.

18  Q.   Was it an expensive race?

19  A.   Yes.  With the printing.  And any time you run a campaign

20  where the person is unknown, it's about name recognition.

21  Supervisor Parra had the name recognition, so therefore we had

22  to get Supervisor Rubio's name out there.  So it was

23  expensive.

24  Q.   During that campaign, did you canvass in Arvin?

25  A.   Yes.  Arvin, Lamont, East Bakersfield and southeast

1 Bakersfield, the areas that were -- and in Westchester,

2 downtown Bakersfield. Any area in District 5, we did. And

3 quite frankly, we canvassed it twice.

4 Q. And --

5      THE COURT: Can I -- I'm sorry.

6 BY MS. LEONI:

7 Q. And at the time do you recall whether the area that you

8 lived in, the East Bakersfield area, was in District 5?

9 A. Yes.

10 Q. And how long did Michael Rubio serve on the Board of

11 Supervisors?

12 A. He was sworn in January of 2005 and he won the senate seat

13 in November 2010.

14 Q. And did you stay with Michael Rubio after the campaign?

15 A. The supervisorial campaign?

16 Q. Yes.

17 A. Yes, I did. At the time I was working, both he and I were

18 working for Senator Florez. And when he became a supervisor,

19 he asked me to join his supervisorial staff and I came in in

20 January of 2005.

21 Q. And what was your position with Michael Rubio, by this

22 time Supervisor Rubio?

23 A. Special assistant. So at the very beginning I did handle

24 quite a bit of his scheduling because he did not have a front

25 office person so to speak. So I did do his meetings,

1  scheduling, those types of things.  However, he realized that

2  I was a better use in the community.  And so he moved me back

3  out into constituent services in the community.

4  Q.  Did this require you to be frequently in the streets of

5  the areas that you represented?

6  A.  Yes.  So we -- so my job was constituent services

7  specifically for East Bakersfield, Arvin and Lamont with

8  regards to any needs that might come up locally.  Also, I

9  attended community events and any events a supervisor could

10 not attend or did attend, because I did assist -- or accompany

11 him to quite a bit of meetings and events.

12 Q.  And how often was Supervisor Rubio in field with you?  I

13 mean not sitting in a supervisorial -- in his office in

14 Bakersfield, but how often was he with you in the streets?

15 A.  About 80 percent, 85 percent of the time.  Michael was

16 quite active.  He was one of the youngest supervisors to be

17 elected in the State of California, so he was 24 at the time

18 when he was elected.  So therefore he was very active.  We did

19 community events, but we also did cleanups around the

20 neighborhoods.  And we were grateful that he was young and

21 able to do those kinds of things.  So --

22 Q.  Okay.  Did you assist him on a large infrastructure

23 project?

24 A.  Yes.

25 Q.  Do you remember -- have any recollections about that?

1   A.   Yes.  I don't remember the year.  But I do remember one of

2   the things, since it was a supervisorial seat, the local

3   issues, local problems were near and dear.  And one of the

4   problems that East Bakersfield and Lamont were facing were

5   curbs, gutters and sidewalks.

6          The Infrastructure Bank loan was specifically, I

7   think, seven -- to the tune of about 7 million dollars.  We

8   did invite the members of the Infrastructure Bank down to the

9   district and took them on a tour of the areas that we wanted

10  to improve.

11         One specifically was Pioneer School in East

12  Bakersfield.  And it had a fence, but asphalt next to that

13  fence.  And what happened where cars were parked up against

14  the fence, which would cause the children to walk out into the

15  street.  And when it rained, it puddled with asphalt.  And

16  that is was one of the areas that we did take them to.  And we

17  were able to draw down the dollars through Community

18  Development Block Grant moneys to get that specific.  And we

19  only used that money around schools or walks to schools, the

20  path that children would generally take to schools.

21  Q.   Okay.  Now, prior to your work with Michael Rubio, either

22  on the campaign or as -- in his role as supervisor, you worked

23  with Dean Florez.  What did that job entail?

