1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   OSCAR LUNA, ALICIA PUENTES,              No.  1:16-cv-00568-DAD-JLT
     DOROTHY VELASQUEZ, and GARY
12   RODRIGUEZ,

13                  Plaintiffs,

14          v.

15   COUNTY OF KERN, KERN COUNTY             FINDINGS OF FACT AND CONCLUSIONS
     BOARD OF SUPERVISORS, MICK              OF LAW
16   GLEASON, ZACK SCRIVNER, MIKE
     MAGGARD, DAVID COUCH, and
17   LETICIA PEREZ, in their official
     capacities as members of the Kern County
18   Board of Supervisors, JOHN NILON, in
     his official capacity as Kern County
19   Administrative Officer, and MARY B.
     BEDARD, in her official capacity as Kern
20   County Registrar of Voters,

21                  Defendants.

22

23          On April 22, 2016, plaintiffs, who are Latino[1] citizens and registered voters in Kern

24   County, commenced this action against the County of Kern, its Board of Supervisors, and other

25   County officials (collectively, "defendants"), challenging Kern County's 2011 redistricting plan

26   under § 2 of the Voting Rights Act, 42 U.S.C. § 1973.  Plaintiffs allege that the County's 2011

27   ─────────────────────

28   [1]  The parties and the witnesses they called to testify at trial have used the terms Latino/Hispanic,
     white/Anglo, and black/African-American interchangeably, and the court follows suit herein.

                                               1

redistricting plan impermissibly dilutes the Latino vote in Kern County and thereby denies

Latinos the opportunity to elect representatives of their choice. After the court denied plaintiffs'

motion for partial summary judgment (Doc. No. 79), the action proceeded to an eleven-day bench

trial, which concluded on December 19, 2017.

At trial, plaintiffs offered the testimony of three experts.[2] David Ely, plaintiffs'

demography expert, testified that a second majority-Latino supervisorial district in Kern County

could have been created in 2011. Dr. Morgan Kousser, plaintiffs' statistical expert, testified

regarding the presence of racially polarized voting in Kern County. Finally, Dr. Albert

Camarillo, plaintiffs' expert historian, testified about the history of discrimination against Latinos

in Kern County and throughout the state of California. In addition, plaintiffs offered the

testimony of Dorothy Velazquez, Gary Rodriguez, Dolores Huerta, Sam Ramirez, Leticia Perez,

and Allan Krauter. Ms. Velazquez and Mr. Rodriguez are plaintiffs in this action and Latino

registered voters of Kern County. Ms. Huerta is a renowned civil rights and labor activist, and a

long-time Kern County resident. Mr. Ramirez is a former candidate for Kern County Board of

Supervisors representing District 2, and Supervisor Perez is currently on the Board of Supervisors

representing District 5, the sole majority-Latino district in Kern County. Mr. Krauter, who was

called by plaintiffs as an adverse witness, was a legislative analyst in the Kern County

Administrative Office ("CAO") at the time of the 2011 redistricting and was primarily

responsible for assimilating input, creating the redistricting map options for the Board's

consideration, and making recommendations concerning which map should be adopted.

At trial, defendants also offered the testimony of three experts. In their testimony,

demographer Dr. Douglas Johnson and the County's Planning & Natural Resources Department

director Lorelei Oviatt rebutted the feasibility of creating a second majority-Latino supervisorial

district in Kern County that would also maintain communities of interest. Defendants' statistical

expert Dr. Jonathan Katz testified in rebuttal to plaintiffs' evidence of racially polarized voting in

---

[2] The court will not dwell on the qualifications of the experts who testified at trial. In keeping with the skilled counsel appearing for both parties, the expert witnesses were among the finest in their fields of expertise with extensive experience testifying in Voting Rights Act cases such as this one.

Kern County. Defendants also offered the testimony of Allan Krauter, John Nilon, Michael Gleason, Zack Scrivner, William Maggard, Jonathan McQuiston, Raymond Watson, Alan Christensen, Kimberly Salas, Teresa Hitchcock, and Karen Rhea. Mr. Nilon was the head of the CAO at the time of the 2011 redistricting, overseeing the work of Mr. Krauter. Mr. Gleason, Mr. Scrivner, and Mr. Maggard are all current members of the Kern County Board of Supervisors, representing Districts 1, 2, and 3, respectively. Mr. McQuiston is a former District 1 Supervisor, and Mr. Watson is a former District 4 Supervisor. Mr. Christensen, Ms. Salas, Ms. Hitchcock, and Ms. Rhea are all Kern County employees. Mr. Christensen is currently the Chief Deputy County Administrative Officer, while Ms. Salas works for the Migrant Education Program with the Kern County Superintendent of Schools. Ms. Hitchcock is employed with the Employers' Training Resource Department, and Ms. Rhea works with the Elections Division.

Over the course of the eleven-day trial, the court heard from the roughly two dozen witnesses listed above and admitted over 150 exhibits. The parties submitted post-trial briefs on January 8, 2018. (Doc. Nos. 185, 186.) The court has given full consideration to all the evidence before it. However, the court will not address every witness or every piece of evidence below because resolution of the issues presented in this case simply does not require it. Having considered the testimonial evidence and exhibits, the briefs of the parties, and the applicable law, the court sets forth the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## LEGAL FRAMEWORK

Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of eliminating racial discrimination in voting. *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966)); *Farrakhan v. Gregoire*, 623 F.3d 990, 995 (9th Cir. 2010) (Thomas, J., concurring). Section 2 of the Voting Rights Act of 1965 was enacted "to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude.'" *Voinovich v. Quilter*, 507 U.S. 146, 152 (1993); *see also Chisom*, 501 U.S. at 404 (recognizing that Congress's express objective in amending § 2 was to "broaden the protection afforded by the

Voting Rights Act").  Section 2 prohibits states or their political subdivisions from enacting

voting standards, practices, and procedures "which result[] in a denial or abridgement of the right

of any citizen of the United States to vote on account of race or color."  52 U.S.C. § 10301(a).  A

violation of § 2 is established if, "based on the totality of circumstances," the challenged electoral

process is "not equally open to participation by members of a [racial minority group] in that its

members have less opportunity than other members of the electorate to participate in the political

process and to elect representatives of their choice."  52 U.S.C. § 10301(b).[3]  "The essence of a §

2 claim is that a certain electoral law, practice, or structure interacts with social and historical

conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters

to elect their preferred representatives."  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); *see also*

*Allen v. State Bd. of Elections*, 393 U.S. 544, 566–67 (holding the language "voting qualifications

or prerequisite to voting, or standard, practice, or procedure" was employed in § 2 in order to be

"all-inclusive of any kind of practice" that might be used to deny citizens the right to vote).

Following Congressional enactment of § 2, the Supreme Court articulated a two-step

inquiry for analyzing vote dilution claims.  First, a minority group of voters challenging a

particular election system must demonstrate three prerequisites:  (1) the minority group is

sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) the minority group is politically cohesive; and (3) the majority group votes sufficiently as a

bloc to enable it, in the absence of special circumstances, "usually to defeat the minority's

preferred candidate."  *Gingles*, 478 U.S. at 50–51; *accord Cooper v. Harris*, ___ U.S. ___, 137 S.

Ct. 1455, 1470 (2017).

Where these threshold conditions are met, the court must then determine whether, "based

on the totality of circumstances," the challenged electoral process impermissibly impairs the

minority group's ability to elect representatives of its choice.  *Gingles*, 478 U.S. at 44–45; *see*

*also Old Person v. Cooney*, 230 F.3d 1113, 1120 (9th Cir. 2000) [hereinafter *Old Person I*]; *Ruiz*

*v. City of Santa Maria*, 160 F.3d 543, 550 (9th Cir. 1998).  In assessing the totality of

---

[3]  Suits brought under this provision are frequently referred to as "vote dilution" claims.

circumstances, the Supreme Court in *Gingles* identified several factors relevant to determining whether a § 2 violation has been established. These so-called "Senate factors," developed by the Senate Judiciary Committee, are as follows:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process;
>
> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> (6) whether political campaigns have been characterized by overt or subtle racial appeals;
>
> (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.
>
> Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
>
> whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
>
> whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37 (citing S. REP. NO. 97-417, 2d Sess., at 28–29 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 206–07 [hereinafter "S. REP. NO. 97-417"]).

Although *Gingles* involved multimember districts, the Supreme Court has held that the *Gingles* test applies in cases, such as this one, involving single-member districts, where the challenged practice is the manipulation of district lines. *See Voinovich*, 507 U.S. at 157–58

5

(citing *Growe v. Emison*, 507 U.S. 25, 40–41 (1993)); *see also Bartlett v. Strickland*, 556 U.S. 1, 11 (2009); *Old Person v. Brown*, 312 F.3d 1036, 1040–42 (9th Cir. 2002) [hereinafter *Old Person II*].

## FACTUAL BACKGROUND

Every ten years, following each decennial census conducted by the U.S. Census Bureau and in accordance with state and federal law, Kern County (the "County") must redraw single-member electoral districts for its five-member Board of Supervisors. This case arises from the 2011 redrawing of those district boundaries. Pertinent to the analysis that follows is the manner in which the 2011 redistricting plan was adopted. Much of the evidence comes from the testimony of Allan Krauter, who at the time was a legislative analyst in the CAO. (*See* Trial Tr., Vol. 3, 391:19–392:11.) The County designated Mr. Krauter as the person most knowledgeable about the 2011 redistricting process, as well as the person most knowledgeable regarding use of the County's redistricting software.[4] (*Id.* at 392:12–393:19.)

At trial, Mr. Krauter testified at length regarding the factors the County took into account in redrawing the supervisorial map.[5] First, since 1991, in order to comply with the Voting Rights Act, the County has maintained one majority-Latino district. (*Id.* at 501:18–19.) One of Mr. Krauter's goals in redrawing the County's districts in 2011 was to maintain one majority-Latino district, referred to by some County employees as the County's "Voting Rights Act district," which was and remains District 5. (*Id.*; *id.* at 427:19–24.) Second, Mr. Krauter considered "compactness, contiguity[,] preservation of geographic boundaries, and other communities of

---

[4]  Mr. Krauter was also designated by the County as the person most knowledgeable about the County's process for receiving and soliciting public comment, public participation, and how that information was communicated to the Board of Supervisors regarding the 2011 redistricting process. (*Id.* at 393:2–7.)

[5]  Unlike some counties and other political units, Kern County did not hire outside consultants to assist it with the 2011 redistricting process. (*Compare* Trial Tr., Vol. 7, 1073:3–18 (testimony of John Nilon), *with* Trial Tr., Vol. 9, 1437:6–9 (testimony of Douglas Johnson).) Kern County Administrative Officer John Nilon, Mr. Krauter's supervisor at the time of the 2011 process, explained that the County conducts its redistricting in-house because "it's been a long tradition for the County Administrative Office to do that and we have capable staff." (Trial Tr., Vol. 7, 1073:10–11.)

6

interest." (*Id.* at 398:20–25.) Third, Mr. Krauter attempted to maintain roughly equivalent populations across all five districts. (*Id.* at 398:12–16.) Fourth, Mr. Krauter and the County considered input from the community, which was expressed at workshops held across the County. (*Id.* at 398:8–11.)

The 2011 redistricting process was based on the 2010 Census, which was released on March 8, 2010. (*Id.* at 399:20–400:5; JX 6 at 1.) Those census numbers indicated that the County had experienced a population increase of roughly 178,000 residents from 2000 to 2010. (JX 6 at 1.) Moreover, because this population increase did not occur evenly across all five districts, district boundaries needed to be altered somewhat "to achieve relatively equal representation within the legally acceptable range." (*Id.*) The 2010 Census population number included prisoners, non-citizens, and children, and also included a breakdown of the percentage of the Kern County population that was Hispanic. (Trial Tr., Vol. 3, 401:12–24, 402:9–403:5; JX 6 at 3.)

In attempting to draw the 2011 district boundaries in accordance with the factors already discussed, Mr. Krauter employed map-drawing software known as Maptitude. (*Id.* at 405:2–7.) Maptitude contained the 2010 Census data, as well as the County district boundaries that had been in place since 2001. (*Id.* at 405:8–19.) The Maptitude program was able to distinguish between Latino and non-Latino residents, as well as between residents who were of voting age and those who were not. Notably, however, according to Mr. Krauter, the data contained in Maptitude was unable to load citizenship data available through the American Community Survey ("ACS"), an annual survey administered by the Census Bureau that collects demographic information, including age, income, education, and citizenship, from a sample of the population. (*Id.* at 405:20–406:21; Trial Tr., Vol. 1, 61:17–62:17.) Mr. Krauter attempted to add ACS citizenship data to Maptitude, but was ultimately unsuccessful. (*Id.* at 482:3–17.) For this reason, Maptitude as employed by Mr. Krauter was unable to calculate the citizen voting age

/////

/////

/////

7

population ("CVAP") of the County or any of the supervisorial districts therein.[6] (*Id.* at 440:10–16.) Instead, Mr. Krauter merely estimated that across the County, the Latino CVAP was roughly 20 percent lower than the Latino voting age population. (*Id.* at 440:20–441:8.) Thus, Mr. Krauter was forced to rely on these rough estimates of the Latino CVAP in each district, conceding at trial that he was unable to determine the number with precision. (*Id.* at 441:9–12.)

Using Maptitude, as well as a presentation he prepared, Mr. Krauter conducted a series of public workshops in various locations across the County to solicit public input in generating various redistricting maps. (*Id.* at 394:25–395:6, 408:5–414:11; JX 4 at 4–5.) Use of Maptitude at these workshops allowed Mr. Krauter to instantly generate multiple permutations of potential district maps (referred to as "Options") based upon feedback he received from those in attendance at these workshops. (Trial Tr., Vol. 3, 490:21–491:4.) In preparation for the workshops, Mr. Krauter began by creating Option 1 as a "rough draft exercise," which made the absolute minimum changes necessary to bring the existing supervisorial map into compliance with equal population requirements. (*Id.* at 444:14–18, 466:18–24; DX 504 at 3.)

Several of these workshops were held in the eastern part of the County, and included workshops in Boron, Ridgecrest, and Inyokern. (JX 4 at 4.) At the meetings held in eastern Kern County, Mr. Krauter observed that the majority of attendees expressed support for maintaining two separate supervisorial districts in the eastern part of the County, one covering the northeastern portion and another covering the southeastern portion. (*Id.*; Trial Tr., Vol. 3, 409:22–410:6.) Mr. Krauter explained that Naval Air Weapons Station China Lake is located in northeastern Kern County, while Edwards Air Force Base is located in southeastern Kern County. (Trial Tr., Vol. 3, 410:2–13.) Although both are active military bases, the comments from attendees at the public workshops in eastern Kern County suggested that these bases "have different missions," and that the residents of the area were "fiercely devoted to their corner of Kern County." (*Id.*) It was therefore generally the preference of those attending workshops in

---

[6] As will be discussed in more detail below, CVAP is the applicable measurement of a minority population for purposes of assessing a claimed violation of § 2 of the Voting Rights Act. *Romero v. City of Pomona*, 883 F.2d 1418, 1425 (9th Cir. 1989), *abrogated on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990).

eastern Kern County to maintain two districts in the east. (*Id.* at 444:8–21.) Accordingly, most of the attendees at the workshops in eastern Kern County expressed support for Option 1, which maintained such a configuration with little change. (*Id.*; *see also* JX 4 at 4.)

Mr. Krauter also conducted a public workshop in Oildale, near Bakersfield. (Trial Tr., Vol. 3, 410:14–16.) The consensus expressed at this workshop, according to Mr. Krauter, was that the Oildale residents did not want Oildale divided up between multiple districts. (*Id.* at 410:17–21.) They also no longer wanted to be represented by someone from Ridgecrest, located in northeast Kern, because of a belief that they received lower quality county services as a result. (*Id.* at 410:22–411:3.) Options 2, 3, and 4 were, therefore, all drawn by Mr. Krauter in a way that unified Oildale. (*Id.* at 411:4–7.)

Mr. Krauter also conducted a workshop in Shafter, in northwestern Kern County. (JX 4 at 5.) Mr. Krauter testified that the opinions expressed there were strongly in favor of creating a "westside district" that did not include any portions of eastern Kern County. (Trial Tr., Vol. 3, 411:22–23.) This new district would, according to its proponents, include Shafter, Delano, McFarland, and Wasco. (*Id.* at 411:23–25.) Such a map was reflected in Option 5 created by Mr. Krauter in response to this input. (*See* JX 4 at 12.)

Mr. Krauter's final public workshop was held in Bakersfield. (*Id.* at 5.) Opinions at this meeting were apparently more divided because some attendees supported Option 5, while others opposed it because it separated Oildale into multiple districts. (Trial Tr., Vol. 3, 412:7–25.) In response to these concerns, Mr. Krauter created Option 6, with the goal of unifying the towns of Delano, Shafter, Wasco, McFarland, Lost Hills, and Buttonwillow, while also preserving two separate districts in eastern Kern County. (*Id.* at 413:9–414:11; 479:1–480:2.)

Kern County advertised the public workshops through radio, print, and television news media, including Spanish language media outlets, and also reached out to "service clubs" in outlying towns, requesting that they circulate the news release about the workshops to their members. (*Id.* at 463:15–464:4, 465:13–466:7.) The evidence at trial established that the public attendance at the workshops put on by County staff with respect to the 2011 redistricting process varied widely. At some workshops—such as in Inyokern, Tehachapi, East Bakersfield, Taft, and

South Bakersfield—no more than two people attended. (JX 4 at 4–5.) At the workshops offered in California City, Arvin, Delano, and McFarland, no residents attended. (Trial Tr., Vol. 3, 512:24–513:25.) Other workshops saw more robust attendance, with 40 individuals attending the workshop in Mojave, located in southeastern Kern County. (JX 4 at 4–5.) Of the sixteen workshops conducted by Mr. Krauter, only 126 individuals attended in total, out of a total county population of more than 839,000. (*Id.* at 4–5; JX 6 at 1.)