24  A.   That was different than a supervisorial.  What I did in

25  the supervisors office because it was a state office.  And it

1 was still constituent services, but they were generally a

2 little less removed than the elected official. So it wasn't

3 potholes or things that we can kind of draw down moneys

4 quickly to do those things. On a State level, it was more of

5 legislation getting passed, constituent services on a State

6 level, what those require. And once again, I was in charge of

7 the East Bakersfield, Arvin and Lamont for Senator Florez.

8 Q. And was Senator Florez with you in the field during this

9 job or --

10 A. No. Senator Florez spent quite a bit of time up in

11 Sacramento. Monday through Thursday generally was his time in

12 Sacramento. Unless they had taken a break. And then

13 generally on the weekends he was in the district.

14 Q. And you were on district staff, if I understand correctly.

15 A. I was a district representative.

16 Q. What was your area of responsibility?

17 A. Arvin, Lamont and East Bakersfield.

18 Q. And was there different staff in Shafter?

19 A. Yes.

20 Q. And was there different staff in Delano?

21 A. Yes. So throughout the district, there were assigned

22 staff for certain areas within the district.

23 Q. Did you come to learn whether the issues in the various

24 communities in the assembly or the senate district were

25 different?

1   A.  Yes.

2   Q.  For example, what were the issues you worked on as Senator

3   Florez' district staff in Arvin and Lamont?

4   A.  In Arvin, there was a Superfund site --

5           MS. GOMEZ:  Objection, Your Honor.

6           THE COURT:  What's the objection?

7           MS. GOMEZ:  I believe Ms. Salas was identified to

8   testify about communities of interest in East Bakersfield.  So

9   specifically about the second illustrative map.

10          MS. LEONI:  We're getting there, Your Honor.

11          THE COURT:  I'll allow some foundation.  Overruled.

12          THE WITNESS:  There was a Superfund site in Arvin.

13  So there were some meetings that had gone on and I was the one

14  to attend that.  Air pollution was a big problem -- still

15  is -- in Arvin and those communities of Arvin.

16          In East Bakersfield, generally it was gang violence,

17  informational hearings that he held.  So there were a number

18  of different items that were very different from, I think,

19  what the northern County provided.

20  BY MS. LEONI:

21  Q.  Okay.  Now, looking at -- can we pull up the map again.

22  Now, refocusing our attention on East Bakersfield and the

23  areas where you have lived, your neighborhood, the areas you

24  have campaigned --

25  A.  Uh-huh.

1 Q.  -- for Michael Rubio and your constituent services as a

2 member of his staff, how would you describe that community?

3 A.  We can start where I grew up, was born and raised, which

4 was on Barlow Street, which was west of the Oswell point that

5 I had pointed out.  And growing up in that area was -- I had

6 lived there 40 years specifically.  I had just recently moved

7 five years ago after my mother passed away.  And it was a

8 working community.  We had people that had worked in offices,

9 jobs, those types of things.

10       And when I moved five years ago, not much has changed

11 in that area.  You have trade workers, you have skilled

12 workers, such as journeyman, electricians, plumbers, those

13 types of things.  A lot of our neighbors -- it's more Hispanic

14 now.  A lot of our neighbors, the females were either

15 housekeepers or they were housewives.  And then moving into

16 the Fairfax area and those areas.  Once again, it was the same

17 kind of community.  And in the community that I live now, in

18 the northeastern part of Bakersfield, it is a lot of -- a lot

19 of my neighbors are teachers, professionals.  Those types.

20 Q.  Okay.  Would you have described --

21       THE COURT:  I'm sorry.  I don't want to prevent us

22 from not being able to finish with Ms. Salas today, but would

23 it be all right to take a ten-minute break --

24       MS. LEONI:  Yes.

25       THE COURT:  Or is that going to --

1 　　　　MS. LEONI:  Yes, Your Honor.  We can continue the

2 questioning.  It won't go that long.