Following these public workshops, Mr. Krauter participated in hearings before the Board of Supervisors, at which members of the public were permitted to discuss the Options he had developed. Initially, Mr. Krauter presented the Board with Options 1 through 5. (Trial Tr., Vol. 3, 484:22–485:2.) However, in response to "overwhelming" testimony against Option 5 at a public hearing before the Board on July 5, 2011, Option 5 was withdrawn from consideration and replaced with Option 6. (*Id.* at 485:3–7.) Option 6 united Delano, Shafter, Wasco, McFarland, Lost Hills, and Buttonwillow into a westside district, while still preserving two eastside districts. (*Id.* at 412:11–414:11.) Following the July 5, 2011 public hearing, it became clear to County Administrative Officer John Nilon that none of these options had the support of a majority of the Kern County Board of Supervisors. (Trial Tr., Vol. 7, 1078:4–24.) Accordingly, sometime following that meeting, Mr. Nilon instructed Mr. Krauter to draft an Option 7 that would be acceptable to the Board. (*Id.*; Trial Tr., Vol. 3, 425:22–426:2.) Pursuant to this direction, Mr. Krauter created Option 7, which was intended to modify the existing districts as little as possible, while depopulating District 4 to the extent necessary in light of anticipated population growth. (Trial Tr., Vol. 3, 437:13–22.)

At a hearing before the Board on August 2, 2011, Steven Ochoa, the National Redistricting Coordinator for the Mexican American Legal Defense and Education Fund ("MALDEF"), proposed redistricting that would include a second majority-Latino district. (Trial Tr., Vol. 3, 485:23–486:3; JX 27 at 16–18.) Mr. Ochoa presented the Board a new map (the "MALDEF Map") that could serve as the basis for drawing the district boundaries so as to create a second majority-Latino district. (Trial Tr., Vol. 3, 487:5–18; PX 204.) Because of these new proposals (i.e., Option 7 and the MALDEF Map), multiple attendees at the August 2, 2011 Board

10

hearing spoke and requested that the Board delay voting on the redistricting options in order to further study the issue. (*See, e.g.*, JX 27 at 16, 26, 27.) Nonetheless, the Board rejected the requests for further study of the newly presented options, instead voted to adopt the new Option 7 as an introduced ordinance, and slated it for formal adoption at a public hearing one week later. (JX 27 at 58–60; Trial Tr., Vol. 3, 453:19–454:9.)

Following the August 2, 2011 hearing, and using the MALDEF proposed map as a starting point, Mr. Krauter attempted to draw a map containing a second majority-Latino district, but, after devoting five hours to the project, was ultimately unable to do so. (Trial Tr., Vol. 3, 440:3–9, 487:19–24, 489:1–7.) Mr. Krauter explained that much of his difficulty at the time was due to the fact that the MALDEF Map had included roughly 18,000 prisoners in its calculation of equal population distribution among the five districts, while Kern County does not include prisoners in its calculations.[7] (*Id.* at 488:1–4.)

After Option 7 was created by Mr. Krauter at Mr. Nilon's direction, but prior to the final vote by the Board, Kern County Counsel determined that Options 3 and 6 were not viable because those maps dropped the Latino CVAP in District 5 below 50 percent. (*Id.* at 428:24–429:10.) Mr. Krauter was unaware of the methodology employed by County Counsel in reaching this conclusion. (*Id.* at 510:25–512:1.) As described above, because Mr. Krauter could not load citizenship data into Maptitude, he was unable to confirm County Counsel's conclusions. Invoking attorney-client privilege, defendants presented no evidence at trial regarding the methodology employed by County Counsel in determining the CVAP district by district with respect to any of the options or redistricting proposals, nor any explanation as to why CVAP

/////

/////

/////

/////

---

[7] Based upon guidance from a legal opinion authored by the California Attorney General's Office, counties are not required to count prisoners when drawing county supervisorial boundaries. (JX 6 at 2, 4–8.)

percentages were never provided to Mr. Krauter despite their apparent relevance to his assignment of fashioning new district boundaries.[8]

At a public Board hearing the following week, on August 9, 2011, members of the public in attendance again urged the Board to delay its final vote on the district boundaries. (*See, e.g.*, JX 30 at 24, 29–31, 34, 38.) Instead, the Board voted to formally adopt Option 7 (*see* "Adopted Map" below), which had not been created until after the public workshops had all been held, maintained two eastern districts, and preserved the one majority-Latino district. (PX 201 at 5; JX 1.)



**ADOPTED MAP**

Plaintiffs initiated this action on April 22, 2016, alleging that the redistricting plan adopted by Kern County in 2011 unlawfully fractured a second Latino voting community between two supervisorial districts. Plaintiffs argue that the 2011 redistricting plan dilutes the strength of Latino voters by depriving them of a second district in which they would constitute a

---

[8] The court does not wish to suggest any criticism whatsoever of Mr. Krauter's performance in connection with the 2011 redistricting. Based upon the testimony presented at trial, the court is convinced that he did his level best under very difficult circumstances, including both time pressures and the lack of all available information. Moreover, the court also notes that plaintiffs in this action did not appear to suggest otherwise.

majority of eligible voters and from which they could elect a candidate of their choice.

Defendants contend that, based on population data and public testimony, Kern County was under no legal obligation in 2011 to create a second majority-Latino district. Defendants deny that a supervisorial district map could have been drawn in 2011 that created two majority-minority districts, each with a compact and politically cohesive Latino population, and which did not violate traditional redistricting criteria. Defendants further argue that this court should deny relief under well-known principles of equity, including the doctrine of laches, given that the County must redraw its districting lines in 2021 in any event in accordance with the 2020 Census. Against this background, the court will address the legal standards applicable to plaintiffs' claim as well as the court's findings based upon the evidence presented at trial.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    *Gingles* I – Latino Numerosity and Compactness

The first *Gingles* precondition requires a showing that the Latino voting population in Kern County is both sufficiently large and geographically compact so as to constitute a numerical majority in a second single-member supervisorial district. *See Gingles*, 478 U.S. at 50; *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994).

To satisfy this first *Gingles* precondition, a § 2 plaintiff must make a preliminary showing that it is *possible* to create "more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy*, 512 U.S. at 1008; *see also Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997) ("Because the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." (citing *Holder v. Hall*, 512 U.S. 874, 881, 950–51 (1994))); *Gingles*, 478 U.S. at 50 n.17 ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."). To do so, a plaintiff typically presents illustrative redistricting plans as evidence of vote dilution. *See Fairley v. Hattiesburg*, 584 F.3d 660, 669 (5th Cir. 2009); *Magnolia Bar Ass'n v. Lee*, 994 F.2d

13

1143, 1151 n.6 (5th Cir. 1993) (noting the first *Gingles* precondition "specifically contemplates the creation of hypothetical districts"). However, neither the plaintiff nor the court is bound by the precise lines drawn in these illustrative redistricting maps; at this stage, a plaintiff need only show that a remedy may be feasibly developed. *See Fairley*, 584 F.3d at 671 n.14 (citing *Gingles*, 478 U.S. at 50 n.17 and *Houston v. Lafayette County*, 56 F.3d 606, 611 (5th Cir. 1995) ("[I]t is sufficient that a plaintiff show that a workable plan for another minority-controlled voting district is possible; the plaintiff's plan need not be an ultimate solution.")); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1399 (E.D. Wash. 2014) (citation omitted) ("What the first *Gingles* precondition does not require is proof that a perfectly harmonized districting plan can be created. Indeed, conditioning a § 2 plaintiff's right to relief upon his or her ability to create a letter-perfect districting plan would put the cart before the horse.").

At trial, plaintiffs presented two illustrative redistricting plans developed by their demography expert, David R. Ely, and which they contend establish that a second majority-Latino supervisorial district in Kern County was clearly possible in 2011. (*See* "Illustrative Map 1" and "Illustrative Map 2" below; PX 103 at 2–3.) In drawing the Illustrative Maps, Mr. Ely used data from the 2010 decennial census for total population and voting age population by race and ethnicity, and data from the 2005–2009 and 2011–2014 ACS Special Tabulations for citizen voting age population. (Trial Tr., Vol. 1, 57:3–21.) Mr. Ely drew the Illustrative Maps in accordance with the traditional redistricting criteria of equal population and contiguity, with reference to underlying topography as well as state legislative and congressional districts. (*Id.* at 67:18–23, Trial Tr., Vol. 2, 102:5–103:21.) Although Mr. Ely did not rely upon socioeconomic data to draw the two Illustrative Maps initially, he did consult socioeconomic data after the fact to confirm that the illustrative districts reflected similar socioeconomic characteristics, including educational attainment, income, homeownership, immigration status, and Spanish language ability. (Trial Tr., Vol. 2, 132:22–133:5; PX 110.) Below, the court will address the specific characteristics of plaintiffs' two illustrative maps individually.

/////

/////

14

A. <u>Illustrative Map 1</u>

Illustrative Map 1 modifies the County's 2011 Adopted Map in three notable ways. First, it adjusts the boundaries of District 5, while still maintaining it as a majority-Latino district. Second, it combines cities in northwestern Kern County with the City of Arvin and areas immediately south of Bakersfield to create a second majority-Latino district ("Illustrative District 1"). Third, it creates a single supervisorial district combining the eastern half of Kern County with the cities of Taft and Maricopa in the southwest part of Kern County. (*See* PX 103 at 2; Trial Tr., Vol. 1, 81:21–84:3.)



i. *Numerosity*

In order to satisfy the numerosity requirement under *Gingles*, a plaintiff must first demonstrate "that the minority population in the potential election district is greater than 50 percent." *Bartlett*, 556 U.S. at 19–20. The Ninth Circuit has held that the appropriate metric by which to measure the size of the minority population is its CVAP, rather than its total population. *Romero*, 883 F.2d at 1425; *see also Montes*, 40 F. Supp. 3d at 1391; *Cano v. Davis*, 211 F. Supp. 2d 1208, 1233 (C.D. Cal. 2002) ("The Ninth Circuit, along with every other circuit to consider the issue, has held that CVAP is the appropriate measure to use in determining whether an additional

effective majority-minority district can be created.") (citing *Romero* with approval), *aff'd*, 537

U.S. 1100 (2003).

Under plaintiffs' Illustrative Map 1, and using data from the 2009 Special Tabulation—

which would have been available to the County at the time of the 2011 redistricting process—Mr.

Ely testified that the Latino CVAP would constitute a numerical majority in two districts,

Districts 1 and 5. (Trial Tr., Vol. 1, 79:12–25; PX 106 at 2.) Specifically, Latinos would

comprise 53.2 percent of the CVAP in District 1, and 54.5 percent of the CVAP in District 5.

(*See* "Illustrative Districts" Table below.) Although defendants' demography expert Dr. Douglas

Johnson produced slightly different CVAP estimates, even Dr. Johnson's estimates similarly

show that Latino voting age citizens would constitute a numerical majority in Districts 1 and 5 of

Illustrative Map 1. (Trial Tr., Vol. 9, 1499:24–1500:6; DX 565 at 26.) In fact, Dr. Johnson's

estimates of Latino CVAP in Districts 1 and 5, using the 2009 Special Tabulation data, were

marginally higher than those of Mr. Ely. (*See* DX 565 at 26 (estimating 57 percent Latino CVAP

in District 1 and 54 percent Latino CVAP in District 5 under Illustrative Map 1).) Accordingly,

the court finds that plaintiffs have satisfied the numerosity requirement with respect to Illustrative

Map 1.

| Illustrative Districts | | | | | |
|---|---|---|---|---|---|
| District | 1 | 2 | 3 | 4 | 5 |
| Census Population | 182092 | 160764 | 161755 | 171974 | 163046 |
| Non-Prison Pop. | 163917 | 160764 | 161755 | 160625 | 163046 |
| Deviation | 1896 | -1257 | -266 | -1396 | 1025 |
| % Deviation | 1.2% | -0.8% | -0.2% | -0.9% | 0.6% |
| % Latino | 74.3% | 30.4% | 38.0% | 24.0% | 77.3% |
| % White | 14.0% | 58.7% | 44.3% | 64.9% | 12.8% |
| % African American | 4.9% | 4.1% | 7.8% | 5.1% | 7.3% |
| % Asian | 5.8% | 4.3% | 7.8% | 2.9% | 1.2% |
| **Voting Age Population** | | | | | |
| % Latino | 69.2% | 26.3% | 33.2% | 21.4% | 73.1% |
| % White | 17.2% | 63.3% | 49.6% | 68.2% | 16.5% |
| % African American | 6.2% | 3.6% | 7.1% | 4.7% | 7.4% |
| % Asian | 6.3% | 4.3% | 8.0% | 2.8% | 1.4% |
| **Citizen Voting Age Population** | | | | | |
| **2009 Special Tabulation** | | | | | |
| % Latino | 53.2% | 21.2% | 25.2% | 12.9% | 54.5% |
| % White | 29.9% | 70.6% | 60.2% | 76.0% | 29.3% |
| % African American | 8.1% | 3.6% | 7.6% | 5.7% | 12.8% |
| % Asian | 7.1% | 2.5% | 5.0% | 2.3% | 1.4% |
| **2015 Special Tabulation** | | | | | |
| % Latino | 65.9% | 27.0% | 31.8% | 15.7% | 62.1% |
| % White | 21.2% | 63.4% | 51.8% | 73.2% | 23.9% |
| % African American | 4.2% | 4.0% | 8.0% | 5.2% | 10.1% |
| % Asian | 7.7% | 3.3% | 6.7% | 3.3% | 1.7% |

*/////*

ii. *Compactness*

Plaintiffs must separately demonstrate that the relevant minority population is sufficiently "geographically compact" to constitute a voting majority in a second single-member district. *See Gingles*, 478 U.S. at 50; *see also Old Person II*, 312 F.3d at 1040. In this context, "compactness" refers not to the shape of the district, but whether the minority community is sufficiently concentrated to constitute a majority of the CVAP in a single-member district. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) [hereinafter *LULAC*]. "While no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* (citations and internal quotations omitted); *see also Ruiz*, 160 F.3d at 558. Other "traditional districting principles" typically include population equality, contiguity, respect for political subdivisions, protection of incumbents, and preservation of preexisting majority-minority districts. *See, e.g.*, *Easley v. Cromartie*, 532 U.S. 234, 239–40 (2001); *Abrams v. Johnson*, 521 U.S. 74, 94 (1997); *Shaw v. Reno*, 509 U.S. 630, 647, 651 (1993).

a. Preservation of Communities of Interest

At trial, Mr. Ely presented maps tending to show that Illustrative Map 1 is more effective than the County's 2011 Adopted Map in grouping into districts populations with similar socioeconomic characteristics, including educational attainment, income, homeownership, immigration status, and Spanish language ability. (Trial Tr., Vol. 2, 132:22–133:5; PX 110.)

Plaintiffs also presented testimony at trial from various lay witnesses that Latinos in Illustrative District 1 share a historical and present-day connection to farmworker and immigrant communities. Consequently, Latinos across Illustrative District 1 face similar issues with respect to immigration (Trial Tr., Vol. 2, 233:19–234:6, 235:10–236:22 (testimony of Dolores Huerta regarding fear of deportation); *id.* at 261:21–263:24 (testimony of Dorothy Velazquez regarding the same)), language (*id.* at 234:7–235:9 (testimony of Dolores Huerta regarding an English-only resolution proposed by the Bakersfield City Council)), and educational disparities (*id.* at 237:23–239:13 (testimony of Dolores Huerta regarding the "school-to-prison pipeline"); Trial Tr., Vol. 5, 793:7–794:2 (testimony of Supervisor Leticia Perez regarding the literacy, educational, and skills

17

gap among Latino students in Kern County)). Ms. Huerta further testified that farmworkers travel seasonally between Arvin and the northwestern Kern communities based on the available crops and labor needs. (Trial Tr., Vol. 2, 240:7–16.) District 5 Supervisor Leticia Perez testified that Latinos in the northern Kern communities are indistinguishable from the Latinos in Arvin, and that these communities share the same history, origin, culture, and socioeconomic indices. (Trial Tr., Vol. 5, 795:2–796:12.)

Plaintiffs also presented evidence of shared concerns in Illustrative District 1 with respect to economic development, air and water pollution, and environmental concerns including those surrounding the issue of hydraulic fracturing. (Trial Tr., Vol. 2, 280:8–287:10.) Supervisor Perez testified that constituents from Delano, Shafter, Arvin, and Lamont have the most in common in terms of infrastructure issues, and that constituents from those communities appear before the Board of Supervisors every budget cycle calling on Supervisor Perez and District 1 Supervisor Mick Gleason to address flooding and other infrastructure challenges in their communities. (Trial Tr., Vol. 5, 788:1–789:10.)

Defendants' demography expert Dr. Douglas Johnson criticized the configuration of District 1 as it appears in plaintiffs' Illustrative Map 1, which "hooks" around Bakersfield to unite territory south of Bakersfield with the northern communities of Delano, Shafter, Wasco, and MacFarland. (Trial Tr., Vol. 9, 1455:1–6.) Dr. Johnson conceded on cross-examination, however, that these communities have shared the same state legislative and congressional districts since 1991, and that this is a factor that could be considered from a traditional redistricting perspective. (*Id.* at 1523:16–1528:14.) Indeed, the court notes that the maps of state legislative and congressional districts share the same "hook" configuration as Illustrative District 1 in plaintiffs' Illustrative Map 1 which Dr. Johnson criticized. (*See* PX 103 at 2; PX 116–18.) The court therefore concludes that the existence of the "hook" in District 1 of plaintiffs' Illustrative Map 1 does not, on its face, divide communities of interest, and in fact comports with the communities of interest contemplated by other district boundaries.

The court also finds that the configuration depicted in plaintiffs' Illustrative Map 1 is distinguishable from the illustrative district rejected in *LULAC*, where the Supreme Court

determined that a newly-drawn majority-Latino congressional district, which included a 300-mile gap between two major Latino communities, was not compact. *LULAC*, 548 U.S. at 432–34. In *LULAC*, the Supreme Court held that "the enormous geographical distance separating [two minority populations], coupled with the disparate needs and interests of these populations—not either factor alone," rendered that district non-compact for § 2 purposes. *Id.* at 435. Here, Mr. Ely testified that the distance between Arvin and Delano was roughly 55 miles, far less than the distance at issue in *LULAC*. (Trial Tr., Vol. 2, 164:18–165:9.) Moreover, as summarized above, several witnesses testified credibly regarding the shared communities of interest among Latinos in Arvin and northern Kern County. The court concludes that the inadequacies of the district boundaries identified in *LULAC* are simply not present here.