3 　　　　THE COURT:  Okay.

4 　　　　MS. LEONI:  Thank you.

5 　　　　THE COURT:  Let's take a ten-minute recess.

6 　　(Recess.)

7 　　　　THE COURT:  You may continue, Ms. Leoni.

8 　　　　MS. LEONI:  Thank you very much, Your Honor.  Could I

9 have the map of --

10 Q.  Ms. Salas, in which supervisorial district is East

11 Bakersfield currently located?

12 A.  The 3rd.

13 Q.  And based on your growing up there and your work there

14 with Supervisor Rubio, do you think that's a good fit for East

15 Bakersfield?

16 A.  Yes.

17 Q.  And why is that?

18 A.  I think there in East Bakersfield, it's very much the

19 same.  We shop there, you know, work there.  Our

20 commute -- quite frankly, my commute on 178 to downtown is

21 about ten minutes on a good day, 15 if it's backed up.  The

22 communities that are there, the schools that are in that

23 neighborhood and in that areas are ones familiar to the East

24 Bakersfield vibe.

25 　　　　As a matter of fact, I have a lot of friends that

1 refuse to move out of East Bakersfield and into the northwest

2 or southwest areas because it's so impacted.

3 Q. Okay. And can we look at PX 103 at 3. And if we can zero

4 in on the -- more -- well, this portion of the map. Now, Ms.

5 Salas, this is a map that has been proposed by the plaintiffs

6 in this case. And the proposal is to link East Bakersfield

7 with Delano. Given your knowledge of the character of East

8 Bakersfield, do you think that's a good idea?

9 A. No. In the area that -- in East Bakersfield, the -- it's

10 more -- I mean, if you could put say Bakersfield or Kern

11 County in urban or rural areas, Bakersfield would be more

12 urban. And I think those outlying areas are more rural.

13 Still very much smaller communities than what we're used to in

14 Bakersfield and East Bakersfield.

15 Q. All right. Now, I want to redirect your attention to the

16 Arvin and the Lamont area. It has been for many years and

17 currently is located in District 5 with East Bakersfield. Or

18 portions -- the greater area of East Bakersfield. And the

19 area that you served Senator Rubio. Do you believe that that

20 is a good fit for Arvin and Lamont?

21 A. Yes. I would think so. If you -- looking at this map, if

22 you go in from the center of it or the top portion of the 5th

23 District, as you move south and east, it's all very much

24 contained, if you would.

25         And I would say that people that live in Arvin and

1  Lamont, they travel up into East Bakersfield.  There's a

2  shopping center up there right by the 178 as well as off of

3  Fairfax, there's a Food Max.  Not to say that there aren't

4  shopping areas in those communities, but those families tend

5  to commute up in that area.  And I would even argue that some

6  of those families that live up towards the Morning Drive area

7  will commute down into Lamont and Arvin to work.  My mechanic

8  lives in Lamont.  So I drive down there.  He takes good care

9  of my car.

10        MS. LEONI:  All rightee.  Thank you.  You know, Your

11  Honor, I don't think we have any more questions for this

12  witness.

13        THE COURT:  All right.

14        MS. LEONI:  Thank you.

15        THE COURT:  Cross-examination.

16        MS. GOMEZ:  No cross, Your Honor.

17        THE COURT:  All right.  May the witness be excused?

18        MS. LEONI:  Yes.  The witness may be excused.

19        THE WITNESS:  Thank you.

20        THE COURT:  Thank you, Ms. Salas.

21        Do the defendants have anybody else present?

22        MR. SKINNELL:  We don't, Your Honor.  Unfortunately,

23  we thought we would be lucky to get through four today and

24  it's moved a little faster than we anticipated.

25        THE COURT:  Right.  I know that's what you were

1 anticipating yesterday.  Yes, Ms. Hulett, you stood.