Defendants challenge plaintiffs' representation that Illustrative Map 1 more effectively groups communities of interest. In this regard, at trial, defendants presented various witnesses who testified to the differing communities of interest grouped in plaintiffs' illustrative districts. Most notably, defendants' expert witness Lorelei Oviatt, director of the Kern County Planning & Natural Resources Department, testified at great length about communities of interest throughout each of the current supervisorial districts, including communities of interest related to oilfields, highways, public transit, commercial developments, crops, and environmental concerns. (Trial Tr., Vol. 7, 1135:1–1147:10, 1190:20–1226:7.) The court will not recount each of these communities of interest in detail. However, the overall import of Ms. Oviatt's testimony is that each Kern County supervisorial district has at least *something* in common with every other. This is hardly surprising in the context of a single county. Defendants argue that plaintiffs' assertion of the communities of interest reflected in District 1 of their Illustrative Map 1 are really concerns that are shared county-wide, and that plaintiffs therefore have not proven that they are entitled to their own separate district. (*See* Trial Tr., Vol. 11, 1795:3–8.) Yet the first *Gingles* precondition does not require plaintiffs to show that they are entitled to their own district because of unique communities of interest, but only that it is possible to draw an alternative map that maintains communities of interest. Even if plaintiffs were required to identify communities of interest unique to Latinos in Kern County, they have met that higher burden with evidence of shared

concerns among Latinos in the areas of immigration, language, culture, and persistent socioeconomic disparities, which evidence was not rebutted by defendants. Plaintiffs are moreover not required to accommodate every conceivable community of interest in Kern County in order to draw a sufficient illustrative map that satisfies the first *Gingles* precondition. Certainly, the County itself did not attempt to do so in its own redistricting efforts: Mr. Krauter testified that, when drawing the map options for the 2011 redistricting process, he did not consider oilfields, commercial developments, public transit, tourism, or other local considerations aside from what residents raised at the redistricting workshops. (Trial Tr., Vol. 3, 445:7–447:23.) The court finds no logical or legal basis to impose such a requirement on plaintiffs.

Defendants further emphasize the absence during the 2011 redistricting process of any public comment by Kern County residents requesting that Arvin be joined with the communities in northern Kern County. (*See* Trial Tr., Vol. 3, 483:22–25; 485:11–14.) Defendants contend that the absence of any such suggestion indicates that Arvin does not share a community of interest with the Latino communities in northern Kern County, and that plaintiffs' arguments to the contrary are simply post hoc justifications for Illustrative Map 1. This argument is unpersuasive. First, the court notes that plaintiffs presented evidence that the unification of the Latino communities proposed in Illustrative Map 1 was not invented for the purposes of this litigation. Dolores Huerta testified that there was discussion during the 2011 Lamont redistricting workshop about including Oildale or Arvin with the northern Kern communities to create a second majority-Latino district. (Trial Tr., Vol. 2, 222:12–25.) Plaintiffs also introduced evidence that, as early as 1991, the Kern County Latino Redistricting Coalition proposed a district that "would include the Delano/McFarland area, the Shafter/Wasco Area, Lost Hills, Button Willow [sic], a minor portion of East Bakersfield, Arvin and Lamont." (JX 12 at 37–40.) In any event, the court would note that the small number of Kern County residents who attended either the public workshops or the public hearings on redistricting diminishes any significance the claimed lack of public suggestion could have.

Second, even if there was an absence of specific public comment suggesting the precise configurations proposed in plaintiffs' Illustrative Map 1, the court rejects the notion that it is the

obligation of County residents to propose where districting lines should be drawn. At the public hearings before the Board of Supervisors on August 2 and August 9, 2011, several members of the public spoke in favor of the creation of a second majority-Latino district. (*See* JX 27 at 16–18, 30–32; JX 30 at 23–31, 37–38.) Simply because these citizens did not identify which specific communities should be included within the second majority-Latino district does not negate a showing of a community of interest among Latinos in Kern County, especially in light of the evidence presented by plaintiffs at trial. The court therefore finds that plaintiffs' Illustrative Map 1 preserves communities of interest.

b. Connectedness

One factor that Mr. Ely considered in constructing Illustrative Map 1 is what he referred to as "connectedness," or residents' ability to easily interact with one another. (Trial Tr., Vol. 2, 174:19–25.) Mr. Ely testified that all communities in Kern County have connections to Bakersfield, but two communities—one in northern Kern County and another in eastern Kern County—are internally connected by highways and public transit without the need to pass through Bakersfield. (Trial Tr., Vol. 1, 82:7–21.) Mr. Ely observed that the County's 2011 Adopted Map splits each of these two communities into different districts and combines each with dissimilar communities apparently in order to meet the population requirements. (PX 112 at ¶¶ 9–12.) In contrast, plaintiffs' Illustrative Map 1 keeps the northern and eastern Kern County communities intact in their own respective districts, combining each with small communities with similar shared interests. (*Id.* at ¶ 13.)

As defendants' expert Dr. Johnson points out, plaintiffs' Illustrative Map 1 does separate Arvin from the nearby communities of Lamont and Weedpatch. (Trial Tr., Vol. 9, 1549:6–12; DX 558 at ¶ 52.) Mr. Ely acknowledged that Arvin is well connected to both Lamont and Weedpatch, but opined that there is, nonetheless, a sufficiently large community of interest among Latinos in Kern County to comprise the majority in two supervisorial districts. (Trial Tr., Vol. 2, 179:1–16.) Therefore, according to Mr. Ely, the boundary line separating Arvin from Lamont could be drawn in many different ways and still maintain majority-Latino CVAP in two

/////

21

districts.[9] (*Id.*)  The court concludes that plaintiffs' Illustrative Map 1 respects the principle of connectedness as defined by Mr. Ely.

### c. Preservation of Kern County's Preexisting Majority-Latino District

The parties' experts present slightly different Latino CVAP estimates for each of the supervisorial districts as they appear under plaintiffs' Illustrative Map 1.  There is no dispute, however, that District 5, Kern County's preexisting majority-Latino district, remains a majority-Latino district under Illustrative Map 1, with a 54.5 percent Latino CVAP according to Mr. Ely's estimates.  (*See* "Illustrative Districts" Table above.)

### d. Preservation of Two Eastern Districts and Minimizing Change

Lastly, in assessing plaintiffs' showing of compactness, the court considers two additional districting principles specific to Kern County:  the desire to retain two supervisorial districts in eastern Kern County and to avoid dramatic change in drawing new boundaries.  Since at least 1981, the eastern half of Kern County has been represented by two supervisors.  (*See* PX 210; PX 236; Trial Tr., Vol. 7, 1071:4–23.)  Mr. Krauter testified at trial that during the 2011 redistricting process, a number of eastern Kern County residents expressed concerns that it would be extremely difficult for one supervisor to adequately represent the entirety of eastern Kern County.  (Trial Tr., Vol. 3, 409:22–410:13.)  Plaintiffs' Illustrative Map 1, however, creates one eastern district.

Defendants also argue that Kern County has for decades adhered to a broader principle that new district maps should maintain the core of existing districts and minimize changes.  (DX 565 at ¶ 19; Trial Tr., Vol. 9, 1466:6–1467:15.)  These principles, defendants contend, help preserve relationships between elected officials and their constituents over time.  (Trial Tr., Vol. 9, 1466:6–1467:15.)  According to defendants' expert Dr. Johnson, plaintiffs' Illustrative Map 1 would move 42 percent of Kern residents into new supervisorial districts.  (*Id.* at 1462:11–1463:3; DX 565 at ¶ 20.)

---

[9]  As noted above, plaintiffs are not bound at this stage of the litigation by the precise lines drawn in the illustrative redistricting maps they present.  *See Fairley*, 584 F.3d at 671 n.14; *Houston*, 56 F.3d at 611; *Montes*, 40 F. Supp. 3d at 1399.

These points, raised by defendants, are valid and worthy of consideration. On the one hand, it has been long recognized that local legislative bodies—rather than federal courts—play the primary role in fashioning reapportionment plans. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 954 (1996) ("States attempting to comply with § 2 retain discretion to apply traditional districting principles and are entitled to a limited degree of leeway."); *Upham v. Seamon*, 456 U.S. 37, 40–41 (1982) (concluding that federal courts must defer to the legislative preferences absent a finding of a constitutional or statutory violation); *see also White v. Weiser*, 412 U.S. 783, 794–95 (1973) ("From the beginning, we have recognized that 'reapportionment is primarily a matter for legislative consideration and determination . . . .'") (quoting *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)). In that regard, a determination of whether such an adopted plan violates § 2 must, at minimum, give *some* consideration to the principles that traditionally guide the redistricting process. *See, e.g.*, *LULAC*, 548 U.S. at 433 (noting "the inquiry *should take into account* traditional districting principles . . ." (emphasis added) (citations and internal quotations omitted)); *Bush*, 517 U.S. at 979 ("[A] district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race *substantially more than is reasonably necessary*.") (emphasis added).

On the other hand, "it would be unfair to require Plaintiffs to draw maps in strict accordance with the County's priorities." *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 745 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris County*, 601 Fed. App'x 255, 260–261 (5th Cir. 2015). A § 2 claim challenges the propriety of the very process by which a legislative body fashioned a particular reapportionment plan—including its choice and application of certain districting principles. *See id.* (citing *De Grandy*, 512 U.S. at 1007). If courts were required to rigidly adhere to the political jurisdiction's redistricting principles,

> [V]oting rights cases could be defeated at the outset by the very barriers to political participation that Congress sought to remove: legislative bodies could evade compliance with the Voting Rights Act by carefully selecting an array of redistricting principles such that it would be difficult for a plaintiff to draw a demonstration map that would both differ from the defendant's map and yet still comply with each of the defendant's redistricting principles. Surely, Congress did not intend for the broad remedial scope of Section 2 to be so easily evaded by a defendants' selection of

redistricting principles.  The scope of the statute must be construed to avoid this anomalous result.

*Id.*

Accordingly, this court concludes that while plaintiffs' Illustrative Map 1 should reasonably comport with the jurisdiction's traditional districting principles, plaintiffs need not prioritize those principles in the same manner as the County did when it created the 2011 Adopted Map.  *See id.* at 746; *see also, e.g.*, *Perez v. Abbott*, 250 F. Supp. 3d 123, 142 (W.D. Tex.) (holding that states cannot "claim that a single traditional districting principle . . . allows them to avoid drawing districts required by § 2 under the totality of circumstances"), *appeal docketed*, __ U.S. __, 138 S. Ct. 49 (2017).  The County's local districting preferences are certainly relevant.  However, to the extent the County desires to leave existing district boundaries as unchanged as possible, this principle cannot effectively override any finding of § 2 liability, especially where such a principle is inescapably linked to the fragmentation of the Latino population.  The court finds that Kern County's preferences in these regards are, therefore, better and more properly addressed at the remedial stage of this litigation, if plaintiffs establish a violation of § 2.  *See Rodriguez*, 964 F. Supp. 2d at 745 ("Under this scheme, the ultimate viability and effectiveness of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions."); *see also Montes*, 40 F. Supp. 3d at 1400–01.

For all of the reasons set forth above, the court concludes that plaintiffs have satisfied their burden of showing that, under their Illustrative Map 1, the Latino population in Kern County is sufficiently numerous and geographically compact for Latinos to form an effective voting majority in a second supervisorial district.

B. Illustrative Map 2

The court now turns to plaintiffs' Illustrative Map 2.  In developing Illustrative Map 2, Mr. Ely sought to maintain the existing districting scheme as much as possible.  (Trial Tr., Vol. 1, 86:21–87:11.)  Illustrative Map 2 shifts existing District 1 to the western side of the County, excluding the eastern communities of Ridgecrest and Lake Isabella, while extending the northern boundary of District 2 to capture these communities.  (*Id.*; PX 103 at 3.)  Illustrative District 1 in

this map constitutes a second majority-Latino district by combining cities in northwestern Kern County with unincorporated areas of East Bakersfield (hereinafter "East Bakersfield"). (Trial Tr., Vol. 2, 147:25–149:13 (describing the boundaries of East Bakersfield).)



i. *Numerosity*

Under Illustrative Map 2, and using data from the 2009 Special Tabulation, the Latino CVAP would constitute a numerical majority in Districts 1 and 5. (Trial Tr., Vol. 1, 84:5–85:3; PX 106 at 3.) Latinos would comprise 51.6 percent and 52 percent of the CVAP in District 1 and District 5, respectively. (*See* "Option 2 Districts" Table below.) Defendants' expert Dr. Johnson again generated slightly different CVAP estimates, but did not dispute that Latino voting age citizens would constitute a numerical majority in Districts 1 and 5 of Illustrative Map 2. (DX 565 at 27.) Dr. Johnson's estimates of Latino CVAP in Districts 1 and 5, using the 2009 Special Tabulation data, were again marginally higher than those of plaintiffs' expert, Mr. Ely. (*See id.* (estimating 53 percent Latino CVAP in District 1 and 52 percent Latino CVAP in District 5 under Illustrative Map 2).) Plaintiffs have thus satisfied the numerosity requirement with respect to their Illustrative Map 2.

/////

| Option 2 Districts | | | | | |
|---|---|---|---|---|---|
| District | 1 | 2 | 3 | 4 | 5 |
| Census Population | 183533 | 166050 | 159234 | 164510 | 166304 |
| Non-Prison Pop. | 165358 | 157533 | 159234 | 161678 | 166304 |
| Deviation | 3337 | -4488 | -2787 | -343 | 4283 |
| % Deviation | 2.1% | -2.8% | -1.7% | -0.2% | 2.6% |
| % Latino | 71.1% | 30.1% | 27.4% | 38.5% | 75.6% |
| % White | 18.1% | 56.1% | 61.9% | 45.7% | 14.2% |
| % African American | 4.8% | 6.6% | 3.5% | 7.0% | 7.1% |
| % Asian | 4.7% | 4.2% | 4.6% | 6.6% | 1.7% |
| Voting Age Population | | | | | |
| % Latino | 65.3% | 26.2% | 23.6% | 33.8% | 71.0% |
| % White | 22.3% | 60.7% | 66.2% | 50.8% | 18.2% |
| % African American | 6.0% | 5.9% | 3.1% | 6.4% | 7.1% |
| % Asian | 5.1% | 4.3% | 4.6% | 6.8% | 2.0% |
| Citizen Voting Age Population | | | | | |
| 2009 Special Tabulation | | | | | |
| % Latino | 51.6% | 17.9% | 18.7% | 23.2% | 52.0% |
| % White | 33.4% | 69.1% | 73.5% | 62.6% | 32.1% |
| % African American | 7.7% | 7.1% | 3.0% | 7.3% | 12.2% |
| % Asian | 5.4% | 3.1% | 2.8% | 4.6% | 2.0% |
| 2015 Special Tabulation | | | | | |
| % Latino | 60.6% | 21.9% | 24.4% | 29.6% | 60.1% |
| % White | 28.5% | 64.1% | 66.7% | 55.0% | 25.7% |
| % African American | 3.8% | 7.3% | 3.1% | 7.4% | 9.9% |
| % Asian | 5.9% | 4.2% | 3.5% | 6.3% | 2.2% |

ii. *Compactness*

a. <u>Preservation of Communities of Interest</u>

As with Illustrative Map 1, Mr. Ely presented maps at trial tending to show that, in comparison to the County's 2011 Adopted Map, plaintiffs' Illustrative Map 2 more effectively grouped into districts populations with similar socioeconomic characteristics, including educational attainment, income, homeownership, immigrant population, and Spanish speaking population. (Trial Tr., Vol. 2, 132:22–133:5; PX 110.) Plaintiffs also introduced evidence of the major employment sectors shared among East Bakersfield, Delano, McFarland, Shafter and Wasco: the largest industries in each of these communities are agriculture and education, health, and social services. (PX 123 at 1.) In addition, plaintiffs presented testimony from Ms. Huerta, who opined that the northwestern communities of Kern County shared a community of interest with East Bakersfield because of the large number of farmworkers residing in East Bakersfield, who travel seasonally between the two areas for work. (Trial Tr., Vol. 2, 242:4–16.) Ms. Huerta further testified that residents of the northwestern Kern communities interact with the residents in East Bakersfield through various cultural festivals celebrating Latino food and music. (*Id.* at 242:23–243:8.) Moreover, Supervisor Perez reiterated in her testimony that the Latino

26

populations in northern Kern and East Bakersfield are "completely indistinguishable," and that "every issue imaginable" is shared equally between these populations. (Trial Tr., Vol. 5, 796:13–797:15.)

Defendants offered little compelling evidence at trial suggesting that East Bakersfield would be an inappropriate fit with the northern Kern communities under plaintiffs' Illustrative Map 2. Ms. Oviatt, the director of the Kern County Planning and Natural Resources Department, testified that although 16 percent, a "healthy portion," of East Bakersfield's population works in agriculture, this percentage is not comparable to that of other northern cities, where the portion is 34 percent or more. (*See* Trial Tr., Vol. 7, 1204:5–1205:7.) District 3 Supervisor Mike Maggard, who currently represents East Bakersfield, expressed the opinion that East Bakersfield and Delano are significantly different communities because they are roughly 30 miles apart, and Delano is the second largest incorporated city in Kern County while only parts of East Bakersfield are incorporated. (Trial Tr., Vol. 8, 1306:12–1307:8.) Kim Salas, an employee with the Kern County Superintendent of Schools, similarly disapproved of linking East Bakersfield with Delano on the basis that East Bakersfield is an urban area while the outlying areas are more rural. (Trial Tr., Vol. 8, 1406:3–14.)

The evidence presented by defendants would seem to suggest that any identifiable difference, no matter how small, between the communities grouped in plaintiffs' Illustrative Map 2 negates a showing of a community of interest. This court concludes that plaintiffs' burden under *Gingles* prong one is not and cannot be one that requires plaintiffs to establish there are no identifiable differences between the communities joined in their illustrative map. It is simply too easy to identify at least some differences between any two communities, because no one community is exactly the same as another. The testimony offered by Ms. Oviatt and Supervisor Maggard does not disprove the notion that the communities appearing in District 1 of plaintiffs' Illustrative Map 2 undoubtedly have significant shared interests. Moreover, the supposed urban/rural incompatibility identified by Ms. Salas in her trial testimony is directly at odds with the County's own purported preference to combine both urban and rural areas into a single district. (*See, e.g.*, Trial Tr., Vol. 7, 1169:1–1170:12 (testimony of Zack Scrivner regarding the

County's practice of having each supervisorial district take a portion of urban Bakersfield to avoid concentration of power in Bakersfield); Trial Tr., Vol. 10, 1600:3–1601:1 (testimony of Mick Gleason regarding the same).)