2         MS. HULETT:  I'm old school.  We've been notified

3 that there's only two witnesses for tomorrow.  And unless

4 that's changed, I really do think that -- we are anxious to

5 get out of here earlier rather than later next week.  And one

6 of the witnesses, for example, is a -- for next week is a

7 records custodian that I understand we've offered to stipulate

8 to authenticity of about anything.  So I guess what I'm asking

9 the Court to do is to ensure that we can have a full day

10 tomorrow.

11         MS. LEONI:  Your Honor, we -- I will note that

12 our -- we have scheduled our case around what we thought was

13 going to be our days.  And the plaintiffs have proceeded far

14 longer than anticipated.  We have witnesses that we have

15 scheduled who can only be here on Monday.  And they are

16 important witnesses.  Monday and Tuesday.  We --

17         THE COURT:  Well, what --

18         MS. LEONI:  -- will be unable to bring them in

19 tomorrow.

20         THE COURT:  Where do you think we're at in terms of

21 concluding?  If you've only got two for tomorrow.

22         MS. LEONI:  We actually have three for tomorrow.

23         THE COURT:  Three?

24         MS. LEONI:  Oh, I see.  I see.  We believe, Your

25 Honor, at this point we will conclude on Tuesday.  We have

1  three for Monday afternoon.  Our elections official, a

2  supervisor and the former city manager of Arvin.  And we have

3  another supervisor on Tuesday.  And we have a city official

4  who's one of our totality of the circumstances witnesses on

5  Tuesday.  I'm sorry.  She is a county official.

6         Your Honor, we had also intended to take some time of

7  the Court to play the videos of the 2011 redistricting

8  hearings.  And we had advised counsel, plaintiffs' counsel,

9  that we would do that at the end of days in our case where

10  there was time to do so.  And --

11         THE COURT:  Is there going to be any objection to

12  those?

13         MS. HULETT:  Just the opposite, Your Honor.

14  We -- our ulterior motive was that our Airbnb ends on

15  Wednesday.  I'll confess.  We really do want to finish on

16  Tuesday.  It's our view that those videos are joint exhibits

17  that we can cite -- both sides can cite to them in post trial

18  findings.  We haven't objected to a single minute of them.

19  And that we should use the Court's time for live testimony

20  rather than videos.

21         THE COURT:  And defense counsel?

22         MS. LEONI:  Your Honor, we're -- our Monday witnesses

23  cannot be changed.  That's the day.  We have people away at

24  conferences.

25         THE COURT:  Okay.

1    MS. LEONI:  And we cannot --

2    THE COURT:  So who are we talking about on -- who are

3    we talking about tomorrow?

4    MS. LEONI:  Tomorrow we're going to do supervisor

5    Watson.  And our demographic expert, Doug Johnson.

6    THE COURT:  Johnson will take a while.

7    MR. SKINNELL:  Yes, Your Honor, we --

8    THE COURT:  I don't know.  But the cross has been --

9    it's a little shorter than I had anticipated.  But Johnson may

10   take a little while.

11   MS. HULETT:  Yes, Your Honor.  We told defendants we

12   don't tend to do long crosses and don't plan to do long

13   crosses.  And we prepared our crosses.  I don't anticipate

14   that the cross for Dr. Johnson is going to be any longer than

15   the cross was for Dr. Katz today.

16   THE COURT:  Well, I think I did advise you too that

17   tomorrow I've got to take a full hour and a half for lunch

18   because of a courthouse traditional event.  So we're going to

19   take from 11:45 to 1:15 tomorrow, a full hour and a half.  Any

20   of the Monday or Tuesday witnesses who there's -- either day,

21   any chance that they might be able to come in tomorrow?

22   MS. LEONI:  Your Honor, we will do our best to see if

23   that's possible.

24   THE COURT:  I mean, Monday you tell me, no, we know

25   those people --

1    MS. LEONI:  Our Monday witnesses, let us -- let us

2 reach out to Tuesday witnesses now and hopefully we can get

3 that done.