Defendants once again note the alleged absence during the 2011 redistricting process of any public comment by Kern County residents suggesting that East Bakersfield be joined with the communities in northern Kern. (*See* Trial Tr., Vol. 3, 483:18–484:5.) Defendants contend that the absence of such a suggestion by members of the public indicates that East Bakersfield does not share a community of interest with the Latino communities in northern Kern, and that any proposal to the contrary is plaintiffs' post-hoc justification for their Illustrative Map 2. This argument is unavailing for the reasons already articulated by the court above. Moreover, the possibility of a community of interest between East Bakersfield and the northern Kern County communities was in fact suggested in 2011: Mr. Krauter testified at trial that the redistricting map put forth by MALDEF at the August 2, 2011 hearing before the Board of Supervisors created a northern district that dipped into East Bakersfield. (*See* Trial Tr., Vol. 3, 486:4–25.) Even if such evidence had not been introduced at trial, public comment can hardly be considered an exhaustive accounting of what communities of interest exist, particularly where, as here, public comment from certain Kern County communities was clearly scant. (*See* JX 4 at 4–5 (summary of redistricting workshops, indicating that one person attended the East Bakersfield workshop).) Accordingly, the court concludes that plaintiffs' Illustrative Map 2 preserves communities of interest.

### b. Connectedness

The analysis of Mr. Ely's "connectedness" principle applies with equal force to plaintiffs' Illustrative Map 2 as with Illustrative Map 1. Illustrative Map 2 similarly maintains in separate districts the communities in northern Kern County and eastern Kern County, which are internally connected by highways and public transit that need not pass through Bakersfield. The County's 2011 Adopted Map, as Mr. Ely noted, splits each of these two communities into different districts, and combines each with dissimilar communities to meet population requirements. Accordingly, Mr. Ely credibly opined that plaintiffs' Illustrative Map 2 better complies with the

principle of connectedness than the Adopted Map.  The court finds that Illustrative Map 2 respects the principle of connectedness as defined by Mr. Ely.

### c.  Preservation of Kern County's Preexisting Majority-Latino District

Again, the parties' experts present slightly different Latino CVAP estimates for each of the districts under Illustrative Map 2, but there is no dispute that District 5 remains a majority-Latino district under plaintiffs' Illustrative Map 2, with a 52 percent Latino CVAP according to Mr. Ely's estimates.  (*See* "Option 2 Districts" Table above.)

### d.  Preservation of Two Eastern Districts and Minimizing Change

As with Illustrative Map 1, defendants criticize plaintiffs' Illustrative Map 2 for dispensing with the County's current configuration of two eastern districts.  Defendants also argue that, though slightly less disruptive than Illustrative Map 1, Illustrative Map 2 would nonetheless move 30 percent of Kern residents into new supervisorial districts.  (Trial Tr., Vol. 9, 1462:11–19; DX 565 at ¶ 19.)

For the reasons stated above, the court concludes that the law requires the objectives of the Voting Rights Act not to be subordinated solely in order to accommodate local districting preferences.  *See Rodriguez*, 964 F. Supp. 2d at 745–46; *see also Montes*, 40 F. Supp. 3d at 1400–01; *Perez*, 250 F. Supp. 3d at 142.  Given Kern County's size and geographical makeup, the court believes that it would be impossible to create a map that perfectly reflected distinct communities of interest, and yet still satisfied equal population requirements and all other traditional redistricting principles.  Therefore, to the extent that other local considerations factor into the districting of Kern County, those considerations are better accommodated at the remedial stage if a § 2 violation is established.

The court thus concludes that, under Illustrative Map 2, plaintiffs have again satisfied their burden of showing that the Latino population in Kern County is sufficiently numerous and geographically compact for Latinos to form an effective voting majority in a second supervisorial district.  Having come forward with two separate examples of maps that include a second majority-Latino supervisorial district, the court concludes that plaintiffs have satisfied the first *Gingles* precondition, and now turns to the second.

**II.**   *Gingles* **II – Latino Political Cohesiveness**

The second *Gingles* precondition is satisfied where the minority group is politically cohesive—that is, where "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56. If the minority group does not have a preferred candidate, it cannot be said that the jurisdiction's electoral scheme thwarts the minority group's interests. *Id.* at 51. Political cohesiveness is frequently demonstrated through statistical evidence of racially polarized voting, though other non-statistical evidence may establish this factor as well. *Monroe v. City of Woodville*, 897 F.2d 763, 764 (5th Cir. 1990) ("Statistical proof of political cohesion is likely to be the most persuasive form of evidence, although other evidence may also establish this phenomenon."). Courts have relied on three statistical methodologies to determine whether minority voters vote cohesively: homogeneous precinct analysis, ecological regression, and ecological inference. *See United States v. City of Euclid*, 580 F. Supp. 2d 584, 596 (N.D. Ohio 2008) (approving the use of these methods); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 995, 1001–04 (D.S.D. 2004) (collecting cases).

Homogeneous precinct analysis ("HPA"), also known as extreme case analysis, examines voting behavior in precincts where the population is close to being racially or ethnically homogeneous, typically where upwards of 90 percent of the population is of the same race or ethnicity. (Trial Tr., Vol. 8, 1334:16–1335:5.) HPA requires no statistical inferences: in homogeneous Latino precincts, whatever percentage of the vote a candidate receives represents the percentage of Latinos who voted for that candidate. (*See* Trial Tr. Vol. 4, 544:11–545:14.) Likewise, in homogeneous white precincts, the percentage of the vote a candidate receives represents the percentage of whites who voted for that candidate. (*Id.*)

Because precincts, of course, are usually not perfectly segregated by race, statisticians have employed other methodologies to estimate individual voting behavior in precincts with heterogeneous racial populations. In 1959, statistician Leo Goodman introduced ecological regression ("ER"), which remains widely used by social scientists and political scientists to estimate group-wide voting behavior. (*Id.* at 564:8–16.) ER takes precinct-level election results and correlates those figures with the racial or ethnic composition of the electorate. ER plots the

vote percentage in each precinct for a Latino candidate against the percentage of Latino voters, and calculates the line of best fit through all those points—that is, the line that minimizes the distance between the line and each of the plot points. (*Id.* at 554:7–17.) The line can be extrapolated in each direction to estimate how precincts that are 100 percent Latino or 100 percent non-Latino would have voted. (*Id.* at 555:2–15). ER has two major deficiencies, however. First, it sometimes produces estimates that are less than 0 percent or greater than 100 percent. (PX 136 at ¶ 20.) Second, it does not take advantage of "bounds" information, which puts some limits on possible voting behavior based on the minimum and maximum percentage of votes a candidate could have received. (*Id.* at ¶¶ 22–27.)

Ecological inference ("EI"), developed by political scientist Gary King in 1997, seeks to overcome some of the shortcomings of ER, and is "similar to, but largely regarded as an improvement upon" the ER methodology endorsed in *Gingles*. *Hall v. Louisiana*, 108 F. Supp. 3d 419, 433 n.15 (M.D. La. 2015). Unlike ER, EI only produces estimates between 0–100 percent, and incorporates bounds data to narrow the range of probabilities based on the actual votes cast in an election. (PX 136 at ¶ 27.)

A. Dr. Kousser's Analysis

Plaintiffs' expert, Dr. J. Morgan Kousser, employed ER (unweighted and weighted)[10] and EI to evaluate racial polarization in Kern County. To do so, he examined 22 non-partisan[11] elections involving Latinos candidates in Kern County from 2004 to 2014. (*Id.* at ¶ 2.) Latinos were identified by their Spanish surnames, based on a list originally compiled by the U.S. Census Bureau and used in California for several decades to match lists of registered voters and those

---

[10]  Unweighted regression treats each precinct exactly the same, regardless of the number of voters within each precinct. This is depicted graphically using points of equal size to represent each precinct. Weighted regression, on the other hand, counts larger precincts more heavily than smaller precincts, representing each precinct with a circle proportional in size to the number of voters in the precinct. (Trial Tr., Vol. 4, 563:6–19; PX 136 at ¶ 19.)

[11]  Because supervisorial elections in Kern County are non-partisan, Dr. Kousser excluded "partisan" elections in which the candidates were nominated by political parties, in order to mitigate the possibility that party identification, rather than race, would drive his voting estimates. (PX 137 at ¶ 28.)

who turned out at the polls. (*Id.* at ¶ 15 & n.8.) Dr. Kousser concluded that of the 22 elections he analyzed in Kern County, 19 were racially polarized to a statistically significant degree. (*Id.* at ¶ 2.)

### i. *Endogenous Elections*

Included in the total of 22 elections he examined, Dr. Kousser analyzed five "endogenous" elections involving the office at issue in this case, i.e. elections for the Kern County Board of Supervisors. (*Id.* at ¶ 29; Trial Tr. Vol. 4, 587:7–10.)

The 2004 District 4 election in Kern County involved a Latino candidate, Joel Moreno, and a non-Latino candidate, Raymond Watson. Under all three methodologies employed by Dr. Kousser—unweighted ER, weighted ER, and EI—Moreno received over 80 percent of the Latino vote, but only about 13 percent of the non-Hispanic white and black vote.[12] (PX 137 at Table V-1.) Dr. Kousser concluded that the 2004 District 4 election was racially polarized.

Dr. Kousser next analyzed the 2010 primary and runoff elections for District 2 Supervisor. Zack Scrivner was the Latino-preferred candidate, garnering 43 percent, the plurality, of the Latino vote using EI, while garnering over 70 percent of the Latino vote using weighted ER. (*Id.* at Table V-2.) In what Dr. Kousser described as an anomaly in Kern County, the Latino candidate Steve Perez polled better with non-Latino voters in the primary election, receiving nearly 30 percent of the non-Hispanic white and black vote under all three methodologies. (PX 136 at ¶ 32; PX 137 at Table V-2.) Dr. Kousser concluded that the 2010 primary election for District 2 Supervisor was polarized, but in the opposite direction as would be expected, that is, with Latino voters favoring the non-Latino candidate, and non-Hispanic white and black voters

---

[12] Dr. Kousser combined non-Hispanic whites and blacks into a single voting bloc, because black voters cannot be systematically identified by surname. (Trial Tr., Vol. 4, 590:24–591:8.) Dr. Kousser testified that isolating black voters from non-Hispanic white voters in his analyses would not disturb his conclusions regarding racial polarization in Kern County. Because of the small black population in Kern County (5.6 percent in 2014, for example), Dr. Kousser explained that combining non-Hispanic whites and blacks nonetheless measures primarily non-Hispanic white voting behavior. (PX 136 at ¶ 30.) If anything, Dr. Kousser opined, combining black and non-Hispanic white voters underestimates the degree of polarization between Latinos and non-Hispanic whites: in analyses he conducted using black citizen voting age population to estimate black voter turnout, Dr. Kousser found that black voters tended to vote with Latinos. (Trial Tr., Vol. 4, 615:15–619:22.)

favoring the Latino candidate.  (PX 136 at ¶ 32.)  In the 2010 runoff election between Zack

Scrivner and Steve Perez, the two candidates split the Latino vote and non-Hispanic white and

black vote fairly evenly.   (*Id.*; PX 137 at Table V-3.)  Dr. Kousser therefore concluded that the

runoff election was not racially polarized.

In the 2012 primary election for District 1 Supervisor, with eight candidates in the race,

Latino candidate Sam Ramirez received approximately two-thirds of the Latino vote, but only 1–

2 percent of the non-Hispanic white and black vote.  (PX 136 at ¶ 33; PX 137 at Table V-4.)

Finally, in the 2012 election for District 5 Supervisor, Latino candidate Leticia Perez

approximately 80 percent of the Latino vote under all three methods of estimation, but only about

one-third of the non-Hispanic white and black vote.  (PX 136 at ¶ 34; PX 137 at Table V-5.)  Dr.

Kousser concluded that the 2012 elections for District 1 and District 5 supervisor were both

racially polarized.

In sum, Dr. Kousser concluded that Latino voters cohered around a particular candidate in

four of the five endogenous Kern County elections that he analyzed.

### ii.  *Exogenous Elections*

Exogenous elections—contests for any other office aside from the Kern County Board of

Supervisors—may also be considered in assessing racial polarization, though they are not as

probative as endogenous elections as to whether the minority group is politically cohesive.

*Montes*, 40 F. Supp. 3d at 1401–02 (citing *United States v. Blaine County*, 363 F.3d 897, 912 (9th

Cir. 2004); *see also Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502 (5th Cir.

1987); *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 432 (M.D. La. 2017)

("Although exogenous elections tend to be less probative of [racially polarized voting] than

endogenous elections, they may not be excluded from the analysis completely, especially where

there are very few relevant endogenous elections.").  Evidence from exogenous elections "should

not be deemed irrelevant *per se* to plaintiffs' claims, but must be evaluated according to its

particular probative value."  *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d

1201, 1208, n.8 (5th Cir. 1989).

/////

Dr. Kousser analyzed seventeen exogenous elections that he deemed sufficiently similar to the elections for Kern County Board of Supervisors, in that they were non-partisan contests involving a Latino candidate and a non-Latino candidate. Of these seventeen, four were local elections, while the remaining thirteen were statewide elections in which Dr. Kousser analyzed only the Kern County voting results. (PX 136 at ¶¶ 35, 39.)

The four local elections Dr. Kousser examined were a 2006 Sheriff's race, a 2010 runoff for the Board of Education, a 2012 election for Kern County Community College Board, and a 2014 election for Assessor. (*Id.* at ¶ 35.) In the 2006 Sheriff's race, Latino candidate Chevy Garza received about half of the Latino vote, even in a seven-person contest, but only about 10 percent of the non-Hispanic white and black vote. (PX 137 at Table VI-1.) In the 2010 Board of Education runoff, Latino candidate Marco Flores garnered roughly 80 percent of the Latino vote, but less than 20 percent of the non-Hispanic white and black vote. (*Id.* at Table VI-2.) The 2014 election for Assessor had a clear Latino-preferred candidate, with Lupe Esquivias receiving approximately two-thirds of the Latino vote, but only 6 percent of the non-Hispanic white and black vote. (*Id.* at Table VI-4.) By contrast, the 2012 race for Kern County Community College Board did not appear to have a Latino-preferred candidate, as Latinos cast votes in roughly equal percentages for candidates Marco Flores and Ruben Hill. (*Id.* at Table VI-3.) Dr. Kousser concluded that all but the 2012 race for Kern County Community College Board were racially polarized. (PX 137 at Table R-1.)

Dr. Kousser next analyzed thirteen statewide contests that took place between 2004 and 2014. (PX 136 at ¶ 39.) Generally, he found that in races involving two or three candidates, Latino candidates received approximately 60–90 percent of the Latino vote. (*See* PX 137 at Tables VII-1; VII-2; VII-3; VII-4; VII-8; VII-11; VII-13.) Only the 2010 contest for Superintendent of Public Instruction defied this pattern, with Larry Aceves receiving a statistically significantly level of higher support from non-Hispanic whites and blacks than he did from Latinos. (PX 136 at ¶ 39; PX 137 at Table VII-6.)

Even in races with more than three candidates, Latino candidates consistently earned a broad share of the Latino vote. For instance, in the 2010 primary for Superintendent of Public

34

Instruction, a twelve-person race, Latino candidates Gloria Romero and Lydia Gutierrez together garnered about 65 percent of the Latino vote.  (PX 137 at Table VII-5.)  In the six-candidate Republican primary for Lieutenant Governor in 2010, the top vote-getter, Abel Maldonado, received approximately 60 percent of the Latino vote, and a statistically significantly different level of support from Latinos and non-Latinos.  (PX 136 at ¶ 42; PX 137 at Table VII-7.)  The 2010 Democratic primary for Attorney General, a seven-person contest, had three Latino candidates who drew disproportionate support from Latino voters, collecting about 85 percent of the Latino votes altogether, compared to roughly 20 percent of non-Hispanic white and black votes.  (PX 136 at ¶ 42; PX 137 at Table VII-9.)  The 2014 primary for Secretary of State, an eight-person contest, saw Alex Padilla garner approximately 68 percent of the Latino vote, but only 8 percent of the non-Hispanic white and black vote.  (PX 137 at Table VII-10.)  In the six-person primary for state Controller in 2014, John Perez garnered about 68 percent of the Latino vote, and only 8 percent of the non-Hispanic white and black vote.  (*Id.* at Table VII-12.)

Defendants argue that any evidence from Dr. Kousser's analysis of exogenous elections is legally irrelevant under *Gingles*, which held that the inquiry into vote dilution is "district specific," and that "[w]hen considering several separate vote dilution claims in a single case, courts must not *rely* on data aggregated from all the challenged districts in concluding that racially polarized voting exists in each district."  478 U.S. at 59 n.28; *see also Old Person I*, 230 F.3d at 1119 n.3 ("The district court was careful to ensure that statistical data relating to racially polarized voting was not aggregated across districts, as the Supreme Court has noted must not be done in a § 2 case.").  Dr. Kousser did not analyze the results of the exogenous elections within the boundaries of each supervisorial district in Kern County, but rather did so for the County as a whole.

The court concludes that defendants read the precedents upon which they rely too literally, overlooking the context in which *Gingles* and *Old Person I* were decided.  Both of those cases involved challenges to legislative districts dispersed throughout a state.  *See Gingles*, 478 U.S. at 101 (noting that the challenged districts were "distributed throughout the State of North Carolina") (O'Connor, J., concurring); *Old Person I*, 230 F.3d at 1119 (plaintiffs alleged vote

dilution "in two separate geographic areas of the state [of Montana]").  The Seventh Circuit

recognized this distinction in *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357 (7th Cir.

1992), finding that "[r]eferences in *Gingles* to district-specific inquiries assume that each multi-

member district spans a different part of the state, with different minority populations and,

perhaps, different cohesiveness of majority and minority voters."[13]  *Id.* at 360.

　　　*Gingles* and *Old Person I* involved "separate vote dilution claims in a single case."

*Gingles*, 478 U.S. at 59 n.28.  Plaintiffs' challenge here, however, is to Kern County's Board of

Supervisors redistricting plan—a single vote dilution claim in a single case.[14]  To require a

_____

[13]  Plaintiffs petitioned to the Supreme Court for a writ of certiorari, specifically identifying as a question for review whether "the Seventh Circuit's decision [is] in conflict with *Gingles* and 42 U.S.C. 1973 by failing to engage in a 'district specific' analysis of the challenged election practice?"  Petition for Writ of Certiorari, at *i, *Baird v. Consol. City of Indianapolis*, 1993 WL 13075666 (1993) (No. 92-1415).  The Supreme Court denied certiorari.  *Baird v. City of Indianapolis*, 508 U.S. 907 (1993).  Although *Baird* involved overlapping single- and multi-member districts, its rationale nonetheless applies here.

[14]　　In a footnote in a reply brief to a motion *in limine*, defendants state that plaintiffs lack standing to challenge the entire Kern County redistricting map.  (Doc. No. 153 at 5 n.4.)  Defendants contend in that footnote that, to have standing to challenge the entire redistricting map, there must be plaintiffs from all five supervisorial districts.  (*Id.*)  Plaintiffs here reside either in District 1 or District 4.  Out of an abundance of caution, and because "[t]he question of standing is not subject to waiver," *United States v. Hays*, 515 U.S. 737, 742 (1995), the court briefly addresses the issue here.