4    THE COURT:  It sounds like we're going to have time

5 for them.  So anything we could get done tomorrow would --

6    MS. HULETT:  Even Monday, Your Honor.  If some of the

7 Tuesday witnesses could come Monday.

8    THE COURT:  Well, but my problem is, remember, I know

9 you're --

10    MS. HULETT:  Oh, that's right.

11    THE COURT:  I know your time is your time.

12    MS. HULETT:  I forgot.

13    THE COURT:  Monday and Tuesdays, I'll let you know,

14 I'm -- especially Mondays.  I am bending over backwards for

15 all counsel because I usually do not try cases on Monday.

16 Because of where we have this scheduled, we said, okay, let's

17 do it.  I'm actually moving my criminal calendars, the last

18 two, up just so that I can jam in all the time I need for the

19 criminal cases and get back to you by one o'clock in the

20 afternoon.

21    And I think I even noted at the outset, hey, my head

22 is kind of spinning coming out of civil law and motion and

23 then trying to pay attention to this.  Because it's

24 a -- it's -- I'm just not that sharp, I guess.  You know, the

25 segues can be difficult at times.

1    But I have an interest, too, in not packing Monday

2  and Tuesday any more than they need to be packed while still

3  finishing up by the end of the day Tuesday.  Just because I'm

4  going to be in court on other matters both of those mornings.

5  So those are tough days for me already.  All we've got is the

6  afternoons on Monday and Tuesday.  Everybody remembers that;

7  right?

8    MR. SKINNELL:  Yes, Your Honor.

9    MS. HULETT:  I do now.  I'm sorry, Your Honor.

10    THE COURT:  That's okay.  But do you still think --

11    MR. SKINNELL:  Actually that had played into our

12  estimate that we would finish on Tuesday.  We took into

13  account the half days.  Otherwise I think we would have

14  finished Monday if it would have been a full day.

15    THE COURT:  Okay.  Well, look, it happens that

16  people -- you know, things all of a sudden move faster.

17  Almost every trial I've ever tried is -- the estimate is one

18  thing when we start and all of a sudden it comes to a crashing

19  halt.  I think everybody kind of loses steam at the end and

20  says, "Okay, we give up.  We want to go home."

21    I would like defense counsel to see if there's any

22  chance, if they make contact with people that anybody could

23  alter their plans, especially it sounds like the Tuesday

24  witnesses.  See if anybody's available to come in tomorrow

25  afternoon.  Because it looks like we're going to get to them.

1        If you all reach a stipulation that you want to just

2  admit the videos tapes in evidence and have me watch them at

3  my leisure outside the presence of the parties, that's

4  certainly fine with me.  If you can't reach a stipulation and

5  somebody wants to play them live in court, I suppose I'll --

6  you know, we'll do that.  If it's necessary.  But as much time

7  as we could use tomorrow, I would love to use it.

8        MR. SKINNELL:  We will make every effort, Your Honor.

9        MS. LEONI:  And we will advise plaintiffs' counsel

10  this evening.

11        THE COURT:  Right.  You folks are in contact with

12  each other at night; right?

13        MR. SKINNELL:  Yes, Your Honor.

14        MS. HULETT:  Yes.

15        THE COURT:  All right.  So I'm not going to order it,

16  but I'm going to strongly encourage.  If we've got any chance

17  of getting somebody in here tomorrow to fill more time, that

18  would be great.

19        Have a nice night.  See you tomorrow morning.  Should

20  we -- should we still start at 8:30?  Yes?

21        MS. HULETT:  It's up to you.

22        THE COURT:  If we're going to run out of witnesses,

23  would you rather get out of here earlier and get on the road?

24  That's probably better for you all.  Yeah, we'll start at

25  8:30.

1          MR. SKINNELL:  Thank you, Your Honor.

2      (The proceedings were concluded at 3:57 p.m.)

3

4          I, KAREN HOOVEN, Official Reporter, do hereby certify

5  that the foregoing transcript as true and correct.

6

7  DATED:  21st of December, 2017     /s/  Karen Hooven____

8                                     KAREN HOOVEN, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25