　　　The Supreme Court has held that plaintiffs alleging racial gerrymandering in violation of the Fourteenth Amendment must live in the challenged district in order to have standing, absent specific evidence that "the plaintiff has personally been subjected to a racial classification."  *Id.* at 745; *see also Ala. Legislative Black Caucus v. Alabama*, __ U.S. __, 135 S. Ct. 1257, 1265 (2015) ("A racial gerrymandering claim . . . applies to the boundaries of individual districts.  It applies district-by-district.");  *Bush*, 517 U.S. at 965.  However, plaintiffs do not allege a Fourteenth Amendment racial gerrymandering claim here, but rather a vote dilution claim under § 2 of the Voting Rights Act.  These theories of liability are "analytically distinct" from one another.  *Shaw*, 509 U.S. at 652; *see also Perez*, 250 F. Supp. 3d at 217; *Cano*, 211 F. Supp. 2d at 1220.  "Whereas a vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities, an action disadvantaging voters of a particular race, the essence of the equal protection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts."  *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citations and internal quotation marks omitted).  This distinction applies similarly to the issue of standing.  Multiple courts have, therefore, concluded that the rule announced in *Hays* requiring a plaintiff to live in the challenged district is inapplicable to vote dilution cases such as this one.  *See Whitford v. Gill*, 218 F. Supp. 3d 837,

mechanistic application of *Gingles*' "district-by-district" requirement would be nonsensical in this context, where the challenge is to the drawing of the County's supervisorial boundaries as a whole. Statistical evidence of voting behavior in each supervisorial district would provide no greater insight into how the supervisorial district boundaries should be drawn. The court therefore rejects the notion that county-wide exogenous election data is irrelevant in the context of § 2 cases such as this one.

### B. Dr. Katz's Critique

Defendants do not dispute the results that Dr. Kousser generated through the application of ER and EI. In fact, defendants' expert Dr. Jonathan Katz testified that he achieved similar estimates of racial polarization when he conducted his own analyses of Kern County supervisorial

929 (W.D. Wis. 2016) ("The rationale and holding of *Hays* have no application" in vote dilution cases), *appeal docketed*, __ U.S. __, 137 S. Ct. 2289 (2017); *Cannon v. Durham Cty. Bd. of Elections*, 959 F. Supp. 289, 297 n.5 (E.D.N.C.) ("[T]his court will not import the standing rules created for a *Shaw* claim to a traditional vote dilution claim."), *aff'd*, 129 F.3d 116 (4th Cir. 1997); *Perez v. Texas*, No. CIV.A. 11-CA-360-OLG, 2011 WL 9160142, at *9 (W.D. Tex. Sept. 2, 2011). While there are courts that have reached the opposite conclusion, *see Hall v. Virginia*, 276 F. Supp. 2d 528, 531 (E.D. Va. 2003) ("Though not precisely on point, the Court is persuaded by the principle established in *Hays*"), *aff'd*, 385 F.3d 421 (4th Cir. 2004); *Old Person v. Brown*, 182 F. Supp. 2d 1002, 1006 (D. Mont.) (citing *Hays*, 515 U.S. at 745), *aff'd*, 312 F.3d 1036 (9th Cir. 2002); *Comm. for a Fair & Balanced Map v. Ill. Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, at *1 (N.D. Ill. Nov. 1, 2011), no opinion of binding authority has so held and the court does not find the decisions cited immediately above to be persuasive on this point. Notably, in affirming *Hall* and *Old Person*, the Fourth and Ninth Circuits explicitly declined to endorse the district courts' standing analyses. *See Hall*, 385 F.3d at 427 n.10 ("We decline to address . . . whether the district court erred in dismissing seven of the nine plaintiffs for lack of standing."); *Old Person II*, 312 F.3d at 1039–40 ("The district court concluded that the plaintiffs lacked standing to allege dilution beyond the [ ]Districts where they reside. We need not reach that issue.").

This court concludes that the standing rule announced in *Hays* is inapplicable to plaintiffs' vote dilution claim here. Plaintiffs challenge Kern County's entire redistricting scheme, alleging Kern County should have two majority-Latino supervisorial districts, not one. *See Miller*, 515 U.S. at 911 (noting a vote dilution claim challenges a "particular voting scheme," and the resulting harm is therefore not confined to specific segments of that scheme); *see also Perez*, 2011 WL 9160142, at *9 ("[Plaintiff] contends that *he* has suffered an injury because *his* vote for *his* preferred candidate in *his* district has been diluted . . . the fact that his own vote has been allegedly diluted because some voters in his district have been moved to other districts is not an assertion of other voter's rights"); *Whitford*, 218 F. Supp. 3d at 929 ("The harm is the result of the entire map, not simply the configuration of a particular district."). Therefore, the court is persuaded that plaintiffs have standing to bring the vote dilution claim alleged in this action.

elections. (Trial Tr., Vol. 8, 1380:7–14.) Defendants do dispute, however, what conclusions may be drawn from those estimates. Dr. Katz critiques Dr. Kousser's conclusions primarily on the ground that, due to the lack of homogeneous precincts in Kern County, ER and EI produce potentially inaccurate results. (DX 622 at 7.) According to Dr. Katz, the method of bounds—one of EI's chief advantages over ER—is only effective when there are "sufficient" homogeneous precincts such that the bounds are informative. (*Id.* at 4.) However, Dr. Katz also testified that Kern County lacks a sufficient number of homogeneous Latino precincts, resulting in estimates that "may be wildly off." (Trial Tr., Vol. 8, 1378:4–10.) Defendants rely on this testimony of Dr. Katz in arguing that because Dr. Kousser's analyses are insufficiently reliable, the court cannot draw any statistically valid conclusions from them. (DX 622 at 7.)

To illustrate the potential inaccuracy of ER and EI as applied to Kern County, Dr. Katz performed ER and EI analyses of Latino Democratic registration in Kern County and compared those estimates to the true values. (*Id.* at 7–9.) Dr. Katz's ER and EI analyses, which Dr. Kousser does not dispute, estimated Democratic registration among Latinos in Kern County to be over 70 percent, whereas the true values hover over 50 percent. (*Id.*) According to Dr. Katz, this disparity casts serious doubt on the accuracy of Dr. Kousser's findings of racially polarized voting in Kern County elections.

Although "absolute perfection on the base statistical data is not to be expected, a trial court should not ignore the imperfections of the data used nor the limitations of statistical analysis." *Overton v. City of Austin*, 871 F.2d 529, 539 (5th Cir. 1989). Though Dr. Katz's critiques are worthy of consideration, the court is unpersuaded that these criticisms preclude plaintiffs from demonstrating Latino political cohesiveness by a preponderance of the evidence. The court certainly recognizes the obvious—that larger numbers of homogeneous precincts produce more accurate EI estimates. But the court finds no basis to conclude that there is some minimum number of homogeneous precincts required before ER and EI analysis have any probative value in a § 2 case. Dr. Katz admitted that Gary King, the political scientist who developed EI, indicated no bright line percentage of homogeneous precincts is necessary in order for ecological inference estimates to be reliable. (Trial Tr., Vol. 8, 1374:1–12.) Plaintiff's expert

Dr. Kousser also could not identify any scholarly articles on ecological inference that set a threshold of homogeneity, below which the methodology should be rejected as unreliable. (PX 137 at ¶ 50.) Dr. Kousser acknowledged that tomography plots, as discussed in Gary King's seminal book introducing ecological inference, provided one means of assessing the reliability of ecological inference. (*Id.*) Defendants' expert, Dr. Katz, also acknowledged that tomography plots could have been used to assess whether there were sufficient homogeneous precincts here, but he did not produce any such plots at trial or otherwise. (*See* Trial Tr., Vol. 8, 1345:6–17.) Dr. Katz himself did not opine on what the threshold of homogeneity would need to be here in order to produce reliable statistical results. Indeed, at trial, he went so far as declining to concede that even a hypothetical county with 990 homogeneous precincts out of 1,000 precincts total would have sufficient homogeneity to render ER and EI analyses reliable. (Trial Tr., Vol. 8, 1372:12–1373:1.) Yet, if courts required this high degree of homogeneity as a prerequisite for considering ER and EI evidence, that evidence would be unnecessary, as an HPA analysis could simply be conducted instead and would provide superior estimates.

In addition to this position lacking support in the field of statistics, numerous cases finding racial polarization have relied on statistical analyses that did not include HPA and made no mention of homogeneous precincts whatsoever. *See, e.g.*, *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017) (experts used only EI to analyze racially polarized voting with no mention of homogeneous precincts); *Montes*, 40 F. Supp. 3d at 1377 (same); *Hall*, 108 F. Supp. 3d at 433 (same); *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-cv-2579, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014) (experts used ER and EI with no mention of homogeneous precincts); *Rodriguez*, 964 F. Supp. 2d at 686 (same). This persuasively demonstrates that an HPA analysis, while perhaps more reliable than ER or EI, is not required as a matter of law in order for a plaintiff to prove their § 2 case.

Notably, in *Benavidez v. City of Irving*, the court explicitly acknowledged that "[t]here are no homogeneous Hispanic precincts in any of these elections in Irving, so this methodology cannot be applied to derive estimates of Hispanic voter's candidate preferences." 638 F. Supp. 2d at 723 (N.D. Tex. 2009). Despite the lack of homogeneous Hispanic precincts, the court went on

to credit the ER and EI analyses conducted by plaintiff's expert. *Id.* Similarly, in *Teague v. Attala County*, the Fifth Circuit held that the district court erred when it concluded that plaintiffs had failed to demonstrate racial polarization in Attala County. 92 F.3d 283, 291–92 (5th Cir. 1996). In that case, the district court had criticized the methodology employed by the plaintiffs' experts because there were no homogeneously black precincts with a 90 percent black voting age population. As the Fifth Circuit noted, however, "such a district does not exist in Attala County." *Id.* at 288. Despite the lack of any 90 percent homogeneous black precincts, the Fifth Circuit reviewed the statistical evidence from the regression analysis and found "overwhelming evidence of racial polarization. The results of the statistical analyses in this case create a strong presumption in favor of a finding of black political cohesion and racial bloc voting." *Id.* at 291.

As the field of statistics evolves, formerly reliable methodology may be undermined by subsequent refinements. However, the court is not persuaded that the methodologies employed by Dr. Kousser here have been undermined in any way. The court finds that Dr. Katz's insistence on "sufficient" homogeneous precincts is undercut by his own work in previous cases, where he performed ER and EI analyses without any reference to the number of homogeneous precincts in the relevant jurisdiction. (*See* Trial Tr., Vol. 8, 1356:1–1359:5.) Moreover, in the present case, Dr. Katz failed to provide the court with any method for determining how many homogeneous precincts would be sufficient in order to obtain reliable results by way of ER and EI. Defendants have provided the court with no basis upon which to depart from those cases which have relied upon ER and EI analyses even in the absence of HPA. The court acknowledges the disparity between the estimates produced by ER and EI in Dr. Katz's analysis of Latino Democratic registration compared to the known values, but is not persuaded as to the implications that defendants would have the court draw therefrom. Notably, Dr. Katz was unable to explain the relationship between registration and voting—only to say that they are "related"—while also acknowledging that they are different and may have different geographical distributions. (Trial Tr., Vol. 8, 1379:4–16.) The court has no reason to believe that the cause of the inflated estimates of Latino Democratic registration is due to insufficient homogeneous precincts as suggested by Dr. Katz, rather than to accept Dr. Kousser's rational explanation—that in heavily Latino

precincts, non-Latinos tend to register as Democrats at a higher rate than non-Latinos in other precincts. (PX 137 at ¶¶ 53–57; Trial Tr., Vol. 4, 648:11–651:16.)

The court recognizes that ER and EI are, ultimately, only estimates, which may not perfectly reflect true values. Even recognizing the limitations of these methodologies, however, the court need not insist on mathematical exactitude in assessing racial polarization. As one district court has explained:

> [A]n approach might yield an inexact result for purposes of a hypothetical mathematical challenge, but could still be correlative, probative, and sufficiently accurate to bear on the ultimate issue of racial bloc voting. The standard of proof here is preponderance, not mathematical certainty.

*City of Euclid*, 580 F. Supp. 2d at 602. Here, Dr. Katz's critique does not raise a doubt sufficient to refute Dr. Kousser's analyses or call them into serious question. Accordingly, the court credits Dr. Kousser's analyses of racial polarization.

C. <u>Non-Statistical Evidence of Cohesiveness</u>

The evidence of Latino political cohesiveness in Kern County provided by Dr. Kousser is corroborated by other non-statistical evidence. Courts may look to such evidence to demonstrate political cohesiveness, since "[t]he experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive." *Sanchez v. Bond*, 875 F.2d 1488, 1494 (10th Cir. 1989); *see also Pope v. County of Albany,* 94 F. Supp. 3d 302, 321 (N.D.N.Y. 2015); *Large v. Fremont County*, 709 F. Supp. 2d 1176, 1196, 1199–1202 (D. Wyo. 2010); *Bone Shirt*, 336 F. Supp. 2d at 1004; *Cuthair v. Montezuma-Cortez, Colo. Sch. Dist.*, 7 F. Supp. 2d 1152, 1168 (D. Colo. 1998) (finding testimony of experienced local politicians "strongly persuasive and highly probative of minority vote dilution").

Plaintiffs presented lay testimony at trial evidencing cohesion among Latinos in Kern County. Several lay witnesses involved in canvassing for Latino candidates for the Board of Supervisors testified that Latino voters supported Latino candidates. (*See* Trial Tr., Vol. 2, 246:17–25; 293:17–294:3.) Other lay witnesses testified about the very different receptions they received canvassing in Latino communities versus Anglo communities. For example, plaintiff

Gary Rodriguez observed that unlike in Anglo communities, Latino communities were excited about having "a like person" run for office, not simply by virtue of being Latino, but because a Latino candidate was "somebody that lives on your side of town that understands the issues that are facing your side of town." (*See* Trial Tr., Vol. 2, 291:5–292:5.) Plaintiff Dorothy Velazquez testified that when she canvassed in 2016 for Emilio Huerta for the 21st congressional district, Latino communities in Wasco, Delano, and McFarland were excited and receptive about Huerta's candidacy, whereas in Anglo communities in Bakersfield, some residents would shut the door and refuse to speak to her. (*See* Trial Tr., Vol. 2, 264:1–266:16.) Support by Latino voters for Latino candidates was also expressed at the August 9, 2011 public hearing on redistricting before the Board of Supervisors, where one Latino resident took to the microphone and stated, "I would love the opportunity of being able to see people up there on the Board of Supervisors to look more like me than not like me." (JX 30 at 39.)

Plaintiffs also presented testimony from two individuals who ran for the Kern County Board of Supervisors, Sam Ramirez and Leticia Perez, both of whom echoed the differences in campaigning in Latino versus Anglo communities. Mr. Ramirez, who ran for District 1 Supervisor in 2012, testified that the communities emphasized different concerns: in Bakersfield and Ridgecrest, which had more Anglo voters, constituents were most interested in parks, water rates, and base realignment and closure, respectively. (*See* Trial Tr., Vol. 3, 370:4–16.) By contrast, in Delano, McFarland, and Shafter—communities with heavy Latino populations— constituents primarily expressed concerns about the need for jobs, ways to address crime, and water quality. (*Id.*) Ramirez also described differences in his experiences while campaigning, observing that he had a "better connection" with Latino constituents in Delano, McFarland, and Shafter in part because he, like the majority of those constituents, is of Mexican descent, and could communicate with them in Spanish if needed. (*Id.* at 370:17–371:13.) Mr. Ramirez also noted that those communities were largely agriculture-focused and the residents were familiar with the history of the United Farm Workers and Cesar Chavez. (*Id.*) Ramirez testified that in Ridgecrest, a predominantly Anglo community, he felt more disconnected from those constituents because he did not grow up near there and did not work or know anyone who worked at the Naval

42

Air Weapons Station. (*Id.* at 371:14–18.) Ramirez was ultimately unsuccessful in his campaign for District 1 Supervisor, coming in fourth in the June 2012 primary. (*Id.* at 372:2–7.) Analyzing precinct results post-election, Ramirez learned that he received the most votes of any primary candidate in both Delano and McFarland, and the second-most votes in Shafter. (*Id.* at 372:8– 18.)

Supervisor Leticia Perez testified that during her campaign for District 5 Supervisor in 2012, she received a very warm and positive reception while campaigning in Latino neighborhoods in East Bakersfield, Arvin, and Lamont. (*See* Trial Tr., Vol. 5, 808:8–16.) In Oleander, however, an Anglo neighborhood that had been moved into District 5 in 2011, Supervisor Perez described her reception as "the exact opposite." (*Id.* at 808:19–20.) Supervisor Perez testified that in her experience campaigning throughout the state of California over two decades, Oleander was the first and only place where she had registered Democrats slam the door in her face, unlike in the Latino communities of her district, where she was able to have meaningful conversations with constituents regarding the concerns of the community, including street lights and stray dogs. (*Id.* at 808:22–810:2.)

The foregoing anecdotal evidence of Latino political cohesiveness in Kern County was not rebutted by any of the witnesses presented by defendants at trial. Defendants argue in their post-trial brief that testimony from Mr. Ramirez and Supervisor Perez amounted to only "vague insinuations of racial motivation," in contrast to the explicit racial statements made in connection with campaigns presented, for instance, by the plaintiffs in *Patino*, 230 F. Supp. 3d at 685–86, 714–15. (Doc. No. 186 at 5 n.10.) In advancing this argument, defendants misapprehend the scope of the second *Gingles* precondition. That second precondition examines whether Latino voters cohere around particular candidates or particular issues; it is not an inquiry into whether non-Latinos vote with racial motivation or bias. *See Blaine County*, 363 F.3d at 912 ("The County . . . contends that the district court erred by failing to require proof that white bloc voting was the result of racial bias in the electorate. But as we have explained, 'proof of groupwide or individual discriminatory motives has no part in a vote dilution claim.'") (quoting *Ruiz*, 160 F.3d at 557). Accordingly, a lack of evidence of explicit racial statements by non-Latino voters does

not render the anecdotal testimony non-probative of Latino political cohesiveness.[15]

In light of the statistical evidence of racial polarization, as well as the testimony regarding Latino political cohesiveness by persons familiar with Kern County, the court finds that plaintiffs' have established that Latinos in Kern County are politically cohesive.

### III. *Gingles* III – Majority Bloc Voting and the Usual Defeat of Latino-Preferred Candidates

The third *Gingles* precondition is satisfied where "the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. In this context, "usually" has been interpreted by the Ninth Circuit to mean more than half of the time. *Old Person I*, 230 F.3d at 1122. An analysis of prong three proceeds in three steps: first, by identifying the minority-preferred candidates; second, by assessing whether the white majority votes as a bloc to usually defeat the minority-preferred candidate; and third, resolving whether there were special circumstances present when the minority-preferred candidates won. *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1020 (8th Cir. 2006); *see also Gingles*, 478 U.S. at 51; *Old Person I*, 230 F.3d at 1121–22.

Having credited Dr. Kousser's estimates with respect to the second *Gingles* precondition, the court again relies on Dr. Kousser's estimates in examining whether plaintiffs have satisfied this third *Gingles* precondition.

A. Endogenous Elections

Of the five endogenous elections for Kern County Board of Supervisors, Dr. Kousser concluded that four contests exhibited racial polarization. According to Dr. Kousser's estimates,

---

[15] The court notes that the evidence introduced at trial in this case does include at least some explicit racial statements made by members of the public during the August 2, 2011 redistricting hearing before the Board of Supervisors. At that hearing, one member of the public commented as follows: "Special interest groups always want to make big changes so they can shove their views down our throat. I say to them if you do -- do not like the views that's created in your district, then move. . . . All I've heard is Hispanics tonight. How about the rest of us?" (JX 27 at 22.) Later in the hearing, presumably in response to this comment, another individual in attendance at the public hearing replied, "I hear, like, 'special interest.' You know, we're just like Americans. . . . I don't understand why people feel so threat -- threatened at the word 'Latino.'" (*Id.* at 39.)

the Latino-preferred candidate in the 2004 election for District 4 Supervisor was Joel Moreno, who lost; the Latino-preferred candidate in the 2010 primary for District 2 Supervisor was Zack Scrivner, who won; the Latino-preferred candidate in the 2012 primary for District 1 Supervisor was Sam Ramirez, who lost; and the Latino-preferred candidate in the 2012 election for District 5 Supervisor was Leticia Perez, who won. (PX 137 at Tables V-1–V-5.)

In one of the two racially polarized elections where the Latino-preferred candidate won, it should be noted that the Latino-preferred candidate, Leticia Perez, won in District 5, Kern County's sole majority Latino district. This election therefore does not weigh in the court's assessment of the usual defeat of Latino-preferred candidates, because an analysis of the third *Gingles* precondition applies only to districts with a majority of white citizens. *Johnson v. De Grandy*, 512 U.S. 997, 1003–04 (1994) (ratifying the district court's finding that there was a "tendency of non-Hispanic whites to vote as a bloc to bar minority groups from electing their chosen candidates *except in a district where a given minority makes up a voting majority*") (emphasis added) (citation omitted). The Ninth Circuit followed this same reasoning in *Old Person I*, 230 F.3d at 1122, where it recognized that Indian electoral success in majority-Indian districts was relevant only to the totality of the circumstances inquiry, and not as to the third *Gingles* precondition. As the Ninth Circuit explained, "[t]o do otherwise would permit white bloc voting in a majority-white district to be washed clean by electoral success in neighboring majority-Indian districts." *Id.* at 1122; *see also Bone Shirt*, 336 F. Supp. 2d at 1011.

Defendants urge this court to discount the defeats of Latino-preferred candidates Joel Moreno and Sam Ramirez, contending that neither candidate presented a viable or serious candidacy, and that this, rather than Anglo bloc voting, resulted in their respective defeats. *See Campos v. City of Baytown*, 840 F.2d 1240, 1245 n.7 (5th Cir. 1988) ("If the minority candidate is not serious and gains little support from any segment of the community, it cannot be said that the minority community 'sponsored' the candidate and that election need not be examined."). In distinguishing between serious and non-serious candidates, a court may consider, among other factors, the number of votes received by a candidate, the percentage of support received from a segment of the population, and the amount of work done and money spent by the candidate. *See*

45

1    *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1222 (S.D. Tex. 1997).

2        In his 2004 run for District 4 Supervisor, Moreno raised less than $2,000.  (DX 586 at 33–

3    40.)  In his 2012 campaign for District 1 Supervisor, Ramirez raised approximately $4,000.  (DX

4    586 at 695–704.)  Defendants argue that in light of these figures, Moreno and Ramirez cannot be

5    considered to have been serious candidates.  But campaign financing is only one possible metric

6    by which to judge the seriousness of a campaign.  *See Rollins v. Fort Bend Indep. Sch. Dist.*, 89

7    F.3d 1205, 1215 n.20 (5th Cir. 1996) (rejecting the defendant's emphasis on fundraising metrics

8    and stating "the emphasis on the money raised and spent ignores other serious campaign efforts

9    that involve little or no money").  Despite limited financial resources, Moreno managed to win

10   over 80 percent of the Latino vote, while Ramirez managed to garner approximately 66 percent of

11   the Latino vote in an eight-person contest.  (PX 137 at Tables V-1, V-4.)  Thus, it cannot be said

12   that these candidates gained "little support from any segment of the community."  *Campos*, 840

13   F.2d at 1245 n.7.

14       It would be inappropriate for the court to conduct any further post-mortem examination of

15   these Board of Supervisor elections.  *See Ruiz*, 160 F.3d at 558 ("It would be a disservice to both

16   the individual candidates and the goals of the Voting Rights Act for federal courts, years after an

17   election, to scrutinize the qualifications of minority candidates who run for public office in

18   jurisdictions with historically white-only officeholders."); *see also City of Euclid*, 580 F. Supp. 2d

19   at 604 ("The issue before the Court is not who ran a better campaign, or who this Court

20   objectively believes deserved to win a particular race, but who voters would have elected if given

21   a fair and equal opportunity to participate in the political process.").  Crediting speculation as to

22   whether Latino candidates have lost elections due to their qualifications or the quality of their

23   campaigns perpetuates a vicious cycle, where "the quality of any given campaign turns on many

24   of the same factors that would justify a conclusion that vote dilution exists— . . . access to

25   campaign funds (which could be impacted by socioeconomic factors, cross-pollinization of

26   fundraising by candidates, perceptions of likely ability to win, etc.) and access to experienced

27   campaign personnel."  *City of Euclid*, 580 F. Supp. 2d at 604.

28   /////

In sum, plaintiffs demonstrated at trial that two out of five endogenous elections featured not simply racial polarization, but *legally significant* racial polarization, in that the Latino-preferred candidate lost.  Although the results in two out of five elections would not normally suffice to demonstrate the usual defeat of Latino-preferred candidates, the characteristics of those other three elections must be taken into account here.  Specifically, the three remaining elections in this sample were atypical:  the Latino-preferred candidate won the 2012 election for District 5 Supervisor, but this election took place in a majority-Latino district and should therefore be disregarded in examining usual defeat.  *See De Grandy*, 512 U.S. at 1003–04; *Old Person I*, 230 F.3d at 1122.  Moreover, both the 2010 primary and runoff for District 2 Supervisor included candidate Steve Perez, whom Dr. Kousser characterized as an anomaly because he was the only Latino candidate in the elections analyzed who consistently fared better with non-Hispanic white and black voters than Latino voters, or whose support evidenced no racial polarization.  (*See* Trial Tr., Vol. 4, 601:12–602:2.)  Steve Perez made it to the top two in the 2010 District 2 primary with significant support from non-Hispanic white and black voters, and though he lost the District 2 runoff, he received roughly equal support from Latino and non-Latino voters.  (PX 137 at Tables V-2, V-3.)  Because the two 2010 elections feature the same apparently anomalous candidate, the court will not afford them each the same weight as the other endogenous elections.

Despite this, it is difficult to discern typical voting results from these elections alone.  The court is left with, in sum, two elections that support a finding in plaintiffs' favor, one election that weighs neither for nor against plaintiffs, and two elections—albeit elections the court is persuaded were anomalous—that support a finding in defendants' favor.  Defendants would have this court disregard any further evidence outside of these five endogenous elections.  (Doc. No. 137 at 14 (citing *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1059 (E.D. Mo. 2016) (explaining the court "need not supplement endogenous election data" from five elections where the evidence was sufficient "to discern typical voting behavior

/////

/////

/////

and usual results"))).[16]  That is not what the law requires.  Rather, it has been recognized that

"[h]ow many elections must be studied to make [a vote dilution] determination depends on the

particular circumstances of the locale."  *Teague*, 92 F.3d at 289 (citing *Gingles*, 478 U.S. at 57

n.25).  The court cannot determine whether the five endogenous elections illustrate "typical

voting behavior and usual results," because no clear pattern emerges from them.  *Mo. State Conf.

of NAACP*, 201 F. Supp. 3d at 1059.  For this reason, it is appropriate for the court to turn to

consideration of the evidence presented at trial regarding exogenous elections.

    B.  Exogenous Elections

    In the 2006 election for Sheriff, the Latino-preferred candidate was Chevy Garza, who

lost; in the 2010 Board of Education runoff, the Latino-preferred candidate was Marco Flores,

who lost; in the 2012 election for Kern County Community College Board, there was no racial

polarization; and in the 2014 election for Assessor, the Latino-preferred candidate was Lupe

Esquivias, who lost.  (PX 137 at Tables VI-1, VI-2, VI-3, VI–4.)  Therefore, Latino-preferred

candidates lost three out of the four local exogenous elections analyzed by Dr. Kousser.  (*Id.* at

Table R-1.)  Of the remaining exogenous statewide elections, Dr.  Kousser found that the Latino-

preferred candidate lost nine times out of thirteen elections.  (*Id.*)

    Defendants argue that the exogenous elections analyzed by Dr. Kousser are not

sufficiently similar to the endogenous elections to be probative of typical voting outcomes in

Kern County.  Defendants' witness Karen Jeanne Rhea, Assistant Registrar of Voters for Kern

County, testified that for state elections, candidates may have their party labels printed on the

ballot, as well as any party endorsements.  (Trial Tr., Vol. 10, 1640:6–22).  Defendants argue that

the state exogenous elections therefore contain partisan cues that make them sufficiently

---

[16]  It bears observing that the court in *Missouri State Conference of NAACP* did, in fact, consider evidence from exogenous elections.  Particularly, the court looked at all of the evidence presented and determined that results from the exogenous elections did not cast doubt on the evidence of racial polarization appearing in the endogenous elections.  201 F. Supp. 3d at 1059–60.  The court admittedly found that the evidence available from the exogenous elections was not as probative for various reasons, notably because the defendant's expert did not conduct a racial polarization analysis at all.  *Id.*  Nevertheless, this decision does not stand for the proposition that courts should not consider evidence of exogenous elections in analyzing the third *Gingles* precondition.

dissimilar from local, non-partisan elections. Defendants' expert Dr. Katz testified that voting behavior varies in high profile versus low profile elections, as well as in partisan versus non-partisan elections. (Trial Tr., Vol. 8, 1338:25–1339:13.) He also criticized Dr. Kousser's examination of Democratic primary elections, because primaries "are restricted to a subset of eligible voters unlike the supervisor races." (*Id.*)

However, defendants proffered no evidence or satisfactory explanation at trial as to why a primary election, even if limited to a particular subset of voters, is sufficiently dissimilar to an election for Board of Supervisors to have no probative value with respect to the relevant inquiry in this case. Moreover, defendants presented no evidence at trial suggesting that partisanship, rather than race, drives the results in the exogenous elections and better explains the usual defeat of Latino candidates in those elections in Kern County.[17] *Cf. Cisneros*, 2014 WL 1668500, at*19, *22 (finding partisan, exogenous elections to be of limited probative value because results from exogenous elections ran counter to the results from endogenous elections, and the defense expert presented evidence that polarization in exogenous elections was driven by the party, rather than the race or ethnicity, of the candidate). Finally, defendants only presented evidence of partisan cues on the ballots for certain statewide contests. Thus, even if the court were to limit its consideration of exogenous elections only to local contests without such partisan cues, plaintiffs have shown that three out of four of the local exogenous elections analyzed by Dr. Kousser featured legally significant racial polarization where the Latino-preferred candidate lost. (PX 137 at Tables R-1, VI-1, VI-2, VI-3, VI–4.)

Accordingly, the court concludes that the statistical evidence presented by plaintiffs at trial, considering both endogenous and exogenous elections together, is sufficient to satisfy the third *Gingles* precondition that the majority votes sufficiently as a bloc to usually defeat minority-preferred candidates.

/////

---

[17] Defendants argued in closing that partisanship was driving polarization in the exogenous state elections. (Trial Tr., Vol. 11, 1830:24–1831:9.) No evidence introduced at trial supports this hypothesis.

**IV.     Totality of the Circumstances**

Satisfaction of the three *Gingles* preconditions is not the end of the inquiry.  To prevail, plaintiffs must also show that, under the "totality of [the] circumstances," members of a minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).  It will only be, however, "the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances."  *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993); *see also Teague*, 92 F.3d at 293; *Clark v. Calhoun County*, 88 F.3d 1393, 1396 (5th Cir. 1996); *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1019 n.21 (2d Cir. 1995).

Having found that plaintiffs have established all three *Gingles* preconditions by a preponderance of the evidence, the court proceeds to an analysis of the totality of the circumstances.  In conducting this analysis, courts look to the following non-exhaustive Senate Factors:  (1) history of official discrimination; (2) racially polarized voting; (3) the presence of voting practices or procedures that tend to subjugate the minority group's voting preferences; (4) the exclusion of minority group members from the candidate slating process; (5) the extent to which the minority group bears the effects of past discrimination in areas that tend to hinder its members' ability to participate effectively in the political process; (6) the use of subtle or overt racial campaign appeals; (7) the extent to which members of the minority group have succeeded in being elected to public office; (8) the extent to which elected officials are responsive to the needs of the minority group; and (9) the tenuousness of the policy underlying the challenged voting practice or procedures.  *Gingles*, 478 U.S. at 44–45.  The court must also examine whether the number of districts in which the minority constitutes an effective majority is roughly proportional to the minority group's share of the CVAP in the relevant area.  *See LULAC*, 548 U.S. at 436; *Old Person I*, 230 F.3d at 1129.

There is no requirement that any particular number of the Senate Factors be proved; rather, "the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political

50

process." *Gingles*, 478 U.S. at 45 (internal quotation marks and citation omitted). However, the Supreme Court has held that the "most important" factors bearing on § 2 challenges are Senate Factors Two and Seven—the extent to which voting is racially polarized, and the extent to which minorities have been elected to public office in the jurisdiction. *Id.* at 48 n.15 (citing S. REP. NO. 97-417 at 28–29); *Blaine County*, 363 F.3d at 903; *Old Person I*, 230 F.3d at 1128. The Ninth Circuit has also identified "proportionality"—the relation of the number of majority-minority voting districts to the minority group's share of the relevant population—as a "third important factor." *Old Person I*, 230 F.3d at 1129. If these "important" factors are present, the other factors "are supportive of, but *not essential to*, a minority voter's claim." *Gingles*, 478 U.S. at 48 n.15.

A. Important Factors

i. *Extent of Racially Polarized Voting (Senate Factor Two)*

Through Dr. Kousser's expert testimony and the corroborating anecdotal evidence, plaintiffs have proved by a preponderance of the evidence that voting in Kern County is racially polarized. Looking just at the five endogenous elections and the four local exogenous elections, Dr. Kousser determined that seven of the nine elections were racially polarized. (PX 137 at Table R-1.) Of these racially polarized elections, the Latino-preferred candidate consistently garnered a statistically significantly greater share of the Latino vote than the non-Latino vote. For example:

- In the 2004 election for District 4 Supervisor, the Latino-preferred candidate gained 82 percent of the Latino vote, but only 12.8 percent of the non-Hispanic white and black vote. (*Id.* at Table V-1.)

- In the 2012 primary for District 1 Supervisor, the Latino-preferred candidate received nearly two-thirds of the Latino vote, even with eight candidates in the race, but only 2 percent of the non-Hispanic white and black vote. (*Id.* at Table V-4.)

- In the 2012 election for District 5 Supervisor, the Latino-preferred candidate received 76 percent of the Latino vote, and only 36 percent of the non-Hispanic white and black vote. (*Id.* at Table V-5.)

- In the 2006 election for County Sheriff, a seven-person contest, the top two Latino-preferred candidates secured approximately 64 percent of the Latino vote, but only 13

1  percent of the non-Hispanic white and black vote between the two of them.  (*Id.* at

2  Table VI-1.)

3  • In the 2010 Board of Education runoff, the Latino-preferred candidate won 80.6

4  percent of the Latino vote, and only 15.4 percent of the non-Hispanic white and black

5  vote.  (*Id.* at Table VI-2.)

6  • In the 2014 election for County Assessor, the Latino-preferred candidate earned 68

7  percent of the Latino vote, and only 4.8 percent of the non-Hispanic white and black

8  vote.  (*Id.* at Table VI-4.)

9  Overall, the court finds that the evidence before the court supports a finding that voting in

10  Kern County is frequently racially polarized.  Consideration of the second Senate Factor weighs

11  in plaintiffs' favor.

12  ii.  *Success Rate of Latino Candidates (Senate Factor Seven)*

13  The seventh Senate Factor assesses the extent to which members of the minority group

14  have been elected to public office in the jurisdiction.  *Gingles*, 478 U.S. at 37.  In Kern County,

15  the only Latino candidate to have been elected to the Board of Supervisors outside of the

16  majority-Latino district is Steve Perez, who was elected in 1994 and re-elected in 1998—roughly

17  two decades ago.  Notably, Dr. Kousser's analyses indicate that of the five endogenous elections

18  and the four local exogenous elections, the Latino candidate was defeated in seven of nine

19  elections.  (PX 137 at Tables V-1–VI-4.)  In the two elections that Latino candidates won, one

20  took place in District 5, the majority-Latino district; the other was a District 2 primary where the

21  Latino candidate garnered second place, and thus "won" advancement to a top-two runoff, where

22  he was eventually defeated by a non-Latino candidate.  (PX 137 at Tables V-5, V-2, V-3.)

23  These elections demonstrate a clear pattern of defeat of Latino candidates in every district

24  outside of District 5, the preexisting majority-Latino district.  Consideration of the evidence with

25  respect to this factor therefore also weighs in plaintiffs' favor.

26  iii.  *Lack of Proportionality (Additional Factor)*

27  The Ninth Circuit has deemed proportionality a "third important factor" in the totality of

28  the circumstances analysis.  *Old Person I*, 230 F.3d at 1129.  The proportionality inquiry

compares the percentage of total districts that are majority-Latino with the Latino share of the citizen voting age population. *LULAC*, 548 U.S. at 436.

At the time the County adopted its 2011 redistricting map, Latinos made up 30 percent of the CVAP in Kern County. (PX 107.) Under the County's 2011 Adopted Map, one of five, that is, 20 percent, of the supervisorial districts is majority-Latino. Strictly proportional representation would require Latinos to make up the majority in 1.5 supervisorial districts, which is not possible. The court concludes that Kern County has a "rough" proportionality of majority-Latino districts compared to the Latino citizen voting age population, which weighs in defendants' favor. *See Fairley v. Hattiesburg*, 122 F. Supp. 3d 553, 578–81 (S.D. Miss. 2015) (finding two majority-African-American districts out of five to be "roughly proportional" to an African-American voting age population of 47.95 percent), *aff'd*, 662 Fed. App'x 291, 299–301 (5th Cir. 2016).

Therefore, the court finds that, on balance, consideration of the identified important factors in the totality of the circumstances analysis weigh in plaintiffs' favor. Nevertheless, the court proceeds to consider the evidence as to the remaining supportive factors before reaching its conclusion.

B. Other Supportive Factors

i. *History of Official Discrimination (Senate Factor One)*

The first Senate Factor considers the extent of any history of official discrimination that "touched" the right of the minority group members' right to register, vote, or otherwise participate in the democratic process. *Gingles*, 478 U.S. at 36–37. This examination of past discrimination demonstrates Congress's concern "not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system." *Rodriguez*, 964 F. Supp. 2d at 778–79 (citing *Gingles*, 478 U.S. at 69).

At trial, plaintiffs offered their expert historian, Dr. Albert Camarillo, to testify as to the history of discrimination against Latinos in Kern County and in the state of California generally. Dr. Camarillo's testimony was both persuasive and essentially unrebutted. The court summarizes that testimony as follows. Kern County was settled as an agricultural community in the early

1900s, which attracted Mexican immigrants who sought work in the County's growing

agricultural economy.  (Trial Tr., Vol. 6, 850:19–852:19.)  Although people from all across the

country settled in Kern County, both Kern and Fresno County were unique in attracting a

substantial out-migration of southerners from former confederate states, who brought with them

not only their knowledge of farming, but also their racial attitudes, including a white supremacist

ideology.  (*Id.* at 853:2–854:20.)  This ideology manifested in the resurgence of the Ku Klux Klan

in the 1920s, which had some of its largest chapters within Kern County.  (*Id.* at 873:22–874:13.)

Klan members were prominent members of the community, and included Stanley Abel, an

outspoken Klan member who served on the Kern County Board of Supervisors for nearly three

decades.  (*Id.* at 874:23–875:14.)  In the 1960s, the Kern County White Citizens Council

emerged in Bakersfield to push back against the civil rights movement in Kern County.  (*Id.* at

898:21–899:8; Trial Tr., Vol. 7, 1035:1–11; PX 168 at 3.)  The Bakersfield City Council

moreover refused to censure the Kern County White Citizens Council at that time, despite pleas

to do so from black and Mexican-American community leaders.  (PX 168 at 3; Trial Tr., Vol. 6,

899:9–900:10.)

From the beginning of Kern County's history, race relations were inseparable from labor

relations:  owners and operators of farms occupied the upper class of Kern County society, while

the farm workers and laborers—largely Mexican-Americans—occupied the lower class.  (Trial

Tr., Vol. 6, 855:3–22.)  This stratification by race and class was not limited to the labor sector.

The "color line" extended to housing, public accommodations, law enforcement, and education.

(*Id.* at 857:3–23.)  This de facto system of racial exclusion of Mexican-Americans, for which Dr.

Camarillo coined the term "Jaime Crow," was present throughout the state of California from the

1920s into the 1960s, in the form of racially restrictive covenants, segregation in education, and

"whites only" pools, parks, restaurants, and movie theaters.  (*Id.* at 858:11–24; 881:25–884:22.)

Classified advertisements about real estate for sale and rental, published in the *Bakersfield

Californian* newspaper throughout the 1940s and 1950s, stated explicitly whether properties were

suitable "for colored," "for Spanish," or for the "white race only."  (*Id.* at 864:23–867:9; PX 167

at 19–21.)  A 1969 *Fresno Bee* article quoted the former Chief of Police of Bakersfield, Robert

Powers, claiming Bakersfield to be "sociologically a backward, racist community," where the police can be used to harass private citizens. (Trial Tr., Vol. 6, 910:25–911:22; PX 167 at 173.) The racial divide was also apparent through explicit signs, posted at the city limits of so-called "sundown towns," which warned people of color, typically African-Americans, that they had to leave town by sundown. (*Id.* at 875:15–876:12.) One such sign was documented as being displayed in the city of Taft in Kern County in the 1930s. (*Id.*) Even in later decades, there was evidence of intense racial discord in Kern County, including an incident as late as 1975 at Taft Community College. (*Id.* at 879:16–880:11.)

Dr. Camarillo also testified about lawsuits in Kern County challenging segregation in education, including a case brought by the state of California and the Department of Justice against the Delano School District for employing explicit policies to relegate Mexican-American elementary students to the west side of Delano while maintaining the elementary schools on the east side almost exclusively white. (Trial Tr., Vol. 6, 902:3–904:7.) Evidence presented at trial suggests that Latino students continue to experience present-day discrimination in education. Dolores Huerta testified that the Dolores Huerta Foundation recently reached a settlement with Kern High School District, after discovering that African-American and Latino students were being disproportionately suspended or expelled compared to white students. (Trial Tr., Vol. 2, 237:23–238:16.)

According to Dr. Camarillo, the history of discrimination in Kern County fits within a larger pattern of discrimination against Mexican-Americans across the state of California. Specifically in the context of voting and democratic participation, this pattern of discrimination was evidenced by successful efforts in the late nineteenth century by the California legislature to overturn a provision of the state constitution that had required all public legal documents to be printed in both English and Spanish, as well as the adoption of a literacy test in order to register to vote, which primarily targeted Chinese-Americans and Mexican-Americans. (Trial Tr., Vol. 6, 848:12–849:8.) In the late nineteenth century, there were explicit efforts in southern California counties to dilute the voting strength of Mexican-Americans through the gerrymandering of districts. (*Id.* at 849:17–25.) Meanwhile, in San Jose in the late 1870s, Mexican-Americans were

explicitly forbidden to attend a Democratic Party convention. (*Id.* at 850:2–5.)

Defendants contend that Dr. Camarillo's testimony regarding historical evidence of discrimination statewide is irrelevant because it does not focus exclusively on discrimination occurring within Kern County. The court rejects such a myopic view. Evidence of statewide discrimination is clearly relevant and may provide context for understanding instances of discrimination within the political subdivision at issue. *See Gomez v. City of Watsonville*, 863 F.2d 1407, 1418 (9th Cir. 1988) (holding the district court erred in its apparent belief that it was required to consider only discrimination committed by the City of Watsonville and noting the court could consider "any relevant history or effects of discrimination committed by others, such as the state of California"); *see also Blaine County*, 363 F.3d at 913 (rejecting argument that district court could only look at discrimination by Blaine County, and not the state or federal government, because such an "overly narrow interpretation of the first Senate factor would result in precisely the sort of mechanistic application of the Senate factors that the Senate report emphatically rejects") (quoting *Gomez*, 863 F.2d at 1418); *Rodriguez*, 964 F. Supp. 2d at 783 (considering state practices of discrimination in a § 2 case); *Cottier v. City of Martin*, 466 F. Supp. 2d 1175, 1184 (D.S.D. 2006) (taking into account the "long, elaborate history of discrimination against Indians in South Dakota in matters relating to voting in South Dakota"), *aff'd,* 551 F.3d 733 (8th Cir. 2008), *reh'g en banc granted, opinion vacated* (Feb. 9, 2009), *on reh'g en banc*, 604 F.3d 553 (8th Cir. 2010).

The court finds Dr. Camarillo's testimony to be compelling evidence of a history of discrimination against Latinos in Kern County and in the broader region. Consideration of this factor weighs heavily in plaintiffs' favor.

ii. *Enhancing Mechanisms (Senate Factor Three)*

The third Senate Factor considers whether there is evidence of voting mechanisms that may enhance vote dilution. *Gingles*, 478 U.S. at 37. Congress recognized that among the most common of these mechanisms are at-large elections, runoff requirements, anti-single-shot devices, and decreases in the size of the elected body. *See* S. REP. NO. 97-417 at 28–29; *Badillo v. City of Stockton*, 956 F.2d 884, 889 (9th Cir. 1992).

Pursuant to state law, elections for Kern County Board of Supervisors are subject to majority vote and runoff requirements. *See* Cal. Elec. Code §§ 1300, 8140. If no candidate receives a majority of the vote, the two candidates who garner the most votes advance to a runoff election. *See* Cal. Elec. Code § 8141. Plaintiffs' expert Dr. Kousser testified that a majority vote requirement, such as that imposed by California law, allows a majority to band together to defeat a minority candidate in a runoff election. (Trial Tr., Vol. 4, 539:2–22; PX 136 at ¶ 46.) The Ninth Circuit similarly acknowledged the dilutive effect of a majority vote requirement and has also noted that "the runoff requirement increases the expense and other burdens of minority candidates by requiring them to run a second time, at-large." *Badillo*, 956 F.2d at 890.

Defendants argue first that the majority vote requirement is imposed by state law, and is neither devised by Kern County nor within its control. (Doc. No. 137 at 19.) The court acknowledges this is the case, but also recognizes that the reason for the existence of the majority vote requirement is irrelevant to the totality of the circumstances inquiry: "[t]his Senate Factor directs the Court to inquire into the existence and effect of [an enhancing mechanism], not its purpose." *City of Euclid*, 580 F. Supp. 2d at 608.

Defendants next argue that the adoption of an enhancing mechanism has no probative value on its own, and that plaintiffs must prove that the majority vote requirement "[has] actually, in real life, prevented minority voters in the jurisdiction from electing their candidates of choice." (Doc. No. 137 at 19.) The court disagrees. Defendants do not cite any controlling authority for this proposition. Moreover, defendants' interpretation of this Senate Factor is belied by the text itself, which merely inquires as to whether such mechanisms "may enhance the opportunity for discrimination," *see* S. Rep. No. 97-417 at 28–29, not whether such mechanisms are the but-for cause of a minority candidate's electoral defeat. Thus, the Ninth Circuit in *Badillo* held that "[t]he district court correctly found that [the challenged electoral system]'s runoff requirement and majority vote requirement *increased the opportunity* for discrimination against minorities in Stockton." 956 F.2d at 890 (emphasis added). The Ninth Circuit's conclusion did not rest on any evidence that the majority vote requirement and runoff requirement had in fact prevented minority candidates from being elected. Moreover, here, this factor is not considered on its own,

but rather in conjunction with the other factors discussed here, many of which support a finding that Latino voters in Kern County have been deprived of an equal opportunity to elect representatives of their choice.

The court therefore concludes that a majority vote and runoff requirement does exist in Kern County, and that these requirements enhance the likelihood that the County's adopted map has a dilutive effect on the Latino vote.

### iii. *Candidate Slating (Senate Factor Four)*

The fourth Senate Factor asks whether minorities have been denied access to a candidate slating process. *Gingles*, 478 U.S. at 37. Here, it is undisputed that Kern County does not utilize a candidate slating process.

### iv. *Socio-Economic Disparity (Senate Factor Five)*

The fifth Senate Factor considers whether the minority group "bears the effects of discrimination" in areas such as education, employment, and health, which hinders the minority group's ability to participate effectively in the political process. *Gingles*, 478 U.S. at 37. Under this fifth factor, plaintiffs must demonstrate both depressed political participation and socioeconomic inequality, but need not prove any causal nexus between the two. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 750 (5th Cir. 1993) (citing S. REP. NO. 97-417 at 29 n.114).

Dr. Kousser testified at trial that although Latinos constitute the majority of the population in Kern County (50.4 percent in 2014), they have been unable to influence elections commensurate with their population size because they form a much smaller percentage of the electorate and are socioeconomically disadvantaged compared to non-Hispanic whites. (Trial Tr., Vol. 4, 660:15–661:2; PX 136 at ¶¶ 47–48.) According to 2014 ACS data, the most recent data available when he prepared his analyses, Dr. Kousser found that Latinos in Kern County comprise only about 38 percent of the citizen population and 32 percent of registered voters, and cast only 22 percent of the votes in the 2014 general election. (Trial. Tr., Vol. 4, 660:15–661:2; PX 136 at ¶¶ 47–48.)

/////

Dr. Kousser drew a direct relationship between depressed Latino political participation in Kern County and the socioeconomic disadvantages faced by Latinos in housing, income, and education. (PX 136 at ¶ 49.) For example, 2014 ACS data shows that while 65 percent of non-Hispanic whites in Kern County own the houses in which they live, only 49 percent of Latinos do. (*Id.*) With respect to income, about 15 percent of non-Hispanic whites in Kern County have incomes below the poverty level, while that figure is double for Latinos, at about 30 percent. (*Id.*) With respect to educational attainment, in 2014, 1.4 percent of non-Hispanic whites in Kern County had received a ninth grade education or less, and 22 percent of non-Hispanic whites had achieved a bachelor's degree or higher. (Trial Tr., Vol. 4, 655:2–17.) In contrast, 27.8 percent of Latinos in Kern County had received a ninth grade education or less, and only 7.1 percent had achieved a bachelor's degree or higher. (*Id.*) Plaintiffs' expert historian Dr. Camarillo echoed Dr. Kousser's findings regarding a persistent educational gap between Latinos and non-Hispanic whites, which Dr. Camarillo testified was documented in reports by the U.S. Commission on Civil Rights in the 1970s, and continues today. (Trial Tr., Vol. 6, 903:16–907:14.) Dolores Huerta also testified at trial about a recent lawsuit brought against Kern High School District, which eventually resulted in a settlement, challenging the disproportionate suspension and expulsion of African-American and Latino students. (Trial Tr., Vol. 2, 237:23–238:16.)

Defendants' expert Dr. Johnson disputed the evidence of educational disparities with data demonstrating that Latino educational attainment in Kern County had improved by several percentage points between the release of the 2005–2009 ACS five-year data and the 2011–2015 ACS five-year data. (Trial Tr., Vol. 9, 1474:9–24.) Defendants argue that this data indicates an upward trend, precluding any conclusions about Latinos' ability to participate effectively in the political process. (Doc. No. 137 at 20.) This argument lacks merit. Defendants provided no comparative evidence at trial regarding the change, if any, to educational attainment among non-Hispanic whites in Kern County. (*See* Trial Tr., Vol. 9, 1542:8–17.) If, for example, educational attainment among non-Hispanic whites improved at the same rate as that of Latinos during this period, the educational gap between those groups would still persist to the same degree. And if educational attainment among non-Hispanic whites has improved at a faster rate than that of

Latinos, the educational gap would in fact be more egregious today than that reflected in Dr. Kousser's 2014 figures. More fundamentally, even if an improvement in the education gap has been made in recent years, it does not mean an education gap no longer exists. Defendants did not present evidence at trial that there currently is no education gap between Latinos and non-Hispanic whites in Kern County.

Moreover, Dr. Johnson provided no testimony rebutting the disparities in income and homeownership presented by Dr. Kousser.[18] Dr. Johnson testified that Latino businesses in Kern County are thriving, as documented by data between 2002 and 2012 indicating that Latino businesses increased their sales and their number of employees, at the same time that white businesses exhibited slower growth or even declined in these categories. (Trial Tr., Vol. 9, 1472:17–1473:7; DX 558 at ¶¶ 70–75.) Dr. Kousser's report noted, however, that despite these increases in sales by Latino businesses, sales of white businesses still dwarf those of their Latino counterparts, at almost twelve times greater in 2012. (PX 137 at ¶ 48.) Ultimately, the evidence proffered by defendants through Dr. Johnson's testimony is insufficient to negate the compelling evidence of socioeconomic disparities between Latinos and non-Hispanic whites in Kern County. Consideration of this factor, therefore, also weighs in plaintiffs' favor.

v. *Overt or Subtle Racial Appeals (Senate Factor Six)*

The sixth Senate Factor asks whether political campaigns have been characterized by overt or subtle racial appeals. *Gingles*, 478 U.S. at 37. Little evidence regarding this factor was adduced at trial; the court notes, however, that Dr. Camarillo related one anecdote to this effect. In the early 1970s, the Kern Council for Civic Unity sought to mobilize voters around Raymond Gonzales, the first Mexican-American to be put forward as a candidate for State Assembly in the

---

[18]  In his report, Dr. Johnson provides data showing that income levels among Latinos in Kern County differ between citizens and non-citizens. (DX 558 at ¶ 77 and Table 2.) The court recognizes that this evidence suggests that the income disparity between Latino and non-Hispanic white *eligible voters* may not be as stark as Dr. Kousser's data indicates. Nonetheless, Dr. Johnson's data is insufficient to overcome plaintiffs' showing of income level disparities between Latinos and non-Hispanic whites, because defendants did not offer any evidence at trial, nor have they even alleged, that comparing only eligible voters in Kern County would extinguish this disparity.

60

area. (Trial Tr., Vol. 6, 915:3–12.) While successful in his 1972 campaign, Gonzales served for only one term, which, according to Dr. Camarillo, was due in part to a concerted effort by the Republican Party and other opponents to vote Gonzales out of office in 1974. (*Id.* at 915:12–22.) Notably, in 1974, Gonzales was defeated by William Thomas, who commented in a reported interview that Kern County had a "vested interest" in maintaining the racial status quo. (*Id.* at 916:4–10.) The editor of the Bakersfield Californian, a strong supporter of Thomas, also publically observed that Bakersfield was the "most harmoniously segregated community in America," that "there is absolutely no crossing of racial and cultural lines," and that prominent community members "literally deny the existence of blacks and Mexican Americans." (*Id.* at 916:13–21.) Defendants did not refute or deny these explicit racial appeals, but offered evidence that other factors contributed to Gonzales' defeat in 1974. (*Id.* at 1003:16–1006:13; 1009:16–1010:1.)

The court finds that plaintiffs have produced some evidence that political campaigns in Kern County have been characterized by racial appeals. Given that the evidence at trial pertained to only one campaign that occurred over four decades ago, the court affords this evidence very limited weight. Moreover, because there is otherwise no evidence of racial appeals in Kern County elections, the court concludes that consideration of this factor, overall, weighs slightly in favor of defendants.

### vi. *Lack of Responsiveness (Additional Factor)*

An additional factor that may be probative in establishing a § 2 violation is whether there is a lack of responsiveness on the part of elected officials to the particularized needs of the minority community. *Gingles*, 478 U.S. at 37.

Plaintiffs presented evidence at trial that the Kern County Board of Supervisors has been, at times, unresponsive to the particularized needs of the Latino community, specifically in the area of immigration. Dorothy Velazquez noted the concern within predominantly Latino communities that undocumented individuals could be detained and deported for simple traffic violations, and the hesitation among undocumented immigrants to report anything to law enforcement for fear of being subsequently deported. (Trial Tr., Vol. 2, 262:7–15.) Several of

plaintiffs' witnesses also testified about their support for Senate Bill 54 ("S.B. 54"), a state legislative proposal that would have made California a "sanctuary state" and which, among other provisions, would have repealed existing laws requiring arresting agencies to notify Immigration and Customs Enforcement when an undocumented individual is arrested. (*See* Trial Tr., Vol. 2, 235:12–24, 263:3–22.) Dolores Huerta had previously testified before the Board of Supervisors, requesting their support for S.B. 54. Ms. Huerta then testified at the trial in this case that the Latino community supported the bill, as evidenced by the many organizations working in the Latino community that demonstrated on behalf of S.B. 54, and the buses of Latino Kern County community members who went to Sacramento to lobby in favor of the bill. (*Id.* at 236:13–22.)

District 5 Supervisor Perez echoed the support of S.B. 54 within the Latino community, testifying that her vote in favor of S.B. 54 was consistent with the response she received from Latinos in Kern County. (Trial Tr., Vol. 5, 803:8–10.) Supervisor Perez noted that, in response to S.B. 54, she received feedback "from more people than [she] had ever heard from as supervisor," and that she had "never seen an outpouring like [she] did during that conversation." (*Id.* at 803:10–19.) The feedback regarding S.B. 54 was not uniform among all her constituents, however: Supervisor Perez's office also received what she described as "very ugly" mail during that time, including a postcard depicting a Latino gang member, which Supervisor Perez interpreted as a serious threat, and which caused her to fear for her safety and that of her family. (*Id.* at 800:7–801:24; *see also* Trial Tr., Vol. 7, 1174:2–1175:2.) Ultimately, despite strong support for the legislation from the Latino community, the Board of Supervisors voted to formally oppose passage of S.B. 54 by a 4 to 1 vote, with only Supervisor Perez voting in favor. (Trial Tr., Vol. 2, 236:6–12; Trial Tr., Vol. 5, 803:3–7.)

Plaintiffs presented additional evidence at trial that current and former supervisors serving District 1, as it is configured in the County's 2011 Adopted Map—which combines the predominantly white community of Ridgecrest with the predominantly Latino communities of Delano, Shafter, and McFarland—have been unresponsive to their Latino constituents. For example, although District 1 Supervisor Mick Gleason testified regarding the various projects he has worked on in Delano, Shafter, and McFarland (Trial Tr., Vol. 10, 1601:13–1604:15), he also

admitted that neither his field representative nor his chief of staff covering the Central Valley towns of Delano, Shafter, and McFarland within his district speak fluent Spanish. (*Id.* at 1607:8–15.) Plaintiffs' witness Sam Ramirez, who formerly served on the Delano City Council, also testified that former District 1 Supervisor John McQuiston was unresponsive to the particularized needs of the Latino community in Delano, failing to consistently address requests to clean up a park and to renovate other County property within Delano city limits. (Trial Tr., Vol. 3, 362:15–364:8; 376:4–14.)

Plaintiffs further presented evidence about environmental concerns within the Latino community, including pollution stemming from a hazardous waste facility outside Buttonwillow (*see* Trial Tr., Vol. 3, 307:21–309:3); water contamination flowing from pesticide facilities in Arvin and Shafter (*see* Trial Tr., Vol. 2, 281:18–282:7); by right dairies[19] in Arvin, Lamont, Shafter, and Wasco (*see* Trial Tr., Vol. 3, 304:12–305:24); hydraulic fracturing in the outskirts of Shafter and Wasco (*see id.* at 303:23–304:4); and safety violations with a composting facility located between Arvin and Lamont, which ultimately resulted in the deaths of two Latino employees (*see* Trial Tr., Vol. 2, 228:1–18). That said, defendants presented significant evidence that these needs were addressed.

Defendants, for their part, presented evidence that the County worked diligently to address the problems faced by all of its citizens. Ms. Oviatt testified that the County entered into a settlement in the early 1990s concerning the hazardous waste facility outside Buttonwillow, and that since that time, the facility has been in full compliance with the law, and the County has not received any complaints from County residents regarding that facility. (Trial Tr., Vol. 7, 1226:8–1229:2.) Ms. Oviatt further testified about the cleanup efforts regarding the pesticide facilities in Arvin and Shafter. (*Id.* at 1240:10–1242:9.) She also explained that the County has not permitted

---

[19] "By right dairy" is apparently somewhat of a misnomer today. According to Ms. Oviatt, up until 1994, all dairies in Kern County were required to obtain a conditional use permit to operate. (Trial Tr., Vol. 7, 1233:14–1236:8.) From 1995 to 2000, Kern County changed its zoning ordinance to only allow the construction of dairies "by right," if certain conditions were met following a less rigorous review process. (*Id.*) In 2000, the County again changed its policy to require dairies to obtain conditional use permits and prepare environmental impact reports prior to construction. (*Id.*)

the construction of a new dairy in fifteen years, and that any new dairy would need to undergo an environmental impact review, followed by a hearing before the Planning Commission. (*Id.* at 1235:5–7, 15–23.) Ms. Oviatt testified as to an incident in 2012 involving illegal disposal of debris from a hydraulic fracturing operation near Shafter, and explained that as soon as the incident came to its attention, the County contacted the responsible state agency and the industry. (*Id.* at 1237:24–1240:9.) The state agency fined the industry and ordered a cleanup of the site, and there have not been any similar incidents in the County since that time. (*Id.*)

With respect to the composting facility between Arvin and Lamont, Ms. Oviatt testified that the County began receiving complaints about the facility in 2006, and discovered other violations regarding which the County held a series of public hearings and for which the facility was extensively fined. (*Id.* at 1229:19–1231:13.) In 2011, following the two deaths that plaintiffs' witness Ms. Huerta testified to, the County revoked the facility's permit. (*Id.* at 1231:21–1232:18.) The County was sued for that decision by the facility owner, and lost in that suit at the trial court level. (*Id.* at 1232:18–21.) While its appeal of that decision was pending, the County reached a settlement in 2013 with the owner of the facility, who agreed to turn over the project to a "more responsible" company. (*Id.* at 1232:21–1233:6.) Since that time, the County has not received any complaints about the facility. (*Id.* at 1233:7–13.)

In sum, plaintiffs presented some evidence at trial that the County has, at times, been unresponsive to the Latino community, most notably with the Board of Supervisors' vote in opposition to S.B. 54. Based on the credible trial testimony of the County's witnesses, however, the court finds that the County has made good faith efforts to respond to at least some of the particularized needs of the Latino community. The court therefore concludes that this factor weighs slightly in defendants' favor.

### vii. *Tenuousness of Rationales (Additional Factor)*

A court may also examine whether the rationale underlying the jurisdiction's challenged voting scheme is tenuous. *Gingles*, 478 U.S. at 37. Evidence of a tenuous county policy "may . . . indicate that the practice or procedure produces a discriminatory result." *League of United Latin Am. Citizens, Council No. 4434*, 986 F.2d at 753. The existence of a legitimate policy rationale,

however, does not preclude a finding of vote dilution: "[E]ven a consistently applied practice premised on a racially neutral policy [does] not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." *Id.* (quoting S. REP. NO. 97-417 at 29 n.117).

Here, Mr. Krauter testified that during the public redistricting workshops, some comments by eastern Kern County residents reflected "very loyal adherence" to the different branches of the armed service, and that eastern County residents are "pretty fiercely devoted to their corner of Kern County." (Trial Tr., Vol. 3, 410:2–13.) According to Mr. Krauter, public input from eastern Kern County residents supported a supervisorial district map that would maintain the existing lines as closely as possible, and that as long as two eastern districts were preserved, those residents did not care how the map was redrawn in any other respect. (*Id.* at 444:8–21.)

Plaintiffs contend that the Adopted Map is the result of the County's pandering to residents in the east, based on the tenuous rationale that the two military installations in eastern Kern County each require their own supervisor. Plaintiffs presented evidence at trial demonstrating that both military installations are located in California's 23rd Congressional District. (*See, e.g.*, Trial Tr., Vol. 7, 1180:22–1181:4.) Plaintiffs' mapping expert David Ely also testified that eastern Kern County does not have sufficient population to comprise one district by itself, much less two. (Trial Tr., Vol. 1, 83:17–19; 207:20–25.)

Defendants insist that the decision to maintain two eastern districts reflects a longstanding, substantive policy of the County. John McQuiston, former District 1 Supervisor, testified about Base Realignment and Closure ("BRAC"), and the severe economic impact that earlier rounds of BRAC had on communities in eastern Kern County in terms of loss of employment, loss of population, loss of businesses, and declining home values. (Trial Tr., Vol. 9, 1555:1–20.) District 2 Supervisor Zack Scrivner further testified that the two military installations in Kern County tend to have different interests in the BRAC process, which could put a single supervisor in what he characterized as "an impossible position" if the BRAC proposal favors one base but disfavors the other. (Trial Tr., Vol. 7, 1165:5–1167:12.) District 1 Supervisor Gleason, the former commanding officer for Naval Air Weapons Station China Lake, reiterated the likely

conflict in having one supervisor represent both the Navy and Air Force bases in eastern Kern County, given their differing attitudes toward BRAC.  (Trial Tr., Vol. 10, 1595:6–1597:12.)

In addition, defendants presented testimony that the current configuration of the district lines, with two eastern districts, bolsters a separate traditional redistricting principle employed by the County—that is, to balance among districts the responsibility over metropolitan Bakersfield and the outlying areas.  Allan Krauter testified that having several compact urban districts and very large outlying districts would result in disproportionate control over County government held by Bakersfield, with County resources unlikely to be distributed equitably to the outlying districts.  (Trial Tr., Vol. 3, 502:5–19.)  District 2 Supervisor Scrivner and District 1 Supervisor Gleason similarly testified to the advantage of having each district share responsibility over a portion of Bakersfield, such that each district contains urban communities, rural communities, and unincorporated areas, to encourage each supervisor to consider the welfare of the County as a whole.  (Trial Tr., Vol. 7, 1169:1–1170:12; Trial Tr., Vol. 10, 1600:3–1601:1.)

Although the court does not doubt the sincerity of the County's convictions in the purported necessity of two eastern districts, the court is unpersuaded that such a justification may override other legal requirements.[20]  The court is unconvinced that a single supervisor would be placed in an impossible position concerning the two military bases, as evidenced by the fact that one congressional representative currently represents both bases.  The court therefore concludes that this factor should be afforded neutral weight, at best.

/////

/////

_____

[20]  The court also notes that in other redistricting cases, attempts to draw district boundaries with the purpose of artificially enhancing the voting power of rural voters at the expense of urban voters—or vice versa—has been found to violate the Equal Protection Clause.  *See Davis v. Mann*, 377 U.S. 678, 692 (1964) ("We also reject appellants' claim that the [ ] apportionment is sustainable as involving an attempt to balance urban and rural power in the legislature"); *Reynolds v. Sims*, 377 U.S. 533, 567 (1964) ("The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote"); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1343–44 (N.D. Ga.) (citing *Reynolds*, 377 U.S. at 579–80) (noting that while there are "legitimate considerations incident to the effectuation of a rational state policy . . . geographic interests do *not* fall within this category of legitimate considerations"), *aff'd*, 542 U.S. 947 (2004).

viii.  *Summary*

In summary, five of the nine factors relevant to Kern County weigh in favor of plaintiffs, including the two most important factors:  the extent of racial polarization and the electoral success of Latino candidates.  Three factors weigh in favor of defendants, and one factor weighs in favor of neither party.  On balance, the court finds based upon the evidence presented at trial that the totality of the circumstances analysis weighs in plaintiffs' favor.  Thus, the court will find that plaintiffs have met their burden in establishing a § 2 violation, absent any affirmative defense.

**V.    Laches**

In their answer, defendants raise the affirmative defense of laches.  (Doc. No. 31 at 11.) Defendants argue that "[t]he facts regarding the redistricting plan challenged herein were known or should have been known to Plaintiffs in 2011, yet Plaintiffs have waited until 2016 to bring their claim."  (*Id.*)  Defendants claim that this delay in bringing the action threatens to prejudice the County and the public interest, since a holding for plaintiffs will cause voter confusion and administrative disruption necessitated by redrawing the district lines.  (*Id.*)  Defendants contend that recognition of a laches defense is particularly appropriate here because there is only one remaining election to be conducted under the current district boundaries, after which the lines will have to be redrawn in any event.  (*Id.*)

Laches "is a defense developed by courts of equity," *Petrella v. Metro-Goldwyn-Mayer, Inc.*, ___ U.S. ___, 134 S. Ct. 1962, 1973 (2014), which applies where a plaintiff "unreasonably delays in filing a suit and as a result harms the defendant."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002).  To assert the defense of laches, the defendant must prove:  "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."  *Kansas v. Colorado*, 514 U.S. 673, 687 (1995) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)); *see also Apache Survival Coal. v. United States*, 21 F.3d 895, 905 (9th Cir. 1994).  "A determination of whether a party exercised unreasonable delay in filing suit consists of two steps."  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002).  First, a court assesses "the length of delay, which is measured from the time

67

the plaintiff knew or should have known about its potential cause of action." *Id.* Second, the court decides "whether the plaintiff's delay was unreasonable . . . in light of the time allotted by the analogous limitations period." *Id.* The court also considers "whether the plaintiff has proffered a legitimate excuse for its delay." *Id.*

In *Garza v. County of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990), defendant asserted a defense of laches because multiple rounds of elections had already occurred since the original redistricting, and "substantial hardship [would] result from a redistricting now, when another regularly scheduled one is set to occur so closely on its heels." *Id.* Moreover, defendants in that case argued plaintiffs had not provided an adequate excuse for their delay in filing their lawsuit. *Id.* Despite these rationales being advanced, the Ninth Circuit held that where the violation is ongoing, and where "the injury [plaintiffs] suffered at the time has been getting progressively worse," plaintiffs' claims are not barred by laches. *Id.*

The arguments advanced by defendants here in support of their defense of laches are indistinguishable from those rejected by the Ninth Circuit in *Garza.* (*See* Doc. No. 31 at 11.) Defendants attempt to avoid this conclusion by arguing that in *Garza*, the Ninth Circuit "affirmed a finding of *intentional racial discrimination* . . . [which] surely presents a vastly different equitable balance than the facts of this case." (Doc. No. 137 at 25 n.26.) However, the language in *Garza* regarding laches is not confined solely to voting rights cases alleging intentional discrimination.[21] Rather than distinguishing between different types of discrimination, the court in *Garza* held that the defense of laches was unavailable in cases where the discrimination was "ongoing." *Garza*, 918 F.2d at 772. The Ninth Circuit noted that the injury alleged by the plaintiffs in that case had been "getting progressively worse, because each election has deprived

---

[21] To be sure, courts have recognized that Voting Rights Act cases in which plaintiffs allege intentional discrimination are distinct from those in which no intentional discrimination is alleged. *Garza* itself drew this distinction in other parts of the opinion. *See Garza*, 918 F.2d at 771. However, the Ninth Circuit made no such distinction in the part of its opinion discussing laches. None of the other cases cited by defendants in support of this distinction addressed laches at all. *See Bartlett*, 556 U.S. at 20; *Gaona v. Anderson*, 989 F.2d 299, 301–02 (9th Cir. 1993); *Cano*, 211 F. Supp. 2d at 1249–50. The court has simply found no support for defendants' contention that application of a laches defense in voting rights cases hinges on whether plaintiff has alleged intentional discrimination.

Hispanics of more and more of the power accumulated through increased population." *Id.* Plaintiffs here have made a similar showing, submitting evidence establishing that the Latino population has increased in every supervisorial district in Kern County between the years 2009 and 2015. (PX 106 at 1.)

In arguing that plaintiffs "oversell" *Garza* (Doc. No. 186 at 9), defendants rely primarily on the decision in *Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Commission*, 366 F. Supp. 2d 887, 908 (D. Ariz. 2005). The district court in that case concluded that plaintiffs who initially brought claims only under state law, and subsequently added claims under § 2 of the Voting Rights Act, were barred by laches. Although that case was decided after *Garza*, the district court made no reference to the Ninth Circuit's holding that ongoing violations of § 2 of the Voting Rights Act "ought not be barred by laches." *Garza*, 918 F.2d at 772; *accord Miller v. Bd. of Comm'rs of Miller Cty.*, 45 F. Supp. 2d 1369, 1373 (M.D. Ga. 1998) (citing to *Garza* for the proposition that "[t]he defense of laches does not apply to voting rights actions wherein aggrieved voters seek *permanent* injunctive relief insofar as the electoral system in dispute has produced a recent injury or presents an ongoing injury to the voters"). To the extent the district court in *Arizona Minority Coalition* reached a contrary conclusion, this court is bound by the Ninth Circuit's decision in *Garza*. Accordingly, because plaintiffs have demonstrated an ongoing violation of § 2 of the Voting Rights Act, the court rejects defendants' suggestion that they are entitled to an affirmative defense of laches.

## CONCLUSION

For all of the reasons articulated above, the court finds that plaintiffs have established, by a preponderance of the evidence, that: (1) the Latino community in Kern County is sufficiently numerous and geographically compact to constitute the majority in a second supervisorial district; (2) that Latinos in Kern County are politically cohesive; and (3) that the majority in Kern County votes sufficiently as a bloc to usually defeat Latino-preferred candidates. The court further finds that, under the totality of the circumstances, the adopted districting for electing the Kern County Board of Supervisors is not equally open to participation by Latino voters. Accordingly, the court

/////

69

concludes that Latino voters in Kern County have been deprived of an equal opportunity to elect representatives of their choice, in violation of § 2 of the Voting Rights Act.

This action must now proceed to the remedial stage. A status conference with respect to scheduling that phase of the litigation is now set for March 6, 2018 at 3:00 p.m. in Courtroom 5 before the undersigned. Counsel may appear telephonically by contacting Courtroom Deputy Renee Gaumnitz at RGaumnitz@caed.uscourts.gov at least 24 hours prior to the status conference. Status reports addressing the parties' proposal for those further proceedings shall be filed and served by March 1, 2018.

IT IS SO ORDERED.

Dated: __February 23, 2018__

_____
UNITED STATES DISTRICT JUDGE